1  LAW OFFICES OF GAVIN M. HUGHES
2  GAVIN M. HUGHES State Bar #242119
   ROBERT A. MAYVILLE, JR. State Bar #311069
3  4360 Arden Way, Suite 1
   Sacramento, CA  95864
4  Telephone: (916) 900-8022
   E-mail: gavin@hughesdealerlaw.com
5
6  ATTORNEYS FOR PLAINTIFF
   Courtesy Automotive Group, Inc., dba Courtesy Subaru of Chico
7
## UNITED STATES DISTRICT COURT
8
## EASTERN DISTRICT OF CALIFORNIA
9
## SACRAMENTO DIVISION
10

11  COURTESY AUTOMOTIVE GROUP, INC.,
    dba COURTESY SUBARU OF CHICO,
12
             Plaintiff,
13
       v.
14
    SUBARU OF AMERICA, INC. and
15  DOES 1 through 50, inclusive,
16
             Defendants.
17

**CASE NO: 2:22-cv-00997-WBS-DMC**

**FIRST AMENDED COMPLAINT FOR:**

1.  **BREACH OF CONTRACT**
2.  **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
3.  **ACCOUNT STATED**
4.  **BREACH OF CONTRACT (LOC)**
5.  **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (LOC)**
6.  **VIOLATION OF UNFAIR COMPETITION LAW**
7.  **INTENTIONAL MISREPRESENTATION**
8.  **NEGLIGENT MISREPRESENTATION**
9.  **UNJUST ENRICHMENT**

**[Filing authorized by Docket Entry No. 23]**

Plaintiff Courtesy Automotive Group, Inc., dba Courtesy Subaru of Chico ("Courtesy"), through its attorneys, sues Defendants Subaru of America, Inc. ("SOA"), and Does 1 through 50, inclusive, and hereby alleges the following:

## NATURE OF THE ACTION

1.    Plaintiff seeks attorneys' fees and costs pursuant to the March 20, 2019, Exhibit 1 to Confidential Agreement to Stipulated Decision and Order of the Board, Filed Under Seal ("Confidential Stipulated Agreement") accompanying the March 20, 2019, [Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit and April 9, 2019, Order Adopting "[Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit" (collectively "Board Order Adopting Stipulated Decision and Order").  Plaintiff invoked the Board's jurisdiction pursuant to the Confidential Stipulated Agreement and prevailed in the underlying confidential action.  Plaintiff is the prevailing party in the underlying confidential action and is entitled to recover its attorneys' fees and costs pursuant to California Civil Code section 1717.

2.    Additionally, Plaintiff seeks payment of Letter of Credit ("LOC") funds totaling $750,000.00 which were called by Defendant SOA.  SOA called the LOC in breach of the Confidential Stipulated Agreement, in breach of the covenant of good faith and fair dealing implied in the contract, and in violation of unfair competition laws.  Upon information and belief, SOA's communications with BMO Harris Bank N.A. calling the LOC were also fraudulent and negligent misrepresentations.  Moreover, SOA's efforts to retain the LOC funds would result in an unjust enrichment and the application of the LOC sections of the Confidential Stipulated Agreement as an unenforceable penalty provision.  Plaintiff is separately entitled to recover its attorneys' fees and costs concerning the LOC causes of action based on California Civil Code section 1717 and the Confidential Stipulated Agreement.

## PARTIES

3.    Plaintiff, Courtesy Automotive Group, Inc., dba Courtesy Subaru of Chico ("Courtesy"), operates as a new motor vehicle dealer, as defined by California Vehicle Code section 426, selling new Subaru vehicles and parts, is duly licensed as a vehicle dealer by the State of California, and is located at 2520 Cohasset Rd., Chico, CA 95973.

4.     Defendant, Subaru of America, Inc. ("SOA"), is a new motor vehicle distributor and manufacturer doing business with Subaru dealers in the State of California and throughout the United States, and is the franchisor of Plaintiff.  SOA is licensed as a vehicle distributor and manufacturer in the State of California.

5.     Plaintiff does not know the true names and capacities, whether corporate, partnership, associate, individual, or otherwise of Defendants sued herein as Does 1 through 50, inclusive, pursuant to California Code of Civil Procedure section 474.  Defendants Does 1 through 50, inclusive, are in some manner responsible for the acts, occurrences, and transactions set forth herein, and are legally liable to Plaintiffs.  Plaintiff will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously-named Defendants together with appropriate charging allegations when ascertained.  Reference herein to Defendant SOA shall be interpreted as including Does 1 through 50, inclusive.

## JURISDICTION AND VENUE

6.     Pursuant to the California Constitution, Article VI, section 10, this Court has jurisdiction over the issues herein raised.

7.     Venue is proper in this County pursuant to California Code of Civil Procedure section 395.

8.     This Court has jurisdiction over Defendants because SOA is a corporation authorized to and conducting substantial business in the State of California, County of Butte.

## GENERAL ALLEGATIONS

9.     Courtesy and SOA (collectively the "Parties") sought to resolve Protest No. PR-2570-18 filed pursuant to California Vehicle Code section 3060 before the California New Motor Vehicle Board ("Board") and a lawsuit in the Eastern District of California, Case No. 2-18-cv-02778-KJM-KJN, by entering into a stipulated decision and order pursuant to California Vehicle Code section 3050.7.

10.    On March 20, 2019, the Parties executed the [Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit and Exhibit 1 to Confidential Agreement to Stipulated Decision and Order of the Board, Filed Under Seal ("Confidential Stipulated Agreement").

11.    Pursuant to agreement of the Parties and the Board, the Confidential Stipulated

Agreement was previously confidential and maintained outside public record pursuant to the [Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit. As a result, Courtesy did not attach a copy of the Confidential Stipulated Agreement to its original Complaint filed on April 6, 2022, to maintain the document as confidential. Courtesy sought to have the Confidential Stipulated Agreement filed under seal in this action to protect its confidential nature. As the Parties and the Board now agree confidentiality is no longer required based on a ruling in the Alameda Superior Court, Courtesy files this Amended Complaint without redactions and without an accompanying motion to seal, and attaches the entirety of the Confidential Stipulated Agreement as Exhibit 1.

12. Paragraph 38 of the Confidential Stipulated Agreement states "[s]hould it become necessary for any Party to this Confidential Agreement to commence a legal proceeding for the purpose of enforcing or interpreting the terms of this Confidential Agreement, the prevailing party in such action shall be entitled to recover its reasonable attorneys' fees and costs incurred for prosecuting or defending the action." (Confidential Stipulated Agreement at ¶ 38.)

13. Paragraph 28 of the Confidential Stipulated Agreement provided Courtesy the opportunity to "file a written request with the Board asking it to appoint an Administrative Law Judge ("ALJ") to hold a hearing on the allegations made in the notice of non-compliance and to make a final determination of whether there has been a material failure to comply with the Conditions by [Courtesy]" following the receipt of a notice of non-compliance sent by SOA and provided "[t]he Board will have continuing jurisdiction over this matter solely for the purpose of appointing an ALJ to determine, in the event of a timely request by [Courtesy], whether there has been a failure by [Courtesy] to materially comply with any of the Conditions in this Confidential Agreement." (Confidential Stipulated Agreement at ¶¶ 28 and 28(b).)

14. The Confidential Stipulated Agreement included a force majeure provision (Paragraph 21) stating that "neither party shall be in default or liable for any delay or failure of compliance with this Confidential Agreement to the extent due to any future event which is beyond the control of the defaulting party...." (Confidential Stipulated Agreement at ¶ 21.)

15. On April 9, 2019, pursuant to Vehicle Code section 3050.7, the Board issued its Order Adopting "[Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit." A

true and correct copy of the Board's April 9, 2019, Order is attached hereto as Exhibit 2.  Courtesy refers to the [Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit and Order Adopting "[Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit" collectively as the "Board Order Adopting Stipulated Decision and Order."

16.    Pursuant to Paragraph 15(d) of the Stipulated Confidential Agreement, the Parties further entered into a Subaru Dealer Agreement and Standard Provision with a Facility Addendum dated October 17, 2019, providing for benchmarks for the completion of a permanent Subaru facility.  The Facility Addendum further provided that "[a]ll terms, conditions, and provisions of this Addendum and of the Stipulated Decision and Order of the Board Resolving Protest and Lawsuit dated March 20, 2019 (and the Confidential Agreement attached as Exhibit 1 thereto) held under confidential seal by the California New Motor Vehicle Board in Protest No. PR-2570-18, shall be incorporated by reference into the [Dealer] Agreement pursuant to Paragraph 20.10 of the [Dealer] Agreement."[1]  A true and correct copy of the October 17, 2019, Facility Addendum is attached hereto as Exhibit 3.

17.    On May 21, 2020, the Parties entered into an Amendment to Existing Facility Addendum to Confidential Subaru Dealer Agreement ("Amended Facility Addendum").  Among other things, the Amended Facility Addendum amended the benchmark dates for completion of a permanent Subaru facility.  A true and correct copy of the Amended Facility Addendum is attached hereto as Exhibit 4.

18.    Paragraph 15(b) of the Confidential Stipulated Agreement required Courtesy provide SOA a $750,000.00 Letter of Credit ("LOC") or performance bond.  In conformity with the Confidential Stipulated Agreement, Courtesy obtained the LOC from BMO Harris Bank N.A. (Standby Letter of Credit No. HACH621044OS) with SOA as the beneficiary.  The LOC was designed to insure Courtesy's performance on its commitment to a new ground-up facility in Chico, California.  A true and correct copy of the LOC is attached hereto as Exhibit 5.

19.    As the LOC provides, "[It was] issued to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility Addendum to the Subaru Dealer Agreement.  We [BMO Harris

---

[1] The Facility Addendum incorporated the Confidential Stipulated Agreement into the Subaru Dealer Agreement by reference.  All allegations herein alleging breach of the Confidential Stipulated Agreement by SOA shall also be read to include breach of the Facility Addendum, Amended Facility Addendum, and Dealer Agreement.

Bank N.A.] are informed that Courtesy Automotive Group, Inc. has committed to a Separate Touch Points Subaru dealership facility at Parcel numbers: APN 006-400-061, APN 006-400-063, APN 006-400-064, APN 006-400-65 and APN 006-400-066 Chico, CA meeting all Subaru minimum standards, as approved by Beneficiary [SOA], by January 31, 2022." (*See* Exhibit 5 at page 3.)

20.    The LOC further provides: "This Credit is available against your draft drawn at sight on us accompanied by the following document(s): 1. Beneficiary's Certificate, on its letterhead, completed, dated and purportedly signed by an authorized individual stating: 'Courtesy Automotive Group, Inc. has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement between Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico and Subaru of America, Inc. – Western Region.  Therefore, we are drawing for USD…., under Letter of Credit No. HACH6210440S. Please wire proceeds to Subaru of America, Inc…. (Instructions will be given at the time of the drawing).' 2. The original of this Credit and subsequent amendment(s), if any." (*See* Exhibit 5 at page 2.)

21.    The LOC was amended by "Amendment no. 1" on July 7, 2020.  The amended terms included changing the expiry date of the LOC to July 31, 2022.  No other amendments were made to the LOC.  Exhibit 5 attached hereto includes the Amendment no. 1.

22.    The Board Order Adopting Stipulated Decision and Order and Confidential Stipulated Agreement provided the Board with continuing jurisdiction "solely to enforce its Order in the future if requested by either party." (*See, e.g.,* Exhibit 1 [hereto] at ¶ 18.)

23.    Paragraph 38 of the Confidential Stipulated Agreement provided the prevailing Party in a legal proceeding to enforce or interpret the terms of the Confidential Stipulated Agreement is entitled to its reasonable attorneys' fees and costs in the action.  The provision entitles a prevailing party to attorneys' fees and costs pursuant to California Civil Code section 1717.

24.    On August 24, 2020, SOA issued a Notice of Non-Compliance to Courtesy seeking to termination Courtesy's Dealer Agreement.  Pursuant to Paragraph 28 of the Confidential Stipulated Agreement, on or about September 3, 2020, Courtesy invoked the Board's continuing jurisdiction to appoint an ALJ to determine whether Courtesy materially failed to comply with the terms of the Confidential Stipulated Agreement.

25.     After Courtesy invoked the Board's jurisdiction, the Board held a confidential proceeding before Administrative Law Judge Evelyn I. Matteucci ("ALJ Matteucci") pursuant to the terms of the Confidential Stipulated Agreement between Courtesy and SOA.

26.     On or about March 8, 2022, BMO Harris Bank N.A. informed Courtesy that SOA was calling the LOC.  Courtesy communicated with SOA in February and March 2022 requesting SOA refrain from its efforts to collect the funds secured by the LOC.  Among other reasons, Courtesy communicated there was a pending decision by the Board and ALJ Matteucci concerning matters relevant to the LOC.

27.     Courtesy requested SOA provide a copy of SOA's demand to BMO Harris Bank N.A. calling the LOC.  SOA refused.  As a result, upon information and belief, Courtesy alleges SOA demanded payment of the LOC based on the language contained in the LOC, in relevant part: "Courtesy Automotive Group, Inc. has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement between Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico and Subaru of America, Inc – Western Region."  Courtesy expressly reserves the right to amend this Complaint upon discovering the actual demand SOA provided BMO Harris Bank N.A.

28.     SOA did not call the LOC "to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility Addendum to the Subaru Dealer Agreement."  Courtesy has existing bank funding in place to complete construction of the permanent facility required by the Facility Addendum, through BMO Harris Bank N.A.  Construction of the permanent facility is ongoing and has been ongoing since approximately June 2021.

29.     Based on information and belief, SOA's calling of the LOC was fraudulent and a negligent misrepresentation.  SOA was aware of Courtesy's ongoing facility construction without the need for further funding.

30.     Based upon information and belief, on or about March 21, 2022, BMO Harris Bank N.A. released the LOC funds to SOA.  Courtesy has incurred a $750,000.00 liability to BMO Harris Bank N.A. as a result of SOA calling the LOC.

31.     On March 24, 2022, as the final determination in the Board's confidential proceeding, ALJ Matteucci issued a Confidential Decision Resolving Stipulated Decision and Order Dispute

("Confidential Decision"). The Confidential Decision is binding and non-appealable pursuant to Paragraph 28 of the Confidential Stipulated Agreement which states "[a]ny such timely request will be submitted for binding, non-appealable determination to an ALJ appointed by the Board…" and "'[b]inding, non-appealable' means that each Party adopts the ALJ's decision as a final, binding settlement of the matter at issue and waives any and all recourse, right of action, or appeal with respect to the resulting ruling and/or any resulting termination, to any individual, forum, or entity of any kind or nature whatsoever, including, without limitation, any state or federal agency, any state or federal court, or any other government, judicial, quasi-judicial, or private entity or forum." (Confidential Stipulated Agreement at ¶¶ 28(b) and 28(c).)

32. The Confidential Decision was in Courtesy's favor. In the Confidential Decision, ALJ Matteucci found Courtesy had not materially failed to comply with the Confidential Stipulated Agreement, and any nonperformance was excused by forces outside of Courtesy's control. (Confidential Decision at ¶¶ 269 and 270.)

33. Based on the Confidential Decision, Courtesy was the prevailing party in the confidential proceeding before the Board and ALJ Matteucci. The litigation was a proceeding to enforce or interpret the terms of the Confidential Stipulated Agreement as articulated by the Confidential Stipulated Agreement. As the prevailing party, Courtesy is entitled to recover its attorneys' fees and costs from SOA pursuant to California Civil Code section 1717.

34. Similar to the Confidential Stipulated Agreement, the Confidential Decision was confidential and maintained outside public record pursuant to the [Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit. As a result, Courtesy did not attach a copy of the Confidential Decision with its original Complaint filed on April 6, 2022, to maintain the document as confidential. Because the Parties and the Board agree sealing is no longer necessary, a true and correct copy of the Confidential Decision is attached hereto as Exhibit 6.

35. Following the Confidential Decision, on March 28, 2022, Courtesy sent SOA a demand letter requesting attorneys' fees and costs, pursuant to the attorneys' fees and costs provision of the Confidential Stipulated Agreement, as well as the return of the LOC funds in the amount of $750,000.00.

36.    SOA responded to Courtesy's demand letter on the same day and refused to provide attorneys' fees and costs as required under the Confidential Stipulated Agreement or return the LOC funds.

37.    On April 6, 2023, Courtesy filed its original Complaint in this action with the Butte Superior Court, seeking to obtains its attorneys' fees and costs as well as other relief including the LOC funds.

38.    SOA removed this action to this Court on June 8, 2023, pursuant to 28 U.S.C. §§ 1441 and 1446.

39.    Courtesy brings this action to obtain its attorneys' fees and costs incurred in the Board action because the Board possesses narrow jurisdictional limits.  The Board is not authorized to award damages or attorneys' fees and costs.  (Cal. Veh. Code § 3050; *see also Hardin Oldsmobile v. New Motor Vehicle Bd.* (1997) 52 Cal.App.4th 585, 597 ("While the Vehicle Code gives the Board statutory authority to hear specific protests by franchisees and also gives general authority to resolve honest differences of opinion between licensees and members of the public, it does not replace the judiciary with the Board as the forum for litigating other statutory and common law causes of action. While some of the language giving the Board authority appears broad, such as 'consider any matter,' the context of the language, especially the absence of statutory authority to award general compensatory and punitive damages, makes it evident the authority of the Board over traditional litigation involving its licensees is not plenary and, indeed, has not been broadly authorized by the Legislature."))  As a result, Courtesy is authorized to bring this action in a court having "jurisdiction over all common law and statutory claims originally cognizable in the courts" to recover its damages, attorneys' fees, and costs.  (Cal. Veh. Code § 3050, subd. (e).)

40.    In addition, Collateral Estoppel, also known as "Issue Preclusion," is an aspect of res judicata which precludes the relitigation of an issue which has been decided in a previous hearing. "'Collateral estoppel applies when (1) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication, (2) there was a final judgment on the merits in the prior action and (3) the issue necessarily decided in the prior adjudication is identical to the one that is sought to be relitigated.'" (*Smith v. ExxonMobil Oil Corp.* (2007) 153 Cal.App.4th 1407, 1414 (quoting *Roos*

*v. Red* (2005) 130 Cal.App.4th 870, 879).)

41.    "Thus, res judicata does not merely bar relitigation of identical claims or causes of action. Instead, in its collateral estoppel aspect, the doctrine may also preclude a party to prior litigation from redisputing issues therein decided against him, even when those issues bear on different claims raised in a later case." (*Smith, supra,* 153 Cal.App.4th at p. 1414.)

42.    "It has long been recognized that collateral estoppel not only prevents relitigation of court findings, but also may be applied to the decision of an administrative agency when that agency is acting in a judicial or quasi-judicial capacity." (*Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 878 (citing *People v. Sims* (1982) 32 Cal.3d 468, 479; *Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477, 481; *Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 242).) "'Indicia of [administrative] proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision.'" (*Basurto, supra*, 211 Cal.App.4th at pp. 878-879 (quoting *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 944).)

43.    Collateral Estoppel is applicable because ALJ Matteucci's March 24, 2022, Confidential Decision was produced pursuant to an administrative proceeding which was judicial in nature.

44.    Collateral Estoppel precludes SOA from relitigating issues determined in the Confidential Decision, including but not limited to those issues relevant to each of Courtesy's Causes of Action below.

45.    Any delay in Courtesy constructing the permanent facility is excused based on Courtesy's commercially reasonable best efforts as well as the force majeure event of the COVID-19 Pandemic. Courtesy did not materially fail to comply with the Confidential Stipulated Agreement.

46.    On May 5, 2022, SOA filed its original Petition for Writ of Administrative Mandate in the Alameda County Superior Court ("Original Petition") seeking judicial review of the Confidential Decision.

47.    Courtesy filed its Demurrer to Petitioner's Petition for Writ of Administrative Mandate

("Original Demurrer") on August 29, 2022, on the grounds the "court has no jurisdiction of the subject of the cause of action alleged in the pleading" and SOA failed to "state facts sufficient to constitute a cause of action" pursuant to California Code of Civil Procedure Section 430.10, subdivisions (a) and (e).

48.     After hearing, the Alameda Superior Court issued its January 11, 2023, Order Sustaining Demurrer with Leave to Amend and Denying Motion to Compel Production of Privileged Document ("Order on Original Demurrer").  The Order on Original Demurrer sustained Courtesy's Original Demurrer with leave to amend.

49.     Following the Order on Original Demurrer, on February 3, 2023, SOA filed its First Amended Petition for Writ of Administrative Mandate ("Amended Petition").  In response, Courtesy and the Board each filed demurrers to SOA's Amended Petition (collectively "Demurrers to the Amended Petition").

50.      On April 4, 2023, the Alameda County Superior Court issued its Order re: Hearing on Demurrer (Name Extension) Real Party in Interest's Demurrer to Petitioner's First Amended Petition for Writ of Administrative ("Order on Courtesy's Demurrer") and Order re: Hearing on Demurrer (Name Extension) Respondent New Motor Vehicle Board's Demurrer to Petitioner's First Amended Petition for Writ of Administrative Mandate ("Order on Board's Demurrer) (collectively, the "Orders on Demurrers to the Amended Petition").  The Orders on Demurrers to the Amended Petition sustained the Demurrers to the Amended Petition without leave to amend.

51.     To finally resolve SOA's Amended Petition, the Alameda County Superior Court then issued its Judgment on May 10, 2023.  The Judgment was entered in favor of the Board as Respondent and Courtesy as the Real Party in Interest, and against Petitioner, SOA.

52.     Throughout the writ petition process, the Parties and the Board continued to file briefs in redacted form and lodged unredacted forms with an accompanying motion to seal in an effort to keep the information confidential.  It was not until March 14, 2023, when SOA proposed it might withdraw its then pending motion to seal associated with the Amended Petition and oppose Courtesy and the Board's similar motions to seal associated with the Demurrers to the Amended Petition.

53.     In response, Courtesy and the Board filed four new motions to seal concerning the

Amended Petition and the briefs filed in support and in opposition to the Demurrers to Amended Petition ("Motions to Seal"). Courtesy and the Board filed these new motions because they were still under the belief the information from the Confidential Stipulated Agreement and the Confidential Decision needed to be kept confidential.[2]

54. On March 30, 2023, SOA filed Petitioner Subaru of America, Inc.'s Response to Real Party in Interest Courtesy Automotive Group, Inc.'s Motion to Seal [Unredacted] First Amended Petition and [Unredacted] Oppositions and Reply Regarding Demurrers opposing Courtesy's and the Board's motions to seal associated with the Amended Petition.

55. On April 11, 2023, the Alameda Superior Court issued its Order re: Hearing on Motion to Seal [Un-Redacted] Memorandum of Points and Authorities in Support of Real Party in Interest's Demurrer to Petitioner's First Amended Petition for Writ of Administrative Mandate ("Order on Motion to Seal"). The Order on Motion to Seal denied the motions to seal on the grounds the parties had failed to show disclosure would cause prejudice or harm to overcome the presumption that court records are open to the public.

56. On June 22, 2022, Courtesy filed a petition (Petition No. P-463-22) ("Petition") requesting the Board direct the California Department of Motor Vehicles ("DMV") to conduct an investigation and issue a written report on SOA's potential violation of Vehicle Code sections 3060 and 11713.3, and for the Board to determine what actions, if any, to take against SOA's manufacturer's license following the DMV investigation and report. A true and correct copy of the Petition is attached hereto as Exhibit 7.

57. On January 26, 2023, the Board issued its Order Granting Petitioner's Request for Relief Pursuant to Vehicle Code Section 3050(b)(1) ("Order on Petition") directing the DMV to investigate and issue a written report concerning whether SOA violated Vehicle Code sections 3060 and 11713.3. A true and correct copy of the Order on Petition is attached hereto as Exhibit 8.

58. Similar to the confidential proceeding before ALJ Matteucci, the Petition is a legal proceeding for enforcing or interpreting the Confidential Stipulated Agreement because it required the

---

[2] The Parties and the Board now agree that confidentiality is no longer required, and sealing of portions of the briefs filed before this Court is no longer necessary.

Board to interpret and enforce the Confidential Stipulated Agreement and Confidential Decision to order the DMV investigation and report, and eventually determine if SOA had violated Vehicle Code sections 3060 and 11713.3.

59.    Courtesy is entitled to recover its attorneys' fees and costs incurred as part of the Petition because the Petition is a legal proceeding for interpreting or enforcing the Confidential Stipulated Agreement within the attorneys' fee provision of the Confidential Stipulated Agreement.

## FIRST CAUSE OF ACTION

## (BREACH OF CONTRACT --- FAILURE TO PAY ATTORNEYS' FEES AND COSTS --- AGAINST DEFENDANT SOA)

60.    Plaintiff incorporates by reference each and every preceding paragraph of this Complaint as if fully set forth herein.

61.     Courtesy and SOA entered into the Confidential Stipulated Agreement on March 20, 2019.  The Confidential Stipulated Agreement is a contract between Courtesy and SOA.

62.    Courtesy properly invoked the Board's jurisdiction to determine whether Courtesy materially failed to comply with the Conditions of the Confidential Stipulated Agreement pursuant to Paragraph 28 of the Confidential Stipulated Agreement..  SOA participated in the proceeding before the Board as described by the Confidential Stipulated Agreement.

63.    Courtesy prevailed in the Board proceeding and was the prevailing party in ALJ Matteucci's Confidential Decision.  The Confidential Decision is binding and non-appealable.

64.    The Confidential Stipulated Agreement provided the prevailing party would be entitled to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of enforcing or interpreting the terms of the Confidential Stipulated Agreement.  (Confidential Stipulated Agreement at ¶ 38.)  Pursuant to California Civil Code section 1717, the Confidential Stipulated Agreement is a contract that specifically provides that attorneys' fees and costs be awarded to the prevailing party on the contract.

65.    On March 28, 2022, Courtesy sent a demand letter to SOA seeking its reasonable attorneys' fees and costs.  The demand letter listed $189,806.50 in attorneys' fees and $23,896.84 in costs as of March 28, 2022, incurred in the Board proceeding.

66.     SOA refused to provide Courtesy its reasonable attorneys' fees and costs incurred in the Board action for enforcing and interpreting the terms of the Confidential Stipulated Agreement before ALJ Matteucci.

67.     SOA breached the Confidential Stipulated Agreement by refusing to provide Courtesy its reasonable attorneys' fees and costs as required by the Confidential Stipulated Agreement.

68.     As a result of SOA's breach, SOA is obligated to pay Courtesy its reasonable attorneys' fees and costs.  Currently Courtesy's attorneys' fees and costs incurred from the Petition proceeding, proceeding before ALJ Matteucci, and proceedings before this court total $258,385.85 as of August 24, 2023.  Courtesy is also entitled to its future reasonable attorneys' fees and costs in this action in seeking to enforce the terms of the Confidential Stipulated Agreement.

69.     SOA is liable for Courtesy's reasonable attorneys' fees and costs incurred in the Board action as well as this action concerning the recovery of Courtesy's attorneys' fees and costs.  SOA is also liable for pre-judgment and post-judgment interest.

## SECOND CAUSE OF ACTION

## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING --- FAILURE TO PAY ATTORNEYS' FEES AND COSTS --- AGAINST DEFENDANT SOA)

70.     Plaintiff incorporates by reference each and every preceding paragraph of this Complaint as if fully set forth herein.

71.     Courtesy and SOA entered into the Confidential Stipulated Agreement on March 20, 2019.  The Confidential Stipulated Agreement is a contract between Courtesy and SOA.

72.     Courtesy properly invoked the Board's jurisdiction to determine whether Courtesy materially failed to comply with the Conditions of the Confidential Stipulated Agreement pursuant to Paragraph 28 of the Confidential Stipulated Agreement.  SOA participated in the proceeding before the Board as described by the Confidential Stipulated Agreement.

73.     Courtesy prevailed in the Board proceeding and was the prevailing party in ALJ Matteucci's Confidential Decision.  The Confidential Decision is binding and non-appealable.

74.     The Confidential Stipulated Agreement provided the prevailing party would be entitled

to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of enforcing or interpreting the terms of the Confidential Stipulated Agreement. (Confidential Stipulated Agreement at ¶ 38.) Pursuant to California Civil Code section 1717, the Confidential Stipulated Agreement is a contract that specifically provides that attorneys' fees and costs be awarded to the prevailing party on the contract.

75. On March 28, 2022, Courtesy sent a demand letter to SOA seeking its reasonable attorneys' fees and costs.

76. SOA refused to provide Courtesy its reasonable attorneys' fees and costs incurred in the action for enforcing and interpreting the terms of the Confidential Stipulated Agreement before the Board and ALJ Matteucci.

77. The law implies in every contract a covenant of good faith and fair dealing. (*See Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (recognizing the covenant in the insurance context); *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 (recognizing the covenant in the employment law context); *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 (recognizing the covenant in the commercial lease context); Rest.2d Contracts § 205 (stating "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement").)

78. As the Restatement describes, "Subterfuges and evasions violate the obligation of good faith in the performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." (Rest.2d Contracts § 205, Comment (d).)

79. SOA failed to comply with the covenant of good faith and fair dealing implied in the Confidential Stipulated Agreement.

80. SOA willfully rendered imperfect performance by failing to provide Courtesy its

1    reasonable attorneys' fees and costs.

2        81.    As a result of SOA's breach of the covenant of good faith and fair dealing implied in the

3    Confidential Stipulated Agreement, Courtesy has been denied its reasonable attorneys' fees and costs

4    which it is due.

5        82.    As a result of SOA's breach, SOA is obligated to pay Courtesy its reasonable attorneys'

6    fees and costs.  Currently Courtesy's attorneys' fees and costs incurred from the Petition proceeding,

7    proceeding before ALJ Matteucci, and proceedings before this court total $258,385.85 as of August 24,

8    2023.  Courtesy is also entitled to its future reasonable attorneys' fees and costs in this action in seeking

9    to enforce the terms of the Confidential Stipulated Agreement.

10       83.    SOA is liable for Courtesy's reasonable attorneys' fees and costs incurred in the Board

11   action as well as this action concerning the recovery of Courtesy's attorneys' fees and costs.  SOA is

12   also liable for pre-judgment and post-judgment interest.

13                        **THIRD CAUSE OF ACTION**

14              **(ACCOUNT STATED – AGAINST DEFENDANT SOA)**

15       84.    Plaintiff incorporates by reference each and every preceding paragraph of this Complaint

16   as if fully set forth herein.

17       85.    "An account stated is an agreement, based on prior transactions between the parties, that

18   the items of an account are true and that the balance struck is due and owing." (*Maggio, Inc. v. Neal*

19   (1987) 196 Cal.App.3d 745, 752 (see *Gleason v. Klamer* (1980) 103 Cal.App.3d 782, 786).) "To be an

20   account stated, 'it must appear that at the time of the statement an indebtedness from one party to the

21   other existed, that a balance was then struck and agreed to be the correct sum owing from the debtor to

22   the creditor, and that the debtor expressly or impliedly promised to pay to the creditor the amount thus

23   determined to be owing.'" (*Maggio, supra*, 196 Cal.App.3d at pp. 752-753 (quoting *H. Russell Taylor's*

24   *Fire Prevention Service, Inc. v. Coca Cola Bottling Corp.*, (1979) 99 Cal.App.3d 711, 726).)

25       86.    The Confidential Stipulated Agreement provided the prevailing party would be entitled

26   to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of enforcing or

27   interpreting the terms of the Confidential Stipulated Agreement.  (Confidential Stipulated Agreement

28   at ¶ 38.)  Pursuant to California Civil Code section 1717, the Confidential Stipulated Agreement is a

contract that specifically provides that attorneys' fees and costs be awarded to the prevailing party on the contract.

87.    On March 28, 2022, Courtesy sent a demand letter to SOA seeking its reasonable attorneys' fees and costs.  The demand letter listed $189,806.50 in attorneys' fees and $23,896.84 in costs totaling $213,703.34 as of March 28, 2022, incurred in the Board proceeding.

88.    SOA refused to provide Courtesy its reasonable attorneys' fees and costs incurred in the action for enforcing and interpreting the terms of the Confidential Stipulated Agreement before the Board and ALJ Matteucci.

89.    In the Confidential Stipulated Agreement, Courtesy and SOA agreed the prevailing party is entitled to attorneys' fees and costs.  As a result, SOA impliedly agreed it would pay Courtesy's attorneys' fees and costs in the event it was the prevailing party in the Board proceeding.

90.    As a result, SOA is liable for Courtesy's reasonable attorneys' fees and costs.  Courtesy is also entitled to its future reasonable attorneys' fees and costs in this action in seeking to enforce the terms of the Confidential Stipulated Agreement, and the Petition before the Board.  Currently Courtesy's attorneys' fees and costs incurred from the Petition proceeding, proceeding before ALJ Matteucci, and proceedings before this court total $258,385.85 as of August 24, 2023.

91.    SOA is liable for Courtesy's reasonable attorneys' fees and costs incurred in the Board action, this action concerning the recovery of Courtesy's attorneys' fees and costs, and the Petition before the Board.  SOA is also liable for pre-judgment and post-judgment interest.

## FOURTH CAUSE OF ACTION

## (BREACH OF CONTRACT --- CALLING ON THE LETTER OF CREDIT --- AGAINST DEFENDANT SOA)

92.    Plaintiff incorporates by reference each and every preceding paragraph of this Complaint as if fully set forth herein.

93.    Courtesy and SOA entered into the Confidential Stipulated Agreement on March 20, 2019, which was adopted by the Board on April 9, 2019.  The Confidential Stipulated Agreement is a contract between Courtesy and SOA.

94.    The Confidential Stipulated Agreement required Courtesy to provide SOA the LOC to

insure Courtesy's performance of its commitment to the Permanent Facility.

95.    Courtesy and SOA executed the Facility Addendum on October 17, 2019.

96.    The Facility Addendum was amended on May 21, 2020 ("Amended Facility Addendum").

97.    The Confidential Stipulated Agreement, Facility Addendum, and Amended Facility Addendum were all incorporated by refence into Courtesy's Dealer Agreement pursuant to Paragraph 7 of the Facility Addendum.

98.    Courtesy obtained and provided SOA the LOC on June 22, 2020, in conformity with the Confidential Stipulated Agreement and the Facility Addendum amended on May 21, 2020.

99.    The LOC was issued "to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility Addendum to the Subaru Dealer Agreement."

100.    The LOC funds only become available to SOA if SOA provided documents to BMO Harris Bank N.A. stating "Courtesy Automotive Group, Inc. has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement."

101.    On March 8, 2022, Courtesy first learned SOA made demands to BMO Harris Bank N.A in order to obtain the LOC funds totaling $750,000.00.  SOA refused to provide a copy of these demands to Courtesy.

102.    Upon information and belief, SOA's demands were based on Courtesy allegedly failing to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement between Courtesy and SOA.

103.    At the time SOA called the LOC, it was aware Courtesy was in the process of constructing the permanent facility described in the Facility Addendum as of the ground-breaking in approximately June 2021.

104.    Upon information and belief, the LOC funds were released to SOA by BMO Harris Bank N.A. on or about March 21, 2022.

105.    "If its presentation is honored, the beneficiary warrants: (1) to the issuer, any other person to whom the presentation is made, and the applicant that there is no fraud or forgery of the kind described in subdivision (a) of Section 5109; and (2) to the applicant that the drawing does not violate any

agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." (Cal. Com. Code § 5110.)

106.    The express terms which would allow SOA to call upon the LOC funds have not been met because Courtesy has not materially failed to fulfill its obligations under the Facility Addendum Amendment.  The COVID-19 Pandemic represented a *force majeure* event precluding Courtesy's timely obligations under the Facility Addendum.  Courtesy exercised commercially reasonable best efforts in having the permanent facility constructed.  SOA is precluded based on the doctrine of Collateral Estoppel from arguing Courtesy did not exercise commercially reasonable best efforts, that the COVID-19 Pandemic was not a *force majeure* event precluding Courtesy's timely obligations under the Facility Addendum, or that Courtesy materially failed to comply with the Facility Addendum Amendment or the Stipulated Confidential Agreement.

107.    The LOC was issued to insure Courtesy did not materially fail to comply with the conditions stated in the Facility Addendum Amendment,[3] however, construction of the permanent facility is ongoing and the project is fully funded.  SOA's calling on the LOC was in breach of the Stipulated Confidential Agreement and the LOC funds called by SOA in no way supports Courtesy's obligations as described in the LOC.

108.    As a result of SOA's breach of contract, Courtesy has been damaged in the amount of the LOC – $750,000.00.

109.    SOA is liable for the breach of contract in the amount of $750,000.00.

110.    In addition, the Confidential Stipulated Agreement provided the prevailing party would be entitled to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of enforcing or interpreting the terms of the Confidential Stipulated Agreement.  Pursuant to California Civil Code section 1717, the Confidential Stipulated Agreement is a contract that specifically provides that attorneys' fees and costs be awarded to the prevailing party on the contract.

111.    The LOC was obtained and issued pursuant to the terms of the Confidential Stipulated

---

[3] The Facility Addendum incorporated the Stipulated Confidential Agreement by reference and the Stipulated Confidential Agreement provided for the determination of whether Courtesy materially failed to comply with conditions therein stated.

Agreement.  SOA is also liable to Courtesy for its attorneys' fees and costs incurred in seeking recovery of the LOC funds.

112.    SOA is liable for Courtesy's damages in the amount of $750,000.00 and Courtesy's reasonable attorneys' fees and costs in this action concerning the LOC.  SOA is also liable for pre-judgment and post-judgment interest.

## FIFTH CAUSE OF ACTION

## (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING --- CALLING ON THE LETTER OF CREDIT --- AGAINST DEFENDANT SOA)

113.    Plaintiff incorporates by reference each and every preceding paragraph of this Complaint as if fully set forth herein.

114.    Courtesy and SOA entered into the Confidential Stipulated Agreement on March 20, 2019, which was adopted by the Board on April 9, 2019.  The Confidential Stipulated Agreement is a contract between Courtesy and SOA.

115.    The Confidential Stipulated Agreement required Courtesy to provide SOA the LOC to insure Courtesy's performance of its commitment to the Permanent Facility.

116.    Courtesy and SOA executed the Facility Addendum on October 17, 2019.

117.    The Facility Addendum was amended on May 21, 2020 ("Amended Facility Addendum").

118.    The Confidential Stipulated Agreement, Facility Addendum, and Amended Facility Addendum were all incorporated by refence into Courtesy's Dealer Agreement pursuant to Paragraph 7 of the Facility Addendum.

119.    Courtesy obtained and provided SOA the LOC on June 22, 2020, in conformity with the Confidential Stipulated Agreement and the Facility Addendum amended on May 21, 2020.

120.    The LOC was issued "to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility Addendum to the Subaru Dealer Agreement."

121.    Pursuant to the LOC, the LOC funds only become available to SOA if SOA provided documents to BMO Harris Bank N.A. stating "Courtesy Automotive Group, Inc. has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement…."

122.    On March 8, 2022, Courtesy first learned SOA made demands to BMO Harris Bank N.A. in order to obtain the LOC funds totaling $750,000.00.  SOA refused to provide a copy of these demands to Courtesy.

123.    Upon information and belief, SOA's demands were based on Courtesy allegedly failing to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement between Courtesy and SOA.

124.    At the time SOA called the LOC, it was aware Courtesy was in the process of constructing the permanent facility described in the Facility Addendum as of the ground-breaking in approximately June 2021.

125.    Upon information and belief, the LOC funds were released to SOA by BMO Harris Bank N.A. on or about March 21, 2022.

126.    "If its presentation is honored, the beneficiary warrants: (1) to the issuer, any other person to whom the presentation is made, and the applicant that there is no fraud or forgery of the kind described in subdivision (a) of Section 5109; and (2) to the applicant that the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." (Cal. Com. Code § 5110.)

127.    The express terms which would allow SOA to call upon the LOC funds have not been met because Courtesy has not materially failed to fulfill its obligations under the Facility Addendum Amendment.  The COVID-19 Pandemic represented a *force majeure* event precluding Courtesy's timely obligations under the Facility Addendum.  Courtesy exercised commercially reasonable best efforts in the timely construction of the permanent facility.  SOA is precluded based on the doctrine of Collateral Estoppel from arguing Courtesy did not exercise commercially reasonable best efforts, that the COVID-19 Pandemic was not a *force majeure* event precluding Courtesy's timely obligations under the Facility Addendum, or that Courtesy materially failed to comply with the Facility Addendum Amendment or the Stipulated Confidential Agreement.

128.    The LOC was issued to insure Courtesy did not materially fail to comply with the conditions stated in the Facility Addendum Amendment, however, construction of the permanent facility is ongoing and the project is fully funded.  SOA's calling on the LOC was in breach of the

Stipulated Confidential Agreement and the LOC funds are not going toward supporting Courtesy's obligations as described in the LOC.

129.    The law implies in every contract a covenant of good faith and fair dealing.  (*See Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (recognizing the covenant in the insurance context); *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 (recognizing the covenant in the employment law context); *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 (recognizing the covenant in the commercial lease context); Rest.2d Contracts § 205 (stating "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement").)

130.    As the Restatement describes, "Subterfuges and evasions violate the obligation of good faith in the performance even though the actor believes his conduct to be justified.  But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."  (Rest.2d Contracts § 205, Comment (d).)

131.    SOA unreasonably and without justification called upon the LOC before a determination of whether Courtesy had materially failed to comply with its obligations had been reached.

132.    SOA violated the covenant of good faith and fair dealing in the Confidential Stipulated Agreement by calling upon the LOC.

133.    SOA refused to return the LOC funds following ALJ Matteuci's Confidential Decision.

134.    SOA's calling of the LOC was in breach of the covenant of good faith and fair dealing.

135.    As a result of SOA's breach, Courtesy has been damaged in the amount of the LOC – $750,000.00.

136.    SOA is liable for the breach of the implied covenant in the amount of $750,000.00.

137.    In addition, the Confidential Stipulated Agreement provided the prevailing party would be entitled to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of

enforcing or interpreting the terms of the Confidential Stipulated Agreement.  Pursuant to California Civil Code section 1717, the Confidential Stipulated Agreement is a contract that specifically provides that attorneys' fees and costs be awarded to the prevailing party on the contract.

138.    The LOC was obtained and issued pursuant to the terms of the Confidential Stipulated Agreement.  SOA is also liable to Courtesy for its attorneys' fees and costs incurred in seeking recovery of the LOC funds.

139.    SOA is liable for Courtesy's damages in the amount of $750,000.00 and Courtesy's reasonable attorneys' fees and costs in this action concerning the LOC.  SOA is also liable for pre-judgment and post-judgment interest.

### SIXTH CAUSE OF ACTION

### (VIOLATION OF UNFAIR COMPETITION LAW – Business and Professions Code section 17200 et seq. --- AGAINST DEFENDANT SOA)

140.    Plaintiff incorporates by reference each and every preceding paragraph of this Complaint as if fully set forth herein.

141.    Courtesy and SOA entered into the Confidential Stipulated Agreement on March 20, 2019, which was adopted by the Board on April 9, 2019.  The Confidential Stipulated Agreement is a contract between Courtesy and SOA.

142.    The Confidential Stipulated Agreement required Courtesy to provide SOA the LOC to insure Courtesy's performance of its commitment to the Permanent Facility.

143.    Courtesy and SOA executed the Facility Addendum on October 17, 2019.

144.    The Facility Addendum was amended on May 21, 2020 ("Amended Facility Addendum").

145.    The Confidential Stipulated Agreement, Facility Addendum, and Amended Facility Addendum were all incorporated by refence into Courtesy's Dealer Agreement pursuant to Paragraph 7 of the Facility Addendum.

146.    Courtesy obtained and provided SOA the LOC on June 22, 2020, in conformity with the Confidential Stipulated Agreement and the Facility Addendum amended on May 21, 2020.

147.    The LOC was issued "to support the obligations of Courtesy Automotive Group, Inc. as

outlined in the Facility Addendum to the Subaru Dealer Agreement."

148.    The LOC funds only become available to SOA if SOA offered documents to BMO Harris Bank N.A. stating "Courtesy Automotive Group, Inc. has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement...."

149.    On March 8, 2022, Courtesy first learned SOA made demands to BMO Harris Bank N.A. in order to obtain the LOC funds totaling $750,000.00.  SOA refused to provide a copy of these demands to Courtesy.

150.    Upon information and belief, SOA's demands were based on Courtesy allegedly failing to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement between Courtesy and SOA.

151.    At the time SOA called the LOC, it was aware Courtesy was in the process of constructing the permanent facility described in the Facility Addendum as of the ground-breaking in approximately June 2021.

152.    Upon information and belief, the LOC funds were released to SOA by BMO Harris Bank N.A. on or about March 21, 2022.

153.    "If its presentation is honored, the beneficiary warrants: (1) to the issuer, any other person to whom the presentation is made, and the applicant that there is no fraud or forgery of the kind described in subdivision (a) of Section 5109; and (2) to the applicant that the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." (Cal. Com. Code § 5110.)

154.    The express terms which would allow SOA to call upon the LOC funds have not been met because Courtesy has not materially failed to fulfill its obligations under the Facility Addendum Amendment.  The COVID-19 Pandemic represented a *force majeure* event precluding Courtesy's timely obligations under the Facility Addendum.  Courtesy exercised commercially reasonable best efforts in having the permanent facility constructed.  SOA is precluded based on the doctrine of Collateral Estoppel from arguing Courtesy did not exercise commercially reasonable best efforts, that the COVID-19 Pandemic was not a *force majeure* event precluding Courtesy's timely obligations under the Facility Addendum, or that Courtesy materially failed to comply with the Facility Addendum

Amendment or the Stipulated Confidential Agreement.

155.   The LOC was issued to insure Courtesy did not materially fail to comply with the conditions stated in the Facility Addendum Amendment, however, construction of the permanent facility is ongoing and the project is fully funded.  SOA's calling on the LOC was in breach of the Stipulated Confidential Agreement and the LOC funds are not going toward supporting Courtesy's obligations as described in the LOC.

156.   Business and Professions Code section 17200 provides unfair competition "shall mean and include any unlawful, unfair or fraudulent business act or practice."  (Cal. Bus. & Prof. Code § 17200.)

157.   "Notwithstanding Section 3369 of the Civil Code, specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition."  (Bus. & Prof. Code § 17202.)  "Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction … by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."  (Bus. & Prof. Code § 17204.)

158.   Upon information and belief, SOA communicated with BMO Harris Bank N.A. regarding Courtesy's alleged failure to fulfill obligations required by the Facility Addendum and Dealer Agreement.  These communications are unfair and fraudulent.

159.   Courtesy is building the permanent Subaru facility, has obtained all necessary funding, and any untimely performance was excused pursuant to the Facility Addendum, Dealer Agreement, and Stipulated Confidential Agreement.  Courtesy exercised commercially reasonable best efforts to timely construct the permanent facility, and the COVID-19 Pandemic represented a force majeure event precluding Courtesy's timely obligations under the Facility Addendum.  Courtesy did not materially fail to comply with the Facility Addendum Amendment.  SOA is precluded based on the doctrine of Collateral Estoppel from arguing Courtesy did not exercise commercially reasonable best efforts, that the COVID-19 Pandemic was not a *force majeure* event precluding Courtesy's timely obligations under the Facility Addendum, or that Courtesy materially failed to comply with the Facility Addendum Amendment or the Stipulated Confidential Agreement.

160.   SOA's actions of calling upon the LOC are unlawful, unfair, and fraudulent business acts

1    or practices.

2    161.    SOA is liable to Plaintiff for the harm caused by SOA's unlawful, unfair, and fraudulent

3    communications in an amount equal to the LOC funds – $750,000.00.

4    162.    In addition, the Confidential Stipulated Agreement provided the prevailing party would

5    be entitled to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of

6    enforcing or interpreting the terms of the Confidential Stipulated Agreement.  Pursuant to California

7    Civil Code section 1717, the Confidential Stipulated Agreement is a contract that specifically provides

8    that attorneys' fees and costs be awarded to the prevailing party on the contract.

9    163.    The LOC was obtained and issued pursuant to the terms of the Confidential Stipulated

10   Agreement.  SOA is also liable to Courtesy for its attorneys' fees and costs incurred in seeking recovery

11   of the LOC funds.

12   164.    SOA is liable for Courtesy's damages in the amount of $750,000.00 and Courtesy's

13   reasonable attorneys' fees and costs in this action concerning the LOC.  SOA is also liable for pre-

14   judgment and post-judgment interest.

15   **SEVENTH CAUSE OF ACTION**

16   **(INTENTIONAL MISREPRESENTATION --- AGAINST DEFENDANT SOA)**

17   165.    Plaintiff incorporates by reference each and every preceding paragraph of this Complaint

18   as if fully set forth herein.

19   166.    Pursuant to Civil Code section 1572, actual fraud includes any of the following acts

20   committed by a party to the contract, or with his connivance, with intent to deceive another party thereto,

21   or to induce him to enter into a contract:

22           a)    The suggestion, as a fact, of that which is not true, by one who does not believe it

23   to be true;

24           b)    The positive assertion, in a manner not warranted by the information of the person

25   making it, of that which is not true, though he believes it to be true;

26           c)    The suppression of that which is true, by one having knowledge or belief of the

27   fact;

28           d)    A promise made without any intention of performing it; or,

-26-
FIRST AMENDED COMPLAINT

e)    Any other act fitted to deceive.

167.    Here, SOA intentionally misled BMO Harris Bank N.A. by calling upon the LOC when Courtesy had not materially failed to comply with its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement or the Stipulated Confidential Agreement.  SOA intended for BMO Harris Bank N.A. to rely on the representation of Courtesy's alleged failure in SOA's communication calling on the LOC.

168.    SOA refused to provide Courtesy a copy of its demand for the LOC to BMO Harris Bank N.A., however, the LOC required a demand be made by SOA sending a beneficiary's certificate stating Courtesy had failed to meet its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement.

169.    In order to obtain the LOC funds, SOA was required to send such a document representing Courtesy had failed to meet its obligations.

170.    "If its presentation is honored, the beneficiary warrants: (1) to the issuer, any other person to whom the presentation is made, and the applicant that there is no fraud or forgery of the kind described in subdivision (a) of Section 5109; and (2) to the applicant that the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." (Cal. Com. Code § 5110.)

171.    Based on information and belief, SOA intentionally and willfully presented BMO Harris Bank N.A. with the document described in the LOC fraudulently stating Courtesy failed to meet its obligations.

172.    BMO Harris Bank N.A. reasonably relied on SOA's certified document in releasing the LOC funds to SOA on or about March 21, 2022.

173.    SOA's actions constitute an intentional misrepresentation, deceit, or concealment of a material fact known to SOA with the intention on the part of SOA to obtain the LOC funds without the condition of Courtesy having materially failed its obligations to construct the permanent facility as provided for in the Facility Addendum, the Dealer Agreement, and the Stipulated Confidential Agreement.

174.    SOA's fraudulent misrepresentation harmed Courtesy in the amount of the LOC –

$750,000.00.

175.   In addition, the Confidential Stipulated Agreement provided the prevailing party would be entitled to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of enforcing or interpreting the terms of the Confidential Stipulated Agreement.  (Confidential Stipulated Agreement at ¶ 38.)   Pursuant to California Civil Code section 1717, the Confidential Stipulated Agreement is a contract that specifically provides that attorneys' fees and costs be awarded to the prevailing party on the contract.

176.   The LOC was obtained and issued pursuant to the terms of the Confidential Stipulated Agreement.  SOA is also liable to Courtesy for its attorneys' fees and costs incurred in seeking recovery of the LOC funds.

177.   SOA is liable for Courtesy's damages in the amount of $750,000.00 and Courtesy's reasonable attorneys' fees and costs in this action concerning the LOC.  SOA is also liable for pre-judgment and post-judgment interest.

178.   Moreover, SOA's actions and communications constitute oppression, fraud, or malice within the meaning of California Civil Code section 3294.

179.   Under California Civil Code section 3294, "Fraud" is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."   Pursuant to California Civil Code section 3294, Courtesy is entitled to recover punitive damages due to SOA's commission of fraud as described herein.  SOA is liable for punitive damages up to nine (9) times Courtesy's actual damages.

## EIGHTH CAUSE OF ACTION

## (NEGLIGENT MISREPRESENTATION)

180.   Plaintiff incorporates by reference each and every preceding paragraph of this Complaint as if fully set forth herein.

181.   Upon information and belief, SOA issued its demand for the LOC by sending a Beneficiary's Certificate to BMO Harris Bank N.A.

182.   Upon information and belief, in its demand, SOA represented to BMO Harris Bank N.A.

that Courtesy had materially failed to meet its obligations pursuant to the Facility Addendum and was therefore entitled to the LOC funds.

183.   Thereafter, on or about March 21, 2022, BMO Harris Bank N.A. released the LOC funds to SOA.

184.   SOA represented Courtesy allegedly failed to comply with its Courtesy under the Facility Addendum.  SOA had no reasonable grounds for believing its representation was true when made.

185.   SOA intended for BMO Harris Bank N.A. to rely on its representation.

186.   BMO Harris Bank N.A. reasonably relied on SOA's representation.

187.   SOA's actions constituted a negligent misrepresentation.  SOA negligently misled BMO Harris Bank N.A. by calling upon the LOC when Courtesy had not materially failed to comply with its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement or the Stipulated Confidential Agreement.  SOA knew or should have known Courtesy was complying with the Facility Addendum and any delays were excused pursuant to the terms of the Stipulated Confidential Agreement.

188.   SOA's negligent misrepresentation harmed Courtesy in the amount of the LOC – $750,000.00.

189.   In addition, the Confidential Stipulated Agreement provided the prevailing party would be entitled to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of enforcing or interpreting the terms of the Confidential Stipulated Agreement.  (Confidential Stipulated Agreement at ¶ 38.)  Pursuant to California Civil Code section 1717, the Confidential Stipulated Agreement is a contract that specifically provides that attorneys' fees and costs be awarded to the prevailing party on the contract.

190.   The LOC was obtained and issued pursuant to the terms of the Confidential Stipulated Agreement.  SOA is also liable to Courtesy for its attorneys' fees and costs incurred in seeking recovery of the LOC funds.

191.   SOA is liable for Courtesy's damages in the amount of $750,000.00 and Courtesy's reasonable attorneys' fees and costs in this action concerning the LOC.  SOA is also liable for pre-judgment and post-judgment interest.

### NINTH CAUSE OF ACTION

### (UNJUST ENRICHMENT --- AGAINST DEFENDANT SOA)

192.    Plaintiff incorporates by reference each and every preceding paragraph of this Complaint as if fully set forth herein.

193.    "We begin with the law of restitution. An individual is required to make restitution if he or she is unjustly enriched at the expense of another." (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662 (see Rest., Restitution, § 1; *California Federal Bank v. Matreyek* (1992) 8 Cal.App.4th 125, 131).) "A person is enriched if the person receives a benefit at another's expense." (*First Nationwide Savings, supra,* 11 Cal.App.4th at p. 1662 (see Rest., Restitution, supra, § 1, com. a).)

194.    The LOC required its funds be issued "to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility Addendum to the Subaru Dealer Agreement."

195.    SOA called the LOC funds from BMO Harris Bank N.A. and has thereafter refused to use the funds to support the obligations of Courtesy.  The terms of the LOC required the funds be used to support Courtesy's obligations.

196.    By calling the LOC, SOA is treating the LOC as if it constituted an alleged liquidated damages provision.  California Civil Code section 1671 concerns whether a liquidated damages clause is enforceable.

197.    "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach.  The amount set as liquidated damages must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.  In the absence of such relationship, a contractual clause purporting to predetermine damages must be construed as a penalty.  A penalty provision operates to compel performance of an act and usually becomes effective only in the event of default upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach. The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." (*Ridgley v. Topa Thrift & Loan*

1   *Assn.* (1998) 17 Cal.4th 970, 977 (internal citations omitted) ("*Ridgley*").)

2        198.   Here, SOA's treatment of the LOC as a liquidated damages provision violates California

3   Civil Code section 1671 because it is being used as an unenforceable penalty provision.   The

4   $750,000.00 amount of the LOC lacks any proportional relationship to any of SOA's actual damages.

5   SOA has not suffered any actual damages as a result of any delays in the permanent facility's

6   construction.   Courtesy continues to sell as many Subaru vehicles as SOA is capable of providing.

7   Courtesy could not have sold any more new Subaru vehicles than it sold from 2020 through present

8   because SOA was unable to provide additional vehicle inventory as a result of ongoing supply

9   constraints.

10       199.   SOA's receipt of the LOC funds is an unjust enrichment.   SOA's use of the LOC

11  provision as a penalty should be considered void pursuant to California Civil Code section 1671.   In

12  addition, SOA is retaining the LOC funds instead of using the funds to support the obligations of

13  Courtesy as outlined in the Facility Addendum to the Subaru Dealer Agreement.

14       200.   Courtesy is entitled to receive restitution from SOA in the amount of the LOC funds SOA

15  received in the amount of $750,000.00.

16       201.   In addition, the Confidential Stipulated Agreement provided the prevailing party would

17  be entitled to recover its reasonable attorneys' fees and costs incurred in an action for the purpose of

18  enforcing or interpreting the terms of the Confidential Stipulated Agreement.   (Confidential Stipulated

19  Agreement at ¶ 38.)   Pursuant to California Civil Code section 1717, the Confidential Stipulated

20  Agreement is a contract that specifically provides that attorneys' fees and costs be awarded to the

21  prevailing party on the contract.

22       202.   The LOC was obtained and issued pursuant to the terms of the Confidential Stipulated

23  Agreement.   SOA is also liable to Courtesy for its attorneys' fees and costs incurred in seeking recovery

24  of the LOC funds.

25       203.   SOA is liable to Courtesy in the amount of $750,000.00.   SOA is also liable for Courtesy's

26  reasonable attorneys' fees and costs in this action concerning the LOC.   SOA is further liable for pre-

27  judgment and post-judgment interest.

28

*[intentionally left blank]*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment as follows and as requested for each cause of action:

A.   For an award of Courtesy's attorneys' fees and costs incurred in the underlying Board proceeding and in this action in the amount of $258,385.85 as of August 24, 2023.

B.   For an award of Courtesy's further attorneys' fees and costs incurred in seeking the award of its attorneys' fees and costs incurred in the underlying Board proceeding in an amount to be determined at the time of the award.

C.   For an award of Courtesy's damages as a result of SOA calling the LOC in the amount of $750,000.00.

D.   For an award of Courtesy's attorneys' fees and costs incurred in seeking recovery of the LOC fund in an amount to be determined at the time of the award.

E.   For an award of punitive damages up in an amount equal to nine (9) times Courtesy's actual damages.

F.   For an award of pre-judgment interest at the legal rate.

G.   For an award of post-judgment interest at the legal rate.

H.   For such and other further relief as this Court deems just and proper.

Dated:  October 2, 2023                          LAW OFFICES OF
                                                 GAVIN M. HUGHES


                                                 By_ /s/ *Gavin M. Hughes*
                                                 Gavin M. Hughes
                                                 Robert A. Mayville, Jr.
                                                 Attorneys for Plaintiffs

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify on October 2, 2023, I electronically filed the redacted version of the foregoing

3

document with the Clerk of Court using the CM/ECF system and I served a copy of the foregoing

4

pleading on all counsel for all parties, via the CM/ECF system and/or mailing the same by United States

5

Mail, properly addressed, and first-class postage prepaid, to all counsel of record on the matter.  The

6

unredacted version was not served through the Court's CM/ECF system and was instead served by

7

electronic mail to counsel for parties as previously agreed to between the parties.

8

9

10

/s/ Robert A. Mayville, Jr.

11

Robert A. Mayville Jr.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

EXHIBIT 1

1   Lisa M. Gibson, Bar No. 194841
    Crispin L. Collins Bar No. 311755
2   NELSON MULLINS RILEY & SCARBOROUGH
    19191 South Vermont Ave., Suite 900
3   Torrance, California  90502
    Telephone:     424.221.7403
4   Facsimile:      424.221.7405
    Email:          lisa.gibson@nelsonmullins.com
5               crispin.collins@nelsonmullins.com

6

    Attorneys for Respondent
7   Subaru of America, Inc.

8                            STATE OF CALIFORNIA

9                       NEW MOTOR VEHICLE BOARD

10

11
    In The Matter Of The Protest Of:          Protest No. PR-2570-18
12
    COURTESY AUTOMOTIVE GROUP,
13  INC., dba COURTESY SUBARU OF            **[PROPOSED] STIPULATED**
    CHICO,                                  **DECISION AND ORDER OF THE**
14                                          **BOARD RESOLVING PROTEST AND**
                          Protestant,       **LAWSUIT**
15
                  v.
16
    SUBARU OF AMERICA, INC.,
17                        Respondent.

18
          Pursuant to Sections 3050.7, 3060, 3061, 3066, and 3067 of the California Vehicle Code,
19
    Respondent Subaru of America, Inc. ("SOA" or "Respondent"), on the one hand, and Protestant
20
    Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico ("Chico" or "Protestant"), on the
21
    other hand, hereby enter into the following agreement (the "Stipulated Decision") resolving the
22
    above-captioned Protest.  This Stipulated Decision is dated March 20, 2019.
23
          SOA and Chico (the "Parties") hereby request that the California New Motor Vehicle Board
24
    (the "Board") issue an order approving the Stipulated Decision as a Stipulated Decision and Order
25
    of the Board, and that the Board reserve jurisdiction solely to enforce its Order if requested by
26
    either party hereto.
27

28

    ─────────────────────────────────────────────────────────────
    EXHIBIT 1 TO CONFIDENTIAL AGREEMENT TO STIPULATED DECISION AND ORDER OF THE BOARD, FILED UNDER SEAL

**I.**

**THE PARTIES**

1.    Protestant Chico is a new motor vehicle dealer licensed by the California Department of Motor Vehicles.  Chico is a corporation organized and existing under the laws of California, with its principal place of business at 2520 Cohasset Road, Chico, California 95973.  Its principal place of place is the location of its BMW, Buick, Cadillac and GMC dealerships. Chico operates as a SOA dealership pursuant to a Subaru Dealer Agreement, executed on or about May 5, 2015 and as amended on December 1, 2017, December 21, 2017 and May 8, 2018 (the "Dealer Agreement").  Chico is represented in this matter by Gavin M. Hughes, Law Offices of Gavin M. Hughes, 3436 American River Dr., Ste. 10 Sacramento, CA  95864.

2.    Respondent SOA is a distributor of new motor vehicles, and holds an occupational license issued by the California Department of Motor Vehicles.  It distributes new SOA vehicles to dealers located in California, as well as in other states.  SOA is a corporation organized and existing under the laws of New Jersey, with its principal place of business at One Subaru Drive, Camden, New Jersey 08103 and is authorized to do business in the State of California.  SOA is represented in this matter by Lisa M. Gibson and Crispin L. Collins of Nelson, Mullins, Riley & Scarborough, 19191 South Vermont Ave., Suite 900, Torrance, California 90502.

**II.**

**FACTUAL AND PROCEDURAL BACKGROUND**

3.    The Dealer Agreement authorized, among other things, Chico to sell Subaru vehicles and other authorized products ("Subaru Products") at 2562 Cohasset Road, Chico, California 95973 ("Sales Premises") and to service Subaru Products and maintain its parts and general office operations at 2520 Cohasset Road, Chico, California 95973  ("Service Premises", collectively "the Dealership Premises").  Section 11 of the Dealer Agreement identifies the Dealership Premises as the only authorized locations and also identifies the specific use of each facility as either the Sales Premises or the Service Premises.

4.    On April 30, 2015, Chico entered into a Subaru Dealership Sign Lease Agreement ("Sign Lease Agreement") with Subaru Leasing Corp ("SLC") a wholly-owned entity of SOA.

1   Pursuant to the Sign Lease Agreement, Chico leases two signs from SLC.  SLC owns and continues

2   to own these signs to this date.  Chico agreed pursuant to protect the signs from "damage, defacing

3   or marring."  Chico also agreed that it would not allow any "banners,  signs, lights or materials of

4   any kind whatsoever" to be affixed to the signs owned by SLC.

5          5.     On or about August 7, 2018, in a face-to-face meeting at the Dealership Premises,

6   Chico informed Mr. Scott Farabee, Zone Director of the San Francisco Zone for SOA,  and SOA

7   learned for the first time of Chico's pending intent to relocate its Subaru sales operations from the

8   Sales Premises to an authorized location.

9          6.     During that meeting and by letter dated August 9, 2018, Chico was notified that the

10  relocation of the Sales Premises was unauthorized, without SOA's consent, and would constitute a

11  material breach of the Dealer Agreement.  In the August 9th letter, SOA made a formal demand that

12  the Subaru operations remain at the Sales Premises or SOA would be forced to seek any remedies

13  available to it under the terms of the Dealer  Agreement and relevant California law, up to and

14  including termination of the Dealer Agreement.

15         7.     On or about August 11, 2018, Chico vacated the Sales Premises and moved all

16  Subaru sales operations to 2522 Cohasset Road, Chico, California 95763 (the "Unauthorized

17  Premises".)

18         8.     Upon information and belief, during 2016 the property for the Sales Premises was

19  sold to another entity directly or indirectly owned or controlled by Mr. Brian Bowen, the principal

20  operating the competing Nissan and Hyundai dealerships.  Sometime after this sale, Chico's lease

21  for the Sales Premises was on a month-to-month basis having expired long before the August 7,

22  2018 meeting with SOA representatives informing them that Chico was relocating to the

23  Unauthorized Premises.

24         9.     Chico had the obligation to maintain a lease for the Sales Premises and the failure

25  to do so constituted a material breach under Section 17.1.8 of the Dealer Agreement.

26         10.    The Sales Premises are currently occupied by a Hyundai dealer and are under

27  renovation for the purposes of operating a Hyundai dealership.  The Subaru constellation logo and

28  name have been removed from the fascia of the Sales Premises.  They have been replaced with the

1    Hyundai designation.  The Subaru pylon sign in front of the Sales Premises has been obliterated

2    and covered with a banner or "shroud" bearing the Hyundai trademarks over the Subaru name and

3    logo.

4            11.    The Dealer Agreement, among other things, authorized Chico to use any trademark,

5    service mark, collective mark, certification mark, logo, insignia, product designation, slogan,

6    fictitious name, or trade name now or at any time adopted, used or claimed by SOA ("Marks") and

7    anything similar which is likely to be confused with or contains a significant part of element of any

8    such Mark.

9            12.    Under Section 13(c) of the Dealer Agreement, it provides that the consent of

10    SOA is required for the relocation of Chico's Subaru operations to any location other than

11    the Dealership Premises.

12            13.    SOA's written decision to withhold consent was promptly communicated by

13    SOA to Chico in the August 9, 2018 letter.

14            14.    On or about August 13, 2018, SOA provided Chico with notice of SOA's

15    intent to terminate the Dealer Agreement (the "NOT") for its unauthorized relocation of the

16    dealership facilities to the Unauthorized Location;

17            15.    In response to the NOT on or about August 22, 2018 and pursuant to section

18    3060 of the California Vehicle Code, Chico filed a protest with the New Motor Vehicle

19    Board of the State of California ("Board"), No. PR- 2570-18 (the "Protest");

20            16.    In addition, SOA filed a lawsuit in the Eastern District of California, Case

21    No. 2-18-cv-02778-KJM-KJN, (the "Lawsuit");

22            17.    SOA and Chico have negotiated the issues between them and desire to resolve the

23    Protest and Lawsuit without the need for further litigation.

24                                            **III.**

25                                      **<u>STIPULATION</u>**

26            The Parties have entered into a confidential agreement (the "Confidential Agreement") to

27    resolve the above-captioned Protest and Lawsuit.  A true and correct copy of the Confidential

28    Agreement is attached hereto as Exhibit 1.

18.    The Parties hereby request that the Board issue an order approving the Confidential Agreement and its terms as a Stipulated Decision and Order of the Board, and that the Board reserve jurisdiction solely to enforce its Order in the future if requested by either party hereto.

19.    The Parties further request that the Board issue an order maintaining the Confidential Agreement and its terms and conditions under confidential seal, so that they are not disclosed or made available to any third parties, including but not limited to, members of the public, dealer members of the Board or the motor vehicle industry.    This request for confidentiality of compromise and settlement documents promotes the public policy of encouraging early, efficient settlement of disputes, and helps to conserve judicial and administrative resources.  This request for confidentiality is also consistent with the provisions of Sections 6254.5 (e) and 6276.28 of the Government Code.

**IN WITNESS WHEREOF, the Parties have entered into this Stipulated Decision and Order as of the date last signed below.**

DATED:  3/19/19 , 2019            COURTESY AUTOMOTIVE GROUP, INC. DBA
                                  COURTESY SUBARU OF CHICO

                                  By_____

                                  Print Name:  Shahram Mihanpajooh

                                  Title:  President

DATED:  March 20 , 2019           SUBARU OF AMERICA, INC.

                                  By Anthony J. Graziano

                                  Print Name: Anthony J. Graziano

                                  Title:  Vice President, Western Region

1    **APPROVED AS TO FORM AND SUBSTANCE:**

2

3    DATED: _March 20_, 2019          NELSON, MULLINS, RILEY & SCARBOROUGH

4                                      By _____

5                                          Lisa M. Gibson
                                           Crispin L. Collins
6                                          Attorneys for Subaru of America, Inc.

7

8    DATED: _March 19_, 2019          LAW OFFICES OF GAVIN M. HUGHES

9

10                                     By _____

11                                         Gavin M. Hughes, Esq.
                                           Attorneys for Courtesy Automotive Group,
12                                         Inc. dba Courtesy Subaru of Chico

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2  Lisa M. Gibson, Bar No. 194841
   Crispin L. Collins, Bar No. 311755
3  NELSON MULLINS RILEY & SCARBOROUGH
   19191 South Vermont Ave., Suite 900
4  Torrance, California  90502
   Telephone:    424.221.7403
5  Facsimile:    424.221.7405
   Email:        lisa.gibson@nelsonmullins.com
6                crispin.collins@nelsonmullins.com

7  Attorneys for Respondent
   Subaru of America, Inc..

8

9                      STATE OF CALIFORNIA

10                 NEW MOTOR VEHICLE BOARD

11

12  In The Matter Of The Protest Of:          Protest No. PR-2570-18

13  COURTESY AUTOMOTIVE GROUP,
    INC., dba COURTESY SUBARU OF
14  CHICO,

15                        Protestant,         **EXHIBIT 1 TO CONFIDENTIAL
                                              AGREEMENT TO STIPULATED
16           v.                               DECISION AND ORDER OF THE
                                              BOARD, FILED UNDER SEAL**
17  SUBARU OF AMERICA, INC.,
                          Respondent.
18

19

20         Pursuant to Sections 3050.7, 3060, 3061, 3066, and 3067 of the California Vehicle Code,

21  Respondent Subaru of America, Inc. ("SOA" or "Respondent"), on the one hand, and Protestant

22  Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico  ("Chico" or "Protestant"), on the

23  other hand, hereby enter into the following agreement (the "Stipulated Decision") resolving the

24  above-captioned Protest.  This Stipulated Decision is dated March **20**, 2019.

25         SOA and Chico (the "Parties") hereby request that the California New Motor Vehicle Board

26  (the "Board") issue an order approving the Stipulated Decision as a Stipulated Decision and Order

27  of the Board, and that the Board reserve jurisdiction solely to enforce its Order if requested by

28  either party hereto.

# I.

## THE PARTIES

1.    Protestant Chico is a new motor vehicle dealer licensed by the California Department of Motor Vehicles.  Chico is a corporation organized and existing under the laws of California, with its principal place of business at 2520 Cohasset Road, Chico, California 95973. Its principal place of place is the location of its BMW, Buick, Cadillac and GMC dealerships. Chico operates as a SOA dealership pursuant to a Subaru Dealer Agreement, executed on or about May 5, 2015 and as amended on December 1, 2017, December 21, 2017 and May 8, 2018 (the "Dealer Agreement").  Chico is represented in this matter by Gavin M. Hughes, Law Offices of Gavin M. Hughes, 3436 American River Dr., Ste. 10 Sacramento, CA  95864.

2.    Respondent SOA is a distributor of new motor vehicles, and holds an occupational license issued by the California Department of Motor Vehicles.  It distributes new SOA vehicles to dealers located in California, as well as in other states.  SOA is a corporation organized and existing under the laws of New Jersey, with its principal place of business at One Subaru Drive, Camden, New Jersey 08103 and is authorized to do business in the State of California.  SOA is represented in this matter by  Lisa M. Gibson and Crispin L. Collins of Nelson, Mullins, Riley & Scarborough, 19191 South Vermont Ave., Suite 900, Torrance, California 90502.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

3.    The Dealer Agreement authorized, among other things, Chico to sell Subaru vehicles and other authorized products ("Subaru Products") at 2562 Cohasset Road, Chico, California 95973 ("Sales Premises") and to service Subaru Products and maintain its parts and general office operations at 2520 Cohasset Road, Chico, California 95973  ("Service Premises", collectively "the Dealership Premises").  Section 11 of the Dealer Agreement identifies the

Dealership Premises as the only authorized locations and also identifies the specific use of each facility as either the Sales Premises or the Service Premises.

4.      On or about August 11, 2018, Chico vacated the Sales Premises and moved all Subaru sales operations to 2522 Cohasset Road, Chico, California 95763 (the "Unauthorized Premises".)

5.      On or about August 13, 2018, SOA provided Chico with notice of SOA's intent to terminate the Dealer Agreement (the "NOT") for its unauthorized relocation of the dealership facilities to the Unauthorized Location;

6.      In response to the NOT on or about August 22, 2018 and pursuant to section 3060 of the California Vehicle Code, Chico filed a protest with the New Motor Vehicle Board of the State of California ("Board"), No. PR- 2570-18 (the "Protest");

7.      In addition, SOA filed a lawsuit in the Eastern District of California, Case No. 2-18-cv-02778-KJM-KJN, (the "Lawsuit");

8.      SOA and Chico have negotiated the issues between them and desire to resolve the Protest and Lawsuit without the need for further litigation.

### III.

### SETTLEMENT

In view of the foregoing, it is hereby stipulated by and between the Parties to this Confidential Agreement, and the Board finds, as follows:

9.      Subject to its full and timely compliance with the conditions specified below ("Conditions"), Chico shall continue to operate its SOA dealership operations unless and until its Dealer Agreement is terminated pursuant to the terms of this Confidential Agreement or pursuant to a new NOT issued on factual circumstances and factual grounds separate from and in addition to the facts and grounds which are currently the subject of the Protest.

10.    Voluntary Dismissal of Lawsuit.   Upon issuance of the Order by the Board of this Stipulated Decision, counsel for SOA shall file with the court for the Eastern District of California a Request for Dismissal of the Lawsuit, and shall copy counsel for Chico with same.

11.    Attorney Fees. Both Parties acknowledge and agree that each party is solely responsible for its own attorneys' fees, costs and expenses in all circumstances, including the Lawsuit and the Protest.

12.    Withdrawal of NOT. SOA shall withdraw the NOT and shall forbear from issuing a new NOT to Chico for a period of four (4) months from the date of this Stipulated Decision.  SOA does not waive any right to issue a new NOT to Chico after that time, if it is deemed warranted by SOA.  Other than as set forth herein, SOA expressly does not waive its right to raise any additional breaches of the Dealer Agreement, or issue any NOT or Notice To Cure pertaining to such breaches at a later time.

13.    Acquisition of Temporary Property and Renovation of Temporary Subaru Sales Facility.   Chico has executed a lease of the property identified as 896 East Avenue, Chico, California 95926 (the "Temporary Property"), for a total term of time necessary   (the "Lease") until the facility at the New Location is completed and approved by SOA as set forth herein.   In return, SOA will, in a new Subaru Dealer Agreement to be executed by the Parties concurrently herewith, consent to the establishment of temporary sales operations to be located at the Temporary Property, subject to the terms and conditions set forth below.

14.    Chico agrees to remodel the facility located on the Temporary Property to meet SOA's requirements, in consideration of the available space, as set forth in the SOA Facilities Addendum, to be attached to the new Subaru Dealer Agreement which will be executed by the Parties concurrently herewith.   A relocation documentation package must be completed with SOA/Western Region and all requirements met and approved **before** Chico can begin operating in Temporary Property.

15.    Concurrently with the execution of this Confidential Agreement and the completion, submission and approval of any SOA-required documentation by Chico, SOA will offer, and Chico agrees to execute a new Subaru Dealer Agreement and Standard Provisions

1   ("Dealer Agreement") in a form acceptable to SOA, which shall approve Chico sales operations

2   at the Temporary Property at 896 East Avenue, Chico, California 95926, subject to the conditions

3   set forth in this Confidential Agreement.  The Dealer Agreement shall include a Facility

4   Addendum, which shall include the following provisions related to the Temporary Property

5   approved operations of Chico:

6           a)      Chico will provide to SOA (i) a fully executed copy of the Lease for a period of

7   time that will cover (by way of the Lease or an option to lease) the completion of the Permanent

8   Facility and, (ii) will provide written evidence to SOA that Chico has obtained the right to occupy

9   the Temporary Property, both prior to the execution of this Confidential Agreement.

10          b)      Within 90 days of the execution of this Confidential Agreement and the dismissal

11  of the Lawsuit, Chico will provide a a $750,000 letter of credit or performance bond to insure

12  Chico's performance on its commitment to the new ground-up facility on the New Location in

13  Chico, CA ("Permanent Facility".) In good faith, SOA will refund the $200,000 performance

14  funds that Chico previously provided to SOA. These funds will be returned to Chico

15  contemporaneous upon issuance of letter of credit or performance bond.

16          c)      An initial visual inspection of the Proposed Temporary Facility must be scheduled

17  and performed by the San Francisco Zone, any corrections and modifications stated by the San

18  Francisco Zone must be completed and the Proposed Temporary Facility must have SOA's final

19  approval before Chico commences operations there. The Temporary Property is presently

20  unacceptable to conduct Subaru operations. In order to obtain SOA's approval, the building's

21  interior paint, furniture, ceiling tiles (if applicable), floor tiles, customer lounge amenities, etc.

22  must comply with the Subaru Finish Schedule and brand standards.  Additionally, the Temporary

23  Property must have a Subaru customer waiting lounge that is not walled off, at least 3 large

24  graphic lifestyle murals displayed in showroom, fixtures and space for customer refreshments and

25  display mounting of lifestyle accessories, i.e., kayak and bike carrier from ceiling.  The Temporary

26  Property must also have all approved Subaru signage.  This Temporary Property, will not be

27  considered a Subaru Signature Facility even if approved after Chico's completion of the above-

28  referenced renovations. Which Signature Facility standards will and will not be required is in

1  SOA's sole discretion. Chico agrees that no other line makes will be allowed to utilize the

2  Temporary Property at any time that Subaru occupies that location. The San Francisco Zone's

3  final inspection must occur and conclude that the required improvements are complete no later

4  than 120 days from the date of execution of this Confidential Agreement and dismissal of the

5  Lawsuit.

6       d)     A Facility Addendum will be required as part of the relocation documentation

7  package for the Temporary Property and will be part of the Subaru Dealer Agreement for the

8  Temporary Property. This Addendum will include benchmarks for the completion of the

9  permanent facility that Chico has committed to build at the New Location (as defined below.)

10       e)     Chico will commence remodelling of the facility at the Temporary Property upon

11  execution of this Confidential Agreement;

12       f)     Chico will complete remodelling of the facility on the Temporary Property by no

13  later than Sixty (60) days after execution of this Confidential Agreement; and

14       g)     Chico will occupy and commence operations at the Temporary Property upon

15  completion of the remodelling, which shall be by no later than Fifteen (15) days following

16  completion of the remodeling of the Temporary Facility.

17       h)     Chico agrees that the Subaru facility at the Temporary Property must satisfy

18  SOA's requirements and be approved in writing to be satisfactory to SOA at the time that

19  remodelling is completed and prior to Chico's occupancy and commencement of any dealership

20  operations thereat.

21       16.     New Location. Chico's new Subaru vehicle and used vehicle sales, service and

22  parts operations will relocate permanently to one of the APN parcels (APN: 006-400-061 APN:

23  006-400-063, 006-400-064, 006-400-065 and 006-400-066, the "New Location".) With respect to

24  the New Location, Chico agrees to construct the facility to meet or exceed the 2023 SOA

25  Signature Facility Image standards, and the Minimum Standards and Operating Guidelines for

26  Dealership Operations taking place at the New Location.  The Dealer Agreement shall include the

27  following provisions:

28

a)     Chico will submit completed construction drawings and site plans to SOA for its prior written approval by June 1, 2019.  Such plans will be for a facility which shall comply with Subaru's projected Signature Image Facility Standards for a dealership facility, (Exhibit A hereto), and be approved in advance of construction in writing by SOA.

b)     Chico will obtain necessary zoning, permits and necessary governmental approvals to provide for the construction of the permanent facility at the New Location as soon as practicable, but in any event on or before December 1, 2019.

c)     Chico will commence construction of the facility on or before January 31, 2020.

d)     Chico will complete construction of the facility and obtain all necessary licenses and permits as to the Subaru sales facility at the New Location by January 31, 2021 and

e)     Chico will obtain a Final Review Verification letter from Feltus Hawkins for compliance upon completion of the remodelling, which Verification shall be provided by Feltus Hawkins by March 1, 2021.

f)     Chico will complete the permanent facility at the New Location by no later than January 31, 2021.

17.     The parties agree that compliance with the terms of this Confidential Agreement and execution by both parties of a Subaru Dealer Agreement with Facility Addendum, containing the milestones for completion of construction and renovations to both the Temporary Property and the New Facility as set forth herein are each separately required according to the timetables set forth in this Confidential Agreement, and completion of construction and renovations for one property/facility does not excuse the need to complete the construction/renovation of the other and that SOA may seek any and all available legal and equitable remedies for any breach of this Confidential Agreement and/or the Dealer Agreement.

18.     Delay Based On Government Action or Inaction.  If, notwithstanding Chico's commercially reasonable best efforts, the necessary approval of a governmental entity cannot be obtained in order to timely satisfy the deadlines set forth herein, solely for reasons beyond the control of Chico, Chico shall, upon first learning of such delay, immediately notify SOA's SFO Zone representative in writing, and shall request the minimum extension of time necessary to

1  complete the actions set forth herein.  SOA representatives are and shall be authorized by Chico

2  to verify these facts (or any facts deemed relevant by SOA in its sole discretion) directly with any

3  governmental entity representatives, and SOA shall retain all rights and remedies as set forth

4  herein.

5        19.    If SOA verifies that the delay is caused by the governmental entity and not by

6  Chico, SOA shall agree to extend the affected deadlines set forth above, on a weekly basis, until

7  the governmental-caused delay is not a factor.  Chico shall provide weekly reports to SOA

8  regarding the status of any governmental delay and the progress, if any, being made on the

9  elimination of the delay and expected duration of the remaining delay.  However, should SOA

10  determine, that all or part of the delay is caused by Chico or its agents, vendors or employees, or

11  should Chico fail or refuse to promptly provide either the first notice or the weekly reports to

12  SOA or not allow SOA to verify such facts directly with any governmental entity representative,

13  then SOA shall not grant any extension (or any further extension), and the deadlines (either as set

14  forth herein or as previously extended by SOA) shall remain in place.

15        20.    <u>No Obligation to Provide Extensions and Force Majeure</u>.  Chico also understands

16  and agrees that SOA has no obligation to extend any time periods or deadlines set forth in this

17  Confidential Agreement, whether or not Chico is unable to comply due to causes within or

18  beyond Chico' control, and further, that any extension of time and the duration of any such

19  extension are made, if at all, solely at SOA's discretion, except as expressly set forth herein and

20  in Paragraph 18.  Any such extension shall be valid only if made in writing, signed by then-

21  current Western Regional Manager of SOA and delivered to Chico.

22        21.    Notwithstanding the provisions of this section, neither party shall be in default or

23  liable for any delay or failure of compliance with this Confidential Agreement to the extent due to

24  any future event which is beyond the control of the defaulting party including, without limitation,

25  landlord approval, fire, flood, hurricane, tornado, earthquake, war, acts of terrorism, embargo, riot

26  or an unforeseeable intervention of any government authority (excluding delays in obtaining

27  permits and licenses), but excluding transport difficulties or strike, lock out or other labor

28  disputes of Chico or third parties, provided the party suffering such delay or failure of compliance

immediately notifies the other party of such delay or failure of compliance.  Should such an event of *force majeure* take place, SOA shall extend the time periods set out in Paragraph 16 to this Confidential Agreement to allow for delays incurred as a result of the event of *force majeure*. Failure to obtain landlord approval for any change contemplated herein shall not be excused by the terms of this paragraph and Chico shall immediately notify SOA of any such failure to obtain landlord approval.

22.     <u>Eligibility for SOA Remodelling Funds</u>.  Chico is eligible to obtain funds from SOA if there is a facility funding program in place at the time of execution of this Confidential Agreement and if Chico qualifies under the terms of said facility funding program. Additionally, the remodelling contemplated by this Confidential Agreement must be completed according to its terms and within a time period and in a manner meeting the eligibility requirements for the applicable SOA program, if any.  The amount of such funds and the timing of their disbursement shall be determined by the terms of the SOA program rules.

23.     <u>Notices</u>.  All notices, requests or other communications hereunder shall be in writing and, except as otherwise expressly provided in this Confidential Agreement, shall be deemed to have been duly given when transmitted by facsimile or e-mail or by a nationally recognized overnight courier service addressed to the Parties' respective addresses set forth below, as such addresses may be modified from time to time on written notice as provided herein.

To Chico:
Shahram "Jerry" Mihanpajouh
Courtesy Automotive Group, Inc.
dba Courtesy Subaru of Chico
2520 Cohasset Road
Chico, CA 95973
jpajouh@me.com

With copy to:
Gavin M. Hughes, Esq.
Law Offices of Gavin M. Hughes
3436 American River Drive, Suite 10
Sacramento, California 95864
gavin@hughesdealerlaw.com

1
2
3
4
5
6
7
8
9
10

To SOA :
Al Salazar
Assistant General Counsel
Subaru of America, Inc.
One Subaru Drive
Camden, NJ  08103
asal@subaru.com

With copy to:
Lisa M. Gibson
Crispin L. Collins
Nelson Mullins Riley & Scarborough LLP
Pacific Gateway, Suite 900
19191 South Vermont Ave
Torrance, CA  90502
Lisa.Gibson@nelsonmullins.com
Crispin.Collins@nelsonmullins.com

11    24.    <u>Mutual Release and Covenant Not To Sue</u>. SOA and Chico, each for themselves,

12  their owners, Affiliates and any of their respective members, partners, venturers, stockholders,

13  officers, directors, employees, agents, spouses, legal representatives, successors, and assigns

14  (collectively, the "Related Parties"), hereby release, settle, cancel, discharge, and acknowledges

15  to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs,

16  expenses, liens, actions, and causes of action of every kind and nature whatsoever, whether

17  known or unknown, foreseen or unforeseen, suspected or unsuspected, which either Party or

18  Related Parties or anyone claiming through or under them currently has against the other Party or

19  Related Parties arising out of or relating to the  Protest, Lawsuit or any issues in connection

20  therewith, provided that the foregoing releases shall not extend to:

21    a)    Valid, non-false and unpaid claims: (a) any vehicle sale incentives currently owing

22  to Chico; (b) any amounts currently owing to Chico in its open account (or equivalent); (c) any

23  advertising incentives or co-op funds currently due and owing to Chico; (d) any credits due SOA

24  from Chico based on transactions in the ordinary course of business posted or to be posted to the

25  open account or Chico' floor plan credit line or otherwise due and owing by Chico to SOA,

26  including but not limited to (1) valid warranty and incentive chargebacks and adjustments, (2)

27  amounts due SOA for the purchase of vehicles, parts or accessories, or for special tools, and (3)

28  amounts due to SOA or third parties for training, publications, subscriptions, data processing or

1  other goods or services that normally post to the open account;  (4) enforcement of this

2  Confidential Agreement; and (5) any dispute over the failure or refusal of SOA to pay Chico any

3  amounts due or alleged to be due under any SOA Program.

4      b)      Product liability or service-related claims alleging a defect in a vehicle

5  manufactured or distributed by SOA or service or inspection provided on a vehicle by Chico and

6  other claims for indemnity by either party under the provisions of the Subaru Dealer Agreement.

7      c)      The Parties hereby acknowledge, understand and agree that, except as provided

8  above and as to any claims arising from a claimed breach of this Confidential Agreement, the

9  foregoing release extends to, and is expressly intended by them to extend to, all claims of every

10  nature and kind whatsoever, known or unknown, suspected or unsuspected.  In this regard, each

11  of the Parties hereby expressly waives the benefit, if any, to it of Section 1542 of the California

12  Civil Code, which reads as follows:

13  **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE**

14  **CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT**

15  **THE TIME OF EXECUTION OF THE RELEASE, WHICH IF KNOWN BY HIM OR**

16  **HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH**

17  **THE DEBTOR."**

18      d)      The Parties expressly assume the risk that after the execution and delivery of this

19  Confidential Agreement they may discover facts which are different from those facts which they

20  believed to be in existence on the date hereof.  Any such discovery shall not affect the validity or

21  effectiveness of the release contained herein.

22      25.    Buy/Sell Deadline. Subject to potential delays and extensions as set forth above,

23  should Chico either (a) not complete the remodeling and construction and occupancy of the

24  permanent facility at the New Location on or before January 31, 2021; or  (b) fails to meet any

25  other Condition or Deadline set forth in this Confidential Agreement,  as set forth above; or (c) not

26  timely produce a Buy/Sell Application Package involving all of its stock or assets, herein by close

27  of business on the Buy/Sell Deadline, as defined herein below, then SOA shall have the right to

28  issue a notice of non-compliance with the terms of this Stipulated Decision and Order.

a)      The Buy/Sell Deadline shall be calculated as follows: If Chico notifies SOA that it desires to sell its SOA dealership assets, in writing and in the matter set forth in Paragraph 23, Chico shall have six (6) months to submit a complete Buy/Sell Application Package, as defined herein.

b)      SOA reserves the right at any time following Chico's failure to comply with the foregoing to issue a notice of non-compliance with the Conditions of this Confidential Agreement, effective 60 days following its receipt by Chico. SOA will provide written notice to Chico of any perceived non-compliance providing at least 30 days to correct or rebut any alleged non-compliance, prior to invoking the Board's jurisdiction to request an order of termination pursuant to the stipulated decision and order.

c)      The Parties agree that Chico's failure to comply with any of the Conditions herein shall constitute good cause to terminate the SOA Dealer Agreement between them under Vehicle Code sections 3060 and 3061.

d)      Post-termination provisions of the Dealer Agreement remain in effect, including: i) Chico would remain liable to SOA for any balance owed on its Parts Account and SOA would remain liable to Chico for any credit balance due Chico on the Parts Account; ii) SOA would honor a repurchase request from Chico for the eligible SOA vehicles and products in the manner provided for in the Dealer Agreement; and iii) Chico shall remove at its expense or permit SOA to remove at Chico's expense, all SOA signs and trademarks at the Chico facilities. Chico acknowledges and agrees that either it owns the dealership facilities and grants SOA permission to remove the subject signs and trademarks or that it will obtain written permission from the land owner for SOA to do so.

26.      Alternatively to its compliance with the terms and conditions in a timely manner and for the periods set forth above, the Parties agree that SOA will permit Chico to present SOA with a Buy/Sell Application Package, prior to the Buy/Sell Deadline, and under the terms and conditions as set forth herein. The Buy/Sell Deadline period shall be tolled upon submission of a completed buy-sell and shall resume upon receipt of a written rejection.

27. Any such proposed buy/sell must satisfy the following requirements, or be subject to automatic rejection by SOA ("Buy/Sell Application Package"):

a) The Asset Purchase Agreement ("APA") entered into by Chico must be with an entity or persons not owned or controlled, in whole or in part, by the current owners of Chico and/or their family members;

b) The APA must provide for a closing within 60 days of approval of the proposed transferee by SOA;

c) The proposed transferee must agree to abide by the terms of a SOA Dealer Agreement as presented to it by SOA and agree to provide an acceptable facility in accordance with the requirements and timeline as reasonably determined by SOA;

d) The proposed transferee must agree to operate in a market acceptable to SOA, and at a location acceptable to SOA in its sole discretion.

e) Failure to close the transfer of the SOA dealership assets within 60 days of approval by SOA, which APA was timely submitted during the period created by Paragraph 11(g) of this Confidential Agreement, for any reason will result in the immediate issuance of a notice of non-compliance with the Conditions of this Confidential Agreement.

f) As modified herein, Chico shall have the right to submit and SOA reserves the right to approve or reject any proposed Buy/Sell Application Package pursuant to the provisions of the California Vehicle Code and other applicable law. Should SOA reject the proposed Buy/Sell Application Package Chico's remedies are limited to those set forth herein;

g) Should either SOA reject or should Chico withdraw the first Buy/Sell Application Package, Chico shall have the right to submit at least one other Buy/Sell Application Package, in compliance with the terms set forth above, pursuant to the following terms and conditions: if Chico submits a Buy/Sell Application Package prior to the close of business on the Buy/Sell Deadline, SOA shall have 60 calendar days from the date of SOA's receipt to approve or reject the final Buy/Sell Application Package. However, if Chico fails to submit a Buy/Sell Application Package by the Buy/Sell deadline, SOA reserves its right to issue the notice of non-compliance with conditions of this Confidential Agreement.

h)    The Parties hereto acknowledge that, under California law, the New Motor Vehicle Board does not have jurisdiction to adjudicate claims regarding buy/sell rejections and that such claims are adjudicated in the courts.

i)    Under no circumstances shall SOA be required to consider more than one Buy/Sell Application Package from Chico at the same time. Submission of a subsequent Buy/Sell Application Package at any time prior to the Buy/Sell Deadline, whether approved or rejected or not yet acted upon by SOA, shall be considered to be a simultaneous withdrawal of any previous Buy/Sell Application Package by Chico, and

j)    Chico will provide or has already provided SOA with a buy/sell assist letter for the purposes of facilitating Chico in locating potentially qualified transferees.

28.    Notice of Non-Compliance.    If SOA contends that there is a failure by Chico to comply with any or all of the Conditions set forth herein, SOA shall, within fifteen (15) business days of its awareness of such failure, serve a notice on Chico in the manner set forth in paragraph 23, setting forth its alleged non-compliance with the Conditions, with a courtesy copy to the Board. Chico shall have fifteen (15) days from receipt of that notice to file a written request with the Board asking it to appoint an Administrative Law Judge ("ALJ") to hold a hearing on the allegations made in the notice of non-compliance and to make the final determination of whether there has been a material failure to comply with the Conditions by Chico.  Chico shall serve a copy of such written request in the manner set forth in paragraph 23 on SOA.

a)    If Chico fails to file such request in accordance with the deadline set forth in this Paragraph, Chico shall terminate automatically as a SOA dealer without any recourse or right of appeal to any individual, forum, or entity of any kind or nature whatsoever, including, without limitation, the Board, any state or federal agency, any state or federal court, or any other governmental, judicial, quasi-judicial, or private entity or forum, in any proceeding challenging the termination or seeking damages or relief of any nature whatsoever arising out of the termination.

b)    The Board will have continuing jurisdiction over this matter solely for the purpose of appointing an ALJ to determine, in the event of a timely request by Chico, whether there has been a failure by Chico to materially comply with any of the Conditions of this Confidential

1   Agreement. Any such timely request will be submitted for binding, non-appealable determination

2   to an ALJ appointed by the Board on an expedited basis, and in no event later than thirty (30) days

3   after the filing by Chico of the request.

4         c)     "Binding, non-appealable" means that each Party adopts the ALJ's decision as a

5   final, binding settlement of the matter at issue and waives any and all recourse, right of action, or

6   appeal with respect to the resulting ruling and/or any resulting termination, to any individual,

7   forum, or entity of any kind or nature whatsoever, including, without limitation, any state or federal

8   agency, any state or federal court, or any other governmental, judicial, quasi-judicial, or private

9   entity or forum. The Parties expressly waive any claim that the Board itself should consider the

10   ALJ's decision, should reach its own decision, or otherwise involve itself in resolving the issue or

11   dispute.

12         d)     The ALJ's decision will be issued expeditiously after the close of evidence. If the

13   ALJ determines that Chico has materially failed to comply with any of the Conditions set forth

14   herein, the termination shall be effective immediately upon issuance of the ALJ's decision and no

15   further conditions may be imposed to require continuation of the relationship between SOA and

16   Chico. If the ALJ determines that Chico has complied with the Condition or Conditions in question,

17   the provisions of this Confidential Agreement that take effect in the event of compliance with the

18   Condition or Conditions in question are effective immediately upon issuance of the ALJ's decision.

19         29.     The Conditions set forth in this Confidential Agreement, and each of them, are fair,

20   reasonable and in the best interests of Chico, SOA, and the consuming public. Chico agrees and

21   acknowledges that this Confidential Agreement and the provisions herein do not violate the

22   provisions of the California Vehicle Code or any other provision of California or Federal law due

23   to the actions and agreements of the Parties as set forth herein, that the each of the Parties has

24   entered and will enter into this Confidential Agreement of its own free will, and agrees not to

25   challenge the legality of this Confidential Agreement under any provision of California or Federal

26   law. Chico understands that SOA is entering into this Confidential Agreement in reliance upon all

27   of Chico's commitments set forth herein. Chico agrees to execute or obtain any documents required

28   by SOA to evidence its agreement as set forth in this paragraph. The Parties agree that they will

1   not do anything to interfere with or inhibit the ability of any other Party to comply with their

2   respective obligations under the terms of the Confidential Agreement.

3         30.    <u>Terms Reasonable Under Economic Conditions</u>.  Chico agrees that both a

4   construction of a facility at the New Location, as well as the remodeling of facility at the

5   Temporary Property, as contemplated under this Confidential Agreement are each reasonable in

6   light of all existing circumstances, including economic conditions and are not prohibited or

7   affected by any provision of applicable law, including without limitation section 11713.13 of the

8   California Vehicle Code.

9         31.    <u>Informed and Voluntary Acts</u>.   The Parties have reviewed this Confidential

10  Agreement with their legal, tax, or other advisors and are fully aware of all of its rights and

11  alternatives.  In executing this Confidential Agreement, each Party acknowledges that its

12  decisions and actions are entirely voluntary and free from any mental, physical, or economic

13  duress. The Parties represent and acknowledge that they have carefully read this Confidential

14  Agreement, that they have not relied upon any oral statements, promises or explanations made by

15  the other party, and that they understand all of its terms.

16        32.    <u>Effectiveness</u>.  This Confidential Agreement shall be deemed executed on the date

17  on which it has been fully and properly executed by both Parties, which date shall be entered in

18  the introductory paragraph of this Confidential Agreement.  If any portion of this Confidential

19  Agreement is held invalid by operation of law, the remaining terms of this Confidential

20  Agreement shall not be affected.

21        33.    <u>Complete Agreement of the Parties</u>.  This Confidential Agreement contains the

22  entire understanding of the Parties relating to the subject matter of this Confidential Agreement

23  and supersedes all prior statements, representations and agreements relating to the subject matter

24  of this Confidential Agreement.  The Parties represent and agree that, in entering into this

25  Confidential Agreement, they have not relied upon any oral or written agreements,

26  representations, statements or promises, express or implied, not specifically set forth in this

27  Confidential Agreement.

28

34.    <u>Interpretation</u>.  Each Party and its counsel have reviewed this Confidential Agreement and the rule of construction that any ambiguities are to be resolved against the drafter will not be employed in the interpretation of this Confidential Agreement.

35.    <u>Non-Assignability</u>.  The Parties agree that this Confidential Agreement shall not be assignable without the express written consent of the non-assigning Party.  Any purported assignment in violation of the preceding sentence shall be void.

36.    <u>No Third-Party Beneficiaries</u>. This Confidential Agreement does not encompass any third-party beneficiaries, and is intended to benefit only the actual parties executing this agreement.

37.    <u>Captions</u>. The caption headings in this Confidential Agreement are for convenience purposes only and shall not be used to interpret or to define any of the terms and provisions of this Confidential Agreement.

38.    <u>Enforcement of Confidential Agreement</u>.   Should it become necessary for any Party to this Confidential Agreement to commence a legal proceeding for the purpose of enforcing or interpreting the terms of this Confidential Agreement, the prevailing Party in such action shall be entitled to recover its reasonable attorneys' fees and costs incurred in prosecuting or defending that action.

39.    <u>Further Assurances</u>.  All the Parties hereto agree to and will cooperate fully with each other in the performance of this Confidential Agreement, and will execute such additional agreements, documents or instruments as may reasonably be required to carry out the intent of the Parties.

40.    <u>Time is of the Essence</u>.  Time is of the essence and the timely satisfaction of the conditions of this Confidential Agreement, and each of them, is necessary in order to provide adequate SOA motor vehicles sales, service, and parts to the consuming public and to provide for the needs of the consuming public, and it would be injurious to the public welfare if the Conditions, and each of them, were not fulfilled by the deadlines set forth in this Confidential Agreement.

41.    <u>Final and Binding</u>. It is the intention of the Parties that this Confidential Agreement be final as between them and that this Confidential Agreement shall resolve this Protest and Lawsuit

1  in its entirety, as well as any claims that could have been brought in connection with the Protest

2  and Lawsuit, and concludes all proceedings before the Board.

3      42.     Entire Agreement. This Confidential Agreement contains the entire agreement and

4  understanding concerning the subject matter hereof between the Parties and supersedes and replaces

5  all prior negotiations, proposed settlements and agreements, written or oral relating to the resolution

6  of the Protest and Lawsuit.  Each of the Parties to this Confidential Agreement acknowledges that

7  no other party to this Confidential Agreement, nor any agent or attorney of any such party, has

8  made any promise, representation, or warranty whatever, express or implied, not contained in this

9  Confidential Agreement, to induce him to execute this Confidential Agreement. Each of the Parties

10  further acknowledges that he is not executing this Confidential Agreement in reliance on any

11  promise representation or warranty not contained in this Confidential Agreement.

12      43.     Days.  Any reference to "days" in this Confidential Agreement is to calendar days.

13  Where the final day to undertake an act contemplated herein falls on a weekend or holiday, the time

14  to perform that act is extended to the next regular business day.

15      44.     Counterparts.  This  Confidential  Agreement  may  be  executed  in  several

16  counterparts, each of which shall be an original as against any party who signed it, and all of which

17  shall constitute one and the same document.

18      45.     Waiver. To the extent any party has, by entering into this Confidential Agreement,

19  waived any right of action, recourse, or appeal, that waiver is intentional, knowing, voluntary, and

20  on advice of counsel of that party's choosing.

21      46.     Advice of Counsel. The Parties to this Confidential Agreement acknowledge that

22  they have signed this Confidential Agreement of their own free will; that they know all of the

23  relevant facts and their rights in connection therewith; that they have received legal advice from

24  attorneys of their choice with respect to the preparation, review and advisability of executing this

25  Confidential Agreement; that they have not been improperly influenced or induced to sign this

26  Confidential Agreement as a result of any act or action on the part of any party or employee, agent,

27  attorney or representative of any other party hereto; and that the terms of this Confidential

28  Agreement have been bargained for after negotiations between the Parties.

47.  <u>Jointly Drafted</u>. Neither party nor their respective counsel shall be deemed the drafter of this Confidential Agreement and instead it shall be deemed to have been jointly drafted, and all provisions hereof shall be construed in accordance with their fair meaning and not for or against either party.

48.  <u>Confidential</u>. The parties Confidential Agreement and each of its terms shall remain strictly confidential between the parties and their respective attorneys, accountants, and necessary financial institutions. Neither the Confidential Agreement nor any part of its terms shall be disclosed to any unauthorized third party without the express written consent of both parties.

49.  <u>Subsequent Waiver</u>. The waiver by any party hereto of the breach of any term, covenant, agreement or condition herein contained shall not be deemed a waiver of any subsequent breach of the same or any other term, covenant, agreement or condition herein, nor shall any custom, practice or course of dealings arising among the Parties hereto in the administration hereof be construed as a waiver or diminution of the right of any party hereto to insist upon the strict performance by any other party of the terms, covenants, agreements and conditions herein contained.

50.  <u>Severability</u>. Should any portion (word, clause, phrase, sentence, or paragraph) of this Confidential Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected.

51.  <u>Due Authority</u>. Each of the persons executing this Confidential Agreement represents and warrants that he is fully authorized to enter into this Confidential Agreement on behalf of the party on whose behalf he is executing the Confidential Agreement and that any required consents, authorizations or approvals have been obtained.  Each of the Parties to this Confidential Agreement represents and warrants that it owns all right, title and interest to all claims, causes of action, demands or indebtedness provided to be released or waived pursuant to

this Confidential Agreement and that no such claims, causes of action, demands or indebtedness have been assigned, hypothecated, transferred or otherwise alienated in whole or in part.

52.     <u>Further Assurances</u>. The Parties hereto agree to cooperate in good faith to effectuate all the terms and conditions of this Confidential Agreement, including doing or causing their agents and attorneys to do whatever is reasonably necessary to effectuate the signing, delivery, execution, filing, and entry of any documents necessary to perform the terms of this Confidential Agreement.

53.     <u>California Law</u>. This Confidential Agreement shall in all respects be interpreted, enforced and governed by the laws of the State of California.

**IN WITNESS WHEREOF, the Parties have entered into this Confidential Agreement to the Stipulated Decision and Order as of the date last signed below.**

DATED: _3/19/19_, 2019          COURTESY AUTOMOTIVE GROUP, INC. DBA
                                COURTESY SUBARU OF CHICO

                                By_____

                                Print Name: _Shahram Mbandojoul_

                                Title: _President._

DATED: _March 20_, 2019          SUBARU OF AMERICA, INC.

                                By _Anthony J Graziano_

                                Print Name: Anthony J. Graziano

                                Title: Vice President, Western Region

1  **APPROVED AS TO FORM AND SUBSTANCE:**

2

3  DATED: _March 20_ , 2019          NELSON MULLINS RILEY & SCARBOROUGH

4                                    By _____

5                                       Lisa M. Gibson

6                                       Crispin L. Collins
                                        Attorneys for Subaru of America, Inc.

7  DATED: _March 19_ , 2019          LAW OFFICES OF GAVIN M. HUGHES

8

9                                    By _____

10                                      Gavin M. Hughes
                                        Attorneys for Courtesy Automotive Group,
11                                      Inc. dba Courtesy Subaru of Chico

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

1 | NEW MOTOR VEHICLE BOARD
1507 – 21ST Street, Suite 330
2 | Sacramento, California 95811
Telephone: (916) 445-1888

**CERTIFIED MAIL**

3

4

5

6

7

8 | STATE OF CALIFORNIA

9 | NEW MOTOR VEHICLE BOARD

10

11 | In the Matter of the Protest of

12 | COURTESY AUTOMOTIVE GROUP, Inc., dba
COURTESY SUBARU OF CHICO,

**Protest No. PR-2570-18**

13

Protestant,

14 | v.

**ORDER ADOPTING "[PROPOSED]
STIPULATED DECISION AND
ORDER OF THE BOARD RESOLVING
PROTEST AND LAWSUIT"**

15 | SUBARU OF AMERICA, INC.,

16 | Respondent.

17

18 | To:   Gavin M. Hughes, Esq.
Robert A. Mayville, Jr., Esq.
19 |       Attorneys for Protestant
LAW OFFICES OF GAVIN M. HUGHES
20 |       3436 American River Drive, Suite 10
Sacramento, California 95864
21

Lisa M. Gibson, Esq.
22 |       Crispin L. Collins, Esq.
Attorneys for Respondent
23 |       NELSON MULLINS RILEY & SCARBOROUGH
19191 South Vermont Avenue, Suite 900
24 |       Torrance, California 90502

25 | ///

26 | ///

27 | ///

28 | ///

1

ORDER ADOPTING "[PROPOSED] STIPULATED DECISION AND ORDER OF THE BOARD
RESOLVING PROTEST AND LAWSUIT"

1    Pursuant to the provisions of Vehicle Code section 3050.7, the "[Proposed] Stipulated Decision

2    and Order of the Board Resolving Protest and Lawsuit," relating to the above-entitled matter, is hereby

3    adopted by the New Motor Vehicle Board.

4    SO ORDERED.

5

6    DATED: April 9, 2019                          NEW MOTOR VEHICLE BOARD

7

8                                          By_____

9                                          TIMOTHY M. CORCORAN
                                           Executive Director

---

2

ORDER ADOPTING "[PROPOSED] STIPULATED DECISION AND ORDER OF THE BOARD
RESOLVING PROTEST AND LAWSUIT"

# EXHIBIT 3

Exhibit 30-8

### FACILITY ADDENDUM TO CONDITIONAL SUBARU DEALER AGREEMENT
### FUTURE ADDRESS

This Addendum is made between Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico ("Dealer") and Subaru of America, Inc./Western Region ("Distributor").

WHEREAS, Dealer has submitted to Distributor an application for a Subaru Dealer Agreement and Standard Provisions ("Agreement") in order to operate as an authorized Subaru dealer; and

WHEREAS, Dealer and Distributor have agreed to allow Dealer to conduct its Subaru operations at a temporary location at 896 East Avenue, Chico, CA 95926 ("Temporary Facility") until Dealer relocates to its permanent facility as detailed below; and

WHEREAS, Dealer's facilities at the Temporary Facility fail to meet the Subaru Minimum Standards incorporated by reference into the Agreement with respect to exclusive Subaru Signature Facility with Image requirements (details below); and

WHEREAS, Dealer desires to commence operations as an authorized Subaru dealer as soon as possible and even before meeting all applicable Subaru Minimum Standards; and

WHEREAS, Dealer has committed to complete specific facility improvements at the Temporary Facility and construction of a new Subaru dealership at the permanent facility located on the following parcels: APN: 006-400-061 APN: 006-400-063, 006-400-064, 006-400-065 and 006-400-066, ("Permanent Facility") and Distributor has relied upon Dealer's commitment as a condition of approving Dealer's application for a Subaru franchise.

NOW THEREFORE in consideration of these premises, Dealer and Distributor agree as follows:

1.  Dealer acknowledges that the facility at the Temporary Facility is only a temporary location for Dealer's Subaru operations until Dealer's Permanent Facility is complete.

2.  Dealer acknowledges that the Temporary Facility fails to meet Subaru Minimum Standards and Operating Guidelines and that Dealer will be unable to meet said Minimum Standards and Operating Guidelines at the Temporary Facility and said deficiencies would permit Distributor to refuse to approve Dealer's application to become an authorized Subaru dealer.

3.  Distributor has agreed to allow Dealer to conduct Subaru operations at the Temporary Facility, provided Dealer meets the following conditions:

    a.  Dealer provides (i) a fully executed copy of the Lease for a period of time that will cover (by way of the Lease or an option to lease) the completion of the Permanent Facility and, (ii) provides written evidence to Distributor that Dealer has obtained the right to occupy the Temporary Property.

    b.  Dealer provides a $750,000 letter of credit or performance bond by July 14, 2019 to insure Dealer's performance on its commitment to construct the Permanent Facility.

    c.  An initial visual inspection of the Temporary Facility is performed by the San Francisco Zone, any corrections and modifications stated by the San Francisco Zone are completed and the Temporary Facility has Distributor's final approval before Dealer commences operations. Dealer agrees to modify the Temporary Facility as follows: the building's interior paint, furniture, ceiling

Exhibit 30-8

# FACILITY ADDENDUM TO CONDITIONAL SUBARU DEALER AGREEMENT
# FUTURE ADDRESS

**Page 2**

d.  tiles (if applicable), floor tiles, customer lounge amenities, etc. comply with the Subaru Finish Schedule and brand standards.  The Temporary Facility has a Subaru customer waiting lounge that is not walled off, at least 3 large graphic lifestyle murals displayed in showroom, fixtures and space for customer refreshments and display mounting of lifestyle accessories, i.e., kayak and bike carrier from ceiling.  The Temporary Facility also has all approved Subaru signage. No other line makes occupy or utilize the Temporary Facility at any time that Subaru occupies that location. The San Francisco Zone's final inspection occurs and concludes that the required improvements are complete no later than July 18, 2019.

e.  Dealer occupies and commences operations at the Temporary Facility upon completion of the remodelling, no later than Fifteen (15) days following completion of the remodeling of the Temporary Facility.

f.  The Temporary Facility satisfies Distributor's requirements and is approved in writing as satisfactory to Distributor at the time that remodelling is completed and prior to Dealer's occupancy and commencement of any dealership operations thereat.

4.  Dealer agrees to construct a new Subaru dealership at the Permanent Facility and agrees to meet the following timelines and conditions:

a.  Dealer submits completed construction drawings and site plans to Distributor for its prior written approval, pursuant to which the Permanent Facility complies with Subaru's projected Signature Image Facility Standards for a dealership facility, and such plans are approved in writing by Distributor in advance of construction.

b.  Dealer obtains necessary zoning, permits and necessary governmental approvals to provide for the construction of the Permanent Facility on or before December 1, 2019.

c.  Dealer commences construction of the Permanent Facility on or before January 31, 2020.

d.  Dealer completes construction of the Permanent Facility and obtains all necessary licenses and permits as to the Subaru sales facility at the Permanent Facility by no later than January 31, 2021.

e.  Dealer obtains a Final Review Verification letter from Feltus Hawkins for compliance upon completion of the remodelling, which Verification shall be provided by Feltus Hawkins by March 1, 2021.

Effective January 1, 1999

Exhibit 30-8

# FACILITY ADDENDUM TO CONDITIONAL SUBARU DEALER AGREEMENT
## FUTURE ADDRESS

**Page 3**

5.  Dealer agrees that its failure to complete one or more of the facility improvements set forth in paragraphs 3 and 4 of this Addendum within the aforementioned prescribed time periods shall constitute a material breach of the Agreement.

6.  This Addendum is not intended to confer any right, benefit or claim upon any person or entity other than Dealer or Distributor.

7.  All terms, conditions and provisions of this Addendum and of the Stipulated Decision and Order of the Board Resolving Protest and Lawsuit dated March 20, 2019 (and the Confidential Agreement attached as Exhibit 1 thereto), held under confidential seal by the California New Motor Vehicle Board in Protest No. PR-2570-18, shall be incorporated by reference into the Agreement pursuant to Paragraph 20.10 of the Agreement.

8.  Except as modified by this Addendum, all terms, conditions and provisions of the Agreement shall remain in full force and effect.


IN WITNESS WHEREOF the parties have hereunto set their signatures on the date first hereinabove written.

**-Electronically signed-**

**Exhibit Name:** Executed Dealer Agreement

**Dealer Number:** 401763

| Signature: | Role: | Date: | Signed By: |
|---|---|---|---|
| jpaj4931 | retailer | 10/16/2019 03:09 PM | Mr. Jerry Pajouh |
| Anthony J Graziano | region | 10/17/2019 01:04 PM | Anthony Graziano |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

# EXHIBIT 4

**SUBARU**

**Subaru of America, Inc.**
**Western Region**
Galleria North Tower
720 S. Colorado Blvd., 3rd Floor, Ste 300-N
Glendale, CO  80246
720-514-4200
www.subaru.com

May 21, 2020

Mr. Shahram Mihanpajouh
Courtesy Automotive Group, Inc.
d/b/a Courtesy Subaru of Chico
896 East Avenue
Chico, CA 95973

**Re: Amendment to Existing Facility Addendum to Conditional Subaru Dealer Agreement Future Address**

Dear Mr. Mihanpajouh,

Courtesy Subaru of Chico did not perform under the original Facility Addendum to your Agreement dated May 5, 2015.  The following benchmarks were missed on that Facility Addendum:

- Lease Property by 05/05/2016
- Purchase property by 05/05/2016
- Complete Design Intent with SOA approved architectural firm by 08/05/2016
- Submit facility drawings (interior, exterior, elevation) to SOA and SOA approved architectural firm by 11/05/2016
- Obtain permits for facility project by 02/5/2017
- Break ground on facility project by 05/05/2017
- All facility deficiencies must be resolved by 12/05/2017

Two Dealer Agreement extensions were issued on December 1, 2017 and May 10, 2018.  Both of these extensions were issued so a settlement agreement could be reached and executed on March 20, 2019.

Courtesy Subaru of Chico has also not performed under the current Facility Addendum to your Agreement dated October 17, 2019. Specifically, the missed milestones were:

- Dealer obtains necessary zoning, permits and necessary government approvals for the construction of the Permanent Facility on or before December 1, 2019
- Dealer commences construction of the Permanent Facility on or before January 31, 2020

Please be advised that Subaru of America, Inc./Western Region ("SOA") hereby agrees to amend your Subaru Dealer Agreement and Standard Provisions ("Agreement") dated and executed October 17, 2019.  This is the final amendment of the facility benchmarks that SOA will issue.  If subsequent benchmarks are missed, SOA reserves the right to exercise all remedies available under the Subaru Dealer Agreement, Facility Addendum and/or the Stipulated Decision dated March 20, 2019, including termination of your Subaru Dealer Agreement. Additionally, should the facility not be completed by the agreed upon date, SOA will execute the Letter of Credit or Performance Bond that secures this amendment.

Your Agreement is amended as follows:

The entries in Paragraph 2 of the Agreement will now read:

2.1    Addendum - Facility Cond Future Address
2.2    Amendment to Facility Cond Future Address dated May 21, 2020

The Facility Addendum to Conditional Subaru Dealer Agreement Future Address will also be amended as follows:

The entries in Paragraph 4 will now read:

- Dealer obtains necessary zoning, permits and necessary government approvals for the construction of the Permanent Facility on or before July 31, 2020
- Dealer commences vertical construction of the Permanent Facility on or before September 30, 2020
- Dealer completes construction of the Permanent Facility, obtains all necessary licenses and permits no later than December 31, 2021
- Dealer obtains a Final Review Verification letter from Feltus Hawkins for compliance upon completion of the remodeling, which Verification shall be provided by Feltus Hawkins by January 31, 2022

All other terms and conditions of the Agreement and Addenda shall remain in full force and effect. Please acknowledge your agreement with the terms of this amendment with your signatures.

**Exhibit Name:** Amendment to Dealer Agreement

**Dealer Number:** 401763

| Signature: | Role: | Date: | Signed By: |
|---|---|---|---|
| jpaj4931 | retailer | 05/21/2020 05:01 PM | Mr. Jerry Pajouh |
| Anthony J Graziano | region | 05/22/2020 09:18 AM | Anthony Graziano |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

EXHIBIT 5

**BMO Harris Bank N.A.**

BMO Harris Bank

| STANDBY/LETTERS OF CREDIT | DOCUMENTARY COLLECTIONS |
|---|---|
| C/O Bank of Montreal | C/O Bank of Montreal |
| 250 Yonge Street, 11th Floor | 250 Yonge Street, 11th Floor |
| Toronto, Ontario, M5B 2L7 | Toronto, Ontario, M5B 2L7 |
| Tel: 1-877-801-0414 | Tel: 1-888-258-6378 |
| Fax: 1-877-801-7787 | Fax 1-888-258-6380 |
| SWIFT: HATRUS44 | SWIFT: HATRUS44 |

# Irrevocable
# Standby Letter of Credit
# No. HACH621044OS

**Amendment no. 1**
Dated July 07, 2020

**Beneficiary:**
SUBARU OF NORTH AMERICA, INC.
WESTERN REGION
720 S. COLORADO BLVD., #300N
DENVER, CO 80246 United States

**Applicant:**
COURTESY AUTOMOTIVE GROUP, INC.
2520 COHASSET RD
CHICO, CA 95973 United States

**We amend our Standby Letter of Credit subject to the following terms and conditions. This amendment forms an integral part of the original instrument.  All other terms and conditions remain unchanged.**

**Amended Terms:**

Expiry date has been amended to July 31, 2022

This Letter of Credit is still subject to the automatic extension clause.

Unless otherwise instructed herein, all correspondence and inquiries regarding this transaction should be directed to our Customer Service Center at the above address, telephone: as indicated. Please indicate our reference number in all your correspondence or telephone inquiries.

Regards,

_____
Authorized Signature(s)

ANAND ASOKAKUMAR

## BMO Harris Bank N.A.

BMO 😊 Harris Bank

| STANDBY/LETTERS OF CREDIT | DOCUMENTARY COLLECTIONS |
|---|---|
| C/O Bank of Montreal | C/O Bank of Montreal |
| 250 Yonge Street, 11th Floor | 250 Yonge Street, 11th Floor |
| Toronto, Ontario M5B 2L7 | Toronto, Ontario, M5B 2L7 |
| Tel: 1-877-801-0414 | Tel: 1-888-258-6378 |
| Fax: 1-877-801-7787 | Fax 1-888-258-6380 |
| SWIFT: HATRUS44 | SWIFT: HATRUS44 |

**Irrevocable**
**Standby Letter of Credit No.: HACH621044OS**

Issuance Date: June 22, 2020

Beneficiary:
Subaru of America, Inc.
Western Region
720 S. Colorado Blvd., #300N
Denver, CO 80246

Applicant:
Courtesy Automotive Group, Inc.
2520 Cohasset Rd
Chico, CA 95973

Amount: Seven Hundred Fifty Thousand and 00/100's United States Dollars (USD750,000.00)

At the request of and for the account of **Courtesy Automotive Group, Inc.**, we, BMO Harris Bank N.A., hereby establish in your favor our Irrevocable Standby Letter of Credit No. HACH621044OS (the "Credit") for a sum not exceeding Seven Hundred Fifty Thousand and 00/100's United States Dollars (USD750,000.00).

This Credit is available against your draft drawn at sight on us accompanied by the following document(s):

1.  Beneficiary's Certificate, on its letterhead, completed, dated and purportedly signed by an authorized individual stating:
'Courtesy Automotive Group, Inc. has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement between Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico and Subaru of America, Inc - Western Region. Therefore, we are drawing for USD ...., under Letter of Credit No. HACH621044OS. Please wire proceeds to: Subaru of America, Inc. . . . . (Instructions will be given at time of drawing).'

2.  The original of this Credit and subsequent amendment(s), if any.

This Credit will expire at our counters on December 16, 2021; subject to the following condition:
This Credit will be automatically extended without amendment for a period of one year upon the Expiration Date hereof or any future Expiration Date unless at least sixty (60) days prior to any such Expiration Date, we

**BMO Harris Bank N.A. Chicago**

BMO Harris Bank

notify the Beneficiary in writing by courier at the above address of our election not to extend this Credit for an additional year.  Upon receipt of such notice, the Beneficiary may draw for an amount not exceeding the then available amount by the presentment of the required documents.

All drafts must be marked 'Drawn under BMO Harris Bank N.A., Letter of Credit No. HACH621044OS'

Presentation and payment of your drawing(s) under this Credit are restricted to us.  We agree with you to honor your drawing(s) presented in compliance with the terms of this Credit when received at BMO Harris Bank N.A., c/o Bank of Montreal, Global Trade Operations, 250 Yonge Street, 11th Floor, Toronto, Ontario, Canada M5B 2L7, prior to 4:00 PM, Eastern Standard Time, Monday through Friday, on or before the then current Expiration Date, upon which date this Credit expires, even if this original Credit and Amendment(s), if any, are not returned to us for cancellation.

This Credit sets forth in full our undertaking and such undertaking shall not in any way be modified, amplified, or limited by reference to any document, instrument or agreement referred to in this Credit, except only the ISP98, referred to herein, and any such reference shall not be deemed to incorporate herein any reference to a document, instrument or agreement.

This Letter of Credit is issued to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility Addendum to the Subaru Dealer Agreement. We are informed that Courtesy Automotive Group, Inc. has committed to a Separate Touch Points Subaru dealership facility at Parcel numbers: APN 006-400-061, APN 006-400-063, APN 006-400-064, APN 006-400-65 and APN 006-400-066 Chico, CA meeting all Subaru minimum standards, as approved by Beneficiary, by January 31, 2022.

The issuing bank will have no obligation to make any payment under this Standby Letter of Credit to any person or entity with whom the issuing bank is prohibited from engaging in transactions under applicable laws, including international trade sanctions and anti-money laundering regulations

If you return this original Credit and Amendment(s) prior to the then current Expiration Date with your intent to terminate same, it must be accompanied by your original, signed letter, addressed and sent directly to us indicating you no longer require this Credit and release BMO Harris Bank N.A. of any obligation hereunder.

This Credit is subject to International Standby Practices (1998), International Chamber of Commerce Publication No. 590 ('ISP98').

BMO Harris Bank N.A.

Authorized Signing Officer
VIVEK VISWANATHAN

EXHIBIT 6

NEW MOTOR VEHICLE BOARD
P.O. Box 188680
Sacramento, California 95818-8680
Telephone: (916) 445-1888

**CERTIFIED MAIL**

STATE OF CALIFORNIA
NEW MOTOR VEHICLE BOARD

In the Matter of the Protest of

COURTESY AUTOMOTIVE GROUP, Inc., dba
COURTESY SUBARU OF CHICO,

                    Protestant,

          v.

SUBARU OF AMERICA, INC.,

                    Respondent.

**Protest No. PR-2570-18**

**CONFIDENTIAL DECISION
RESOLVING STIPULATED
DECISION AND ORDER DISPUTE**

**PRELIMINARY STATEMENT**[1]

1.      In 2015, Protestant Courtesy Automotive Group, Inc., dba Courtesy Subaru of Chico ("Courtesy" or Protestant)[2] was authorized to conduct its Subaru sales operations at 2562 Cohasset Road, Chico, California ("sales premises") and to service Subaru Products and maintain its parts and general office operations at 2520 Cohasset Road, Chico, California. [Exh. J-301.02:20-26, .08:22-27] In 2016, the Subaru sales premises which Courtesy leased, were sold to an entity associated with the competing Nissan and Hyundai dealerships. In 2018, the property became occupied by a Hyundai dealership, and

///

---

[1] References herein to Roman numerals are to the transcript volumes of the proceedings.
[2] All references to "Chico" in the Stipulated Decision and letters from Subaru of America, Inc. ("SOA") are to the Protestant, and not the City of Chico. It was agreed at the hearing that for purposes of clarity, Protestant would be referred to as Courtesy, not Chico. [RT Vol. I 11:25-2:17]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

the Subaru constellation logo and name were removed. [Exh. J-301.03:18-23; .03:26-.04:3; .09:3-6] In August 2018, Courtesy relocated its Subaru sales operations to its Buick/GMC facility located at 2522 Cohasset Road in Chico, California, which was not an authorized location for Subaru sales. [Exh. J-301.03:15-17; RT Vol. V 181:12-18; Vol. VI 140:24-141:12] Subaru service, and the sale of Subaru parts and other products continued to be maintained at 2520 Cohasset Road, as authorized by the Dealer Agreement. [Exhs. J-300.05; J-301.02:20-26]

2.     In 2018, Respondent Subaru of America, Inc. ("SOA") sent Courtesy a notice of intent to terminate the franchise because of Courtesy's unauthorized relocation of its Subaru sales facility. Courtesy filed a timely Vehicle Code section 3060 termination protest on August 22, 2018.[3]

3.     The parties sought to resolve the protest by entering into a Confidential Agreement ("Confidential Agreement") and Stipulated Decision and Order (collectively "Stipulated Decision") on March 20, 2019, pursuant to Sections 3050.7, 3060, 3061, 3066 and 3067.[4] Section 3050.7(a) provides that the "board may adopt stipulated decisions and orders, without a hearing pursuant to Section 3066 . . ., to resolve one or more issues raised by a protest . . . filed with the board."

4.     The Stipulated Decision noted that Courtesy had executed a lease for a temporary Subaru location at 896 East Avenue, Chico, and that SOA agreed to consent to the establishment of temporary Subaru vehicle sales at this location, in a concurrently executed new Subaru Dealer Agreement.[5] Courtesy agreed to complete remodeling of the facility to meet SOA's requirements no later than 60 days after execution of the Confidential Agreement. [Exh. J-301.10:13-19, .12:12-13] Further, the Stipulated Decision provided that a new Subaru Dealer Agreement and Standard Provisions, which shall include a Facility Addendum, will be executed by Courtesy and it will include "benchmarks for the completion of the permanent facility" at the "New Location" referenced as certain APN parcels on Garner Lane in Chico. [Exh. J-301.10:26-.11:4,12:7-9, 21-23; P-32.001, .023, .043; P-64.010; R-104.17-.18, .21] The Stipulated Decision, which became a New Motor Vehicle Board ("Board") Order on April 9, 2019,

---

[3] Hereinafter, all section references are to the California Vehicle Code unless otherwise indicated.
[4] This Decision is confidential and is not subject to disclosure absent stipulation of counsel for both parties. [Exh. J-301.04-.05]
[5] The new Subaru Dealer Agreement, executed on October 17, 2019, authorized Subaru vehicle sales at the temporary location, subject to five conditions as outlined in Joint Exhibit 300, pages .33-.34.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  confirmed that the Board shall retain jurisdiction pursuant to the terms and conditions contained therein.

2  [Exhs. J-301.20:26-21:1; J-302.01-.02]

3      5.      SOA and Courtesy entered into a Subaru Dealer Agreement and Standard Provisions

4  ("Dealer Agreement") and Facility Addendum dated October 17, 2019. [Exh. J-300.01-.36] The Dealer

5  Agreement has a stated termination date of October 16, 2022. [J-300.02] The Facility Addendum

6  provided that "[a]ll terms, conditions and provisions of this Addendum and of the Stipulated Decision

7  and Order of the Board Resolving Protest and Lawsuit dated March 20, 2019 (and the Confidential

8  Agreement attached as Exhibit 1 thereto) held under confidential seal by the California New Motor

9  Vehicle Board in Protest No. PR-2570-18, shall be incorporated by reference into the [Dealer]

10  Agreement pursuant to Paragraph 20.10 of the [Dealer] Agreement."[6] [Exh. J-300.35, ¶ 7]

11      6.      Subsequently, an Amendment to the Facility Addendum to the Subaru Dealer Agreement

12  was entered into by the parties. The Amendment to Facility Addendum, dated May 21, 2020, was

13  executed by Mr. Pajouh on behalf of Courtesy on May 21, 2020, and by Mr. Graziano for SOA on May

14  22, 2020. [Exh. R-101.01-.03]

15                          **STATEMENT OF THE CASE**

16      7.      In 2020, a dispute arose between Courtesy and SOA concerning Courtesy's compliance

17  with the terms of the Stipulated Decision.

18      8.      On August 24, 2020, SOA issued a Notice of Non-Compliance to Courtesy. The Notice

19  stated:[7]

20      On March 20, 2019, Courtesy Subaru of Chico ("Chico") and Subaru of America, Inc. ("SOA")
        entered into a Stipulated Decision ("Stipulated Decision") pursuant to which Chico agreed to
21      meet certain milestones required for compliance with the Confidential Agreement attached as
        Exhibit 1 thereto ("Confidential Agreement"). The final Subaru Facility Addendum amendment
22      dated on 05/22/2020 ("Facility Addendum") to the Subaru Dealer Agreement dated October 17,
        2019 ("Subaru Dealer Agreement") also includes agreed-upon benchmarks related to the
23      construction of Courtesy Subaru of Chico. At this point, Chico has missed the first two Stipulated
        Decision milestones as noted below. **Accordingly, this letter serves as formal Notice of Non-**
24      **Compliance with the Stipulated Decision based on Chico's failure to meet the following**
        **milestones:**

25  ///

26

27  ─────────────────────────

    [6] Paragraph 20.10 of the Dealer Agreement is entitled Documents Incorporated by Reference and provides that the
    Dealer Agreement is "deemed to incorporate and render enforceable" nine listed documents. [Exh. J-300.31]
28  [7] See Footnote 2.

### 1. Obtain zoning and permits.

Pursuant to paragraph 16.b of the Confidential Agreement, Chico was required to "obtain necessary zoning, permits and necessary governmental approvals to provide for the construction of the permanent facility at the New Location as soon as practicable, but in any event on or before December 1, 2019."

Paragraph 4.b. of the Facility Addendum also requires Chico to obtain "necessary zoning, permits and necessary governmental approvals to provide for the construction of the Permanent Facility on or before December 1, 2019."

To date, Chico has not obtained the necessary zoning, permits and government approvals necessary to satisfy this milestone.

### 2. Commence construction.

Pursuant to paragraph 16.c of the Confidential Agreement, Chico was required to "commence construction of the facility on or before January 31, 2020." However, Chico has still not commenced construction as required.

The milestones for obtaining zoning/permits and commencing construction pursuant to the Stipulated Decision have not been achieved and are dates that clearly precede any COVID-19 related timeframe. Even during the pandemic timeframe, construction has been ongoing throughout California due to its status as an essential service under California Executive Order N-33-20. There is, therefore, nothing that Chico has provided SOA in terms of establishing either the necessary governmental action or inaction that the zoning permits have not been attainable. Chico also has not established a *force majeure* given that the Executive Orders in California deem construction as an essential business. The Stipulated Decision milestones are each separately required to be achieved and each separately constitute its own material breach of the Stipulated Decision. Based on its failure to meet the two milestones outlined above, at this time, Chico is in material breach of the Stipulated Decision.

The failure to meet the first benchmark of the Facility Addendum is also a material breach of the Subaru Dealer Agreement. Although this letter should not be deemed a notice of termination of the Subaru Dealer Agreement under California Vehicle Code §3060(a)(1)(A), it is notification in writing of the non-compliance of the Stipulated Decision by [Courtesy] Subaru of Chico relating to the two missed milestones. SOA reserves the right to exercise all remedies available under the Subaru Dealer Agreement and Facility Addendum, including but not limited to issuing a notice of intent to terminate the Subaru Dealer Agreement.

**Accordingly, please be advised that should Chico not come into compliance with the milestones outlined above within thirty (30) days of receipt of this letter, SOA is hereby requesting an order of termination of your Subaru Dealer Agreement from the California New Motor Vehicle Board in accordance with its rights under the Stipulated Decision.** (Emphasis in original.) [Exh. J-303.01-.02]

9.    On February 1, 2021, SOA issued an Amended Notice of Non-Compliance and added the failure by Courtesy to complete construction by January 31, 2021. The Notice had essentially the first two paragraphs set forth above, and in addition provided, in pertinent part, as follows:

///

To date, Chico[8] has not completed construction or obtained the necessary licenses and permits for its Subaru sales facility as required.

. . .

**Accordingly, please be advised that should Chico not come into compliance with the milestones outlined above within thirty (30) days of receipt of this letter, SOA is hereby requesting an order of termination of your Subaru Dealer Agreement from the California New Motor Vehicle Board in accordance with its rights under the Stipulated Decision and this Amended Notice of Non-Compliance. The additional missed milestone is hereby included with the issues raised by SOA in the non-compliance hearing relating to the Protest filed by Chico as Protest No. PR-2570-18 which is currently pending before the New Motor Vehicle Board in accordance with its rights under the Stipulated Decision.** (Emphasis in original.) [Exh. J-304.01-02]

10.      Pursuant to Paragraph 28 of the Stipulated Decision, the Administrative Law judge is to hold a hearing and "to make the final determination of whether there has been a material failure to comply with the Conditions" by Courtesy. [Exh. J-301.20] Thus, this Decision will not be considered by the Board.

11.      Section 3050.7 (b) provides that:

"[i]f the board adopts a stipulated decision . . . filed pursuant to Section 3060 . . . in which the parties stipulate that good cause exists for the termination of the franchise of the protestant, and the order provides for a conditional or unconditional termination of the franchise of the protestant, . . . . a hearing to determine whether good cause exists for termination of the franchise, is inapplicable to the proceedings. . . . If the stipulated decision and order provides for the termination of the franchise, conditioned upon the failure of a party to comply with specified conditions, the franchise may be terminated upon a determination, according to the terms of the stipulated decision and order, that the conditions have not been met. If the stipulated decision and order provides for the termination of the franchise conditioned upon the occurrence of specified conditions, the franchise may be terminated upon a determination, according to the terms of the stipulated decision and order, that the stipulated conditions have occurred."

Section 3050.7 does not state what standard applies to determine if conditions "have been met" or "occurred." The statute does not preclude substantial occurrence or excuse of condition.

12.      The Stipulated Decision does not provide that good cause existed at that time of the execution of the Confidential Agreement for the termination of Protestant's franchise. Rather, the parties agreed that Courtesy's failure to comply with any of the conditions in the Stipulated Decision shall constitute good cause to terminate the SOA Dealer Agreement between them under Sections 3060 and

---

[8] See Footnote 2.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

3061. [Exh. J-301.18:11-13]

**PARTIES AND COUNSEL**

13.     Courtesy is a new motor vehicle dealer and a "franchisee" within the meaning of Sections 331.1 and 3060(a)(1). Courtesy's general office, parts facility, and service facility are located at 2520 Cohasset Road and its new vehicle showroom and display, outside used vehicle display and storage, and sales work area and office are located at 896 East Avenue in Chico, California. [Exh. J-300.05]

14.     Protestant is represented by Gavin M. Hughes, Esq. and Robert A. Mayville, Jr., Esq. of the Law Offices of Gavin M. Hughes at 3436 American River Drive, Suite 10, Sacramento, California 95864.

15.     SOA is a distributor of new motor vehicles and is a "franchisor" within the meaning of Sections 331.2 and 3060(a)(1).

16.     Respondent is represented by Lisa M. Gibson, Esq. and Amy M. Toboco, Esq. of Nelson Mullins Riley & Scarborough LLP, 19191 South Vermont Avenue, Suite 900, Torrance, California 90502.

17.     This matter was assigned to Administrative Law Judge Evelyn I. Matteucci ("ALJ Matteucci"). Initially, it was to be decided on the parties' briefs, declarations with exhibits, and a day of witness testimony. After extensive briefing, this matter was heard on September 14-16, 2021, and October 18-19, 26, and 28, 2021.

**WITNESSES**

**Respondent's Witnesses**

18.     Anthony ("Tony") Graziano has been the Regional Vice-President of the Western Region of SOA since 2005. [Stipulation Regarding Background and Qualifications of Witnesses] The Western Region is based in Denver, Colorado and covers 13 western states, including California. Courtesy is located in the SOA Western Region. [Stipulated Glossary of Non-Controversial Terms]

19.     Scott Farabee has been the Director, San Francisco Zone, SOA since 2017. [Stipulation Regarding Background and Qualifications of Witnesses] The Zone is the geographic area including sub-groupings of Subaru Retailers' Areas of Responsibilities ("AORs") within the Region that are called upon by a District Sales Manager and a District Parts and Service Manager. Courtesy is located in the

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

San Francisco Zone.[9] [Amended Stipulated Glossary of Non-Controversial Terms]

20. Ray Smit is the Market Development Manager for SOA in Northern California. [Stipulation Regarding Background and Qualifications of Witnesses] Mr. Smit is the "SOA employee who is responsible for working with SOA Retailers in undersized or non-compliant dealership facilities to expand their facility capacity through upgrades, construction, expansions and/or relocations." [Stipulated Glossary of Non-Controversial Terms]

**Protestant's Witnesses**

21. Jerry Mihanpajouh ("Mr. Pajouh") is the Dealer Principal of Courtesy and also owns and operates franchises for Cadillac, Buick, GMC, BMW, Mercedes-Benz and Volvo. He previously constructed a dealership facility in Fresno, California and has been involved in the new car sales industry for 42 years. [Stipulation Regarding Background and Qualifications of Witnesses] Mr. Pajouh was also called as an adverse witness for Respondent pursuant to Evidence Code section 776.[10] [RT Vol. I 104:2-4, 117:5-7]

22. James Stevens (testimony via deposition only) is a land surveyor with Northstar Design Solutions ("Northstar"), an engineering and building design firm, where he has worked since 1983. He was charged with securing entitlements from the County of Butte[11] prior to annexation of the Courtesy properties by the City of Chico.[12] [Stipulation Regarding Background and Qualifications of Witnesses; Exh. P-46.009:9-15; RT Vol. I 152:12-17] Northstar originally contracted directly with Courtesy for site plans related to grading and drainage, County entitlements and the Development Agreement until June 25, 2020. Mr. Stevens then contracted with Modern Building in August 2020 for further site development and design services for an estimated fee of $6,200. [Exhs. P-20.001; P-21.001-.010; P-46.009:9-15; P-62.051:12-18; P-66.002:3-16; R-119.27:17-19, .28:10-12; RT Vol. I 134:21-24, 135:12-

---

[9] The Stipulated Glossary states that Courtesy is in the San Francisco *Region*, but it is clear from the testimony that Courtesy is in the San Francisco Zone, which covers from Monterey to Eureka, California and over to Reno, Nevada. [RT Vol. II 69:23-70:9]
[10] Subdivision (a) of Evidence Code section 776 provides that: "A party to the record of any civil action, or a person identified with such a party, may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the witness."
[11] References to "County" mean "Butte County."
[12] References to "City" mean the "City of Chico."

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

20, 138:17-22; Vol. II 29:25-30:10]

23.     James Seegert is the Responsible Managing Officer and president of Modern Building, the general contractor on the multi-franchise dealership under construction for Courtesy. [Stipulation Regarding Background and Qualifications of Witnesses]

**Independent Witness**

24.     Michael Sawley, employed by the City of Chico since 2006, is currently the principal planner for the City, and during some of the timeframe of this matter, was the senior planner. Mr. Sawley was assigned to process the Development Agreement in connection with the project.

[Stipulation Regarding Background and Qualifications of Witnesses; RT Vol. III 7:17-23]

**ISSUES PRESENTED**

25.     Did SOA sustain its burden of proof of establishing that which is alleged in the Notice of Non-Compliance dated August 24, 2020, that: "The Stipulated Decision milestones are each separately required to be achieved and each separately constitute its own material breach of the Stipulated Decision. Based on its failure to meet the two milestones outlined above,[13] at this time, Chico [Courtesy] is in material breach of the Stipulated Decision" and that "[t]he failure to meet the first benchmark of the Facility Addendum is also a material breach of the Subaru Dealer Agreement?"[14] [Exh. J-303.02]

26.     If Courtesy has failed to achieve the milestones/benchmarks as alleged by SOA, should Courtesy's delay be excused due to circumstances beyond its control? This is Courtesy's burden of proof.

///

///

///

---

[13] As stated in the Notice of Non-Compliance of February 1, 2021, there are now three missed milestones which are: "[t]he milestones for obtaining zoning/permits and commencing construction pursuant to the Stipulated Decision have not been achieved and are dates that clearly precede any COVID-19 related timeframe. Chico [Courtesy] has now also failed to meet the milestone to complete construction of the Subaru sales facility." [Exh. J-304.02]

[14] It is noted that the Notice of Non-Compliance is reinforcing the conclusion that the parties intended that the standard to be applied to the non-occurrence of the milestones/benchmarks is that of whether any non-occurrence constitutes a "material breach" of the Stipulated Decision and the Subaru Dealer Agreement.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

## PROCEDURAL BACKGROUND

### Request for Appointment of ALJ to Determine
### Compliance with Stipulated Decision

27.     Paragraph 28 of the Stipulated Decision provides that if SOA contends that there is a failure by Courtesy "to comply with any or all of the Conditions, SOA shall, within fifteen (15) business days of its awareness of such failure, serve a notice on [Courtesy] in the manner stated in paragraph 23, setting forth its alleged non-compliance with the Conditions, with a courtesy copy to the Board." Courtesy "shall have fifteen (15) days from receipt of that notice to file a written request with the Board asking it to appoint an Administrative Law Judge ('ALJ') to hold a *hearing* on the allegations made in the notice of non-compliance and to make the final determination of whether *there has been a material failure to comply with the Conditions by [Courtesy].*"[15] (Emphasis added.) [Exh. J-301.20]

28.     Paragraph 28.b further provides "[t]he Board will have continuing jurisdiction over this matter solely for the purpose of appointing an ALJ to determine, in the event of a timely request by [Courtesy], *whether there has been a failure by [Courtesy] to materially comply* with any of the Conditions of this Confidential Agreement. Any such timely request will be submitted for binding, non-

---

[15] Respondent asserts that there is no authority for the ALJ to hold an "evidentiary hearing," with live testimony in this matter. [Respondent's Reply Brief p. 20, lines 19 through 27] In a traditional merits hearing, the Board conducts its hearings pursuant to the Administrative Procedure Act ("APA"). The provisions, beginning in Government Code section 11400 through 11529, Chapter 4.5 (Gov. Code §§ 11400-11475.70), apply to any adjudicative proceeding required to be conducted under Chapter 5 (Gov. Code §§ 11500-11529). These statutes are the basic authority or "rules of procedure" governing administrative quasi-judicial proceedings. They govern administrative hearing procedures unless the statutes relating to a specific agency's proceedings provide otherwise. (Gov. Code §§ 11410.50, 11415.10, and 11415.20) Government Code section 11415.20 defines "adjudicative proceeding" as "an evidentiary hearing for determination of facts pursuant to which the agency formulates and issues a decision." The hearing the parties agreed to is an adjudicative proceeding.

Any provisions of the APA not in conflict or inconsistent would supplement the Vehicle Code and the Board's regulations in Title 13 of the California Code of Regulations. The Courtesy hearing is a hybrid that is, in part, defined by the Stipulated Decision. The parties stipulated and the Board ordered a "hearing" be held. Subdivision (b) of Section 3050.7 provides in part: "If the stipulated decision and order provides for the termination of the franchise conditioned upon the occurrence of specified conditions, the franchise may be terminated upon a determination, *according to the terms of the stipulated decision and order*, that the stipulated conditions have occurred." (Emphasis added.) Without a specifically defined dispute mechanism in the Stipulated Decision (other than the word "hearing"), the Board defaults to the APA, the Vehicle Code, the Board's Regulations and any other applicable laws to ensure due process. A hearing was held over seven days and SOA was allowed to present witnesses, including Mr. Pajouh as an adverse witness, and Courtesy called witnesses, including Mr. Sawley.

1   appealable determination to an ALJ appointed by the Board on an expedited basis, and in no event later

2   than thirty (30) days after the filing by [Courtesy] of the request." (Emphasis added.) [Exh. J-301.20-.21]

3        29.    On February 8, 2022, the record was opened to admit additional exhibits.

4        30.    On March 18, 2022, a Zoom hearing was held regarding "counsel for Respondent's

5   assertion that ALJ Matteucci received an 'impermissible ex parte communication during a pending

6   proceeding under Section 11430.10 of the Government Code.'"[16] (March 11, 2022 Order Opening the

7   Record Regarding the Alleged Ex Parte Communication) At the commencement of the hearing, ALJ

8   Matteucci indicated that it was not necessary to open the record to have the emails be admitted as

9   evidence in the proceeding as the email communications from each side became part of the

10  administrative record upon their receipt by the Board. ALJ Matteucci determined that the March 10,

11  2022, email communication did not meet the definition of an ex parte communication pursuant to

12  Government Code section 11430.10[17] because "[t]he content of the alleged ex parte communication is:

13  (1) Not an 'issue in the proceeding;' (2) The Board is not a party to the Protest; (3) Respondent's counsel

14  was copied in the email communication; and (4) The Responses of Respondent's counsel were forwarded

15  to ALJ Matteucci prior to her response to Protestant's March 10, 2022 email." ALJ Matteucci also

16  determined that "Respondent's assertions that the transmission of the March 10, 2022, email to the Board

17  and its subsequent handling by the Board's staff and the Administrative Law Judge resulted in an ex

18  ///

19  

_____

20  [16] The communication in question was an email sent on March 10, 2022, from Mr. Hughes, counsel for Protestant,

21  with a copy to Ms. Gibson and Ms. Toboco, counsel for Respondent, directed to Robin P. Parker, Esq., Chief
    Counsel, and Danielle R. Phomsopha, Esq., Senior Staff Counsel, New Motor Vehicle Board. This email was

22  forwarded in the normal and customary course by Ms. Parker to ALJ Matteucci. Ms. Gibson responded to the
    initial email and those responses were also forwarded to ALJ Matteucci. After consideration of Protestant's request

23  and Respondent's responses, ALJ Matteucci indicated in an email sent by Ms. Parker that "Protestant's request for
    relief is outside the Board's jurisdiction. The dispute as to whether the payment is proper under the Letter of Credit

24  needs to be resolved in Superior Court. This email correspondence will not be considered by ALJ Matteucci in
    drafting the Decision. . . ." (March 10, 2022, email chain) The referral to Superior Court is consistent with

25  subdivision (e) of Section 3050 ("the courts have jurisdiction over all common law and statutory claims originally
    cognizable in the courts. For those claims, a party may initiate an action directly in any court of competent

26  jurisdiction.")
    [17] Government Code section 11430.10(a) provides: "While the proceeding is pending there shall be no

27  communication, direct or indirect, regarding any issue in the proceeding, to the presiding officer from an employee
    or representative of an agency that is a party from an interested person outside the agency, without notice and

28  opportunity for all parties to participate in the communication."

1  parte communication in violation of ethical standards are without merit."[18] (March 21, 2022 Order

2  Following Hearing Opening the Record Regarding the Alleged Ex Parte Communication/Order Striking

3  Language in the "Order Opening the Record Regarding the Alleged Ex Parte Communication" Dated

4  March 11, 2022)

5  **Effect of the ALJ's Findings in this Matter Per the Stipulated Decision**

6      31.    Paragraph 28.c of the Stipulated Decision states that "'binding, non-appealable' means

7  that each Party adopts the ALJ's decision as a final, binding settlement of the matter at issue and waives

8  any and all recourse, right of action, or appeal with respect to the resulting ruling and/or any resulting

9  termination . . . The Parties expressly waive any claim that the Board itself should consider the ALJ's

10  decision, should reach its own decision, or otherwise involve itself in resolving the issue or dispute."

11  [Exh. J-301.21]

12      32.    Further, in Paragraph 28.d of the Stipulated Decision it is stipulated that "[i]f the ALJ

13  *determines that* [*Courtesy*] *has materially failed to comply* with any of the Conditions set forth herein,

14  the termination shall be effective immediately upon issuance of the ALJ's decision and no further

15  conditions may be imposed to require continuation of the relationship between SOA and [Courtesy]."

16  (Emphasis added.) [Exh. J-301. 21]

17      33.    On September 3, 2020, Protestant filed a Request for Appointment of ALJ to Determine

18  Compliance with Stipulated Decision. In its request, Courtesy asserted that it "exercised its best efforts to

19  achieve timely compliance" and any non-compliance on its part "is due to factors beyond Protestant's

20  control." [Exh. J-305.02:13-15] Protestant claimed that: (1) it used commercially reasonable best efforts

21  to satisfy its obligations set forth in the Stipulated Decision; (2) governmental delays excused

22  Protestant's alleged untimely compliance; and (3) substantial investment had already been made toward

23  the construction of its permanent facility as well as the investment made in its temporary location. [Exh.

24  J-305.02:19-23] On February 8, 2021, Courtesy filed with the Board an Amended Request for

25  Appointment of ALJ to Determine Compliance with Stipulated Decision, with essentially the same

26  contentions. [Exh. J-306]

27  _____

28  [18] There has been no violation of Rule 3.5 of the California Rules of Professional Conduct.

**The ALJ's November 5, 2020 Order**

34.     On November 5, 2020, an Order was issued pertaining to the relevancy of the Facility

Addendum to the Subaru Dealer Agreement and the parties' burden of proof. The Order provided that:

> The burden to prove there has been a "material failure" by Protestant to "materially
> comply" with Paragraphs 16.b and 16.c of the Stipulated Decision is on SOA. Paragraph 28
> of the Stipulated Decision provides, the ALJ is to hold a hearing on the allegations of non-
> compliance made by SOA and make a determination of whether there has been a "material
> failure to comply with the Conditions by Chico [Courtesy]." The parties are in agreement
> with this initial burden determination.[19]

> Once that burden is met by SOA, the burden shifts to Courtesy to show that its
> failure to comply or perform the Condition(s) is not material or is otherwise excused,
> including, but not limited to, that performance of the Condition(s) was waived by SOA.

> The Subaru Dealer Agreement with Facility Addendum, which includes different
> deadlines, although referenced in Paragraphs 15(d) [sic] and 17 of the Stipulated Decision,
> is not part of the Stipulated Decision nor incorporated explicitly or by reference into the
> Stipulated Decision.  However, in order to determine non-compliance with the Conditions
> of the Stipulated Decision, the Subaru Dealer Agreement with Facility Addendum may be
> relevant to the determination of material compliance or excuse. If the deadlines in the
> Subaru Dealer Agreement with Facility Addendum are relevant, the burden of proof would
> not change." [Order Following Briefing and Oral Argument on Issues Pertaining to
> Respondent's Notice of Protestant's Non-Compliance with the Conditions in the Stipulated
> Decision]

35.     That Order was subsequently amended on July 20, 2021, clarifying the language

concerning Courtesy's burden, and provides as follows: "Once that burden is met by SOA, the burden

shifts to Courtesy to show that its failure to comply or perform the Condition(s) is excused, including, but

not limited to, that performance of the Condition(s) was waived by SOA." [Amended "Order Following

Briefing and Oral Argument on Issues Pertaining to Respondent's Notice of Protestant's Non-

Compliance with the Conditions in the Stipulated Decision"]

## THE CONFIDENTIAL SETTLEMENT AGREEMENT
## AND STIPULATED DECISION

### The Milestones

36.     Both Paragraphs 15 and 16 of the Stipulated Decision required that a new Subaru Dealer

---

[19] At the hearing on this matter, SOA noted for the first time that the November 2020 order placed a "double
materiality burden" on SOA of showing both material failure by Protestant to comply, and also Protestant's failure
to materially comply with Paragraphs 16.b pertaining to zoning, permits and approvals by December 1, 2019, and
16.c regarding Courtesy commencing construction by January 31, 2020. Such a "double burden" was not intended
by the wording of the order, and it was clarified at the hearing that SOA's burden was to show only material failure
by Courtesy to comply with or complete the milestones. [RT Vol. I 48:19-50:10]

Agreement and Standard Provisions be executed concurrently with the execution of the Confidential Agreement, including a Facility Addendum. The parties agreed that the Facility Addendum shall include the milestones set forth in Paragraphs 15 and 16 related to the Temporary Property and the New Location.

37.    The following milestones[20] were set forth in the Confidential Agreement and agreed to by the parties:

    a.  Paragraph 15.a required Courtesy provide SOA a fully executed copy of the lease for the property at 896 East Avenue and evidence of the right to occupy.

    b.  Paragraph 15.b required Courtesy provide SOA a $750,000 letter of credit ("LOC") or performance bond. (Courtesy provided $750,000 cash in lieu of the LOC.)

    c.  Paragraph 15.c sets forth a series of facility remodeling requirements for the temporary Courtesy Subaru location required to be completed to SOA's satisfaction and approval.

    d.  Paragraph 15.d-h required that a Facility Addendum will be part of the Subaru Dealer Agreement and largely reiterated the preceding benchmarks.

    e.  Paragraph 16 required the Dealer Agreement include the following provisions:

        (1) Paragraph 16.a required Courtesy submit construction drawings and site plans for a facility meeting Subaru's Signature Image Facility Standards and receive SOA's approval in writing by June 1, 2019.

        (2) Paragraph 16.b required Courtesy to have secured all government approvals and construction permits to provide for the construction of the permanent facility at the new location by December 1, 2019.

        (3) Paragraph 16.c required Courtesy to have commenced construction of the facility before January 31, 2020.

        (4) Paragraph 16.d required Courtesy to have completed construction of the facility and obtain all necessary licenses and permits as to the Subaru sales facility at the new location by January 31, 2021.

---

[20] The Stipulated Decision uses the following terms seemingly interchangeably: "conditions," "Conditions," "deadlines," "benchmark," and "milestones."

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

(5) Paragraph 16.e required Courtesy to have obtained a Final Review Verification letter from Feltus Hawkins by March 1, 2021.[21]

(6) Paragraph 16.f required Courtesy to have completed the permanent facility by January 31, 2021. [Exh. J-301.10-.13]

38.    Paragraph 17 provides, in part, that "[t]he parties agree that compliance with the terms of this Confidential Agreement and execution by both parties of a Subaru Dealer Agreement with Facility Addendum, containing the milestones for completion of construction and renovations to both the Temporary Property and the New Facility as set forth herein are each separately required according to the timetables set forth in this Confidential Agreement . . ."

**OTHER RELEVANT PROVISIONS OF THE STIPULATED DECISION**

39.    Paragraph 9 of the Stipulated Decision provides that Courtesy shall, "[s]ubject to its full and timely compliance with the conditions specified . . ., continue to operate its SOA dealership operations" unless and until terminated or pursuant to a Notice of Intent to Terminate. [Exh. J-301.09:22-26]

40.    With regard to delays in performance by Courtesy, the Stipulated Decision provides, in relevant part, as follows:[22]

18.    Delay Based On Government Action or Inaction.  If, notwithstanding Chico's commercially reasonable best efforts, the necessary approval of a governmental entity cannot be obtained in order to timely satisfy the deadlines set forth herein, solely for reasons beyond the control of Chico, Chico shall, upon first learning of such delay, immediately notify SOA's SFO Zone representative in writing, and shall request the minimum extension of time necessary to complete the actions set forth herein. SOA representatives are and shall be authorized by Chico to verify these facts (or any facts deemed relevant by SOA in its sole discretion) directly with any governmental entity representatives, and SOA shall retain all rights and remedies as set forth herein.

19.    If SOA verifies that the delay is caused by the governmental entity and not by Chico, SOA shall agree to extend the affected deadlines set forth above, on a weekly basis, until the governmental-caused delay is not a factor. Chico shall provide weekly reports to SOA regarding the status of any governmental delay and the progress, if any, being made on the elimination of the delay and expected duration of the remaining delay. However, should SOA determine, that all or part of the delay is caused by Chico or its

---

[21] Feltus Hawkins is a "[t]hird-party vendor (architectural consultants) utilized by SOA to perform on-site dealership design consultations, the renderings for the Retailer's Subaru Signature compliant design, and post-construction compliance evaluations against Subaru Signature requirements." [Stipulated Glossary of Non-Controversial Terms]

[22] As noted in footnote 2, "Chico" is used by the parties in the Stipulated Decision to refer to "Courtesy."

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

agents, vendors or employees, or should Chico fail or refuse to promptly provide either the first notice or the weekly reports to SOA or not allow SOA to verify such facts directly with any governmental entity representative, then SOA shall not grant any extension (or any further extension), and the deadlines (either as set forth herein or as previously extended by SOA) shall remain in place.

20.    No Obligation to Provide Extensions and Force Majeure.  Chico also understands and agrees that SOA has no obligation to extend any time periods or deadlines set forth in this Confidential Agreement, whether or not Chico is unable to comply due to causes within or beyond Chico' [*sic*] control, and further, that any extension of time and the duration of any such extension are made, if at all, solely at SOA's discretion, except as expressly set forth herein and in Paragraph 18. Any such extension shall be valid only if made in writing, signed by then-current Western Regional Manager of SOA and delivered to Chico.

21.    Notwithstanding the provisions of this section, neither party shall be in default or liable for any delay or failure of compliance with this Confidential Agreement to the extent due to any future event which is beyond the control of the defaulting party including, without limitation, landlord approval, fire, flood, hurricane, tornado, earthquake, war, acts of terrorism, embargo, riot or an unforeseeable intervention of any government authority (excluding delays in obtaining permits and licenses), but excluding transport difficulties or strike, lock out or other labor disputes of Chico or third parties, provided the party suffering such delay or failure of compliance immediately notifies the other party of such delay or failure of compliance. Should such an event of *force majeure* take place, SOA shall extend the time periods set out in Paragraph 16 to this Confidential Agreement to allow for delays incurred as a result of the event of *force majeure*. Failure to obtain landlord approval for any change contemplated herein shall not be excused by the terms of this paragraph and Chico shall immediately notify SOA of any such failure to obtain landlord approval. (Italics in original.) [Exh. J-301.13-.15]

41.    Paragraph 25 of the Confidential Agreement, provides in relevant part:

25.    Buy/Sell Deadline. Subject to potential delays and extensions as set forth above, should Chico either (a) not complete the remodeling and construction and occupancy of the permanent facility at the New Location on or before January 31, 2021; or (b) fails to meet any other Condition or Deadline set forth in this Confidential Agreement, as set forth above; or (c) not timely produce a Buy/Sell Application Package involving all of its stock or assets, herein by close of business on the Buy/Sell Deadline, as defined herein below, then SOA shall have the right to issue a notice of non-compliance with the terms of this Stipulated Decision and Order.

. . .

b)    SOA reserves the right at any time following Chico's failure to comply with the foregoing to issue a notice of non-compliance with the Conditions of this Confidential Agreement, effective 60 days following its receipt by Chico. SOA will provide written notice to Chico of any perceived non-compliance providing at least 30 days to correct or rebut any alleged non-compliance, prior to invoking the Board's jurisdiction to request an order of termination pursuant to the stipulated decision and order.

c)    The Parties agree that Chico's failure to comply with any of the Conditions herein shall constitute good cause to terminate the SOA Dealer Agreement between them under Vehicle Code sections 3060 and 3061. [Exh. J-301.17-.18]

///

42.    Other relevant provisions of the Stipulated Decision include:

(1)    Paragraph 29, which acknowledges that the provisions and conditions of the parties' agreement pursuant to the Stipulated Decision are "fair" and "reasonable" and in the best interests of the parties and the consuming public. [Exh. J-301.21-.22]

(2)    Paragraph 30, which provides that Courtesy agrees that "construction of a facility at the New Location . . . as contemplated under [the Stipulated Decision is] reasonable in light of all existing circumstances, including economic conditions. . . ." [Exh. J-301.22]

(3)    Paragraph 33, which provides that "[t]his Confidential Agreement contains the entire understanding of the Parties relating to the subject matter of this Confidential Agreement and supersedes all prior statements, representations and agreements relating to the subject matter of this Confidential Agreement. . . ." [Exh. J-301.22]

(4)    Paragraph 40, which sets forth that "[t]ime is of the essence and the timely satisfaction of the conditions of this Confidential Agreement, and each of them, is necessary in order to provide adequate SOA motor vehicles sales, service, and parts to the consuming public and to provide for the needs of the consuming public, and it would be injurious to the public welfare if the Conditions, and each of them, were not fulfilled by the deadlines set forth in this Confidential Agreement." [Exh. J-301.23] and,

(5)    Paragraph 47 provides that the agreement is jointly drafted by the parties and their counsel and states that "all provisions hereof shall be construed with their fair meaning and not for or against either party." [Exh. J-301.25]

## RESPONDENT SOA'S CONTENTIONS

43.    Respondent asserts that pursuant to the language of the Stipulated Decision, Courtesy "agreed to meet certain construction benchmarks for a new permanent facility beginning in June 2019" in Chico. Starting with the benchmark to secure building permits by December 1, 2019, Courtesy, according to SOA, has failed to meet any of the other agreed upon benchmarks and "all are material breaches of its obligations and substantially based on events within its control." [Respondent Subaru of America, Inc.'s Opening Brief, p. 1, lines 20-24; p. 2, lines 5 through 6]

44.    According to Respondent, "[t]he language of the Stipulated Decision itself … reflects that

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

the construction deadlines are **'material'** and must be met in a timely fashion and that a breach of one provision constitutes a breach of the entire agreement, entitling SOA to issue a notice of non-compliance to Courtesy" and support a finding of material breach. (Emphasis in original) [Respondent Subaru of America, Inc.'s Opening Brief, p. 20, lines 20-22; p. 23, lines 20-23] SOA asserts any other interpretation of the Stipulated Decision would render the decision and Board's Order "entirely meaningless" and would require SOA to repeatedly litigate issues concerning Courtesy's non-compliance. "Vehicle Code [Section] 3050.7 would also be gutless [*sic*];" it "would become a nullity." SOA contends that the entire purpose of the Stipulated Decision, which was to eliminate the need for further litigation over Courtesy's non-performance with regard to its Subaru dealership, would be undermined. [Respondent's Reply Brief, p. 1, lines 16 through 19; p. 5, lines 4 through 8; p. 16, lines 27 through p. 17, lines 5]

45.     Respondent's position is that Courtesy "is unable to demonstrate any viable excuse for its failure to achieve the construction benchmarks which would relieve it from performance under the terms of the Stipulated Decision." The delays in obtaining permits were caused by Courtesy "itself failing to timely apply for permits from the County of Butte early on, before Chico annexed the subject dealership property." That failure "resulted in Chico's hands being tied with respect to honoring the County rules for public improvements." SOA contends that because Courtesy "wanted a really sweet deal" in terms of a Development Agreement with Chico, which would significantly benefit [Courtesy] financially, [Courtesy] unnecessarily prolonged negotiations for two years on extraneous factors." Rather than pushing forward and, at least, achieving the agreed-upon milestone of December 1, 2019 for permits, Courtesy "persisted in pursuing a waiver from Chico relating to a right-of-way on a parcel and for a purpose wholly unrelated to permitting the Subaru dealership," causing unnecessary delay in the permitting and finalization of the Development Agreement until February 2021. [Respondent Subaru of America, Inc.'s Opening Brief, p. 2, lines 7-18; p. 4, lines 25 through 28; p. 5, lines 18 through 21]

46.     Courtesy, according to Respondent, "will seek to shift the blame for its failure to meet benchmarks in the Stipulated Decision to Chico, the COVID-19 pandemic and the Camp Fire in Northern California." [Respondent Subaru of America, Inc.'s Opening Brief, p. 2, lines 25-27; Respondent Subaru of America, Inc.'s Reply Brief, p. 3, lines 20-22] However, the provisions of Paragraph 18 of the Stipulated Decision state that before SOA will extend any deadlines set forth in the Stipulated Decision

for failure to obtain the necessary approval of a governmental entity, the delays must be "solely" for reasons beyond the control of Courtesy. [Respondent Subaru of America, Inc.'s Opening Brief, p. 24, line 22 through p. 25, line 2; Respondent Subaru of America, Inc.'s Reply Brief, p. 13, lines 1-12] Respondent notes that the Camp Fire in Butte County occurred in November 2018, one year prior to Courtesy submitting the permit application in November 2019 and did not affect Courtesy's "ability to meet any of the construction benchmarks in the Stipulated Decision." [Respondent Subaru of America, Inc.'s Opening Brief, p. 19, lines 6-10] In addition, "the statewide stay-at-home order related to the COVID[-19] pandemic was not issued by the Governor of the State of California until March 19, 2020, well *after* the deadline for [Courtesy] to obtain permits (December 1, 2019) and to commence construction (January 31, 2020)." (Emphasis in original.) [Respondent Subaru of America, Inc.'s Opening Brief, p. 19, lines 3-6] And, although the City of Chico may have closed its physical office doors for a period of time during the pandemic, City employees were working remotely. [Respondent Subaru of America, Inc.'s Opening Brief, p. 3, lines 1-3]

47.     Moreover, Respondent asserts in order for Courtesy to exercise the excuse for delay provisions of Paragraph 18 of the Stipulated Decision, Courtesy "must establish that it has met certain conditions precedent to raising that provision, namely that [Courtesy] properly notified SOA in writing of its inability to achieve the stated deadlines and the need for an extension of time and that [Courtesy] secured SOA's written authorization to extend the deadlines on a weekly basis. [Respondent Subaru of America, Inc.'s Opening Brief, p. 3, lines 12-16] Courtesy failed to properly notify SOA and thus, did not obtain any written extensions as required. [Respondent Subaru of America, Inc.'s Opening Brief, p. 26, lines 16-23; Respondent Subaru of America, Inc.'s Reply Brief, p. 13, lines 1-6]

48.     It is Respondent's position that because "the milestones for permitting the building (December 1, 2019) and commencing construction (January 31, 2020) all occurred prior to any COVID-related shutdowns (which began in March, 2020)" it could not have been truly excused. Additionally, since construction has been ongoing throughout California during the pandemic and is designated an "essential service" under California Executive Order N-33-20, there is no excuse for Courtesy's failure to construct the facility during the pandemic. [Respondent Subaru of America, Inc.'s Opening Brief, p. 3, lines 19-23]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

49.    Respondent further asserts that because Paragraph 21 specifically excludes "delays in obtaining permits and licenses" from the *Force Majeure* provisions, evidence relating to the Camp Fire and COVID-19 pandemic and the governmental orders and actions related thereto, and their impact on construction and permitting in Chico, is not relevant to any of the issues in this matter and cannot excuse Protestant's non-compliance.[23] [Respondent's Reply Brief p. 2, lines 10 through 12; p. 3, lines 20 through 22, p. 4, lines 23 through 24]

50.    SOA also contends that "in California, a 'time is of the essence provision' is generally held to mean that a failure to perform within the time specified in the parties' agreement is [considered] a ***material*** breach of the agreement." See, *Gold Mining & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 27 ("[i]t has been held that when time is made of the essence of a contract, a failure to perform within the time specified is a material breach of the contract," citing *C. O. Bashaw Co.* v. *A. U. Pink ham Co.* (1926) 77 Cal. App. 591) . . ." (Emphasis in original.) [Respondent Subaru of America, Inc.'s Opening Brief, p. 22, lines 17-21; Respondent Subaru of America, Inc.'s Reply Brief, p. 16, lines 17-21] Respondent contends Protestant's reliance on the opinion in M*agic Carpet Ride LLC* v. *Rugger Investment Group, LLC* (2019) 41 Cal. App. 5th 357 is misplaced. According to SOA, *Magic Carpet Ride* is distinguishable because: (1) This case is not a simple breach of contract or a mere settlement agreement, but involves a negotiated Stipulated Decision and order which was approved by the Board; (2) Courtesy has not missed deadlines just by a few days, but by one year, seven months and counting and; (3) "*Magic Carpet Ride* still requires that adherence to time and date conditions be reasonably met." [Respondent Subaru of America, Inc.'s Opening Brief, p. 22, line 23 through p. 23, line 2; Respondent Subaru of America, Inc.'s Reply Brief, p. 18, line 27 through p. 19, line 1]

51.    SOA further asserts that the language of the "no waiver provision" and "integration clause" in the Stipulated Decision "expressly provides that the Stipulation is not modified or affected by any other agreement between the parties. Therefore, the Stipulated Decision stands alone with respect to the issues" in this matter and was not amended by the Amendment to the Facility Addendum.

---

[23] As such, Respondent contended in its Motion in Limine No. 2 that all evidence, testimony and argument regarding these issues should be excluded from consideration at the hearing in this matter. This motion was denied on September 14, 2021. [RT Vol. I 52:21-64:3]

1  [Respondent Subaru of America, Inc.'s Opening Brief, p. 32, lines 6-9, 18-24]

2  **PROTESTANT COURTESY'S CONTENTIONS**

3  52.    Protestant admits that there has been a failure of certain conditions by Courtesy but asserts

4  "the failure of these conditions cannot be considered material because the evidence demonstrates

5  Courtesy's tremendous investment and efforts to achieve full compliance with its obligation [] to

6  construct a new Subaru branded facility." [Protestant's Opening Brief, p. 5, lines 9-12]

7  53.    Moreover, according to Protestant, "the failures of the conditions are the result of

8  circumstances beyond Courtesy's control" and occurred "despite Courtesy's commercially reasonable

9  best efforts." [Protestant's Opening Brief, p. 5, lines 12-13; Protestant's Reply to Subaru of America

10  Inc.'s Opening Brief, p. 19, lines 13-17] "Courtesy has been diligently working to complete a complex

11  facility project involving seven different brands to be housed in three separate showroom buildings, a

12  separate service center, collision center, car wash, and used car lot." The project is complex, requiring

13  "facility design approval from each franchisor and its independent design firms" and is further

14  complicated because the "proposed location is entirely without improvements and requires the

15  establishment of sewer, water, and electricity." [Protestant's Opening Brief, p. 5, lines 16-21]

16  54.    Protestant asserts that the doctrine of equitable estoppel is applicable. "It has four

17  elements: '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct

18  shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so

19  intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the

20  conduct to his injury.' (*Mathews* v. *Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236,

21  258 (quoting *City of Goleta* v. *Superior Court* (2006) 40 Cal.4th 270, 279).)" [Protestant's Opening

22  Brief, p. 10, lines 6-11] SOA therefore "should be estopped from denying it modified the deadlines

23  described in the Stipulated Decision . . . by entering into a subsequent dealer agreement with Courtesy."

24  [Protestant's Opening Brief, p. 10, lines 12-13]

25  55.    Courtesy acknowledges that "SOA was understandably frustrated with the project

26  delays . . ." Courtesy asserts that "it was Mr. Smit's negligent attention to detail that poisoned SOA's

27  decision-making process" by incorrectly assuming and falsely notifying SOA that Courtesy had obtained

28  building permits in January of 2020. [Protestant's Opening Brief, p. 10, line 28 through p. 11, line 4; p.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

12, lines 15-18] Because of this mistaken belief that Courtesy had obtained permits, Courtesy contends that "SOA persists in its refusal to acknowledge the extent of Courtesy's efforts toward compliance, the evidence of government delays, and the impact from the pandemic." [Protestant's Opening Brief, p. 11, line 25 through p. 12, line 8; p. 12, lines 15-20]

56.     Courtesy contends that the "primary factual question before the Board is whether Courtesy exercised commercially reasonable efforts to comply with the obligations of the Stipulation." Courtesy claims it exercised "commercially reasonable efforts and should not be considered in breach because the delay is directly attributable to government delay that was compounded by the pandemic." [Protestant's Opening Brief, p. 12, lines 24-27]

57.     Protestant claims to the extent any delay may reasonably be attributable to Courtesy, this delay is immaterial. [Protestant's Opening Brief, p. 5, lines 13-14] "[I]n the event the Board determines Courtesy to be in breach, the Board's inquiry must turn to the question of whether any such breach is *material*." Protestant contends that "'[i]n determining the materiality of a failure to fully perform a promise[,] the following factors should be considered: (1) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated; (2) the extent to which the injured party may be adequately compensated in damages for lack of complete performance; (3) the extent to which the party failing to perform has already partly performed or made preparations for performance; (4) the greater or less hardship on the party failing to perform in terminating the contract; (5) the willful, negligent, or innocent behavior of the party failing to perform; and (6) the greater or less uncertainty that the party failing to perform will perform the remainder of the contract. (*Sackett* v. *Spindler* (1967) 248 Cal.App.2d 220, 229.)" (Italics in original.) [Protestant's Opening Brief, p. 12, line 28 through p. 13, line 9]

58.     Protestant claims "the substantial forfeiture that would result to Courtesy if the Board determines the failure of the conditions to be material based on timing alone, is not justified in equity." [Protestant's Reply Brief, p. 7, lines 16-17] Courtesy notes that "SOA asks the Board to presume it has been injured because Courtesy's compliance has been delayed. The requirements for the determination of materiality require the consideration of any harm to SOA—there is none. In contrast, Courtesy faces the extreme harm of the loss [of] its Subaru franchise, which is a central piece of its facility project."

1  [Protestant's Reply Brief, p. 8, lines 10-13]

2  59.    Protestant does not claim its entire performance should be excused but rather that the

3  Board must determine "whether Courtesy's inability to timely perform the Stipulation's remaining

4  conditions should be considered a material breach. Courtesy's inability to provide timely compliance is

5  both excused and cannot be considered material." [Protestant's Reply Brief, p. 16, lines 17 through 22]

6  **STIPULATED FACTS[24]**

7  60.    Respondent SOA is a corporation organized and existing under the laws of New Jersey,

8  and is authorized to do business in the State of California. SOA distributes Subaru-brand vehicles in the

9  United States, and holds an occupational license issued by the California Department of Vehicles.

10 [Stipulation of Facts, ¶ 1]

11  61.    Protestant Courtesy Automotive, Inc. dba Courtesy Subaru of Chico ("Courtesy") is a

12  corporation organized and existing under the laws of California, and is a new motor vehicle dealer

13  licensed by the California Department of Motor Vehicles. [Stipulation of Facts, ¶ 2]

14  62.    Courtesy operates a Subaru dealership in Chico, California pursuant to a Subaru Dealer

15  Agreement and Standard Provisions, executed between Courtesy and SOA on October 17, 2019.

16  [Stipulation of Facts, ¶ 3; see also Exh. J-300]

17  63.    The owners and officers of Courtesy are husband and wife, Sharam Mihanpajouh (aka

18  "Jerry Pajouh") and Diane Mihanpajouh (aka "Diane Pajouh"). [Stipulation of Facts, ¶ 4]

19  64.    Mr. Pajouh is the President, Executive Manager, General Manager and Treasurer of

20  Courtesy Subaru. [Stipulation of Facts, ¶ 5]

21  65.    SOA and Courtesy entered into a Stipulated Decision on March 20, 2019 pursuant to

22  Sections 3050.7, 3060, 3061, 3066 and 3067 of the California Vehicle Code to resolve the Section 3060

23  protest filed by Courtesy. [Stipulation of Facts, ¶ 6]

24  66.    The Stipulated Decision was adopted by the New Motor Vehicle Board on April 9, 2019

25  and is a final Order of the Board. [Stipulation of Facts, ¶ 7]

26  67.    The final Order of the Board adopting the Stipulated Decision has never been amended by

27
_____

28 [24] The Stipulation of Facts filed by the parties used Chico as the reference for Courtesy but for clarity, all references to Chico are replaced with Courtesy, unless it is a reference to the City of Chico.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

the Board. [Stipulation of Facts, ¶ 8]

68.     The Stipulated Decision provides the Board shall retain jurisdiction pursuant to the terms and conditions contained therein. [Stipulation of Facts, ¶ 9]

69.     Courtesy and SOA executed the Amendment to Existing Facility Addendum to Conditional Subaru Dealer Agreement Future Address, dated May 21, 2020. This document provided benchmarks for the Courtesy facility project that are different from those set forth in the Stipulation. However, the parties did not seek to amend the Stipulated Decision. [Stipulation of Facts, ¶ 10]

70.     On August 24, 2020, SOA issued a Notice of Non-Compliance with the Stipulated Decision to Courtesy. [Stipulation of Facts, ¶ 11]

71.     On September 3, 2020, Protestant filed with the Board its Request for Appointment of ALJ to Determine Compliance with Stipulated Decision. [Stipulation of Facts, ¶ 12]

72.     On February 1, 2021, SOA issued an Amended Notice of Non-Compliance with the Stipulated Decision to Courtesy. [Stipulation of Facts, ¶ 13]

73.     On February 8, 2021, Courtesy filed with the Board an Amended Request for Appointment of ALJ to Determine Compliance with Stipulated Decision. [Stipulation of Facts, ¶ 14]

74.     In addition to the Subaru dealership, Courtesy also plans to have dealership franchises with Mercedes-Benz, Cadillac, Buick-GMC, BMW and Volvo at the multi-franchise dealership project in Chico, California. [Stipulation of Facts, ¶ 15]

75.     Courtesy submitted its application to Chico for a building permit for the construction of the sales facility for the Subaru dealership on November 26, 2019. [Stipulation of Facts, ¶ 16]

76.     Annexation of the project into Chico commenced by the City of Chico at the end of 2017 and was completed in six months.[25] [Stipulation of Facts, ¶ 17]

77.     Chico issued a building permit for the construction of the sales facility for the Subaru dealership on April 30, 2021. [Stipulation of Facts, ¶ 18]

---

[25] Although the parties stipulated that the annexation of the area where the project is located started in late 2017 and was completed approximately six months later, that is not correct. The City produced via Mr. Sawley, the City planner, a Butte Local Agency Formation Commission Certification of Completion recorded November 30, 2017 showing annexation of the Esplanade Annexation No. 29 (which includes the project site) was completed by Resolution on October 5, 2017. [Exh. P-64.010]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

78. Courtesy submitted its application for the service building permits on or about June 10, 2021. Chico has not issued a building permit for the construction of the service center dealership facility. Courtesy entered into a Development Agreement with Chico with regard to the multi-franchise dealership construction project which was finalized and recorded on April 16, 2021. [Stipulation of Facts, ¶ 19]

**OFFICIAL NOTICE**

79. Government Code section 11515 provides for official notice "of any fact which may be judicially noticed by the courts of the state." Official Notice was taken of the following documents:

(1) State of California Executive Order N-33-20 ("Stay-At-Home Order") issued by Gavin Newsom, Governor of the State of California, on March 19, 2020, available online at https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

(2) Relevant excerpts from the document entitled "Essential Workforce" designating "Essential Critical Infrastructure Workers" under the Governor of California's Executive Order N-33-20, available online at https://COVID19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf which included construction as an essential business.

(3) California Department of Forestry and Fire Protection "Cal Fire News Release" dated May 15, 2019, available online at https://www.fire.ca.gov/media/5121/capfire_cause.pdf. The news release states: "The Camp Fire in Butte County, started the morning of November 8, 2018, and burned a total of 153,336 acres, destroying 18,804 structures and resulting in 85 civilian fatalities and several firefighter injuries. The Camp Fire is the deadliest and most destructive fire in California history." The release continued: "Tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."

(4) Relevant excerpts from United States of America Department of Commerce, Service Assessment "November 2018 Camp Fire," available online at https://www.weather.gov/media/publications/assessments/sa1162SignedReport.pdf. The assessment notes that: "The Camp Fire began around 6:30 AM PST on Thursday, November 8, 2018 near Pulga in Butte County of Northern California . . . . The Fire was 100 percent contained on November 25, 2018."

(5)     Acting Governor Newsom's November 8, 2018 Proclamation of a State of Emergency pertaining to the Camp Fire in Butte County.

(6)     Governor Newsom's March 4, 2020 Proclamation of a State of Emergency pertaining to COVID-19.

(7)     Chico "On-Line Permit," Permit No. B19-00573, for Butte Humane Society, issued on 7/2/2020 and approved on June 24, 2020. [Exh. R-141]

(8)     Chico "On-Line Permit," Permit No. B19-00481, for Subaru/Volvo, issued on 4/30/2021 and approved on May 3, 2021.[26] [Exh. R-142]

## FINDINGS OF FACT[27]

## The Camp Fire and the COVID-19 Pandemic

80.     The Camp Fire in Butte County, California, the deadliest and most destructive fire in California history, began on November 8, 2018. The fire decimated three towns, including Paradise, California, a town of 27,000 people, and burned as far as the outskirts of east Chico. The fire was contained on November 25, 2018. On that same day, Acting Governor Newson declared a State of Emergency to exist in Butte County. [See Paragraph 79, *supra*] After the Camp Fire, residential permits in Chico took precedence over commercial permits, including through mid-2020. [RT Vol. III 8:16-9:25] Mr. Sawley, senior planner for the City, testified the impact from the Camp Fire on Chico was "surreal." There was "a crush of stress on the [City] Planning Department . . . it was another huge distraction." [Exh. P-63.112:16-19, 113:17-20]

81.     During the aftermath of the Camp Fire, Mr. Sawley thanked Mr. Stevens, who was the point person on the Courtesy project at the time, for understanding that Mr. Sawley could not give the Courtesy project timely consideration nor review the Development Agreement between the City and Courtesy. Mr. Sawley was instead focused on the residential needs of people displaced from Paradise,

---

[26] The permit for the Butte Humane Society facility was approved first and then issued. Whereas, the permit for the Subaru/Volvo facility was issued first and then approved. [RT Vol. II 167:11-22; Exhs. R-141.01; R-142.01]

[27] References to testimony, exhibits or other parts of the record are intended to be examples of evidence relied upon to reach a finding, and not to be exhaustive. Findings of Fact are organized under topical headings for readability only, and not to indicate an exclusive relationship to an issue denoted by the topic heading. The absence of a citation generally signifies that the underlying facts are foundational or uncontested, or that the finding is an ultimate fact finding of the Board based upon other facts in the record and reasonable inferences therefrom.

California. [RT Vol. III 14:1-9; Exh. P-63.111:19-112:7]

82.    On March 4, 2020, Governor Newsom declared a State of Emergency in California due to the COVID-19 pandemic. The California statewide COVID-19 stay-at-home Executive Order was issued by Governor Newsom on March 19, 2020. In accordance with the order, the State Public Health Officer designated a list of 13 categories of "Essential Critical Infrastructure Workers," who were exempt from the stay-at-home order. Item 13 was identified as "Industrial, Commercial, Residential and Sheltering Facilities and Services" and included construction workers (and those who assist in construction such as plumbers and electricians) who support construction projects. [See Paragraph 79, *supra*]

83.    Similar to events after the Camp Fire, Mr. Sawley testified that Mr. Pajouh was understanding about not being able to give the Courtesy project the time or the immediate attention when Courtesy's items were submitted for review during the COVID-19 pandemic. [Exh. P-63.111:19-.112:14] The Courtesy facility was not a priority for the City during the pandemic. [RT Vol. III 11:2-24]

84.    The Chico City offices at 411 Main Street were closed from March 2020 to mid-May 2021. [Exh. P-63.109:3-14] The Chico building department offices continued to conduct business during the COVID-19 pandemic and statewide stay-at-home order and employees worked remotely during that time. [Exh. P-63.25:24-.26:11] Mr. Sawley testified the City may have slowed down in its responses, and instituted some protocols during the pandemic. City business was conducted by appointment. COVID-19 created additional burdens and "tremendous" delay in City functions.[28] [Exh. P-63.109:15-110:1] During COVID-19 "it was much harder to get meetings . . . it was extra difficult." [Exh. P-63.27:16-28:2] Mr. Stevens testified that COVID-19 had an effect on virtually all his projects. "It was more challenging and more effort-inspiring, more effort intense." [Exh. P-46.028:2-14]

85.    Mr. Pajouh testified to the difficulty communicating with the City in 2020 due to COVID-19. He explained there were delays in City responses throughout 2020 due to the fact that many City staff

///

///

///

---

[28] Mr. Sawley testified that the City opened its doors the day before his deposition on May 19, 2021. May 18, 2021 was the first day the doors had not been locked in over a year. [Exh. P-63.109:8-14]

were working remotely and that City offices were closed.[29] [Exhs. P-14.001-.002; P-62.164:11-24] However, the situation improved at the start of 2021. [Exh. P-62.052:17-20, .053:8-9, .064:11-17, .083:17-24]

86.    Mr. Farabee testified in April 2021 that, although technically the automotive industry was deemed essential, SOA employees had not been in their offices and offices were closed to most people for the majority of COVID-19. [Exh. P-59.006:12-20] SOA representatives stopped visiting dealers in person in March 2020. [Exh. P-59.006:12-25] Mr. Graziano confirmed that COVID-19 had impacted SOA and both the regional office and zone offices were closed for some period of time.[30] [Exh. P-61.006:23-.007:21, .008:2-12]

**The Leased Subaru Facility**

87.    Mr. Pajouh is currently leasing the property at 896 East Avenue, Chico, a former video store location, for its Subaru sales. [Exh. J-300.02] The store is across the street from Mr. Pajouh's other franchises and has been remodeled, rebranded, and approved by SOA. [RT Vol. II 75:6-17; Vol. IV 80:8-10, 118:3-21] It is on the corner of Cohasset Road and East Avenue. [Exh. P-62.142:11-19] The building does not currently look like a video store. However, it does not look like a traditional dealership building either. [RT Vol. IV 118:18-21] The current Subaru facility is deficient in that it does not meet Subaru Minimum Standards and Operating Guidelines, but Mr. Pajouh said it is better than any of his other facilities. [Exhs. J-300.33; P-62.142:11-19] It is the newest and most modern building that Courtesy operates out of and has better exposure on East Avenue. [RT Vol. VII 24:14-25:9, Exh. 62.142:11-19] Everything that was required to be done at the temporary facility under the Stipulated Decision was completed. [RT Vol. III 232:12-14] Courtesy has a lease on the sales building at the East Avenue location until March 31, 2023. [RT Vol. VI 221:21-222:1; Vol. VII 14:20-15:9]

88.    Mr. Pajouh also leases property at 2520-2522 Cohasset Road for his European car sales and the Buick/GMC sales and service facility. Courtesy uses this facility for service of Subaru customers'

---

[29] See Exhibit P-14 which are emails to Mr. Smit from Mr. Pajouh about the status of the plans and the difficulty working with City officials during COVID-19.

[30] BMW, unlike SOA, recognized that dealers faced issues during COVID-19. BMW sent out a letter to all dealerships that were under either renovations or new building construction, giving an automatic extension of six months to any deadlines, and indicated a re-evaluation of the projects would be done after that. [RT Vol VI 153:8-23]

cars (as was previously authorized). The term of that property lease is through December 31, 2021. [Exhs. R-176; R-177] Courtesy is negotiating an addendum to the lease to extend the lease until December 2022. [RT Vol. VI 224:8-10; Vol. VII 15:10-17] The European building on Cohasset is currently in escrow to Enterprise Rent-a-Car and the sale is subject to the lease. [RT Vol. VII 15:18-16:25]

### Sales by Courtesy of Subaru Vehicles

89.    In 2015, Mr. Pajouh purchased Courtesy Subaru and his other dealerships in Chico. [Exh. 62.022:2-10, .029:7-13] Courtesy's total investment in the purchase all of the dealerships (Courtesy Automotive Group) was $6.6 million plus assets of approximately $1 million for a total of $7.6 million. [RT Vol. VII 11:1-20] Mr. Pajouh estimated that the cost to purchase the Subaru franchise was approximately 40 percent of the total cost or about $3 million. [RT Vol. VII 11:21-12:2]

90.    For 2016 through 2020, Mr. Pajouh's most profitable year was 2020 by approximately a quarter million dollars. [Exh. P-62.029:20-.030:6] Mr. Farabee testified that he could not offer an opinion whether Subaru is losing sales as a result of Courtesy still being in a temporary location. [RT Vol. III 222:14-21] Subaru sales generally are up six percent and Courtesy's Subaru sales, in particular, were up year-to-date (July 2020 to July 2021). [RT Vol. III 222:18-19, 224:20-23] Courtesy's sales were triple the national average sales (up 19 percent) during that timeframe. [RT Vol. III 224:7-23; Vol. IV 66:22-24, 79:17-22] According to Mr. Farabee, Courtesy sells probably 35-45 Subaru vehicles a month. [RT Vol. IV 116:2-5] Mr. Pajouh testified in his deposition that Subaru is an integral part of the business of Courtesy Automotive Center and is its biggest volume. [Exh. P-62.147:3-21] In 2019, Subaru sales and service accounted for over 40 percent of Courtesy's unit sales in generating cash flow. [RT Vol. VII 8:8-25, 29:20-30:3] Subaru is Courtesy's biggest generator of revenues based on volume.[31] [RT Vol. VII 7:21-8:25, 29:16-30:3]

91.    Courtesy could not sell any more Subaru vehicles than they are currently selling because

---

[31]According to Mr. Pajouh, Courtesy's GM franchise generates more revenues as far as gross profit. He explained that when you multiply the number of units sold per gross profit, gross profit per unit is higher on GM, "but the unit sales are not anywhere near Subaru Sales." As an example, if on an average month Courtesy sells 50 Subaru vehicles and each unit generates $1,500 the total gross revenue would be $75,000, but that same month it sells 8-10 GM products and they generate $2,000-$2,500 per unit the maximum gross would be $25,000. [RT Vol VII 9:9-10:7]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

of the worldwide problem producing computer chips due to COVID-19.[32] [RT Vol. III, 213:5-22, 222:22-223:15] Courtesy is "nearly flat to where they were in [2019], which is pre-pandemic numbers" but "that's better performance than Northern California or the country too."[33] [RT Vol. III 225:1-4] Mr. Farabee testified that in terms of presently not having an inventory of cars that "[m]ost retailers would tell you they're okay with how things are right now . . . because profitability is through the roof. They're making more per car than they have. Their pricing on cars has gone up." [RT Vol. IV 67:24-68:3] In 2021, to the date of Mr. Pajouh's testimony, Courtesy is two-and-a-half times more profitable than 2020. [RT Vol. VII 39:6-15, 40:5-8] Mr. Graziano confirmed that it was the best profit year for Subaru retailers and for the company itself in the history of SOA. [Exh. P-61.006:23-007:4]

### **The Butte Humane Society Building**

92.     According to SOA, the construction of the Butte Humane Society building in Chico is a comparable project and relevant to whether Courtesy could have built its multi-franchise project in a timelier manner. The Butte Humane Society applied for a permit at approximately the same time as Courtesy and is nearing completion. [Exhs. R-141.01; R-142.01; RT Vol. II 168:12-15; Vol. V 92:11-14] The Butte Humane Society owns a 10-acre parcel located at 13391 Garner Lane across the street from the Courtesy property and was originally located in the County and annexed in 2017. [RT Vol. II 167:5-10; Vol. III 24:3-14; Exh. P-64.010] It is currently constructing an approximately 20,000-25,000 square foot main office/kennel building on a portion of the 10 acres [Exh. R-141.01; RT Vol. II 167:17-19; Vol. III 111:8-16; Vol. V 94:17-21] The value of the construction project shown on the permit is a little over $4.3 million. [Exh. R-141.01; RT Vol. III 111:7-21, 119:7-14] The total project cost is approximately $8-9 million. [RT Vol. V 95:1-3]

93.     The entire Butte Humane Society project, which includes a future barn and dog park, is to be done in phases. [RT Vol. III 111:11-16, 111:23-112:5, 113:21-114:4; Vol. V 93:10-13; Exh. P-63.076:13-25] The Butte Humane Society parceled off the three acres where the building was to be built

---

[32] Mr. Farabee explained that longer term, because of a business model shift in the last year of people ordering cars and taking possession in 60 days, Courtesy (and other dealers) could take more sold orders and get more cars. [RT Vol III 223:16-224:5, 225:5-13]

[33] Prior to March 2020 (pre-pandemic), Courtesy's average inventory level was 50-70 cars and in 2019 Courtesy sold 594 new Subaru vehicles or approximately 49 per month. [RT Vol. VI 128:25-129:14]

prior to City design review and the use permit application. This was more of a logical sequencing and thus, easier to process for the City. [RT Vol. III 116:10-25] Butte Humane Society applied for a permit on December 19, 2019 (Permit No. B-19-00573). The permit was approved on June 24, 2020, and issued on July 2, 2020, approximately six months after its application. [RT Vol. II 167:11-22; Exh. R-141.01]

94.    Mr. Sawley, although not assigned to the Butte Humane Society project, was familiar with it. [RT Vol. III 109:21-24, 110:15-111:1] Mr. Sawley explained that unlike Courtesy, Butte Humane Society did not plan to build in the County; it did not submit building permits or planning entitlements prior to annexation. It was conceived and approved in the City. [RT Vol. III 24:12-18, 118:16-119:6] Butte Humane Society's design professionals knew they needed to show and pay for City improvements. There was no need for a Development Agreement to defer improvements and costs.[34] [RT Vol. III 24:15-18, 113:11-15, 118:16-23] Butte Humane Society did ask for the same kind of deferral as Courtesy was getting approved for, but Mr. Sawley stated that the City "shut that down." [RT Vol. III 113:16-20] Because Butte Humane Society was designed to meet City standards, they were able "to get faster through the process." [RT Vol. III 146:3-16] Mr. Sawley agreed that the projects were not comparable given that one did not qualify for use of a Development Agreement and the other did; Courtesy planned to build in the County and had plans that reflected County-level improvements.[35] [RT Vol. III 118:16-119:6] It would have required changes to Courtesy's plans to build to City standards. [*Ibid.*]

95.    Construction of the Butte Humane Society building was very close to being completed at the time of the hearing in September 2021. [RT Vol. II 168:12-24; Vol. V 92:11-14]

96.    Mr. Sawley testified that the Butte Humane Society was "more of a lovable project that doesn't get much opposition." He explained that it was an easier project to process because of its mission to take care of animals that may be displaced from fires and "the wind they have at their back with all their donors and stuff. I mean, don't get in the way of Butte Humane." [RT Vol. III 116:10-25].

97.    Mr. Seegert was also familiar with the project as Modern Building was also the

---

[34]Mr. Sawley admitted that these City requirements for the Butte Humane Society were like "building a sidewalk to nowhere." [Exh. P-63.117:13-22]

[35] Mr. Sawley at the same time testifying the projects were not comparable, clarified his testimony, noting that the building was bigger than he had originally thought (20,000 square feet versus 25,000 square feet) and that the acreage was larger than what he originally testified to (five acres versus 10 acres). [RT Vol. III 111:12-21] He explained that the Butte Humane Society project is "a big project." [RT Vol. III 119:7-19]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

contractor on the building project. [Vol. II 166:22-167:1; Vol. V 107:21-25] In his opinion, the Butte Humane Society kennel building is on a smaller portion of the overall site than Courtesy's and not as complex; "it's not even a comparable project." [RT Vol. II 167:11-22]

98.　　Although the two projects have some similarities, such as needing to be connected to utilities and the land is approximately 10 acres, they are not comparable. [RT Vol. II 167:11-22, 169:10-15; Vol. III 118:9-119:6] Butte Humane Society is a single building about 20,000-25,000 square feet. Courtesy has five buildings with 110,00-120,000 square feet, needed four permits, and had multiple plan checks. [RT Vol. V 120:2-18] Mr. Sawley testified that that Butte Humane Society project was more straightforward, with one building and a parking area in front. [RT Vol. III 148:9-16] The Courtesy project had more "problems" in obtaining approval such as lot line adjustments and shared parking areas between all the buildings, which required the City to see all the connections. [RT Vol. III 148:1-8] Butte Humane Society had no basis for asserting that City improvements were not required because the project had not applied for any entitlements with the County. Thus, there was no issue of City versus County requirements that would have triggered delay in coordination between the two entities. Butte Humane Society did not have the option to have a Development Agreement to avoid paying presently for City improvements. [RT Vol. II 167:11-22; Vol. III 113:7-114:4, 117:24-118:23] Therefore, the fact that Butte Humane Society applied for their building permit at about the same time as Courtesy, and that its construction is almost complete, is not relevant to whether Courtesy could have built its facility in a timelier manner, or whether it materially breached the conditions of the Stipulated Decision.

**The New Courtesy Multi-Franchise Project**[36]

**(1)　　The Building Permits and the City Plan Check Process**

99.　　The Courtesy project is a complex multi-franchise project involving seven different brands: Subaru, Mercedes-Benz, Cadillac, Buick-GMC, BMW and Volvo. [Stipulation of Facts, ¶ 15] The dealerships are to be housed in three separate showroom buildings, each 17,600 square feet, a

///

---

[36] For a better understanding of the site and the layout of the project, see Attachments 1, 2 and 3, which were Exhibits "A " and "C" to the Development Agreement. [Exh. R-104.17, .18 and .20] Attachment 1 shows the vicinity of the project, Attachment 2 shows the total acreage and the parcels on the property, and Attachment 3 depicts the layout of the buildings superimposed over the five parcels.

separate service and repair center, which is 56,000 square feet, a car wash,[37] and used car lot. [Exhs. P-63.044:1-5, 103:3-8; R-104.02, Section 1.4; RT Vol. VII 18:21-19:21] It is located on five parcels. [Exh. R-172.02] The property is a little over 11 acres and the square footage of the project is approximately 110,000-120,000. [Exh. R-104.02; RT Vol. II 168:7-9, 171:25-172:5; Vol. III 113:1-6]

100.    This project requires facility design approval from each franchisor and their independent design firms. The project is further complicated by the fact the proposed location is a "greenfield project:" which is a ground up facility entirely without public improvements and requires connection to utilities such as sewer, water, gas, fiber optics and electricity. [RT Vol. I 177:11-12; Vol. II 111:25-112:4, 192:7-8]

101.    Courtesy timely completed the first five milestones of the Stipulated Decision and the Facility Addendum, including acquisition and remodeling of the temporary facility according to SOA specifications, provision of $750,000 cash in lieu of a LOC, and completion of, and approval of, construction drawings by June 1, 2019. [RT Vol. IV 58:21-23; Vol. VI 55:15-60:3]

102.    The Subaru and Volvo building was the first to be approved by Courtesy Automotive Group's franchisors and the first to be submitted for approval to the City. [RT Vol. V 115:22-116:3, 116:10-18] Courtesy submitted the application for four permits to the City on November 26, 2019, including for the Subaru/Volvo building (Permit No. B-19-00481).[38] [RT Vol. V 115:22-116:3, 119:19-120:8] The initial plan set was submitted for the Subaru/Volvo building in late 2019, and for the other buildings just after the first of the year in 2020.[39][40] [RT Vol. V 116:12-18, 117:4-14]

103.    The Chico Building Department is the City unit that is the "pinpoint [department] that delegates or distributes to other departments" and issues the permit. [RT Vol. II 160:7-14, 164:4-16,

---

[37] There is a quick oil and lube building that was specifically requested by SOA. The cost of this building to construct is approximately $200,000. [RT Vol. V 163:19-25, 164:6-25; Vol. VII 18:21-19:9]

[38] Mr. Smit received a copy of the November 26, 2019 permit application and payment receipt from Courtesy, and mistakenly thought the permit had been issued. [Exh. P-51.022:5-24, .035-.036] Mr. Pajouh sent an email on January 8, 2020 explaining to Mr. Smit that he had applied for plan check and permitting in November [2019] and that the City has everything they need to "proceed with permitting." [Exh. P-48.030] However, still under the misunderstanding, Mr. Smit sent out letters indicating that the zoning and permit objective had been achieved. [Exh. P-51.012:20-.013:10, .015:22-.016:14, .026:14-.027:1, .037-.038] Mr. Smit later requested a copy of the permit but it could not be produced since Mr. Pajouh had only filed the application. [Exh. P-51.013:5-16]

[39] Mr. Seegert was given instructions to prioritize the Subaru building. [RT Vol. II 146:18-147:4]

[40] The City of Chico has no capability of having documents submitted online. [Exh. P-47.022:3-17]

165:2-12] The City plan check is a process whereby the building department and a third-party vendor, Bureau Veritas ("BV"), review submitted plans on "big plan checks" such as Courtesy's, and provide feedback to the applicant concerning requested changes or additions to be included with the next set of submitted plans. [Exhs. P-32.003; P-47.015:3-17, .016:13-25; P-63.107:16-25; RT Vol. I 203:18-204:12; Vol. III 21:17-22:4, 71:15-19] The project also required multiple approvals from various other City departments such as Planning, Sewer, and Development Engineering. [Exhs. P-13.002; P-17.001, .003; P-32.001-.062]

104.    On February 14, 2020, Tony Lindsey with the City's building department contacted Mr. Seegert to ask how complete Courtesy's plans were. [Exh. P-17.004; RT Vol. III 179:4-5] Mr. Seegert responded that when the drawings were submitted, the intent was to have the City start the plan check process at that time. [Exh. P-17.004]

105.    Mr. Sawley reviewed the plans on February 18, 2020, and noted that the plans needed to "show public frontage improvements meeting City standards (or complete draft Development Agreement authorizing waiver therefrom)." [Exh. P-32.001; RT Vol. III 36:16-24] Mr. Sawley testified at the hearing that he and the other City reviewers were not "urgently wanting to look at these plans" while the Development Agreement was being negotiated because it would be premature and cause incomplete reviews.[41][42] [RT Vol. III 29:7-14, 169:19-170:9, 171:6-172:12] Mr. Sawley confirmed that BV performed timely reviews of the plans because they wanted to get back to the City at the predetermined deadlines set by the City. [RT Vol. III 172:4-8]

106.    On February 20, 2020, Mr. Lindsey told Mr. Seegert that BV would receive the plans the following week and had been notified that "it's a priority project." [Exh. P-17.003] BV received the plans from the City the last week of February 2020 or early March due to a delay in City staff receiving

---

[41] Although Mr. Sawley's comments on the City permit review form on February 18, 2020 seem consistent with his testimony, Mr. Sawley did not mention in his deposition the delay of plan reviews pending the Development Agreement. Further, it seems inconsistent with Mr. Lindsey's email where he indicates that Courtesy's plans will be given "priority."

[42] Upon later questioning, Mr. Sawley testified inconsistently. He said that late requests from the City in January and February 2021 asking for such things as intersection alignment and frontage improvements on a nearby private lane to be included in the Development Agreement, did not delay the permit because "the permits are on their own separate track and they're being reviewed by the Building Department for adherence to the building codes." [RT Vol. III 20:3-21:20]

1   shipping labels.[43] [RT Vol. III 30:10-24; Exhs. P-17.002-.003; P-47.016:9-22] On March 3, 2020, Mr.

2   Lindsey confirmed that BV had the plans and were reviewing them. [Exh. P-17. 002] The structural

3   calculations from Courtesy were received by the City on March 5, 2020, and provided to BV. [RT Vol.

4   III 33:2-34:4; Exh. P-32.003] BV did a building initial review in approximately three weeks, and on

5   March 20, 2020, provided a six-page response to the City. [Exh P-32.003-.00.10; Vol. V 144:23-145:4]

6   Mr. Seegert did not receive any plan check responses until the end of March 2020, which did not include

7   comments from all departments, and some did not arrive until after April 20, 2020. [RT Vol. II 158:15-

8   22; Vol. III 30:25-31:16, 40:5-16, 42:4-15; Exhs. P-13.003; P-14.003-004; P-17.001-.004; P-32.003]

9        107.    The City departments other than building and planning started reviewing the plans on

10  February 24, 2020. [RT Vol. III 30:10-18, 36:21-24; Exhs. P-32.003; R-166.03] On April 15, 2020, Mr.

11  Seegert sent an email asking Mr. Lindsey the status of the engineering, parks and sewer departments'

12  reviews. Mr. Lindsey responded that he would send a reminder to the reviewers and "urge them to

13  review" the plans.[44] [Exh. P-17.001]

14       108.    Mr. Pajouh had never heard from Mr. Seegert or been told by anyone from the City that

15  City personnel were not working on the plan check because the Development Agreement was not

16  complete or that the plan check process was not proceeding as quickly as possible. [RT Vol. VI 87:12-25,

17  88:6-14] Mr. Pajouh testified that he understood that the Development Agreement and the plan

18  check/permit process were "two ships sailing alongside each other." [RT Vol. VI 86:13-23, 87:21-88:5]

19       109.    Resubmittals were often done by mail during COVID-19, and the plans sat on a shelf for a

20  couple of days because the City staff thought they could not touch them due to protocols. [RT Vol. III

21  35:4-16]

22       110.    Courtesy resubmitted documents responsive to the City's plan check responses on five

23  occasions. [Exh. P-32.001-.022; RT Vol. II 158:7-14; Vol. III 50:14-22, 52:4-9, 170:21-25] Mr. Sawley

24  testified that Modern Building was checking in frequently "([Mr. Seegert] was being the pest that he said

25

26  [43] The City delayed shipment of the plans because of late receipt of shipping labels. [Exh. P-17.002]
27  [44] Mr. Sawley, when asked about this email, testified that he did not know why these other departments had not
    responded. He did however note, given the date of "one month into COVID[-19]," that many people were not
28  allowed into the building due to COVID-19 restrictions. The plans were "hard copy plans on the shelf, which
    means you have to be in the building to look at them." [RT Vol. III 184:18-185:12]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1    he didn't want to be") and they were moving forward on all fronts "in the pursuit of trying to get to the

2    end result faster." [RT Vol. III 182:19-184:7]

3        111.    Courtesy had a billing disagreement with Mr. Stevens at Northstar Design Solutions, who

4    was hired to do the civil design work. Northstar sent a letter to Courtesy dated June 25, 2020, terminating

5    their contract. Northstar noted that it was paid its November 2019 invoice, its December 2019 invoice

6    was skipped, and had not been paid since January 10, 2020. Mr. Pajouh asked for documentation for the

7    disputed billings in February 2020 and Mr. Stevens responded on April 3, 2020. [Exh. R-102.01-.03] The

8    contract termination letter listed 10 remaining items that were "necessary to secure a building permit

9    according to City staff." [Exh. R-102.02-.03] Items one through five (secure ARB approval, ensure site

10   design was acceptable to City staff, design intersection improvements and frontage improvements, and

11   prepare and complete use permit) were not items Northstar had been engaged to perform.[45] [Exhs. R-

12   102.02-03; R-119.15:16-.17:24] There were two other items (numbers six and seven) that NorthStar

13   asserted it had been engaged to perform: (1) apply for and complete the Boundary Line Modification (the

14   five parcels had to be reconfigured because a building cannot be built on an existing parcel line), and (2)

15   abandonment of the right-of-way or ROW[46] at the Highway 99 and Garner Lane intersection.[47] Both

16   could have been done later and did not need to be done before permitting. [Exhs. R-102.03; R-119.18:3-

17   .20:14]

18       112.    The dispute was resolved "amicably" and Courtesy paid the agreed amount to Northstar

19   after the June 25, 2020 letter Northstar sent to Mr. Pajouh. [Exhs. R-102.01-.03; R-119.11:10-14, .13:2-

20   25, .14:11-15:1] Courtesy was later advised that a storm drainage report was needed, as well as additional

21   civil design services for the Express Service and Wash/Detail buildings, and that Northstar's involvement

22   would be beneficial. [Exh. P-21.001-002] Courtesy then authorized Modern Building to contract directly

23

24   _____

25   [45] There is an April 2019 email from Mr. Stevens to Mr. Pajouh indicating that Mr. Sawley agreed with the
     County's decision to not require a use permit since a rezone was done. [Exh. R-130.10] Mr. Stevens testified that
26   the City changed its mind and wanted a use permit. [Exh. R-119.17:17-24] The Development Agreement indicates
     that no use permit was required by the City. [Exh. R-104.03, Section 2.1]
27   [46] Right-of-Way or ROW is defined by the parties as: "The parcel of land owned by the City of Chico, and
     preserved as a right-of-way, on Garner Lane in the City of Chico adjacent to the property on which the Multi-
     franchise project is located." [Stipulated Glossary of Non-Controversial Terms]
28   [47] Mr. Pajouh testified that Northstar was not contracted to do items six and seven. [RT Vol. I 194:5-12, 195:3-5]

with Northstar on August 4, 2020, to complete the work for a fixed price. [Exhs. P-21.003-.010; P-66.002:10-16] Items six and seven in the June 25, 2020 letter from Northstar were not performed by Northstar under the subcontract with Modern Building. [Exh. P-46.025:4-8, .026:10-16]

113.    On July 15, 2020 Mr. Pajouh sent an email to Mr. Smit stating that "James Seegert mentioned they are having difficulties not just with the City Officials but also with their subcontractors and field crew as some have contracted the virus so the rest of the group don't show up for work." [Exh. R-159.08] Mr. Farabee testified in his deposition that he called Mr. Pajouh about the email because his understanding had been that the project was stalled because of the City's closure. According to Mr. Farabee, Mr. Pajouh told him that "there had been some issues contacting the correct people" on Mr. Pajouh's side to secure the information needed by Chico to move forward with the permits and to process requests made by the City on plan checks. Mr. Pajouh told Mr. Farabee that "between his contractor and subcontractors, they were having difficulty getting what they needed back to the city." [Exh. R-122.02:24-.04:15, .12:5-.13:12; .14:8-.15:18]. Mr. Farabee testified at the hearing that he called Mr. Pajouh about the email and Mr. Pajouh "told me that he had what he needed and the City was waiting on his team for a response." He did not recall Mr. Pajouh saying he was having "difficulty with his subcontractors." [RT Vol. II 96:8-97:2]

114.    Mr. Pajouh in his corrected declaration in support of the Protestant's Reply Brief and in his testimony asserts Mr. Farabee's testimony was incorrect. [Exh. P-66.001:26-002:2] Mr. Pajouh explained he was merely repeating in the email what he had heard from Mr. Seegert and that it was not related to the Courtesy project or its subcontractors. [RT Vol. I 184:17-185:2, 186:1-10, 188:16-23] Mr. Pajouh stated that he "was never aware of any significant issue with subcontractor availability due to COVID-19 illness or any other reason." [Exh. P-66.001:26-002:2]

115.    Mr. Seegert testified that intermittently, throughout the job, there were general delays from some of his subcontractors because of issues related to working remotely during COVID-19. [RT Vol. II 172:8-173:3] He did have discussions with Mr. Pajouh about some "boots on the ground" or field crew subcontractors that did not show up for work because of COVID-19 illnesses. [Vol. II 173:12-174:2] There was never a specific instance where a subcontractor on the Courtesy project who was supposed to respond to City plan check could not respond due to COVID-19. [RT Vol. II 173:4-11] Mr.

1   Seegert also testified that there was no one working on responses to plan checks that was unavailable due

2   to anything else in July 2020. [RT Vol. II 177:25-178:4, 178:22-179:4]

3                    **(2)    The Development Agreement and The Right-of-Way (ROW) Issue**

4          116.    The Courtesy facility project was originally situated and conceived in Butte County on

5   approximately 11.3 undeveloped acres with unimproved gravel shoulders and roadside ditches. [Exhs. P-

6   46.009:9-15; R-104.01] The County adopted a mitigated negative declaration[48] and established

7   conditions of approval for Courtesy to follow. [Exh. P-46.009:9-.012.3] Courtesy had to prepare

8   construction documents, building plans, and achieve other conditions imposed by the County before the

9   County would issue a building permit. [*Ibid.*]

10         117.    Before County permits could be obtained, Courtesy had to do a general plan amendment, a

11  rezone of the property, and a lot line adjustment. [RT Vol. I 132:3-12; Exhs. P-46.011:11-20; P-

12  63.064:12-065:3] Mr. Pajouh had gone to the County and "got a lot of legislative actions done,"

13  including a specific plan amendment and a rezone, but "they didn't give him entitlement to build and that

14  became a problem upon annexation." [Exh. P-63.101:21-102:15] Courtesy went through a "significant

15  county process," and then the City "snapped up the property through an annexation and that kind of sent

16  him back to the starting gates." [Exh. P-63.012:11-18, 102:12-15, 103.13-.104:1] Courtesy did not apply

17  for permits with the County of Butte prior to the annexation by Chico. [Exhs. P-46.030:20-25; P-

18  63.064:12-22].

19         118.    The November 2017 annexation of the 21 parcels, including the Courtesy dealership and

20  Butte Humane Society properties by the City of Chico, was completed in six months. [RT Vol. III 24:3-

21  14; Exh. P-64] The annexation was "a land speed record," being completed in about one third the usual

22  time. [Exh. P-63.065:4-23] If Courtesy had obtained County permits prior to annexation, the City would

23  have honored those. [Exh. P-63.064:12-22]

24         119.    Part of the City's annexation included an odd-shaped parcel of land near the intersection

25  of Garner Lane and Highway 99 given to Butte County by Caltrans. [Exhs. P-7.001-.003; P-46.015:6-

26  .016:9; P-63.096:4-6] This ROW is adjacent to the property and immediately north of the multi-franchise

27

28  [48]A Mitigated Negative Declaration is "a negative declaration prepared for a project when the initial study has
identified potentially significant effects on the environment." [Public Resources Code section 21064.5]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

project land. [Exh. P-46.016:15-20]

120.    There were discussions between Courtesy and Butte County about abandonment of the ROW to Courtesy and according to Mr. Stevens, abandonment was "met with concurrence from the county. It wasn't going to do them any good; they were willing to abandon it." [Exhs. P-7.001-.003; P-46.015:6-.016:9; RT Vol. I 153:17-20] Additionally, the Initial Study filed by the County included a notation that the abandonment had been applied for.[49] [RT Vol. III 160:16-23] Mr. Sawley testified that the County was "going down the path of abandonment," and he had no reason to doubt that the County would have abandoned the right-of-way to Courtesy. [RT Vol. III 148:18-149:14, 149:23-150:1; Exhs. P-7.001-.003; P-63.095:12-.096:1, .096:12-.097:3]

121.    The City of Chico, however, acquired the ROW through annexation, and wanted to preserve it for a possible interchange.[50] [Exhs. P-46.016:21-.017:4; P-63.093:13-20; R-119.08:6:25]

122.    Courtesy's design team approached the City and discussed that during the annexation process when a property is annexed, it is annexed with its entitlements. Courtesy had processed a general plan amendment, a specific plan amendment and a rezone under the County's jurisdiction. [Exh. P-63.012:11-18] At the point of entitlement by the County for the project, the City stepped in and annexed the property. Mr. Stevens explained that there is a period of time that entitlement lasts, typically for two to three years. Initially, the City agreed to allow the project to be built to County standards. [Exhs. P-46.012:6-23; P- 46.029:12-21; R-111.01]. But according to Mr. Stevens, the City "went back on their agreement."[51] [Exhs. P-46.029:12-.030:9; R-102.02; R-119.35] Approximately a year and half after the annexation, the City decided that Courtesy had waited too long, and that Courtesy now had to build to City standards. [Exhs. P-46.029:12-.030:9; R-119.22:7-.23:9] It was at this point that a Development Agreement was suggested. [*Ibid.*]

123.    Assistant City Manager Chris Constantin explained it differently in an email dated

---

[49] The California Environmental Quality Act requires that the Lead Agency, through its initial study, evaluate the whole of a project's potential environmental impacts. (Title 14, Cal. Code Reg. § 15063)

[50] Mr. Stevens testified that he was surprised when the City's director of public works first mentioned that the City was thinking about the potential for an interchange in the ROW since construction of a large church had already been allowed on the north side of the ROW by the County. [Exhs. P-12.002; R-119.08:17-.09:1]

[51] In the June 25, 2020, letter from Northstar to Courtesy, Mr. Stevens noted "the *significant* work ahead of [Courtesy] due to the City going back on their agreement. . ." (Emphasis added.) [Exhs. R-102.02; Exh. R-119.35]

September 20, 2019, to other City staff related to Courtesy's draft Development Agreement. He stated: "The original understanding was that [the City] would honor the standards in place based on the date [Courtesy] filed. For reasons completely under their control, [Courtesy] missed doing so before the property was annexed."[52] [Exh. R-111.01] Mr. Constantin added that: "Our proposal for delaying the public improvements *benefits the City more than Courtesy* (especially if its built to then [later] standards), but it extended a benefit to Courtesy giving them some of what we discussed with them before annexation." (Emphasis added.) [Exh. R-111.01]

124.    In this case, Chico would have required urban frontage improvements (curb, gutter and sidewalk) including reconstruction of the roadway. [Exh P-46.013:11-23] Additionally, the City's typical improvements include storm drainage, sanitary sewer, landscaping, parkstrip and streetlights in order for the project to be permitted and proceed to the construction. [Exhs. R-104.03, Section 2.2; P-63.010:14-11:13] Generally, the City requirements are more burdensome and expensive than the County requirements, creating a more significant financial obligation. [Exhs. P-46.013:6-10; P-63.011:14-23, .110:24-111:4] In the absence of a Development Agreement, Courtesy would have had to include the necessary public improvements in its plans and complete them as part of the construction of the project. [Exhs. P-46.014:6-13; P-63.013:5-.014:23]

125.    A Development Agreement is not required by Chico to construct within the City. [Exh. P-63.015:7-18 ; RT Vol. III 113:7-15] Development Agreements under usual circumstances, take months-to-years to process, depending on the terms. [RT Vol. III 12:13-23] However, it was decided a Development Agreement would be used for the Courtesy project because the project plans, developed prior to the annexation, were based on County standards, and would require a significant cost to meet the City's requirements. [RT Vol. I 133:23-134:13; Exhs. P-46.014:4-25; P-62:166:11-21] Mr. Sawley explained, when asked if "most people do a development agreement in this kind of situation," that "[t]here is no 'this kind of situation'" because "[m]ost of the time developers weren't approved for major

---

[52] There is no testimony from Mr. Constantin. Mr. Sawley testified when asked about the September 2019 email that: "[i]t's really easy to write it in a paragraph, and I'm sure there were important things happening at the time, like they still needed a lot line adjustment from the county to get the property lines out of the way of the building, so there was a similar set of challenges to get it done in the county. And what I don't think comes clear in an email like this is the fact that the city pursued annexation and it was a done deal in like six months, which is a land speed record for annexation. We don't do them that fast. They rarely get done that fast." [Exh. P-63.064:12-.065:12]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

things through the County and then annexed before they were able to secure building permits" and caught between County standards and City standards. He did not know of any other situation where a developer was caught this way. [RT Vol. III 17:8-21]

126.    A Development Agreement would allow Courtesy to build essentially to County standards and defer the completion of the City public improvements for 20 years. [Exhs. P-46.014:4-25, .029.7-.030:9; P-62.166:11-21; P-63.055:24-.056:3] The amount deferred was "probably a million dollars' worth of infrastructure." [RT Vol. III 85:17-86:5] The parties agreed in the Development Agreement that construction of City standard improvements along the frontage of the property was premature as there were "no urban-level public frontage improvements in the area." [Exh. R-104.03, Section 2.2]

127.    Courtesy applied for the Development Agreement on October 24, 2018, and paid a fee of $6,820. [RT Vol. I 138:9-25; Exh. P-42.04] A draft Development Agreement was sent by Mr. Stevens along with the application. [Exh P-63.043:6-12]

128.    Four months later, on March 1, 2019, Mr. Sawley sent a response to the Development Agreement, to Mr. Stevens. [RT Vol. III 127:15-19] Mr. Stevens responded and a second City response or "turnaround" to the Development Agreement was completed by Mr. Sawley on or about June 4, 2019, and sent to Mr. Stevens. [Exh. R-175; RT Vol. III, 133:6-24]

129.    Courtesy sent a revised draft of the Development Agreement to the City on September 19, 2019, with a deferral of public frontage improvements for 20 years, without any collateral for the City. [Exh. R-111.03] On October 2, 2019, Mr. Sawley sent an email to Mr. Pajouh and Mr. Stevens indicating that abandonment of the ROW by the City was not an option. [Exh R-112.01] Courtesy sent another draft to the City in November 2019. Mr. Sawley acknowledged in an email dated November 21, 2019, that although the draft terms now had sufficient commitment to protect the City's interest, there remained the "sticking point" of abandonment of the ROW, that follows a different legal process and would be challenging to incorporate into the Development Agreement. [Exhs. P-63.040:11-.041:2, .168]

130.    Courtesy sent a draft Development Agreement dated December 3, 2019, with four phases to the City. The four phases included: (1) the development of the multi-franchise facilities including dealership buildings and service centers, (2) a pre-owned (used) sales building and an express wash building, (3) a convenience store and a food service building over the ROW and (4) a small retail use

building such as food service or other commercial use in the City's ROW. [Exh. P-63.021:4-.022:16, .042:18-.043:25, .195-.196]

131.    Rather than abandonment of the ROW, Assistant City Manager Chris Constantin continued discussions with Courtesy for possible leasing of the right-of-way land, to generate sales tax revenue, including a possible "temporary" gas station. Mr. Sawley testified that "Chris [Constantin] did go quite a bit down the road with [Mr. Pajouh] on negotiating how that [temporary] lease" would work, without abandoning the ROW. [Exh. P-63.093:2-25; .095:4-11] Mr. Sawley explained that "[w]e're not taking away the right-of way but we're going to let something happen on it." [Exh. P-63.095:4-11]

132.    In February 2020, Mr. Constantin suggested, as an alternative to the Development Agreement, to finance the public improvement infrastructure costs and development impact fees through the state government's Statewide Community Infrastructure Program ("SCIP"). [Exh. P-63.220] The SCIP option would have covered the City standard improvements, but not all the improvements that were included in the Development Agreement, such as light pole heights, signage requirements, and parking spaces on the property. [Exh. P-63.017:18-25; .097:11-25] Mr. Sawley described it as "government morass programs" that Courtesy would have "to wade into and get money out of." [Exh. P-63.20:5-9]

133.    Mr. Sawley testified he did not make the Development Agreement a priority during COVID-19 because it did not require a 30-day turnaround. He testified: "[t]here was a little less heat on getting it processed." [RT Vol. III 11:14-24] Development Agreements were not "the highest priority [during COVID-19]." [Exh. P-63.028:4-9]

134.    Mr. Sawley was a less active participant during 2020 in the negotiations of the Development Agreement because of other duties he had related to COVID-19. Chris Constantin became more involved in order to move things forward. [Exh. P-63.024:19-.025:5; .093:2-7, .100:17-.101:6, .110:9-19] There was back and forth between the City and Courtesy during 2020, but relative to earlier responses from the City, there were delays during COVID-19. [Exh. P-63.027:16-.028:2]

135.    On August 11, 2020, Mr. Constantin wrote to Mr. Pajouh and sent a redline version of the Development Agreement. [Exh. P-23.001-.002] Mr. Constantin stated "the DA [Development Agreement] should not be a stumbling block for your project as the critical path for the development is the Community Development portions that currently include the ARHPB [Architectural Review and

Historical Preservation Board ("ARHPB" or "ARB")]. Thus, we can continue to refine and finalize this DA." [Exhs. P-23.001; RT Vol. VI 205:10-206:17] Mr. Pajouh testified that Mr. Constantin also verbally assured him that a Development Agreement was not slowing down the process. [RT Vol. VI 202:19-203:9]

136.    The ARB approves new construction projects through a public hearing and one that Courtesy had to go through. [RT Vol. VI 92:15-23; Exhs. P-63.101:21-102:21; P-66.002:18-21; R-159.09-.10] The ARB design review approval process is a City requirement that the County does not have. [Exh. P-63.101:25-102:2] Before taking the project to the ARB, Mr. Sawley asked Courtesy to work out a variant of the design of the collision center to make it look more appealing, which caused a delay. [Exh. P-63.102:22-.103:10] The ARB presentation occurred in the fourth quarter of 2020. [RT Vol. I 210:20-24; Vol. II 52:25-53:17]

137.    As late as November 2020, Mr. Pajouh and Mr. Constantin, with Mr. Sawley and others present, discussed changing the lease terms for the ROW from 40 to 30 years, with a 10-year grace period to build and the ability to finance over 20 years. [Exh. P-29.004]

138.    The City staff returned to work in early 2021 (although the buildings remained closed), which allowed the project to gain some momentum. [Exh. P-62.052:17-.053:9, .083:17-24, .164:11-24] In February 2021, Mr. Sawley said "things seemed to be getting more urgent" with regard to finalizing the Development Agreement. [Exh. P-63.104:16-105:11, 106:23-107:3; 121:2-16] The project had to be approved by the Planning Commission, which was accomplished on or about February 11, 2021. [RT Vol. III 85:17-23, 87:21-88:4, 89:9-24; Exh. P-29.001] It then was reviewed by the City Council for two meetings and approved by the Chico City Council via ordinance, in February 2021. Lastly, 30 days had to elapse for the ordinance to take effect and before it could be recorded. It was approximately a three-month process. [RT Vol. III 87:15-19; Exh. R-150.01]

139.    Bruce McClure, the point person with the Building Department, left the City a number of months before the Courtesy permits were issued. After his departure, City staff could not find pertinent documents so "they were trying to piece the puzzle back together" and Mr. Seegert had to submit replacement documents. [RT Vol. II 164:4-18, 165:2-12] Additionally, it took weeks between when Courtesy was told the permit was approved and issuance of the permit due to the City taking a

1   considerable amount of time to calculate the fees owed. [RT Vol. II 161:15-162:8, 162:24-163:22]

2       140.   Cal Water, a private purveyor, requested that Courtesy and its neighboring businesses

3   make one application for water. [RT Vol. III 92:17-20; Exh. P-46.032:5-12] Courtesy formed an LLC

4   with the Butte Humane Society and another neighboring building owner, Down Range, to bring in the

5   infrastructure, including water, sewer, gas, electricity, and fiber optic cable. [RT Vol. I 177:4-16; Exh. P-

6   46.024:17-.025:3, .033:3-10] An additional demand from the City was that Courtesy and the other two

7   developments extend the City sewer trunk line for connection to the properties and pay for this expense.

8   [RT Vol. I 177:4-16; Exh. P-46.020:20-.021:15, .025:4-.026:4] The City required the sewer extension be

9   built to sufficient capacity (larger than currently needed) for potential future development of other nearby

10  properties that Courtesy and the other members of the LLC did not own. [Exhs. P-25.001-.002; P-

11  46.025:4-.026:9; P-63.122:16-.124:1]

12      141.   The City "haggled" Courtesy over the size of the storm drain pipe, wanting a surge pipe

13  bigger (oversized) than what was needed for the Courtesy development. The City finally agreed to a

14  reimbursement agreement with Courtesy for the higher costs. [Exh. P-63.122:16-.124:8]

15      142.   When asked why the City didn't just reject the proposed use of the ROW by Mr. Pajouh,

16  Mr. Sawley explained that Mr. Constantin's role was "how do we give everybody what they actually

17  need out of the deal." He continued that Mr. Pajouh was trying to salvage the project that was going to be

18  approved by the County with the ROW included and Mr. Constantin was good at exploring "the option of

19  being able to do both." Mr. Pajouh trusted that the City "would be able to work that out in a way that

20  everybody could get onboard with." [Exh. P-63.105:18-106:22] Mr. Constantin left the City in December

21  2020. [Exh. P-63.016:10-17, 017:8-17]

22      143.   Mr. Sawley believed that Mr. Pajouh "was diligently trying to move the project forward"

23  and was "diligently trying to pursue several things at once, including the main thing which is . . . the new

24  dealership buildings." [Exh. P-63.104:7-15] Mr. Sawley thought Mr. Pajouh "wanted a really sweet

25  deal," but the City needed to balance protection of the public interest and facilitating productive

26  development in the City. [Exh. P-63.111:5-17] Mr. Sawley thought it was "unfortunate that [Mr. Pajouh]

27  couldn't let go of the right-of-way sooner, but we entertained different ideas for trying to keep it in the

28  mix . . ." [Exh. P-63.104:7-12]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

144.    Mr. Farabee did not recall any discussion that [Courtesy] was not moving forward nor did he have any reason to believe that Courtesy was not diligently working through the plan check process. [Exh. P-52.012:12-20, .016:23-.017:6]

145.    The plan check process and Development Agreement negotiations continued into 2021 with Mr. Sawley. The City would not issue the building permits until the Development Agreement was finalized and until the plan check process was complete. [Exh. R-150:01]

146.    On January 20, 2021, Mr. Sawley in an email indicated he was available to discuss the ROW lease but indicated that his recollection was that the lease area would be suitable for displaying vehicles, "but not so much for structures that would require building permits." He also noted that "the concern about these improvements in the ROW lease area had been narrowed down to just the underground storage tanks associated with the fuel station." If the underground tank issue could be resolved, Mr. Sawley noted that the parties were "closer to a tentative agreement than previously indicated." [Exh. P-29.003]

147.    On January 21, 2020, Mr. Sawley, following a conversation with Mr. Pajouh, sent a draft of the Development Agreement with changes to simplify and streamline the agreement and deleted the ROW. [Exh P-29.001; RT Vol. III 196:2-17] It became apparent to Mr. Pajouh that the Development Agreement would not be recommended for City approval with any reference to the proposed development of the ROW. Mr. Pajouh, in an email to Mr. Sawley on January 25, 2021, agreed to the draft Development Agreement. [Exhs. P-29.001; P-66.002:21-25, 66.021; RT Vol. III 196:2-17, 196:18-23] At this same time, Mr. Pajouh was advised that the plan check process was nearing completion. [Exh. P-66.002:25-26]

148.    The City continued to make additional project demands in 2021, which included the requirement Courtesy secure approval for the realignment of the intersection of Esplanade and Garner Lane. [RT Vol. III 82:2-18, 83:22-84:4; Exhs. P-63.119:7-120:12; R-104.24]

149.    The City also wanted Courtesy to agree to make frontage improvements on Three Sevens Lane, a private road that borders the project. Mr. Sawley succeeded in getting the public works department to drop the request. [Exh. P-63.124:9-25, .246]

150.    The Development Agreement was signed and recorded on April 16, 2021. [Exh R-104.01]

Courtesy agreed to a subordinated deed of trust on the property with the City as a lien holder. [Exhs. P-63.023:1-13, .050:9-16, .056:21-23; R-104.03] The deferral of the improvements under the agreement is until the first of either two triggering events: (1) 20 years or, (2) development of surrounding properties such that infrastructure is already existing on those properties. The term of the agreement is 22 years. [Exh. P-63.055:2-.056:18]

151.    Section 4.7 of the Development Agreement provided for "Special Conditions" that allowed Courtesy to use non-City standards for six free-standing signs (25 feet, 6 inches), freestanding light poles (28 feet), and the depth of the standard parking stalls shall be 19 feet and the drive aisle width 25 feet. [Exhs. P-63.097:20-.098:1; R-104.08; RT Vol. I 214:6-23, 215:2-9]

### (3)    The Letter of Credit (LOC) and the Amended Facility Addendum

152.    Mr. Smit testified that SOA put the LOC requirement into the Stipulated Decision because "[i]t's a common financial instrument that [SOA] use[s] for assurance on performance." Mr. Smit could not recall if SOA had ever called a LOC. [RT Vol. VI 34:7-24] Mr. Farabee testified that SOA has the practice of requiring a letter of credit for those retailers that are performing a greenfield facility project such as Courtesy's project. Mr. Farabee explained that SOA does this, not in lieu of the dealer performing the facility project, but as an assurance that a project will get done in a set amount of time or by a certain date. [RT Vol. II 111:25-112:4, 112:10-14, 113:14-17; Vol. IV 143:13-145:20]

153.    Mr. Smit was the SOA person most knowledgeable and primary point of contact for Mr. Pajouh. Mr. Farabee testified that "Ray [Smit] was most closely tied with [Mr. Pajouh] on this [letter of credit] process." [Exh. P-52.008:2-9] Mr. Smit, according to Mr. Farabee, was the primary person working with Courtesy "on trying to secure the letter of credit that the Stipulated Decision required." [RT Vol. II 107:15-21]

154.    In March 2020, Courtesy's sales operation was shut down (service and parts remained open) by the City of Chico code enforcement and Mr. Pajouh communicated that to Mr. Smit. [RT Vol. VI 62:21-24, 65:10-19; Exh. P-62.079:2-6, .080:3-9, .155:3-4] Mr. Pajouh asked for the return of the $750,000 deposit he had given to SOA (in lieu of a LOC) because of the uncertainty due to COVID-19. [RT Vol. VII 21:9-20]

155.    By letter dated April 2, 2020, Mr. Smit responded to Mr. Pajouh that SOA declined to

change the terms of the Stipulated Decision and denied the request for early release of the $750,000. [Exh. R-123.14]

156.    After March 2020, Mr. Smit and Mr. Pajouh had a further discussion, and Mr. Smit followed up with an email dated April 29, 2020, stating: "I am following up on our conversation last Tuesday regarding the settlement agreement dates." [Exh. P-16.001] Mr. Smit affirmed that when he referred to "settlement agreement dates" he was referring to the Stipulated Decision. [RT Vol. VI 15:20-16:20] Mr. Smit testified in his deposition that "this noncompliance letter revolves around . . . the Stipulated Decision" and when Mr. Pajouh provided the revised dates, "it was reset."[53] [Exh. P-51.025:17-.026:4]

157.    Mr. Smit stated in the April 2020 email that "to even consider exchanging a LOC in lieu [of] your performance deposit," Mr. Pajouh needed to provide revised and definitive dates for permitting, commencing construction, completing construction, and final verification for the permanent facility. Mr. Smit noted "I know you said [that these] dates were unobtainable during our conversation, but we need solid benchmarks." Mr. Pajouh, in his reply email to Mr. Smit on the same date, noted that the $750,000 was intended to only be a bridge to the issuance of the LOC. He proposed new dates, "based upon little more than hopeful optimism." [Exh. P-16.001] Mr. Smit testified in his deposition that: "Like this is ground zero. We're in the middle of shut down. And he gives us dates to hit, revised dates. And, you know, this in the middle of everything being shut down. So, we take them. He makes a promise to us, and we accept it. I would think you build in some slack on these dates for the unexpected."[54][55] [Exh R-123.09:3-11] Mr. Pajouh testified that Mr. Smit did not discuss with Mr. Pajouh what he meant in his

---

[53] Mr. Smit testified that he did not expect the dates that he asked Mr. Pajouh to provide would replace the Settlement Agreement dates because "I mean, the Facility Addendum Amendment and Settlement Agreement are two distinct separate things. They're mutually exclusive." But when asked why he referenced the Settlement Agreement dates in his email, he said "I might have talked to him about the Settlement Agreement," but he could not recall that particular conversation. [Exh. R-123.11:4-14]

[54] Mr. Smit could not recall the names of anyone involved in the decision-making for this email other than it was made at multiple levels and it was a "group decision." [RT Vol. VI 18:7-16, 18:25-19:11, 19:15-20:6]

[55] Despite Mr. Pajouh's description of the dates as (1) optimistic, (2) Mr. Smit testifying that he would have built in some "slack," and, (3) that Mr. Pajouh provided the dates in the "the middle of shut down," Mr. Smit testified he did not discuss the selected dates with Mr. Pajouh; he just accepted the dates. [RT Vol. VI 33:4-34:6] In his deposition, Mr. Smit said he tells "all [his] retailers to build in slack time" and that he had "said that to [Mr. Pajouh] before." [Exh. P-51.021:2-19]

1    email by "hopeful optimism." Mr. Pajouh felt he had to give them dates to get his cash back in lieu of the

2    LOC. [RT Vol. VI 63:5-24]

3         158.    Mr. Pajouh testified that both parties were optimistic that they could get through the

4    pandemic but did not know how long it would take, and SOA needed dates. Mr. Pajouh thought that they

5    had an understanding that the dates would be reviewed again at a later time. [Exh. P-62.043:2-10]

6         159.    According to Mr. Smit, the purpose of the May 21, 2020, letter was "to update what

7    actually happened" and "actually to help [Mr. Pajouh] with achieving some of the financial instruments

8    needed to continue on with the project."[56] [Exh. R-101; P-51.017:6-13]

9         160.    Mr. Farabee testified that Mr. Pajouh could not secure the letter of credit and the solution

10   was to revise the Facility Addendum. [RT Vol. II 107:18-25, 108:16-20] According to Mr. Farabee, a

11   bank will request the Dealer Agreement when considering a LOC and, in this instance, the Facility

12   Addendum to the Dealer Agreement had benchmarks already missed. Therefore, it was not likely a bank

13   would extend a LOC, so SOA reset the benchmarks for Courtesy. [Exh. R-122.08:6-19]

14        161.    Mr. Graziano testified that SOA helped secure the LOC for Courtesy because SOA "really

15   did try to continue . . . we did try to work with [Mr. Pajouh]. But there was never – our intent was never

16   to extend the date another year. . . . We were hopeful we could move forward. . . . we opted to do what

17   we felt at that point in time was the right thing to do." [RT Vol. V 24:4-19] Mr. Graziano explained that

18   even though SOA sent out the letter in May 2020 with the new dates, SOA believed that they still "could

19   move forward with the dates on the Stipulated Decision." He believed that SOA reserved the right to

20   adhere to the Stipulated Decision dates. [RT Vol. V 28:10-12]

21        162.    An irrevocable standby LOC, with an issuance date of June 22, 2020, was secured from

22   BMO Harris Bank N.A.in the amount of $750,000 "at the request of and for the account of Courtesy

23   Automotive Group . . ." [Exh. J-307.01-.03] The credit was set to expire on December 16, 2021. [Exh. J-

24   307.02] The beneficiary is SOA and the credit "is available against [SOA's] draft drawn at sight on

25   [BMO]" when accompanied by Beneficiary's Certificate stating that "*Courtesy Automotive Group, Inc.*

26   *has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement*

27   _____

28   [56] According to Mr. Smit, the Amended Facility Agreement "remedied any kind of misunderstanding [about the permit date]." [Exh. P-51.017:6-13]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1   . . ." (Emphasis added.) [Exh. J-307.02] The LOC stated that "[t]his Credit sets forth in full [BMO's]

2   undertaking and such undertaking shall not in any way be modified, amplified, or limited by reference to

3   any document, instrument or agreement referred to in this Credit . . ." [Exh. J-307.03] The LOC was

4   issued "to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility

5   Addendum to the Subaru Dealer Agreement" and BMO Bank acknowledges that Courtesy Automotive

6   Group, Inc. has "committed" to a Subaru dealership facility, at certain identified parcel numbers in

7   Chico, meeting all Subaru minimum standards, "by January 31, 2022." [*Ibid.*] On July 7, 2020

8   Amendment No. 1 was sent to the parties, amending the expiry date to July 31, 2022. [Exh. J-307.01]

9        163.    Mr. Smit testified that he thought the trigger date for calling the LOC would be by

10   December 31, 2021 if completion of construction did not happen by that date. He believed Subaru could

11   elect to call it then or sometime thereafter. [RT Vol. VI 34:25-35:11] Mr. Farabee testified that the letter

12   of credit expires July 31, 2022, and requires that Courtesy perform under the Facility Addendum on or

13   before January 31, 2022. In his opinion, Subaru can call the letter of credit on January 31, 2022. [RT Vol.

14   II 113:14-17, 114:8-20, 115:5-10; Vol. IV 144:13-145:20; Exh. J-307.03]

15        164.    The LOC, according to Mr. Pajouh, was assurance for SOA that they would get a new

16   facility in operation. [RT Vol. VII 20:9-21:20] The LOC cost is $7,500 per year. [RT VII 19:22-20:8]

17        165.    By an amendment dated May 21, 2020, and executed on May 22, 2020 ("Amended

18   Facility Amendment"), Courtesy and SOA executed a Facility Addendum to the Dealer Agreement.

19   [Stipulation of Facts, ¶ 10] SOA agreed to amend the Facility Addendum for the dates that Mr. Pajouh

20   provided in his April 29, 2020, email to Mr. Smit as follows:

21        (1)    Obtain final permits by July 31, 2020;

22        (2)    Commence construction September 30, 2020;

23        (3)    Complete construction by December 31, 2021;

24        (4)    Obtain final verification by January 31, 2022.

25   [Exh. R-101.01-.02]

26        166.    In the Amended Facility Amendment, if subsequent benchmarks were missed, SOA

27   reserved its rights under the Stipulated Decision and other agreements. The provision reads:

28   ///

This is the final amendment of the facility benchmarks that SOA will issue. If subsequent benchmarks are missed, SOA reserves the right to exercise all remedies available under the Subaru Dealer Agreement, Facility Addendum and/or the Stipulated Decision dated March 20, 2019, including termination of your Subaru Dealer Agreement. Additionally, should the facility not be completed by the agreed upon date, *SOA will execute the Letter of Credit or Performance Bond that secures this amendment.* (Emphasis added.) [Exh. R-101.01]

167.    Courtesy failed to meet each of the following benchmarks contained in the Amended Facility Addendum:

- ▪ "Dealer obtains necessary zoning, permits and necessary government approvals for the construction of the Permanent Facility on or before July 31, 2020;

- ▪ Dealer commences vertical construction of the Permanent Facility on or before September 30, 2020;

- ▪ Dealer completes construction of the Permanent Facility, obtains all necessary licenses and permits no later than December 31, 2021;

- ▪ Dealer obtains a Final Review Verification Letter from Feltus Hawkins for compliance upon completion of the remodeling, which Verification shall be provided by Feltus Hawkins by January 31, 2022." [Exh. R-101.02]

///
///
///
///
///
///
///
///
///
///
///
///
///

49

**Chart Showing the Differing Benchmarks**

168.    The following chart compares the four pertinent benchmark dates under the Stipulated Decision with those under the Amended Facility Addendum, the date the deadline was or was not achieved and the number of months of delay.

| Benchmark | Stipulated Decision deadline Board Adopted April 9, 2019 | Amendment to Facility Addendum to Subaru Dealer Agreement (May 21, 2020) | Achieved deadline |
|---|---|---|---|
| Paragraph 16.b: Secure all government approvals and construction permits | December 1, 2019 | July 31, 2020 (8-month extension) | The permit for the Subaru/ Volvo building was issued on April 30, 2021; 9-months late. |
| Paragraph 16.c: Commence construction | January 30, 2020 | September 30, 2020 (8-month extension) | Ground-breaking on June 28, 2021, and construction began shortly thereafter: 9-months late. |
| 16.d: Complete construction of Subaru sales facility | January 31, 2021 | December 31, 2021 (11-month extension) | Completion of construction is delayed at least 16-18 months (December 2022) and/or until April 2023. |
| 16.e: Final Review Verification letter | March 1, 2021 | January 31, 2022 (11-month extension) | No information in this regard. |

[Exhs. J-300.33-.36; J-101; R-101; R-142]

**Overview of Courtesy's Permits, Groundbreaking and Construction**

169.    Courtesy was issued construction permits on April 30, 2021, and obtained all government approvals on May 3, 2021, with the exception of the service building. [Exh. R-142.01] The service building was submitted to the City for plan check and a response was received with a few remaining items. [RT Vol. II 124:22-126:2; Vol. V 108:16-109:7] Mr. Seegert testified that he believed that the permit for the service center building would be issued approximately six weeks from September 15, 2021. The service center building would not delay construction or overall completion of the sales buildings. It would be completed before the sales buildings. [RT Vol. II 126:7-19, 188:11-25]

170.    Mr. Seegert explained that each building has its own permit and has to have its own certificate of occupancy. [RT Vol. II 190:11-25] The Subaru/Volvo building will be completed first. Mr. Seegert testified that "it is highly conceivable" that the Subaru/Volvo building could open first, prior to

1    the other buildings, particularly given its location at the farthest north end of the site. [RT Vol. II 191:1-
2    15]

3        171.    Permits for the infrastructure for water, sewer, electric, gas and fiber optic cable were
4    obtained prior to the permits for the buildings, and construction started on those projects in the first
5    quarter of 2021. [RT Vol. II 55:16-24, 56:2-12] Groundbreaking on the site was June 28, 2021, and
6    construction on the multi-franchise buildings commenced shortly thereafter. [RT Vol. II 189:1-9] At the
7    time Mr. Seegert testified in October 2021, less than 10 percent of the work had been completed and 18
8    percent had elapsed of the total time allotted for the project.[57] [RT Vol. V 74:22-75:3, 77:19-22] The next
9    task is the footings and pouring of slabs for all three buildings, and structural steel is expected in January
10   2022. [RT Vol. V 78:12-79:12, 81:1-5]

11       172.    All of the buildings include a prefabricated steel component. According to Mr. Seegert,
12   there is a huge back-up of prefabricated steel components in the industry. [RT Vol. II 126:20-127:23]
13   The dealership buildings include design build, pre-engineered steel joists in the roof system, that only a
14   handful of companies on the west coast make. [*Ibid.*] The service center is a pre-engineered metal
15   building that has the same supply availability issue as noted above. The normal lead time for a metal
16   building is six months; it is now a year or more. [RT Vol. II 127:24-128:9, 129:9-23] Mr. Seegert ordered
17   these items before receiving the permits, some four-to-five months prior to his testimony in September
18   2021 and anticipates delivery between February and March 2022. [RT Vol. II 128:10-129:4; Vol. V
19   81:6-9]

20       173.    The original timeframe for completion of construction was 16-18 months (or
21   approximately the end of 2022). However, because of long lead time for steel components, the
22   Subaru/Volvo building will not be completed until April 2023.[58] [RT Vol. II 189:10-18; Exhs. P-45.003;
23   P-62.047:20-25] Mr. Pajouh testified that Mr. Seegert's goal is to have the three sales buildings and the
24   service center obtain a certificate of occupancy by December 31, 2022. [RT Vol. VII 18:15-20, 45:1-22]
25   ///

---

[57] Mr. Seegert explained that the total time for the project from June 28, 2021, to March 20, 2023, is 438 workdays.
At the time of his testimony, on October 19, 2021, 80 workdays had elapsed, and there were 358 workdays left.
[RT Vol. V 74:4-20, 75:1-3]
[58] Mr. Seegert said he is 90% certain of the project closeout date of April 2023. [RT Vol. V 109:14-110:3]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1

**The Impact on Courtesy's Multi-Franchise Project if its Subaru Franchise is Terminated**

2

174.    It would be catastrophic, according to Mr. Pajouh, if Subaru was not part of Courtesy's

3  project. [RT Vol. VI 216:20-23] The project would proceed "to the extent it can" if the Subaru franchise

4  was terminated because of the obligations to the other businesses. However, Mr. Pajouh explained that

5  Subaru, being its biggest volume, accounts for over 40 percent of unit sales in generating cash flow, and

6  is thus, an integral part of Courtesy's business. [RT Vol. VI 216:24-218:25; Vol. VII 8:1-11]

7

175.    According to Mr. Pajouh, losing the Subaru franchise would "put a financial burden on the

8  whole organization of the volume that we do, the gross profit, the cash flow, the number of employees

9  . . . . [it] would put financial constraint on the organization because now we have the carrying cost of

10  something that's not producing -- generating revenues, gross profit, and everything that it takes for us to

11  continue with [the] total project." [RT Vol. VI 219:1-220:18] Mr. Pajouh testified that "I don't know how

12  the bank would behave with the revenues being lost and not having the franchise . . . .  the bank has that

13  as part of their calculation of them approving the financing." [RT Vol. VII 8:1-11] Termination of the

14  Subaru franchise would impact the funding of the entire project because "the funding is based on the

15  whole package, which is all the franchises and the total revenue and gross profit . . ." [RT Vol. VI 232:7-

16  15]

17

176.    Courtesy's cost for the remodeling of its current location was approximately $225,000-

18  $250,000. [RT Vol. VI 61:25-62:3] The construction cost for the single Subaru/Volvo building is shown

19  on the permit as approximately $2.5 million. [Exh. R-142.01] As of April 2021, Courtesy had spent

20  $5,990,632 on the project. [Exh. P-42.005] From April until the time of Mr. Pajouh's testimony in

21  October 2021, Courtesy spent approximately another $500,000. [RT Vol. VII 6:13-21, 7:2-13] Courtesy's

22  investment in acquisition of the site was $2.8 million. [RT Vol. VI 52:5-7] The $6.5 million in upfront

23  costs plus the purchase price of the property constitutes 20 percent participation by Courtesy in the total

24  cost, apart from furniture, fixtures and equipment ("FF&E"). FF&E costs are estimated to be $4 million

25  for a total cost of the project at $34 million. [RT Vol. VII 43:16-44:16] Mr. Pajouh has a construction

26  loan of $23.5 million and obtained the latest loan approval in May 2020. [RT Vol. VI 50:13-19, 214:10-

27  12, 214:25-215:18; Vol. VII 22:1-2] Mr. Pajouh testified that the delay in having the multi-franchise

28  facility built is costing Courtesy in the tens of thousands of dollars in property carrying costs and

1  insurance every month that it is not completed. [Exh. P-62.046:22-.047:3]

2      177.    Courtesy spent approximately $7.6 million to purchase all of the dealerships, including

3  goodwill and hard assets. Mr. Pajouh estimated that the Subaru franchise portion of that cost is about 40

4  percent or approximately $3 million. [RT Vol. VII 11:3-12:2] Should Mr. Pajouh's franchise be

5  terminated, he would lose not only the investments made in the temporary facility, and 40 percent of the

6  $6.5 million, but also the $3 million investment made in purchasing the Subaru dealership. [RT Vol. VII

7  10:18-11:2]

8                                    **Subaru's Damages**

9      178.    Mr. Smit testified that he searched in August 2021 on a local commercial real estate

10  website for properties that might be available in Chico for a replacement dealer. He identified 2522 and

11  2520 Cohasset Road as for sale, the properties that Courtesy is currently occupying with its other

12  franchises.[59] [RT Vol. VI 6: 2-20, 7:8-15, 10:8-11:6] Mr. Sawley, the senior City planner, knew of no

13  other vacant locations in Chico that could be used as a location for a dealership, other than where

14  Courtesy is currently located. [RT Vol. III 208:1-19] Mr. Graziano did not know of any vacant dealership

15  properties in Chico. [RT Vol. IV 187:4-6]

16      179.    According to Mr. Smit and Mr. Graziano, it would be acceptable to SOA to move another

17  dealer into the East Avenue site currently occupied by Courtesy, which is, according to SOA, deficient

18  and unacceptable. [RT Vol. VI 8:1-13; Vol. IV 219:1-9] Mr. Graziano testified he had a high level of

19  certainty that SOA could find a qualified dealer to replace Courtesy and his estimate is that it would take

20  approximately 90 days to find one. [RT Vol. IV 186:8-18, 214:23-215:4] SOA would have at least a 90-

21  day disruption of sales and service during that time. [RT Vol. IV 187:12-21, 188:6-17]

22      180.    The search for another Subaru candidate to operate in Chico involves the process of

23  vetting candidates' applications-including their capital, management, and ability to find an acceptable

24  facility solution. A review of the plans for a permanent location by Feltus Hawkins would be required,

25  but SOA could go forward with a facility design intent and an addendum under a sales and service

26  agreement that the new facility would be built within a certain time. [RT Vol. IV 214:23-215:4, 218:17-

27  

28  [59] These premises are under lease to Courtesy and Mr. Pajouh is negotiating an addendum to the lease to extend the lease until December 2022. [RT Vol. VI 224:8-10; Vol. VII 15:10-17]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

219:19; Vol. V 41:1-13, 47:14-48:3, 48:4-21] Mr. Graziano indicated that although SOA is not excited about Courtesy's current location, SOA could continue selling cars there by taking over the existing Courtesy lease, and "figure out a way to handle service." [RT Vol. IV 187:4-188:5; Vol. V 20:12-21:1, 51:10-17] Mr. Graziano noted it is difficult to estimate how long it would take to get another Subaru dealership up and running, but something less than a year. [RT Vol. IV 220:3-8; Vol. V 32:8-21]

181.    SOA is frustrated that Subaru owners' car repair services are not being provided in a Subaru facility, which impacts retaining repeat Subaru customers. [60] [RT Vol. IV 80:17-81:21] From a frequency of "customer touch," service is 15 to 20 times more frequent compared to sales. [RT Vol. IV 116:2-20] A metric used for measuring customer experience is the "Net Promoter Score" based on a survey.  Courtesy's scores for both sales and service are historically the bottom ninth or tenth out of 10 stores in their zone, which encompasses the area of Sacramento to Redding. [61] [RT Vol. IV 81:15-21; Exh. R-178.20, .23, .26, .30] According to SOA, it is harmed by service being done at a non-Subaru-branded service department and a sales facility that does not have appropriate parking. These impact "the customer experience" and, according to Mr. Graziano, are "long term impacts for this brand." [RT Vol. IV 158:6-24] Mr. Farabee and Mr. Graziano both agreed that those damages are hard to quantify. [RT Vol. IV 81:1-9, 81:23-82:10, 117:8-13, 159:2-9] Mr. Graziano testified there is no dollar amount to compensate SOA. He noted that SOA is not looking for money – that the LOC is really more of an insurance policy and "not in lieu of a retailer doing what is required." [RT Vol. IV 176:24-177:8]

182.    SOA asserts that COVID-19 was not an impediment to Courtesy building their multi-franchise facility nor did the wildfires have anything to do with Courtesy's failure to meet the benchmarks. [RT Vol. IV 185:13-17, 228:4-11, 231:15-23] Mr. Graziano pointed out that 30-plus Subaru dealership facilities are being built in the region during COVID-19 and 10-13 facilities were completed. [RT Vol. IV 180:17-181:6] Mr. Smit testified that there are approximately six greenfield projects in the San Francisco zone. [RT Vol. V 177:10-20; Vol. IV 205:2-13] Of all these other pending SOA projects,

---

[60] SOA witnesses testified that service is more important than selling cars to SOA, and yet there is no indication that there is any place available in Chico for servicing vehicles if SOA awards a franchise to another dealer in Courtesy's place.
[61] Some of the comments in the survey relate to the location (ease of access to the facility, waiting area and availability of parking) and some relate to servicing of the vehicle (responsiveness to needs and cleanliness of the vehicle on return). [Exh. R-178.04, .10, .14, .23]

1    the only project that is somewhat similar to Courtesy's project is One Subaru in Hayward, California,

2    which is scheduled to be completed in the Spring of 2022. [RT Vol. II 111:13-14; Vol. III 229:18-230:5;

3    Vol. VI 45:13-24] One Subaru, like Courtesy, is being built on completely vacant land. However, Mr.

4    Farabee did not know whether it was totally undeveloped land with no utilities running to it, as is the case

5    with Courtesy's property. [RT Vol. III 227: 20-25, 229:18-230:5] One Subaru is being built at a cost of

6    approximately $42 million, including $3 million for earthquake remediation. Mr. Smit did not know how

7    much of that total cost was for purchase of the land. [RT Vol. III 228:25-229:3; Vol. VI 36:5-9, 41:6-17]

8    According to Mr. Smit "substantial construction" started in 2020 on that project in the form of

9    foundations poured and installation of earthquake mitigation systems. [RT Vol. VI 42:25-43:11]

10    ### ANALYSIS

11    183.    This case is very difficult because of the important and significant public policy

12    supporting settlement agreements and enforcement of the Board's Stipulated Decision and Order.

13    However, that public policy is not inviolate, and in the proper circumstances, where there are other

14    competing public policies, there must be a balancing. Enforcement of the agreement may have to give

15    way to other public policy concerns. In the related contexts of enforcement of settlements under Code of

16    Civil Procedure section 664.6, the California Supreme Court has ruled that Section 664.6[62] does allow a

17    court to enforce a provision in a settlement agreement or stipulation which is illegal, contrary to public

18    policy, or unjust. [See *California State Auto Assn. Inter-Ins. Bureau* v. *Superior Court* (1990) 50 Cal.3d

19    658, 664]

20    184.    Along the same lines, "[t]he case law uniformly treats a settlement agreement as a contract

21    subject to all the [usual and] normal legal and statutory contractual requirements." [*Timney* v. *Lin* (2003)

22    106 Cal.App.4th 1121, 1127] "A settlement agreement is in the nature of a contract and is therefore

23    governed by the same legal principles applicable to contracts generally." [*In re Marriage of Hasso* (1991)

24    229 Cal.App.3d 1174, 1180-1181] The validity of this Stipulated Decision and Order must be judged by

25

26    [62] Code of Civil Procedure section 664.6(a) provides: "If parties to pending litigation stipulate, in a writing signed
by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof,

27    the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the
court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the

28    settlement."

1  the same legal principles applicable to contracts generally. [*Weddington Productions Inc.* v. *Flick* (1998)

2  60 Cal.App.4th 793, 810-811] There is a strong public policy favoring settlement of litigation, but that

3  "policy does not excuse a contractual clause that is otherwise illegal or unjust." [*Timney* v. *Lin, supra,*

4  106 Cal.App.4th at 1127]

5    185.    SOA's counsel noted at the hearing that nothing in Code of Civil Procedure section 664.6

6  authorizes "a judge to create the material terms of the settlement [agreement]" citing *Hernandez* v. *Board*

7  *of Education* (2004) 126 Cal.App. 4th 1161, 1176. [RT Vol. I 21:15-18] The court in *Hernandez* notes

8  that when enforcing settlement agreements, the court "is powerless to impose on the parties *more*

9  *restrictive or less restrictive or different terms* than those contained in their settlement agreement."

10  (Emphasis added.) [*Ibid* at p. 1176] However, no different terms or more restrictive terms are being

11  imposed here. The terms of the agreement were set by the parties and they are "material failure to

12  comply."

13    186.    There are the understandable frustrations endured by SOA because of the delays, along

14  with the real-life complications for Courtesy initially being in the County's jurisdiction, and then,

15  suddenly thrust into the City's more onerous and complex jurisdiction following a "land speed record"

16  annexation. Then, the devastating Camp Fire occurred in 2018, with its attendant ramifications on Chico

17  and, consequently, on Courtesy during 2019. Next, a worldwide pandemic occurs in March 2020 and the

18  State of California issues the COVID-19 stay-at-home order. The consequences of the order included

19  business disruption impacts and restrictions generally, and specifically resulted in difficulties imposed on

20  City staff to timely process the Development Agreement and plan check reviews. The City told Mr.

21  Pajouh that they would not abandon the ROW as part of the Development Agreement, but they

22  entertained the option of a lease on the ROW until at least mid-January 2021. [Exh. P-29.003-.004; RT.

23  Vol. III 202:21-25, 204:11-22; Vol. VI 82:16-19, 84:1-7] The pandemic restrictions and City negotiations

24  delayed the permits being issued to Courtesy, with its attendant consequences on Courtesy's inability to

25  complete its facility under the original benchmarks. Once Mr. Sawley told Mr. Pajouh he needed to

26  abandon the development of the ROW, the necessary hearings were held and the permits issued. Lastly,

27  there are the enduring disruptions from the now two-year global pandemic which continue to wreak

28  havoc on the project, with supply chain issues related to materials and supplies.

187.    SOA asserts that the wording of the Stipulated Decision eliminates the need for any balancing of factors by the ALJ. However, as noted above, the Stipulated Decision does not provide that good cause existed at that time of the execution of the Confidential Agreement for the termination of the Protestant's franchise, but rather, the parties agreed that Courtesy's *failure to comply with any of the conditions in the Stipulated Decision* shall constitute good cause to terminate the SOA Dealer Agreement between them under Sections 3060 and 3061. [Exh. J-301.18:11-13] The conditions outlined in the Stipulated Decision are whether the Protestant *materially failed* to comply.

## Incorporation by Reference

188.    The Stipulated Decision and the Facility Addendum had the same benchmarks for the Courtesy facility project and the Stipulated Decision was incorporated by reference into the Facility Addendum. [Exhs. J-301.13 ¶16; J-300.34 ¶4] Incorporation by reference is almost universally held "to mean the inclusion, within a body of a document, of text which, although physically separate from the document, becomes as much a part of the document as if it had been typed in directly. [*Republic Bank* v. *Marine Nat. Bank* (1996) 45 Cal.App.4th 919, 922] Black's Law Dictionary (11th ed. 2019) page 916, defines the phrase to mean "[a] method of making a secondary document part of a primary document by including in the primary document a statement that the *secondary document should be treated as if it were contained within the primary one*." (Emphasis added.) "A written agreement may, by reference expressly made thereto, incorporate other written agreements; and in the event such incorporation is made, the original agreement and those referred to must be considered and construed as one." (Citations omitted.) [*Republic Bank, supra,* 45 Cal.App.4th at 923][63]

189.    The Stipulated Decision and Facility Addendum must be considered and construed as *one document*. The Stipulated Decision is as much a part of the Facility Addendum as if its terms "were recited verbatim." [*Republic Bank, supra,* 45 Cal.App.4th at 921] When SOA executed the Amended

---

[63] In *Republic Bank* the master lease, which had an attorney's fees clause, was incorporated by reference into the sublease. There were provisions in the master lease that differed from or even were inconsistent with the sublease and the master lease had an integration clause. The subleasee argued that due to those differences, the parties did not intend the relationship to be governed by the master lease. The court rejected that argument and held that just because there were overlapping or inconsistent provisions, does not mean "that the parties *necessarily* intended that *no* provisions of the master lease *could possibly* be incorporated into the sublease." (Emphasis in original) [*Republic Bank, supra,* 45 Cal.App.4th at 924-925]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

Facility Addendum, it amended the Stipulated Decision also and new benchmarks for both were set. Those new dates are the dates by which Courtesy's actions must be reviewed.

190.    Further, SOA's argument that the integration clause in the Stipulated Decision, which provides that the agreement is not modified or affected by any other agreement between the parties, is not applicable because integration clauses only discharge prior agreements or contemporaneous oral agreements. Integration clauses do not affect subsequent amendments.[64]

**Promissory Estoppel**

191.    An additional basis for the holding that the Amended Facility Addendum also changed the dates as to the Stipulated Decision, is the doctrine of promissory estoppel. The execution of the May 2020 Amended Facility Addendum by SOA is relevant to these proceedings because it induced reliance by Courtesy. SOA essentially authorized Courtesy additional time to secure permits and commence construction beyond the dates set forth in the Stipulated Decision and the Facility Addendum, and Courtesy continued with the project in reliance on those extensions.

192.    Courtesy provided to SOA a $750,000 cash deposit which was a bridge to the issuance of the LOC provided for in the Stipulated Decision. [RT Vol. VI 56:2-6; Vol VII 21:9-20] In March 2020, Mr. Pajouh asked for the return of the $750,000 deposit he had given to SOA, in lieu of a LOC, because of the uncertainty due to COVID-19. [RT Vol. IV 58:21-59:2, 125:3-12; V 22:19-25; VI 62:19-63:15, 65:10-25; VII 21:9-20] On April 29, 2020, Mr. Pajouh again requested the cash deposit be released to him upon issuance of the LOC. Mr. Pajouh said to Mr. Smit: "SOA is well aware of the size and scope of [the] facility project. We did not anticipate having $750,000 in cash locked up for the duration of the project. . . . My builder and architect are doing all they can to expedite final approval . . . " [Exh. P-16.001]

---

[64] See California Code of Civil Procedure section 1856(a): "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement." Subsection (h) of section 1856 provides that "agreement" includes contracts. See also Uniform Commercial Code (UCC) section 2202: "[t]erms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented." A franchise includes sale of vehicles so a franchise is a transaction in goods and thus, within the UCC Division 2 – Sale of Goods.

193.    SOA argues that the Amended Facility Addendum benchmarks were for the sole purpose of permitting Courtesy to get its money back and secure a $750,000 LOC in its place. SOA claims it always intended to hold Courtesy responsible for the admittedly unachievable timelines, containing benchmarks already missed, set forth in the Stipulated Decision. If SOA's claim is true, SOA possibly mislead the bank by issuing the Amended Facility Addendum with knowledge and expectation the bank would rely on this document in making the determination to issue the LOC. SOA tried to keep the Amended Facility Addendum and the Stipulated Decision separate, as well as the different benchmarks. However, there is sufficient evidence (separate and apart from the fact that the Facility Addendum incorporated the Stipulated Decision, making them one) that Mr. Smit believed that the new agreed dates also changed or reset the Stipulated Decision benchmarks and conveyed that to Mr. Pajouh. [Exh. P-16.001-16.002]

194.    SOA's assertion that the Amended Facility Addendum has no effect on the benchmarks in the Stipulated Decision must fail. According to Mr. Graziano, SOA wanted to continue the project and work with Mr. Pajouh. This was done certainly with the expectation that Courtesy would rely on that extension and would attempt to comply with the dates in the Amended Facility Addendum, continue to expend funds, and start construction of the facility, which it has done.

195.    The Amended Facility Addendum was completed so the bank would issue the LOC, since the dates in the Facility Addendum (which incorporates the Stipulated Decision) had expired. Mr. Smit testified that the new dates were to "make him [Mr. Pajouh] *comply with what was going on with COVID, take that into account*. And I think it was really to help him establish a letter of credit." (Emphasis added.) [Exh. R-123.10:13-24] The Amended Facility Agreement was "to update what actually happened, and . . . to help [Mr. Pajouh] with achieving some of the financial instruments needed to continue on with the project." [Exh. P-51.017:6-13] Courtesy's bank issued the LOC noting that Courtesy had committed to a Subaru dealership in Chico "meeting all [SOA] minimum standards . . . by January 31, 2022" which is the date agreed to for final verification by Feltus Hawkins. [Exh. J-307.03] Thus, the LOC was issued in reliance on the amended dates and Mr. Pajouh continued the project also based on that reliance.

196.    The April 2020 email from Mr. Smit, the SOA person closest to the project, asking for

1    new benchmarks to be included in the 2020 Facility Addendum specifically states: "I'm following up on

2    our conversation last Tuesday *regarding the settlement agreement dates*. At this point, to even consider

3    exchanging a LOC in lieu of your performance deposit we need revised and definitive dates for the

4    [permits, commencement of construction, completion of construction and final verification]

5    benchmarks." (Emphasis added.) [Exh. P-16.001] Mr. Smit even testified the letter of noncompliance

6    revolves around the Stipulated Decision and when Mr. Pajouh provided the revised dates "it was reset."

7    SOA issued the Amended Facility Addendum with the expectation that Courtesy would continue its

8    efforts to perform by complying with the amended benchmarks and construct the facility as agreed.[65]

9    This conclusion is supported by the fact that, although the Letter of Non-Compliance referenced the

10   missed benchmark dates from the Stipulated Decision, it was not sent until August 24, 2020, after

11   Courtesy missed the new date of July 31, 2020 for obtaining its permit. [Exh. J-303.01]

12       197.    Without the LOC, the project probably could not continue since Mr. Pajouh needed his

13   $750,000 returned to continue the project. It seems unlikely that the bank would have issued a LOC to

14   support the construction performance and completion by Courtesy in this instance if it knew there were

15   other dates that SOA could rely on to terminate the dealership. It is simply not credible to think the bank

16   would have issued the LOC had it known that SOA would use the Stipulated Decision with dates

17   different from, and older than, those in the Amended Facility Addendum to affect the rights of Courtesy

18   so drastically as to terminate its Subaru dealership. It is unclear if the bank was even aware of the

19   existence of the Stipulated Decision.

20       198.    California has adopted the Restatement Second of Contracts § 90 doctrine of promissory

21   estoppel: "A promise which the promisor should reasonably expect to induce action or forbearance on the

22   part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be

23   avoided only by enforcement of the promise." [*Kajima/Ray Wilson* v. *Los Angeles County Metropolitan*

24   _____

25   [65] Mr. Smit's contradictory testimony that the LOC had nothing to do with the Stipulated Decision is not credible.
     When asked if the dates he was asking Mr. Pajouh to provide would replace the settlement agreement dates, Mr.

26   Smit stated that "[a]bsolutely not. I mean the Facility Addendum Amendment and Settlement Agreement are two
     distinct separate things. They're mutually exclusive." But when asked why he referenced the settlement agreement

27   in his email, Mr. Smit said: "I might have talked to him about the Settlement Agreement. I can't recall that
     particular conversation. . . . [w]e were trying to get him so he could get his letter of credit and *comply with the*

28   *financial instrument required by the Stipulated* [*Decision*]." (Emphasis added.) [Exh. R-123.11:4-24]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1    *Transportation Authority* (2000) 23 Cal.4th 305, 310, citing Rest. 2d Contracts, § 90] Promissory

2    estoppel binds a promisor "when he should reasonably expect a change of position, either by act or

3    forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." (Citation

4    omitted.) [*Jones* v. *Wachovia Bank* (2014) 230 Cal.App.4th 935, 944]

5         199.    The elements needed for application of promissory estoppel are:

6         (1)    A promise clear and unambiguous in its terms;

7         (2)    Reliance by the party to whom the promise is made;

8         (3)    The reliance must be both reasonable and foreseeable; and

9         (4)    The party asserting the estoppel must be injured by his or her reliance [detrimental

10   reliance]. [*Granadino* v. *Wells Fargo Bank, N.A.* (2015) 236 Cal. App. 4th 411, 416]

11        200.    A "promise" is "a person's assurance that the person will or will not do something."

12   [Black's Law Dict. (11th ed. 2019) p. 1466] A promise to employees that if they continued to work for a

13   company until it was sold, they would be paid a bonus from the sale proceeds that would be sufficient for

14   them to retire, was enforceable under the doctrine of promissory estoppel when the employees turned

15   down other offers of employment because they did not want to lose the retirement allowance. [*Moncada*

16   v. *West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768]

17        201.    Promissory estoppel binds a promisor "when he should reasonably expect a substantial

18   change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided

19   only by its enforcement." [*Garcia* v. *World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1041, quoting

20   *Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 249] The court of appeal in *Garcia*

21   explained that "[t]he vital principle is that he who by his language or conduct leads another to do what he

22   would not otherwise have done shall not subject such person to loss or injury by disappointing the

23   expectations upon which he acted. (Citations omitted)." [*Ibid.*] Because promissory estoppel is an

24   equitable doctrine, "courts are given wide discretion in its application." [*U.S. Ecology, Inc.* v. *State of*

25   *California* (2005) 129 Cal.App.4th 887, 902]

26        202.    As noted above, the April 29, 2020, email from Mr. Smit demanded revised and definitive

27   dates from Mr. Pajouh for the benchmarks. According to Mr. Farabee, Mr. Smit was the SOA person

28   most knowledgeable and primary point of contact for Mr. Pajouh. "Ray [Smit] was most closely tied with

[Mr. Pajouh] on this process." [Exh. P-52.008:2-9] Mr. Smit testified the letter of noncompliance revolved around the Stipulated Decision, stating when Mr. Pajouh provided the revised dates, he confirmed that: "I mean, this noncompliance letter revolves around, you know, the Stipulated Decision. It just – he [Mr. Pajouh] gave me the dates. It was reset." [Exh. P-51.025:23-.026:1] When Mr. Smit followed up and asked for the permit that he thought Courtesy had obtained in November 2019, and it could not be produced, he said: "[s]o, we had to correct [the dates]." [Exh. P-51.013:5-10]

203.    Additionally, the Amended Facility Addendum itself notes that "[t]his is the final amendment of *the facility benchmarks* that SOA will issue. *If subsequent benchmarks are missed*, SOA reserves the right to exercise all remedies available under the Subaru Dealer Agreement, Facility Addendum *and/or the Stipulated Decision* dated March 20, 2019." (Emphasis added.) [Exh. R-101.01] The letter does not say this is the final amendment to the Facility Addendum – it says it is the final amendment to the *facility benchmarks*. There is little doubt that the new benchmarks are applicable to both documents. Both had the same initial benchmarks for the permanent facility.[66] Both the testimony of Mr. Smit (the person most familiar with the project and the person others at SOA deferred to) and his contemporaneous email referencing the Stipulated Decision connect the resetting of the benchmarks to the Stipulated Decision.

204.    SOA knew Courtesy would act upon such an extension and Courtesy did so act by continuing to send in numerous revised plans and to negotiate the Development Agreement with the City so Courtesy could get the necessary permits and start construction. In *Wade* v. *Markwell & Co.* (1953) 118 Cal.App.2d 410 the court found detrimental reliance where a coat owner, who had given her coat as security for a loan, was prepared to redeem her coat, but was induced by the lender to forbear from immediately redeeming the coat under the assurance that it would be held for a week. She refrained from exercising her right to redeem for the extra week in reliance on the lender's oral representations, only to have the coat sold. Mr. Pajouh's discussions with Mr. Smit that the dates had been "reset" induced him to believe the extension applied to the Stipulated Decision, as well as the Amended Facility Amendment. Mr. Pajouh's reliance was reasonable and foreseeable given the key role of Mr. Smit. Further, it makes

---

[66] The Facility Addendum set specific dates for the provision of the LOC (July 14, 2019) and for when the inspection of the leased premises was to be completed by SOA (July 18, 2019). [J-Exh. 301.33-34]

no sense to have two different deadlines for the same events. The execution of the Amended Facility Addendum induced reliance that SOA authorized Courtesy additional time to secure permits and commence construction, beyond the dates set forth in the Stipulated Decision. SOA understood that it could not seek termination before the newly set permit issuance date of July 31, 2020, which is supported by the non-compliance letter not being sent until August 24, 2020.

205.    The fourth element of promissory estoppel of injury, sometimes described as "injustice can be avoided only by enforcement of the promise," is substantively the same principle as the requirement of unconscionable injury. [*Munoz* v. *Kaiser Steel Corp.* (1984) 156 Cal.App.3d 965, 974, distinguished on other grounds in *Dalkilic v. Titan Corp.* (S.D. Ca 2007) 516 F. Supp. 2d 1177, 1194] Unconscionable injury results from denying enforcement of an agreement (or a provision of an agreement) after one party is induced by another party to seriously change position relying upon the agreement. [*Siam Numhong Prods. Co.* v. *Eastimpex* (N.D. Cal. 1994) 866 F. Supp. 445, 448; Rest.2d Contracts, § 139]

206.    The dates were reset due to COVID-19 and to secure the LOC. Courtesy changed its position in reliance on the new dates and relied on those dates to its injury, in not only the expense of the LOC, but also in continuing to expend time, effort, and money to get the plans approved, the permits issued, and the buildings constructed. It would be unconscionable for SOA to deny it did not modify the deadlines outlined in the Stipulated Decision by entering into the Amended Facility Addendum with Courtesy and agreeing to those dates set forth as the revised (reset) applicable dates for the project. To assert that the change only applies to the Amended Facility Addendum and to subject Courtesy to termination based on the earlier dates would be an unconscionable injury.

**<u>Conditions Versus Promises</u>**

207.    In the Stipulated Decision, the terms "conditions," "deadlines," "benchmarks," and "milestones" seem to be used interchangeably. Section 1436 of the California Civil Code defines a condition precedent as one "which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." Although the Restatement avoids the terms "condition precedent" and "condition subsequent," preferring the word "condition" alone to define the former concept (see Rest.2d Contracts, § 224, com. e), the definition it provides is essentially the same for

1    purposes of the issue in this case: "A condition is an event, not certain to occur, which must occur, unless

2    its non-occurrence is excused, before performance under a contract becomes due." [Rest.2d, Contracts, §

3    224]

4        208.    "The existence of a condition precedent normally depends upon the intent of the parties as

5    determined from the words they" use in a contract. [*JMR Construction Corp.* v. *Environmental*

6    *Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 593-594, modified and

7    rehearing denied January 2016] But "'stipulations in an agreement are not to be construed as conditions

8    precedent unless such construction is required by clear, unambiguous language; and particularly so where

9    a forfeiture would be involved or inequitable consequences would result. [Citations.]'" [*Alpha Beta Food*

10   *Markets* v. *Retail Clerks* (1955) 45 Cal.2d 764, 771, cert. denied, 350 U.S. 996 (1956); see *Rubin* v.

11   *Fuchs* (1969) 1 Cal.3d 50, 53 citing the rule that contract provisions are not "construed as conditions

12   precedent in the absence of language plainly requiring such construction."] Because "'such conditions are

13   not favored by the law, [they] are to be strictly construed against one seeking to avail [it]self of them.

14   [Citations.]'" [*Antonelle* v. *Kennedy & Shaw Lumber Co.* (1903) 140 Cal. 309, 315; *JMR Construction*

15   *Corp.* v. *Environmental Assessment & Remediation Management, Inc., supra,* 243 Cal.App.4th at 594;

16   See also *Effects Associates Inc.* v. *Cohen* (9th Cir. 1990) 908 F.2d 555, 559 n.7 "Conditions precedent are

17   disfavored and will not be read into a contract unless required by plain, unambiguous language."] See

18   also *Richardson v. Hislop* (1930) 109 Cal.App. 440, 449, quoting Williston on Contracts, section 671,

19   page 1294, that "[c]ourts are disinclined to construe the stipulations of a contract as conditions precedent

20   . . . [because] such a construction prevents the court from dealing out justice to the parties according to

21   the equities of the case."

22       209.    In *Pacific Allied* v. *Century Steel Products* (1958) 162 Cal.App.2d 70 the defendant,

23   Century, agreed to fabricate and sell steel forms to the plaintiff, Pacific, for the purpose of using them to

24   install storm drains. [*Id.* at p. 72] Century also guaranteed that Pacific's labor costs, through its use of

25   Century's steel forms, would not exceed four cents per square foot. Further, Century would, upon

26   completion of the job and Pacific's submission of an itemized cost breakdown, pay Pacific's labor costs

27   in excess of 4 cents per square foot. [*Id.* at p. 73] Pacific agreed to keep a detailed account of labor costs

28   and give Century a "continuous report." [*Ibid.*] Pacific kept Century apprised of costs during the project

and gave it periodic oral reports, but it did not provide a detailed cost breakdown upon the project's completion. [*Id*. at p. 78] The court rejected Century's contention that Pacific was required to provide a detailed cost breakdown as a condition precedent to its recovery under the contract. [*Id*. at pp. 79-80] The appellate court held that (1) conditions precedent are not favored in the law; (2) neither the express terms of the contract nor a reasonable implication drawn from them compelled a finding that providing the cost breakdown was a condition precedent to Pacific's recovery; and (3) the interpretation advanced by Century was particularly disfavored because it would result in a forfeiture. [*Id*. at pp. 79-80]

210.    Paragraph 9 of the Stipulated Decision begins with "[s]ubject to its full and timely compliance with the conditions specified below." However, "the conditions specified below" are that Courtesy "*agrees* to remodel the facility (¶14); that Courtesy *agrees* to execute a new Subaru Dealer Agreement which shall include a Facility Addendum with certain provisions which Courtesy agrees to do related to the lease (¶15); and that the Dealer Agreement will include benchmarks for completion of the permanent facility, including dates, *inter alia*, for when Courtesy will submit construction drawings, obtain governmental approvals, and commence and complete construction (¶¶ 15 and 16).  Further, the parties *agree* that compliance with the terms of the Stipulated Decision and *execution* of the Dealer Agreement containing the *milestones* are each separately required (¶17). (Emphasis added.) [Exh. J-301] Additionally, there is the language in Paragraph 28 in two places that the ALJ must determine whether there has been a *material failure to comply* with the any of the conditions by Courtesy, which certainly implies a promise which is either materially or non-materially breached. [Exh. J-301:020-.021]

211.    It is questionable whether there is a basis here for a construction that the agreement contains language that Courtesy's right to continue its franchise is a condition. The language, which is to be construed against finding a condition here, is ambiguous and does not necessarily purport to declare a condition precedent. The language of the Stipulated Decision is that Courtesy agrees or promises to do certain things by certain deadlines, and agrees to include certain provisions in another document. The language, like that in *Pacific Allied,* does not compel a finding that obtaining permitting, beginning construction, and completing construction are a condition precedent to Courtesy retaining its franchise. Further, the plain language used by the parties is "material breach" of terms that are promises and conditions. Thus, the terms should not be construed as express conditions requiring full and complete

1  performance. As noted above, conditions precedent are not favored and will not be read into an

2  agreement.

3       212.    Further, if the interpretation is that the language (material breach) is a condition, it would

4  here, as in *Allied Pacific*, result in a disproportionate forfeiture being inflicted on Courtesy as Courtesy

5  has spent considerable money, time and effort in completing the project, albeit late, only to lose its

6  Subaru franchise. Thus, the fact that there has not been full occurrence of a condition, if it is a condition,

7  must be excused.

8       213.    Promises are undertakings that something will or will not happen in the future; that is,

9  someone has made a commitment to do or refrain from doing something in the future. Promises may be

10  breached with the level of breach being either a "material breach" (major breach) or "non-material

11  breach" (minor breach). If there is a material breach, the other party may terminate the contract and

12  recover damages or seek some other remedy. If the breach is only minor, the other party must continue to

13  perform and can recover damages only for the minor breach. (Rest. 2d Contracts, § 241)

14       214.    As noted above, the Stipulated Decision does not provide that good cause existed at the

15  time of the execution of the Confidential Agreement for the termination of the Protestant's Subaru

16  franchise. Rather, the parties agreed that Courtesy's failure to comply with *any of the conditions* in the

17  Stipulated Decision shall "constitute good cause to terminate the SOA Dealer Agreement between them

18  under sections 3060 and 3061." The condition for review here is whether there is *material failure to*

19  *comply by Courtesy*. (Emphasis added.) [Exh. J-301.18:11-13, .20]

20       215.    The parties here have used the vocabulary "material breach" regarding the non-

21  compliance with the benchmarks. The parties provided the standard here to be "material failure to

22  comply." Therefore, the occurrence of the conditions here should be measured by whether they have

23  "substantially occurred" or have been "substantially performed" – the same standard that applies to

24  whether there is a "material breach of promise," as the conditions here are also promises.

25       **No Material Failure to Comply with the New Dates --- Courtesy's Substantial Compliance**

26       216.    Based either upon incorporation by reference or promissory estoppel, the new dates in the

27  Amended Facility Addendum (and by incorporation, the Stipulated Decision) apply and materiality will

28  be assessed using those dates. The sole failure to meet those dates does not equal materiality. If it did,

there would be no need for the words "material failure" or "materially complied" in the Stipulated

Decision. However, unlike the characterization of this matter by Respondent that the ALJ is simply to

make a determination of whether Protestant has or has not complied with the provisions of the Stipulated

Decision, the determination to be made is whether Protestant has or has not *materially* complied.

(Emphasis added.) [Exh. J-300.20, ¶28]

217.    Material compliance requires evaluation under the factors articulated in *Sackett* v. *Spindler*

(1967) 248 Cal.App.2d 220. "In determining the materiality of a failure to fully perform a promise the

following factors are to be considered: (1) The extent to which the injured party will obtain the

substantial benefit which he could have reasonably anticipated; (2) the extent to which the injured party

may be adequately compensated in damages for lack of complete performance; (3) the extent to which

the party failing to perform has already partly performed or made preparations for performance; (4) the

greater or less hardship on the party failing to perform in terminating the contract; (5) the wilful [*sic*],

negligent, or innocent behavior of the party failing to perform; and (6) the greater or less uncertainty that

the party failing to perform will perform the remainder of the contract." [*Id.* at 229] Material compliance

requires evaluation under the factors articulated above and analysis under Restatement of Contracts,

Second § 241. [See also Rest. Contracts, § 275]

218.    Although Respondent asserts that the only determination left in the Stipulated Decision is

whether Protestant timely complied or did not timely comply and by how much, "materialness is only

timeliness," this statement oversimplifies the legal definition of materiality. [RT Vol. IV 20:15-23] As

explained above, the Stipulated Decision is a settlement agreement that is a contract subject to all the

usual and normal legal and statutory contractual requirements. Because the legal determination of

materiality requires consideration of whether Respondent suffered any injury or could be adequately

compensated for such harm, the parties did intend by their language for the Board to make findings

concerning legal materiality.

219.    Respondent asserts that because the parties have already stipulated to good cause to

terminate under Section 3061, the factors in *Sackett* have no application to this matter and that case is not

determinative. However, as noted above, the parties in the Stipulated Decision did not stipulate that good

cause existed at the time of the execution of the agreement, but rather that Courtesy's failure to comply

with the conditions in the agreement shall constitute good cause. [Exh. J-301.18 ¶ 25(c)] Thus, the need for determining materiality.

220.    Further, Respondent asserts that because good cause has already been agreed to that essentially the good cause factors in Section 3060 are the same as the *Sackett* factors. Requiring Respondent to show any alleged non-compliance be material is not the same as showing good cause to terminate pursuant to Sections 3060 and 3061. The parties were not litigating the *Sackett* factors in 2018 and they are not litigating the good cause factors in this dispute. Respondent argued in its Motion in Limine that the Board should refrain from considering evidence necessary to determine materiality because the "parties stipulated to good cause for the failure to meet any condition for good reason, to avert this exact balancing of the existing circumstances." [Respondent's Motion in Limine No. 1, p. 3, lines 13-14] Reviewing the evidence regarding the materiality factors is not the same as determining "existing circumstances" under the good cause factors. It is to do a full evaluation of the *Sackett* factors regarding material breach.[67]

221.    Allowing introduction of this evidence of what SOA's damages are, if any, is not tantamount to imposing further conditions to unlawfully continue the franchise relationship in direct contravention of both the Board's retention of jurisdiction and statutory mandate.

## **Material Compliance Factors**

### **(1)    The Extent to which the Injured Party will Obtain the Substantial Benefit**

222.    The first requirement is the extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated. The substantial benefit contracted for by SOA is a new facility. The facility project was delayed, with construction commencing on June 28, 2021, some nine months after the time agreed to under the Amended Facility Addendum. The Subaru/Volvo building is expected to be the first building completed and it is expected to be by April 2023, if not sooner. Realistically, the soonest SOA could get another Subaru dealership in operation is approximately a year.

---

[67] However, how circumstances have changed may be important in determining the *Sackett* factors. Paragraph 30 of the Stipulated Decision provides that Protestant agrees that the remodeling of the facility at the temporary facility and the construction of a new facility as contemplated under the Stipulated Decision "are each reasonable in light of all existing circumstances, including economic conditions. . . . ." [Exh. J-301.22] Arguably, this language allows consideration of how circumstances have changed, which they clearly have.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

SOA witnesses testified that they would attempt to use the current sales location for the new dealer's sales office, but there is currently no facility available in Chico for service.[68] Although Mr. Smit testified that Courtesy's current service location on Cohasset is for sale, Mr. Pajouh testified that he is negotiating leases of his other dealerships' buildings through December 2022. [RT Vol. VI 224:8-10, 229:13-15; Vol. VII 15:10-17] It is highly unlikely that a new Subaru dealer could have a sales and service location by March of 2023, which is approximately when the Subaru/Volvo building should be completed.

### (2)    The Extent the Injured Party is Adequately Compensated by Damages

223.    The next requirement is the extent to which the injured party may be adequately compensated in damages for lack of complete performance. Respondent contends that evidence of harm and/or damages is not relevant to the determination of the issues because the Stipulated Decision does not provide for damages in the event of non-compliance and the Board is not authorized to award damages or grant any other relief in this matter.[69]

224.    Nothing in the Stipulated Decision provides any statement that damages would be inadequate to address any alleged breach of the Stipulated Decision.[70] Respondent's assertion that damages for failure to timely perform are inadequate is contradicted by the fact a LOC was required by SOA as *assurance for performance*. SOA witnesses testified that the LOC was requested as an assurance of performance. Mr. Farabee testified that the LOC was "an assurance that a project will get done in a set amount of time or by a date certain." He explained that SOA would have a discussion regarding the LOC after the last date in January 2022 (Feltus Hawkins verification) is missed. [RT Vol. IV 144:13-145:20] The May 2020 Amended Facility Addendum states "should the facility not be completed by the agreed upon date, *SOA will execute the Letter of Credit or Performance Bond that secures this amendment*." (Emphasis added.) [R-101.01] If there are damages for lack of timely performance, the LOC for $750,000, which SOA believed it could call as soon as January 31, 2022, should be seen as adequate since that is what the parties agreed to.

_____

[68] SOA seems to assume that a new dealer could secure a lease for the current Courtesy premises. Mr. Pajouh has a lease on the 896 East Avenue location until December 2022, with a month-to-month extension for three months through March 2023. [RT Vol. VII 14:16-15:9]

[69] In this Decision, the Administrative Law Judge is not awarding damages nor amending the Stipulated Decision.

[70] We cannot assume, as SOA asserts, that delay automatically equals damages.

225.    Letters of credit are governed by Division 5 of the California Uniform Commercial Code. Uniform Commercial Code Section 5102(a)(10) defines a LOC as "a definite undertaking that satisfies the requirements of Section 5104 by an issuer to a beneficiary at the request or for the account of an applicant . . . to honor a documentary presentation by payment or delivery of an item of value."[71] In *San Diego Gas & Electric Co. v. Bank Leumi*, (1996) Cal.App.4th 928, the court explained that in recent years, "the use of the letter of credit has expanded to include guaranteeing or securing a bank's customer's promised performance to a third party in a variety of situations. This use is referred to as a standby letter of credit." [*Id.* at 933] The liability of the issuer of a letter of credit to the letter's beneficiary is direct and independent of the underlying transaction between the beneficiary and the issuer's customer. [*San Diego Gas & Electric Co.* v. *Bank Leumi*, supra, 42 Cal.App.4th at pp. 933-934] A letter of credit is not a form of guaranty or a surety obligation.[72] The issuer of a letter of credit cannot refuse to pay based on extraneous defenses that might have been available to its customer. [See Uniform Commercial Code section 5108(f)][73]

226.    SOA will receive the full benefit of a newly constructed Subaru facility in Chico, albeit on a delayed timeframe. The current Subaru facility may be deficient, but Mr. Pajouh said it is better than any of his other facilities. And further, it is the exact location where SOA witnesses testified that SOA would put another dealership if Courtesy were terminated (apparently assuming the new franchisee could lease the location).

227.    Mr. Pajouh testified that Courtesy had a great year selling Subaru vehicles. Mr. Farabee testified that Courtesy's sales were up 19% compared to the national average of 6%. There was no

---

[71] Uniform Commercial Code section 5104 provides that "[a] letter of credit, confirmation, advice, transfer, amendment, or cancellation may be issued in any form that is a record and is authenticated (i) by a signature or (ii) in accordance with the agreement of the parties or the standard practice referred to in subdivision (e) of Section 5108."

[72] Civil Code section 2787 provides that "[a] letter of credit is not a form of suretyship obligation."

[73] Uniform Commercial Code Section 5108(f) provides that "[a]n issuer is not responsible for: (1) the performance or nonperformance of the underlying contract, arrangement, or transaction, (2) an act or omission of others, or (3) observance or knowledge of the usage of a particular trade other than the standard practice referred to in subdivision (e)." Subdivision (e) provides that "[a]n issuer shall observe standard practice of financial institutions that regularly issue letters of credit. Determination of the issuer's observance of the standard practice is a matter of interpretation for the court. The court shall offer the parties a reasonable opportunity to present evidence of the standard practice."

evidence presented that showed any decline or loss in sales by Courtesy by failing to complete the new sales facility in accordance with the schedule. Consequently, there are no damages to SOA for lack of performance in sales. SOA asserts that it is damaged because service is more important than sales and the location where the service is performed on Subaru vehicles is at Courtesy's Buick/GMC location. But that is exactly what SOA agreed to under the original Dealer Agreement, although service has continued there longer than anticipated. Additionally, the new multi-franchise facility will have a new service facility and a separate express service center exclusively for Subaru vehicles which should allay any service concerns.

### (3)    The Extent to which the Party Failing to Perform has Already Partly Performed or Made Preparations for Performance

228.    Courtesy's performance was hindered by annexation, and similar delay requests by the City due to the Camp Fire and COVID-19 impacts on Chico. It was extremely difficult to get everyone in the City together and the additional burdens were tremendous. Mr. Sawley told Mr. Stevens and Mr. Pajouh that he may not be able to give the project his immediate attention. SOA witnesses testified that Courtesy's ongoing performance in getting the project built has been steady and uninterrupted, despite the pandemic.  No one from SOA testified that Courtesy was not moving forward – instead the testimony was that Mr. Pajouh was "doing everything he could." The import of the email about Courtesy's people not getting back to the City was conflicting. It appears that the delay referenced in the email was probably about delays related to Modern Builder's subcontractors who were working "in the field" not showing up for work related to COVID-19, unrelated to the Courtesy project. The "ball was in Courtesy's court" in July 2020 to respond to the City's plan check comments, but there was no testimony that Courtesy delayed in responding to the City. Mr. Sawley testified that Modern Building was checking in frequently ("[Mr. Seegert] was being the pest that he said he didn't want to be") and they were moving forward on all fronts "in the pursuit of trying to get to the end result faster." [RT Vol. III 182:19-184:7]

229.    Courtesy has made many preparations for performance and has spent at least $6.5 million thus far in design and start of construction for the multi-franchise facility. Courtesy has made major investments in acquisition of $2.8 million along with acquiring a construction loan of $23.5 million. As noted above, Subaru sales and service accounted for over 40 percent of Courtesy's unit sales in

1  generating cash flow. Subaru is Courtesy's biggest generator of revenues based on volume. [RT Vol. VII

2  7:21-8:25; 29:16-30:3] Although Courtesy will not lose all of these expended amounts if the Subaru

3  franchise is terminated, the Subaru dealership is arguably approximately 40 percent of that expenditure,

4  which is substantial. The bank loan is also potentially threatened if Mr. Pajouh loses the Subaru franchise

5  since funding the loan was based on the entire project. [RT Vol. VI 232:7-15; Vol. VII 8:6-11, 10:24-

6  11:2]

7  **(4)    The Greater or Less Hardship on the Party Failing to Perform in**
   **Terminating the Contract**
8

9      230.    The next factor to consider is the degree of harm to the breaching party, in particular, the

10  possibility that the party will suffer inequitable and disproportionate forfeiture if the contract is

11  terminated. Termination would cause substantial hardship to Courtesy and will result in a forfeiture. Mr.

12  Pajouh testified that Subaru is an integral part of the business of Courtesy Automotive Center and is its

13  biggest volume. As noted above, Courtesy has spent approximately $6.5 million thus far apart from the

14  purchase of the property, and has made major investments in acquisition, design, and start of

15  construction.  Mr. Pajouh has incurred a construction loan of $23.5 million. As explained by Mr. Pajouh,

16  losing the Subaru franchise would "put a financial burden on the whole organization of the volume that

17  we do, the gross profit, the cash flow, the number of employees that we have . . ." [RT Vol. VI 220:1-4]

18  To complete the Volvo/Subaru dealership building without the Subaru franchise "would put [a] financial

19  constraint on the organization because now [Courtesy has] the carrying cost of something that's not

20  producing -- generating revenues, gross profit, and everything that it takes to continue with [the] total

21  project." [RT Vol. VI 220:7-18] If the Subaru franchise were to be terminated, Mr. Pajouh testified it

22  would cause an issue with the funding of the entire project because funding is based on the whole

23  project.[74] [RT Vol. VI 232:7-15; Vol. VII 7:16-8:25]

24  **(5)    The Willful, Negligent, or Innocent Behavior of the Party Failing to Perform**

25      231.    Courtesy used commercially reasonable best efforts and encountered delays beyond its

26  _____

27  [74] There was no testimony as to how likely or unlikely it would be to obtain another franchisee to replace the SOA
    franchise in Chico or the willingness or likelihood of another franchisor to award a franchise to a dealer that had
28  been terminated.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

control, including the City's rapid annexation, and Camp Fire and COVID-19 impacts on the City and Courtesy's team. Commercially reasonable best efforts as explained in *California Pines Property Owners Ass'n.* v. *Pedotti* (2012) 206 Cal.App.4th 384, 394 do "not require the promisor to ignore its own interests, spend itself into bankruptcy, or incur substantial losses to perform its contractual obligations." The court explained that where the contract does not define the phrase best efforts, "the promisor must use the diligence of a reasonable person under comparable circumstances." (Citations omitted.) [*Id.* at p. 394] Best efforts requires a person to use "such efforts as are reasonable in light of that party's ability and means at its disposal and of the other party's *justifiable expectations. . . .*" (Emphasis added [*Id.* at pp. 394-395] SOA did not have justifiable expectations that this huge multi-franchise project could get plan check approval, permit approval and the Development Agreement done during COVID-19, especially with all the added requirements from the City. Additionally, the extended dates of the Amended Facility Addendum were not reasonable such that SOA could rely on them. The time to obtain the permit was extended from May 22, 2020, to July 31, 2020, approximately six weeks. Mr. Pajouh told Mr. Smit the dates were unobtainable and optimistic, and Mr. Smit said he would have built in slack. [Exhs. P-16.001; R-123.09:3-11]

232.    Courtesy was not unreasonable in trying to get the ROW development/lease issue resolved in its favor. Basically, the County had made assurances to Courtesy that it would abandon the ROW. The County allowed a church to be built in the ROW, complicating any use of it as an interchange (see footnote 49, *supra*). It took over two years from late October 2018 to January 2021 to reach agreement. However, the Camp Fire occurred in November 2018 and impacted the City of Chico for many months. Mr. Sawley was working on residential needs of the City until June 2020. Mr. Sawley sent his first response to Mr. Stevens in March 2019, a delay of four months. Mr. Sawley asked Courtesy for relief from reviewing the Development Agreement during the aftermath of the Camp Fire and during COVID-19, given his other significant duties. Mr. Pajouh did not have to ignore his own interest in the ROW, and reasonably pursued his negotiations for the lease option as long as the City continued discussions, which Mr. Constantin did, and while the plan check was not complete.

233.    The Development Agreement was not a priority for the City. In March 2020 when COVID-19 hit and the City closed its offices, Mr. Sawley testified because the agreement did not have a

30-day turnaround time, it was not a priority for him. He also testified that he and other City departments delayed plan check review because the Development Agreement was not complete. [RT Vol. III 169:19-170:9] Although Mr. Sawley said he and others did not review the plans given the outstanding Development Agreement, it is not clear that other City departments did so, given the building department's official indicating it was a priority. BV, the primary building reviewer, timely did their review. [RT Vol. V 144:20-145:4, Vol. III 21:16-25, 169:12-18] Further, Mr. Pajouh said he was not aware that Mr. Sawley was not reviewing the plans because of the incomplete Development Agreement, which should have been explained to him. Mr. Pajouh thought the plan check and the Development Agreement were "two ships sailing alongside of each other." [RT Vol. VI 86:13-23, 87:21-88:5]

234.    Mr. Graziano testified Courtesy delayed the multi-franchise project because Mr. Pajouh wanted to build a gas station in the ROW but was having difficulty getting the City to agree. Courtesy, in his opinion, did not move forward with the Subaru facility because it was held up getting the larger project, including the ROW, done at that location. Completing the Subaru facility by a specific date "was not as relevant for [Mr. Pajouh]." [RT Vol. IV 198:2-8, 199:5-17] However, Mr. Sawley said the City was willing to explore options of being able to do both – what the City needed and what Courtesy needed. Chris Constantin continued to negotiate the terms of a lease with Courtesy until late 2020. [Exh. P-29.003-.004] Mr. Sawley explained that "[w]ell [the City] can't give up the [ROW] long term so [the City is] not going to abandon it" and "Chris [Constantin] is really good at saying '[h]ey, let's explore the option of being able to do both." Courtesy "trusted that [the City] would be able to work that out in a way everybody could get onboard with." [Exh. P-63.106:16-22]

235.    Mr. Graziano testified that he thought Mr. Pajouh "willfully did not meet the agreement, because it appears agreements just don't mean that much," citing Mr. Pajouh's repeated failure to complete agreements back to 2015, including the "willful" move to an unauthorized relocation.[75] [RT Vol. IV 179:8-21, 185:4-17] It is difficult to believe Mr. Graziano's testimony about his belief that Mr.

_____

[75] SOA witnesses testified that the history of broken promises in their dealings with Courtesy go back to 2015, and their belief that Mr. Pajouh had not been honest and forthright in their dealings influenced their decision to send the Notice of Non-Compliance. [RT Vol. IV 109:6-15, 110:14-25, 185: 4-17] Although it is understandable that history may have played a part in SOA's lack of trust and decision to send the notice, for purposes of this Decision only the facts surrounding the Stipulated Decision and events following thereafter are relevant.

1   Pajouh was "willful" given that SOA extended the benchmark dates via the Amended Facility Addendum

2   and in effect, as found here, extended the time for Courtesy to complete the project. [RT Vol. V 21:8-

3   22:15] Mr. Graziano tried to explain that the extension did not extend the Stipulated Decision, but if one

4   believes that a partner is *willfully* not completing agreements, no extension of any kind should have been

5   given. Mr. Graziano's explanation that it was "just about the LOC" is not credible because giving new

6   dates for the LOC extended the dates for the project or, at the very least, there was the risk that an

7   adjudicator would not agree with SOA that the extension was so limited. [RT Vol. V 22:10-15]

8   Additionally, it is difficult to find willfulness here on the part of Courtesy when Mr. Pajouh testified that

9   the delay in having the multi-franchise facility built is costing Courtesy in the tens of thousands of dollars

10   in expense every month. It is simply not reasonable that someone in this situation could be found to be

11   willfully delaying getting these buildings built.

12        236.   Mr. Graziano pointed out that 30-plus Subaru dealership facilities are being built during

13   COVID-19 and 10-13 facilities were completed, supporting SOA's position that the pandemic did not

14   stop other projects. [RT Vol. IV 180:17-181:6] Although he agreed that there was a pandemic and

15   wildfires near Chico, Mr. Graziano simply does not believe those "extenuating circumstances" inhibited

16   Courtesy from moving forward. [RT Vol. IV 185:12-17] However, as noted above, only One Subaru in

17   Hayward, of all of those other projects, is similar to Courtesy's, and it may have started construction in

18   2019.[76] Additionally, the location was not impacted by the Camp Fire and its aftermath.

19        237.   The project received ARB approval in October 2020 after delays by the City, and Mr.

20   Constantin continued to negotiate with Mr. Pajouh. Not until Mr. Sawley, in January 2021, told Mr.

21   Pajouh that he needed to drop the ROW in order to obtain the permit, did things move, and even then, the

22   City had more requests of Courtesy, such as reconfiguring the intersection of Garner and Esplanade. [RT

23   Vol. I 174:17-175:2, 176:9-177:2; Vol. II 23:4-15]

24        238.   Moreover, there is repeated testimony that Mr. Pajouh was diligent, and there is no

25   evidence that Courtesy had any intention of doing anything other than build the facility as soon as it

26   possibly could. [Exh. P-63.104:7-15.] Mr. Pajouh asked Mr. Seegert to make the Subaru/Volvo building

27   

28   [76] Mr. Smit hedged as to whether construction at One Subaru started in 2019, testifying only that "substantial construction" began in 2020. [RT Vol.VI 42:19-43:11, 44:1-19]

1    a priority and the City acknowledged to Mr. Seegert that Courtesy's plan check was "a priority project."

2    [Exh. P-17.003]

3            **(6)    The Greater or Less Uncertainty that the Party Failing to Perform will
                     Perform the Remainder of the Contract**

4

5        239.    Mr. Graziano testified that he had a "low level of certainty" that Courtesy will perform the

6    remainder of the settlement agreement. [RT Vol. IV 185:22-186:7] At this point, there is no evidence to

7    support any genuine concern the facility will not be constructed. Courtesy has made a major investment

8    already and has carrying costs associated with both the construction loan and the expense of the leased

9    buildings at the same time. None of Courtesy's other franchisors (Cadillac, Buick/GMC, BMW,

10   Mercedes-Benz and Volvo) have sought to terminate their franchises. Construction has started and at the

11   time of the hearing was approximately 10 percent complete.

12       240.    SOA asserts in its reply brief that *Sackett* supports a finding of material breach in favor of

13   SOA because of the uncertainty of the completion of construction. In *Sackett*, the plaintiff, Sackett, sued

14   for breach of contract after he entered into an agreement with defendant Spindler whereby Sackett agreed

15   to purchase Spindler's outstanding shares in a newspaper corporation. The contract called for a purchase

16   price of $85,000 to be paid by Sackett in installments by specific deadlines. Sackett paid the first

17   payment timely, most of his second payment late, and the third check bounced after being paid a month

18   late. After Spindler reclaimed the shares of the company he had placed in escrow, Sackett telegrammed

19   Spindler that he was ready, willing and eager to transfer the remaining funds. Spindler told Sackett that if

20   he did not pay the balance within 10 days, he would cancel the agreement. Sackett failed to make the

21   payment due. Sackett subsequently agreed to pay the outstanding balance, and Spindler gave him another

22   week. Sackett did not pay, but informed Spindler that he could set up a financing agreement because his

23   assets had been freed due the termination of his divorce proceedings. Spindler responded that he was

24   cancelling the contract as a result of Sackett's delay. Sackett sued for breach of contract and the question

25   before the court was whether Spindler's duty to perform was discharged by Sackett's conduct and

26   whether Spindler was justified in cancelling the contract. The court found that Spindler was justified in

27   terminating the contract for non-payment despite Sackett's subsequent offers and promises to perform.

28   The court held that "despite Sackett's 'offers' to perform and his assurances to Spindler that he would

1   perform, it was extremely uncertain as to whether in fact Sackett intended to complete the contract."

2   [*Sackett, supra,* 248 Cal.App.2d at 230] The court noted that although Sackett never repudiated the

3   contract and expressed willingness to perform, the evidence was sufficient to warrant the inference that

4   he did not intend to perform. [*Id.* at p. 231]

5        241.    Courtesy has expended a considerable amount of time and investment to get the project to

6   the point that it is at currently. Much of the delay was due to the City of Chico's actions or non-actions.

7   The majority of the permits have been obtained and grading is complete, and construction has begun. It is

8   not extremely uncertain that the project will not get built nor does Courtesy want an "open-ended"

9   timeframe to perform, since any delay is costing it in terms of time and money.

10   **Time is of the Essence Provision**

11        242.    A time is of the essence provision in a contract equals materiality in California except

12   when it doesn't. The traditional rule has been tempered so that the provision in a contract does not always

13   make untimely performance a breach. [*Magic Carpet Ride LLC* ("MCR") v. *Rugger Investment Group,*

14   *LLC* ("Rugger") (2019) 41 Cal. App. 5th 357, 367] "[A]n unqualified rule enforcing time is of the

15   essence provisions and permitting default is at odds with prior and subsequent developments in

16   California law." (Citation omitted.) [*Ibid.*]

17        243.    *Magic Carpet Ride* involved a contract by Mr. Rugger to sell an airplane to Mr. Jennings

18   for $610,000. The aircraft was to be released free and clear of all liens and encumbrances. A lien was

19   filed against the aircraft. An amendment was entered into identifying MCR instead of Jennings as the

20   buyer and gave Rugger 90 days from the date of closing in which to show the lien had been released.

21   Rugger agreed to hold back $90,000 in escrow for that 90-day period. If Rugger did not provide evidence

22   that the lien had been released within those 90 days, then the $90,000 would be given to the buyer, MCR.

23   The aircraft bill of sale passed title to the plane to MCR on the date of closing. Rugger paid $38,000 for a

24   lien release eight days after the expiration of the 90 days, and delivered it to escrow. MCR refused to

25   release the $90,000 in escrow to Rugger. Rugger contended it substantially performed, but the trial court

26   held for MCR.

27        244.    The court of appeal concluded that a time is of the essence provision does not

28   automatically make untimely performance a breach of contract where there are triable issues regarding

the scope of that provision and whether its enforcement would result in a forfeiture. The court held that "a time is of the essence provision will not automatically be enforced if doing so would work a forfeiture." [*Magic Carpet Ride LLC, supra,* 41 Cal.App. 5th at 367, citing *Galdjie* v. *Darwish* (2003) 113 Cal.App.4th 1331, 1341] The court, quoting Corbin on Contracts, stated: "If the enforcement of an express provision causes an excessive penalty or an unjust forfeiture, *equity will prevent enforcement.* Thus, equity limits our power to determine our own contractual rights and duties." (Emphasis added; citation omitted.) [*Magic Carpet Ride LLC, supra,* 41 Cal.App. 5th at 368] The court noted that inequitably Rugger would lose the money he paid for the lien release, would lose the $90,000 holdback, in effect a price reduction, and MCR would receive an aircraft free and clear of liens. There was no evidence of any damages suffered by MCR caused by the delay, and if there is any, MCR could be compensated for it. The appellate court sent the case back to the lower court to determine the triable issue of fact as to substantial performance and whether Rugger faced a risk of forfeiture if strict compliance were required. [*Magic Carpet Ride LLC, supra*, 41 Cal.App. 5th at pp. 366-367]

245.    SOA asserts that *Magic Carpet Ride* is distinguishable because this case is not a simple breach of contract or a "mere" settlement agreement, but rather involves a carefully negotiated Stipulated Decision and Order which was approved by the Board. All contracts and settlement agreements are arguably carefully negotiated and crafted. And, as noted above, a settlement agreement, or in this case, a Stipulated Decision does not have a higher value than a contract. It must be judged by the same legal principles applicable to contracts generally. [*Weddington Productions Inc.* v. *Flick* (1998) 60 Cal.App.4th 793, 810-811] It is a Board order, but that fact alone is not a distinction that would make *Magic Carpet Ride*'s holding inapplicable.

246.    Further, SOA argues that Courtesy has not missed deadlines by just a few days (as was the case in *Magic Carpet Ride*) but by one year, seven months and counting. However, given the application of the doctrine of promissory estoppel here, the missed deadline for government approvals and commencement of construction is nine months. *Magic Carpet Ride* does require time and date conditions be reasonably met. [*Magic Carpet Ride LLC,* supra, 41 Cal.App. 5th at p. 364] To resolve whether reasonable adherence has been met, the court in *Magic Carpet Ride* looked at substantial performance and would the enforcement of the provision work a forfeiture. [*Id*. at 367]

247.    The court noted in *Magic Carpet Ride* that the evidence submitted showed that Rugger did not willfully depart from the terms of the contract and diligently sought to obtain the release. [*Id*. at 364] Likewise, Mr. Pajouh did not willfully depart from the terms of the contract and diligently sought to get the project permitted and constructed. The evidence from Mr. Sawley was that Mr. Pajouh was diligently trying to move the project forward, and that he did not sense any sort of desire to delay anything at all by Courtesy. Mr. Farabee testified that he did not recall any discussion that Courtesy was not moving forward.

248.    Nine months delay for the start of construction in this case is adherence to time and date conditions being reasonably met. Given the kind and scope of the project, the benchmarks were reasonably met to the extent possible. The construction of the multi-franchise project was complex, with seven different franchises. In addition, there was the change by the City from allowing County versus City requirements, and the attendant need for figuring out how the different improvements plus the higher cost would be resolved, which necessitated extended discussions with the City over the Development Agreement. Furthermore, there was the need to extend water, sewer and other utility services to the site with other property owners. Mr. Constantin articulated in an email that the completion of the Development Agreement did not delay the project. However, the City continued to delay the project, asking for more improvements, even after the permit was approved. The new dates agreed to in the Amended Facility Addendum were described as "optimistic." SOA was not justified in relying on them given the impact of COVID-19, especially given Mr. Pajouh telling Mr. Smit the dates were "unobtainable," and Mr. Smit's comments that Courtesy should have built in some slack in the dates since "[l]ike this is ground zero. We're in the middle of shut down" due to COVID-19. The pandemic continues to impact business nationwide, and certainly the achievement of deadlines in this case to date. To strictly enforce the provision of time is of the essence here would result in the exact kind of forfeiture for Courtesy that *Magic Carpet Ride* explains should be avoided.

249.    There is no evidence of any damages suffered by SOA caused by the delay. Courtesy is selling as many cars as it can and three times more than the national average. SOA is frustrated that servicing of its customers' vehicles are not being provided in a Subaru facility, which impacts retaining repeat Subaru customers. [RT Vol. IV 80:17-81:21] According to SOA, the Subaru brand is being

1  "poorly" represented because of the deficient temporary location and servicing cars in a shared location.

2  [RT Vol. IV 77:6-78:5] SOA witnesses agreed that those damages are hard to quantify. [RT Vol. IV

3  81:23-82:10, 117:8-13] According to SOA witnesses, the LOC was to provide assurance that Courtesy

4  would perform and Courtesy has not performed as SOA expected. The intent of the amended dates was

5  "to secure the LOC" and "get the building complete." [RT Vol. IV 124:8-21] If there is any harm to SOA

6  because of the delay in performance, SOA can be compensated for it by calling the LOC.

7  **Protestant's Excuse Based on Paragraphs 18 and 19 of the Stipulated Decision**

8      250.    Paragraph 18 of the Stipulated Decision provides that "[i]f, notwithstanding [Courtesy's]

9  commercially reasonable best efforts, the necessary approval of a governmental entity cannot be obtained

10  in order to timely satisfy the deadlines [], *solely* for reasons beyond the control of" Courtesy, Courtesy

11  "shall, upon learning of the delay, immediately notify SOA's SFO Zone representative in writing, and

12  shall request the minimum extension of time necessary to complete the actions" set forth in the Stipulated

13  Decision. (Emphasis added.) [Exh. J-301.13:24-14:1] Paragraph 19 of the Stipulated Decision provides

14  that "[i]f SOA verifies that the delay is caused by a governmental entity and not by [Courtesy], SOA shall

15  agree to extend the affected deadlines [] on a weekly basis, until the governmental-caused delay is not a

16  factor. Courtesy "shall provide weekly reports to SOA regarding the status of any governmental delay

17  and the progress, if any, being made on the elimination of the delay and expected duration of the

18  remaining delay." If SOA determines that all or part of the delay is caused by Courtesy or its vendors or

19  employees, or if Courtesy fails or refuses to promptly provide either the initial notice of the governmental

20  delay or the weekly reports to SOA, or does "not allow SOA to verify such facts directly with any

21  governmental entity representative, then SOA shall not grant any extension (or any further extension),

22  and the deadlines (either as set forth [in the Stipulated Decision] or as previously extended by SOA) shall

23  remain in place." [Exh. J-301.5:14] In other words, if Courtesy was at all responsible for any of the delay

24  in permitting and obtaining the other benchmarks, Courtesy has no excuse for its non-performance under

25  these provisions.

26      **(1)**    **Delay by Courtesy while in the County's Jurisdiction**

27      251.    There is the conflicting testimony that Courtesy should have moved more quickly between

28  the time of its County application, negotiations, and the annexation.

252.    SOA asserts based on the email from Mr. Constantin that County permits were not obtained prior to annexation due to Courtesy's delay. The email from Mr. Constantin is in conflict with the testimony from Mr. Sawley and Mr. Stevens. Mr. Stevens testified that the City changed its mind and reneged on the agreement to use County requirements. Mr. Sawley testified that Courtesy worked diligently during that year and a half. This testimony supports that Courtesy did not delay getting permits from the County prior to the annexation by the City which would have allowed the City to honor the County standards for the property and no Development Agreement would have been necessary. Mr. Sawley described substantial amounts of work by Courtesy in the County, trying to get the entitlements. Chico moved in such an expeditious way and/or changed its mind as to what was agreed upon that there was not sufficient time for Courtesy to obtain County permits prior to annexation. Given the number of things Courtesy needed to accomplish in the County prior to the annexation, and the speed of the annexation, Mr. Constantin's email comment about Courtesy's delay is rejected.[77]

### (2)    Courtesy's Billing Disagreement with Northstar

253.    Courtesy had issues with Northstar Design Solutions starting in 2019, and Courtesy paid the full agreed-upon amount to Northstar after the June 25, 2020, letter Northstar sent to Mr. Pajouh. Courtesy was later advised additional services were required and that Northstar's prior involvement would be beneficial, so Courtesy authorized Modern Building to contract directly with Northstar in August 2019. There was a delay of approximately six weeks between June 25, 2020, and August 4, 2020, when Mr. Stevens was not working on the project. However, the two items for which Northstar was engaged to perform previously and which had not been completed were not required prior to permitting, and thus did not delay the project. Therefore, there is no delay attributable to the dispute with Northstar.

### (3)    The Conflicting Testimony about the July 2020 Email and Delay by Courtesy's Subcontractors

254.    There was testimony that in July 2020, Mr. Pajouh acknowledged to Scott Farabee for the first time that delays in obtaining permits were also caused by his contractors not providing information

---

[77] Mr. Constantin noted in that email that the Development Agreement benefited the City more than Courtesy since the improvements would be built to standards 20 years later when, presumably, the improvements made would be of a higher quality. [Exh. R-111.01]

needed by Chico to process the permits. [Exh. R-122.12:5-13:12, 14:8-18:14] Mr. Pajouh's Declaration claims Mr. Farabee's testimony was incorrect regarding Mr. Pajouh's alleged statements that his subcontractors had contracted COVID-19 and were unable to work. Mr. Seegert confirmed that the delays he and Mr. Pajouh discussed were not on the Courtesy project. Mr. Seegert did not have an on the ground "crew" working on the Courtesy project at the time of the email. The email statement is not very clear as to who is referenced and it appears to be a misinterpretation by Mr. Farabee of the import of the email regarding delay by Courtesy's contractors due to COVID-19. The only clear statement is that the City had sent the plan check documents back to Mr. Seegert and the "ball was in Courtesy's court" to respond. Mr. Seegert clearly testified that Modern Building did not have any issues with subcontractors on the Courtesy project due to COVID-19 or anything else in July 2020 and there is no evidence that Modern Building responded other than timely to the comments on the plan checks from the City.

### (4)    The Development Agreement

255.    It was commercially reasonable for Courtesy to seek the deferral of the City-required improvements through the Development Agreement. Moreover, testimony from Mr. Stevens indicates the City changed directions on Courtesy.

256.    SOA did not have justifiable expectations that this huge project could get approved and built under the old benchmarks or the new ones during COVID-19 (optimistic dates) with all the added requirements of the City versus the County.

257.    Moreover, it is unclear that the negotiations on the Development Agreement did delay the permitting. There is conflicting testimony. Mr. Sawley said that the negotiations delayed the plan check review. The two emails from Mr. Lindsey with the building department stating that the project is a priority and that he would *urge* the others' reviews does not substantiate or comport with the position that reviews by other City departments were being delayed pending the Development Agreement.

258.    Mr. Constantin said "the DA [Development Agreement] should not be a stumbling block for your project as the critical path for the development is the Community Development portions that currently include the ARHPB [Architectural Review and Historical Preservation Board]. Thus, we can continue to refine and finalize this DA." [Exh. P-23.001] Arguably, Courtesy used commercially reasonable best efforts. It is allowable for Mr. Pajouh to look out for his own best interests regarding the

1  ROW, although given the deadlines he was under, it may not have been the wisest decision.

2      259.    The delays in getting the Development Agreement and permitting completed and

3  construction started were mostly attributable to the governmental agencies, but not solely. There were

4  various delays on both sides.

5      260.    There is no evidence that Courtesy notified SOA in writing of the government delay nor

6  did it obtain weekly extensions. Since Courtesy did not provide written notice on a weekly basis to SOA

7  as required, Courtesy did not establish an excuse for its non-compliance under the language of

8  Paragraphs 18 and 19 of the Stipulated Decision.

9  <u>**Protestant's Excuse Based on Paragraph 21 -- Force Majeure**</u>

10      261.    Paragraph 21 provides that "neither party shall be in default or liable for any delay or

11  failure of compliance" with the Stipulated Decision "to the extent due to any future event which is

12  beyond the control of the defaulting party. . ." Paragraph 21 continues, "including, without limitation,"

13  listing force majeure types of occurrences, including the one event in contention which is "an

14  unforeseeable intervention of any government authority (excluding delays in obtaining permits and

15  licenses), but excluding transport difficulties or strike, lock out or other labor disputes of [Courtesy] or

16  third parties, provided the party suffering such delay or failure of compliance immediately notifies the

17  other party of such delay or failure of compliance." [Exh. J-300.14:22-.15:1]

18      **(1)**    <u>**The Camp Fire**</u>

19      262.    The Camp Fire may have been "contained" on November 25, 2018, but the consequences

20  of the "deadliest and most destructive fire in California history," which reached the eastern portion of

21  Chico, were obviously long-term to the communities directly impacted, including the City of Chico. [See

22  Paragraphs 79 and 80, *supra*]

23      263.    Although the Camp Fire came months before the Stipulated Decision was signed, it still

24  can be deemed an "intervening" event that was "unforeseeable." This was one of the largest fires in

25  California history. The nearby City of Paradise was significantly impacted, the town being "decimated

26  within 12 hours." [See Paragraph 79, *supra*] The impact and consequences on Chico and the permitting

27  delay to the project were unforeseeable. Mr. Sawley testified that the consequences of the fire are still

28  impacting Chico. The City's attention was diverted from Protestant's project. Mr. Sawley delayed

working on the Development Agreement until approximately March 2019 and was as diligent as he could be, returning the agreement back to Courtesy, but simultaneously he asked Mr. Stevens if it could be delayed. Commercial properties in Chico were not afforded any priority given the pressing need for housing through mid-2020.

### (2)    The COVID-19 Pandemic

264.    The doctrine of *force majeure* is set forth in California Civil Code section 3526: "No man is responsible for that which no man can control." Paragraph 2 of California Civil code section 1511 states that non-performance of an obligation or any delay therein "is excused . . . [w]hen it is prevented or delayed by an irresistible, superhuman cause . . ." *Force majeure* is not necessarily limited to the equivalent of an act of God, but the test is whether under the particular circumstances there was such an insuperable interference occurring without the parties' intervention as could not have been prevented by prudence, diligence and care. (*Pacific Vegetable Oil Corp. v. C. S. T., Ltd.* (1946) 29 Cal.2d 228, 238]

265.    The nature and spread of the COVID-19 global pandemic are unprecedented or at least have not occurred in 100 years. There were further COVID-19 related delays from the various state orders regarding shutdowns and substantial interruptions to businesses and governments from shelter-in-place orders. SOA itself was impacted as was the world.

266.    Additionally, the consequences of the pandemic were not an "intervention" here, but rather resulted in a delay or non-action because of government shutdowns/substantial interruptions and shelter-in-place orders. If the Shelter-in-Place Order restricted the City and its employees from operating or performing their duties, then the non-performing party is not "in default or liable for any delay or failure of performance" (Paragraph 21 of the Stipulated Decision) so long as they can trace their delay or inability to perform (get permits) to the City of Chico's inabilities or delay in performance.

267.    The City of Chico was open during COVID-19, and although Mr. Sawley and others kept working, there were delays. Mr. Sawley explained: "I think the record will show that there was back and forth at various times throughout 2020. I think it would also be true that relative to earlier responses from the city, it was delayed during Covid because it was much harder to get meetings . . . during Covid it was extra difficult. . . ." [Exh. P-63.27:16-28:2] Mr. Sawley testified that Development Agreements do not require a 30-day turnaround that most of their other applications do, so he did not "typically promote

them to the highest priority." [Exh. P-63.28:6-9, .112:2-14]

268.     Therefore, the *force majeure* provisions apply and the Protestant is excused from timely performance of the benchmarks in the Amended Facility Addendum until the City reopened in April 2021. Courtesy notified SOA about the difficulties related to COVID-19. In March 2020, Courtesy's sales operation was shut down by the City of Chico code enforcement and Mr. Pajouh communicated that to Mr. Smit. In any event, arguably no notice was required or it would have been superfluous, since these events were well known to SOA.[78]

## DETERMINATION OF ISSUES

269.     SOA failed to prove that Courtesy is in material breach of the Stipulated Decision and Order of the Board.

270.     The delays in performance by Courtesy are excused as they are due to circumstances beyond its control.

## CONCLUSION

Based on the evidence presented and the findings herein, IT IS HEREBY ORDERED THAT SOA's request for an order of termination of Courtesy's Subaru Dealer Agreement is denied without prejudice. SOA is not permitted to terminate the Subaru franchise of Courtesy at this time.

SO ORDERED.


DATED: March 24, 2022                    NEW MOTOR VEHICLE BOARD


By _____
     EVELYN I. MATTEUCCI
     Administrative Law Judge




Attachments: as stated

---

[78] As Mr. Graziano testified, the COVID-19 pandemic "impacted the world." [Exh. P-61.006:23-.007:4]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE



VICINITY MAP
CITY OF CHICO, CA
NOT TO SCALE

| CITY OF CHICO | PUBLIC WORKS DEPARTMENT | |
|---|---|---|
| DRAWN BY lcm    DATE 1/29/2021<br>CHECKED MJ    SCALE NTS<br>APPROVED<br>for PUBLIC WORKS DIRECTOR | DEVELOPMENT AGREEMENT<br>City of Chico/JP Real Estate<br>Investments LLC (DA 18—01) | EXHIBIT<br>A<br>SHEET 3 OF 4 |

ATTACHMENT 1

RESPONDENT HEARING EXHIBIT R-104.17



ATTACHMENT 2

RESPONDENT HEARING EXHIBIT R-104.18



**Exhibit "C"**

ATTACHMENT 3

EXHIBIT 7

LAW OFFICES OF GAVIN M. HUGHES
GAVIN M. HUGHES State Bar #242119
ROBERT A. MAYVILLE, JR. State Bar #311069
3436 American River Drive, Suite 10
Sacramento, CA 95864
Telephone: (916) 900-8022
E-mail: gavin@hughesdealerlaw.com

ATTORNEYS FOR PETITIONER

# STATE OF CALIFORNIA

## NEW MOTOR VEHICLE BOARD

In the Matter of the Petition of:

COURTESY AUTOMOTIVE GROUP, INC.,
dba COURTESY SUBARU OF CHICO,

              Petitioner,

       v.

SUBARU OF AMERICA, INC.,

              Respondent.

PETITION NO.:

**[UNREDACTED] PETITION**

MAY NOT BE EXAMINED WITHOUT COURT ORDER-CONTAINS MATERIAL FROM CONDITIONALLY SEALED RECORD

Petitioner, Courtesy Automotive Group, Inc., dba Courtesy Subaru of Chico ("Courtesy"), files this petition under the provisions of the California Vehicle Code section 3050 subdivision (b)[1] and alleges as follows:

1.      Courtesy is a new motor vehicle dealer selling Subaru vehicles and parts, is duly licensed as a vehicle dealer by the State of California, and is located at 896 East Ave., CA 95973; Petitioner's telephone number is (530) 345-9444.  Courtesy is a licensee of the California Department of Motor Vehicles ("DMV") and also appears herein as a "person" pursuant to California Vehicle Code sections 470 and 3050(b).

2.      Respondent, Subaru of America, Inc. ("SOA"), distributes Subaru products and is the franchisor of Petitioner.  SOA is a licensee of the DMV authorized and licensed to do business and doing business in the State of California (Vehicle Distributor License No. 18593).  SOA's Main Location address for its license is 720 S Colorado Blvd., Suite 300N, Glendale, CO 80246; SOA's phone number listed for its license is (720) 514-4200.

3.      Petitioner is represented in this matter by Law Offices of Gavin M. Hughes, whose address and telephone number are 3436 American River Drive, Suite 10, Sacramento, California 95864; (916) 900-8022.

4.      Petitioner files a redacted version of this Petition, Petitioner's Motion to File Unredacted Petition Under Seal ("Motion"), and the Declaration of Robert A. Mayville, Jr. in Support of Petitioner's Motion to File Unredacted Petition Under Seal ("Mayville Decl.") and lodges an unredacted version of this Petition, the Motion, and the Mayville Decl. pending the Board's ruling on the Motion.

**<u>INTRODUCTION</u>**

5.      Courtesy operates a Subaru franchise in Chico, California.  Courtesy is well into the construction phase for multiple sales facilities and a combined service facility pursuant to agreements with franchisors including, BMW, Mercedes, Volvo, Subaru, Cadillac, Buick, and GMC (the "facility project").  To date, Courtesy has invested more than $14 million in its facility project.

6.      SOA unreasonably refuses to provide Courtesy electrical and structural specifications for

---

[1] All references to statutory code sections herein are to the California Vehicle Code unless otherwise stated.

Subaru brand signage and is also refusing to permit Courtesy to order the permanent signage required to be installed at the new facility ("Sign Package"). Courtesy is obligated to install the Subaru brand signage necessary to meet SOA facility image requirements, as required under the facility design approved by SOA. However, SOA refuses to provide the Sign Package in an effort to prevent Courtesy from securing final SOA approval and likely forming the basis for SOA to refuse to provide the OL 124 form required for DMV approval of the new facility location.

7.     SOA is engaged in a course of conduct that ignores the Confidential Decision Resolving Stipulated Decision and Order Dispute in Protest Number PR-2570-18 ("Confidential Decision") from Administrative Law Judge Evelyn I. Matteucci ("ALJ Matteucci") holding Courtesy did not materially fail to comply with the March 20, 2019, [Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit, Exhibit 1 to Confidential Agreement to Stipulated Decision and Order of the Board, Filed under Seal, and the April 9, 2019, Order Adopting "[Proposed] Stipulated Decision and Order of the Board Resolving Protest and Lawsuit" (collectively, "Stipulated Decision"). The Confidential Decision denied SOA's efforts to terminate Courtesy's Subaru Dealer Agreement and Standard Provisions ("Dealer Agreement"). ALJ Matteucci's Confidential Decision is binding and non-appealable pursuant to the terms of the Stipulated Decision paragraphs 28(b) and 28(c).

8.     A true and correct copy of the Stipulated Decision is attached hereto as Exhibit 1. A true and correct copy of the Confidential Decision is attached hereto as Exhibit 2.

9.     SOA's conduct subsequent to the issuance of the Confidential Decision is intended to coerce Courtesy to sell its Subaru franchise under the threat of being denied approval to commence operations at the new facility. Absent Board or DMV Occupational Licensing intervention, Courtesy will be condemned to operate from its temporary leased location even after the completion of its permanent facility.

10.     Courtesy requests the Board refer this matter to the Occupational Licensing branch of the California Department of Motor Vehicles ("DMV") for investigation.

11.     Courtesy requests the Board direct the DMV to conduct an investigation of SOA's violation of Sections 3060 and 11713.3 as described herein and make a written report on the results of the investigation.

## BACKGROUND

12.     Courtesy and SOA entered into the Stipulated Decision on March 20, 2019.  The Board adopted the Stipulated Decision on April 9, 2019.  The Stipulated Decision resolved a pending termination protest before the Board with Protest Number PR-2570-18 and associated civil litigation between Courtesy and SOA.  The parties incorporated the Stipulated Decision by reference into Courtesy's Dealer Agreement.  (*See* Exhibit 2 at ¶ 5.)

13.     The Stipulated Decision at paragraph 39 required Courtesy and SOA to "cooperate fully with each other in the performance of this Confidential Agreement, and will execute such additional documents or instruments as may reasonably be required to carry out the intent of the Parties."  (Exhibit 1 at ¶ 39.)

14.     The Stipulated Decision at paragraph 29 also required the parties to "not do anything to interfere with or inhibit the ability of any other Party to comply with their respective obligations under the terms of the Confidential Agreement."  (Exhibit 1 at ¶ 29.)

15.     Pursuant to the terms of the Stipulated Decision, Courtesy agreed to remodel a temporary Subaru facility while continuing efforts to complete its multi-franchise facility project to provide a permanent Subaru facility.  (Exhibit 1 at ¶¶ 15-16.)

16.     Courtesy completed the required renovations to the temporary facility at 896 East Avenue, Chico, California 95926 and is currently operating its Subaru franchise at this location.

17.     Courtesy and SOA entered into an Amendment to the Facility Addendum to Courtesy's Dealer Agreement dated May 21, 2020, concerning the dates to complete milestones for the permanent facility.  (*See* Exhibit 2 at ¶ 6.)  The milestones in the Amended Facility Addendum provided for Courtesy to obtain final permits by July 31, 2020; commence construction September 30, 2020; complete construction by December 31, 2021; and obtain final verification by January 31, 2022.  (*See* Exhibit 2 at ¶ 165.)

18.     Courtesy originally designed its facility project for Butte County building requirements.  However, the City of Chico's "land speed" annexation of the property that included the facility project

1    resulted in unanticipated delays to Courtesy's permitting and construction efforts.[2]  Courtesy's facility

2    project was further delayed by the Camp Fire which destroyed the neighboring town of Paradise,

3    California and materially impacted the City of Chico's resources, including those involved with

4    permitting and other approvals pertaining to Courtesy's facility project.  The COVID-19 Pandemic

5    caused further delays.  While the City continued efforts to conduct business throughout the pandemic,

6    the City of Chico was physically closed to the public from the onset of the COVID-19 Pandemic until

7    April 2021.

8        19.    Courtesy employed commercially reasonable best efforts to secure permits for the facility

9    project as well as start construction of the sales facilities and service facility at the dates provided in the

10   Stipulated Decision and Amended Facility Addendum.  Delays to the facility project have frustrated

11   Courtesy as much, if not more so, than any of Courtesy's franchisors.  The project delays significantly

12   harmed Courtesy and would have been avoided were it possible to do so.  At no time did Courtesy

13   suspend its efforts, even upon the onset of the COVID-19 Pandemic.

14       20.    Despite Courtesy's ongoing efforts to obtain facility permits in the middle of the COVID-

15   19 Pandemic, on August 24, 2020, SOA issued Courtesy a Notice of Non-Compliance, pursuant to the

16   terms of the Stipulated Decision.  SOA's notice alleged Courtesy failed to comply with the Stipulated

17   Decision by purportedly failing to comply with the milestones set forth in the Stipulated Decision.

18       21.    On September 3, 2020, Courtesy filed a Request for Appointment of ALJ to Determine

19   Compliance with Stipulated Decision pursuant to paragraph 28(b) of the Stipulated Decision.  (Exhibit

20   1 at ¶ 28(b).)  Paragraph 28(b) specifically provided the Board "continuing jurisdiction over this matter

21   solely for the purpose of appointing an ALJ to determine, in the event of a timely request by Chico,

22   whether there has been a failure by Chico to materially comply with any of the Conditions of this

23   Confidential Agreement."  The Board timely appointed ALJ Matteucci to hear the dispute.

24       22.    Following discovery, deposition designations, briefing, and witness testimony, ALJ

25   Matteucci issued the March 24, 2022, Confidential Decision.  The Confidential Decision determined

26   SOA failed to prove Courtesy to be in material breach of the Stipulated Decision and the delays in

27

28   _____

[2] The annexation occurred in November 2017 and was completed in approximately a third the usual time.

1  performance are excused as they are due to circumstances beyond its control.  As a result, ALJ Matteucci

2  denied SOA's request to terminate Courtesy's Subaru Dealer Agreement.

3          23.    ALJ Matteucci's Confidential Decision is binding and non-appealable.  The Stipulated

4  Decision provides in pertinent part at paragraphs 28(b) and 28(c) that "'Binding, non-appealable' means

5  that each Party adopts the ALJ's decision as a final, binding settlement of the matter at issue and waives

6  any and all recourse, right of action, or appeal with respect to the resulting ruling and/or any resulting

7  termination, to any individual, forum, or entity of any kind or nature whatsoever, including, without

8  limitation, any state or federal agency, any state or federal court, or any other governmental, judicial,

9  quasi-judicial, or private entity or forum.  The Parties expressly waive any claim that the Board itself

10  should consider the ALJ's decision, should reach its own decision, or otherwise involve itself in

11  resolving the issue or dispute."

12          24.    As part of Courtesy's efforts to construct the facility project, including the permanent

13  Subaru facility, Courtesy requires electrical and structural specifications for Subaru signs (the "Sign

14  Package" as referenced above).  The Sign Package is necessary for Courtesy's contractors to construct

15  the Subaru facilities that are part of Courtesy's facility project.  Moreover, Courtesy must be permitted

16  to order the required Subaru brand signage in advance of the project's completion to ensure the signage

17  is available to be installed upon completion.  Courtesy first requested the Sign Package on March 28,

18  2022.  On April 4, 2022, Courtesy sent a follow up email concerning its March 28 request.  Courtesy

19  again requested the Sign Package on or about May 10, 2022.  Copies of Courtesy's March 28, 2022,

20  April 4, 2022, and May 10, 2022, requests are attached hereto as Exhibit 3.  Thereafter, on May 10, 2022,

21  SOA's counsel provided Courtesy an email refusing to Provide Courtesy the Sign Package.  A true and

22  correct copy of SOA's May 10, 2022, email is attached hereto as Exhibit 4.

23          25.    SOA is unlawfully attempting to constructively terminate the Courtesy Subaru franchise

24  despite the binding, non-appealable Confidential Decision issued by ALJ Matteucci denying SOA's

25  request to terminate Courtesy.

26          26.    SOA's May 10, 2022, email claims it will not provide the electrical and structural

27  specifications because it has filed a writ in Superior Court seeking to overturn ALJ Matteucci's alleged

28  "unauthorized determination."  SOA claims it will not provide the specifications because Courtesy's

dealer principal (Mr. Pajouh) is allegedly required to "mitigate his damages" based on SOA's pending writ petition.

27.     SOA's writ petition is meritless.  ALJ Matteucci's Confidential Decision was authorized by paragraph 28(b) of the Stipulated Decision.  (*See* Exhibit 1 at ¶ 28(b).)  SOA is not permitted to seek a writ petition to dispute ALJ Matteucci's binding, non-appealable Confidential Decision pursuant to Stipulated Decision paragraphs 28(b) and 28(c).  (*See* Exhibit 1 at ¶ 28(b) and 28(c).)

28.     Moreover, even if SOA had some basis to appeal or seek a writ concerning ALJ Matteucci's binding, non-appealable Confidential Decision,[3] SOA is prohibited by law from treating Courtesy as terminated unless and until ALJ Matteucci's Confidential Decision is actually overturned.  SOA cannot treat Courtesy as *soon to be terminated* simply by filing a writ petition of the <u>non-appealable</u> Board decision.  Similarly, SOA is prohibited by law from modifying Courtesy's Dealer Agreement by refusing to provide the Sign Package necessary to complete the permanent facility.  (*See* Cal. Veh. Code § 3060.)

29.     SOA's argument Courtesy is obligated to mitigate its damages is an alleged legal defense to any damages Courtesy might allege in a subsequent lawsuit.  SOA cannot assert mitigation of damages to prevent Courtesy from incurring costs necessary to complete the ongoing facility project—authorized and required by the Stipulated Decision.

30.     Following SOA's refusal to provide Courtesy the Subaru Sign Package, Courtesy provided SOA a letter dated May 11, 2022, urging SOA to reconsider its position and immediately provide Courtesy the complete Sign Package required for its ongoing facility project.  A true and correct copy of Courtesy's May 11, 2022, letter is attached hereto as Exhibit 5.

31.     Courtesy's May 11, 2022, letter also reiterated SOA must treat Courtesy in good faith unless and until the franchisee-franchisor relationship is terminated.  The letter further noted ALJ Matteucci's Confidential Decision was binding and non-appealable.  The letter also raised Courtesy's concern SOA may subsequently rely on its writ petition to refuse to provide Courtesy an OL 124 upon Courtesy's completion of the permanent facility.  (*See* Exhibit 5.)

---

[3] As noted above, SOA has no basis to challenge the Confidential Decision.

32.     In response to Courtesy's May 11, 2022, letter, SOA provided a May 25, 2022, letter. The May 25 letter again confirms SOA refuses to provide Courtesy the necessary Sign Package despite the Confidential Decision finding SOA cannot terminate Courtesy's Subaru franchise.  SOA now characterizes Courtesy's facility as "a building that should not be built."  SOA goes on to state, "SOA encourages your client to cease and desist with the building, terminate or sell the franchise, and allow SOA the opportunity to appoint a retailer that is willing to perform its obligations both fully and timely." A true and correct copy of SOA's May 25, 2022, letter is attached hereto as Exhibit 6.

33.     SOA's position contained in the May 25, 2022, ignores the legal effect of ALJ Matteucci's binding, non-appealable Confidential Decision.   The Decision precluded SOA from terminating Courtesy's franchise.  Courtesy must continue its efforts to construct the permanent facility pursuant to the terms of the Stipulated Decision and the Dealer Agreement.  SOA cannot unilaterally decide Courtesy's permanent facility "should not be built" when the Stipulated Decision and Dealer Agreement remain in effect and each require the parties continued good-faith performance.[4]

34.     SOA's May 25, 2022, letter also makes clear SOA will refuse to cooperate with Courtesy in completing construction of the permanent facility and suggests SOA will withhold the OL 124, necessary to authorize Courtesy to operate from the new facility.  SOA's refusal to provide the Subaru Sign Package also threatens to further delay completion of the permanent facility.  The required signage is necessary for Courtesy to receive final approval of the constructed facility and the achievement of all branding elements by SOA's third-party-vendor, Feltus Hawkins.  SOA's conduct demonstrates its intent to refuse to permit Courtesy to relocate to the new facility and instead, remain at the temporary leased facility while its newly constructed facility sits vacant.  SOA is seeking to constructively terminate Courtesy while disingenuously relying on SOA's writ as purported justification for its unlawful acts.  It is also an unlawful effort to modify Courtesy's Dealer Agreement without notice.

35.     The Board cannot permit SOA to willfully ignore the explicit requirements of Vehicle

---

[4] As noted above, ALJ Matteucci's Confidential Decision was within the Board's jurisdiction. Paragraph 28 of the Stipulated Decision reserved the Board's continuing jurisdiction to determine whether there has been a failure by Courtesy to materially comply with the Stipulated Decision. (Exhibit 1 at ¶ 28(b).)  Within that jurisdiction, the Confidential Decision reached a determine of whether Courtesy materially failed to comply with the Stipulate Decision.  (*See* Exhibit 2.)

Code section 3060.  As a licensee of the DMV, SOA must be required to treat each of its franchisees in good faith during a pending termination proceeding unless and until the franchisee is in fact terminated by order of the Board.

36.     Courtesy respectfully requests the Board direct the DMV to conduct an investigation into SOA's conduct subsequent to the Confidential Decision.  The Board should direct the DMV to conduct an investigation into SOA's alleged violations of Vehicle Code sections 3060 and 11713.3 through its refusal to provide Courtesy the Sign Package.  The Board should further request the DMV provide the Board a written report concerning the results of the investigation.  Pursuant to Section 3050 subdivision (b)(3), the Board would have the option to order the DMV to take appropriate action against SOA's license status.

**FIRST VIOLATION:**

**SOA violates California Vehicle Code section 11713.3(l) by treating Courtesy's Dealer Agreement as terminated or modified in violation of Section 3060**

37.     Petitioner incorporates by reference each of the allegations alleged in the preceding paragraphs as if specifically alleged herein.

38.     California Vehicle Code section 11713.3 subdivision (l) makes it unlawful for a manufacturer, manufacturer branch, distributor, or distributor branch to directly or indirectly "modify, replace, enter into, relocate, terminate, or refuse to renew a franchise in violation of Article 4 (commencing with Section 3060) or Article 5 (commencing with Section 3070) of Chapter 6 of Division 2." (Cal. Veh. Code § 11713.3 subd. (l).)

39.     California Vehicle Code section 3060 subdivision (a) prohibits a franchisor from terminating or refusing to continue any existing franchise unless the franchisor complies with notice requirements contained in Section 3060(a).  (Cal. Veh. Code § 3060, subd. (a).)  Moreover, the franchisor may not terminate the franchise while a protest and Board hearing is pending, if the franchisee files a Section 3060(a) termination protest.  (Cal. Veh. Code § 3060, subd. (a)(2).)

40.     California Vehicle Code section 3060 subdivision (b) prohibits a franchisor from modifying or replacing a franchise with a succeeding franchise if the modification or replacement would substantially affect the franchisee's sales or service obligations or investment unless the franchisor

complies with notice requirements continued in Section 3060(b). (Cal. Veh. Code § 3060, subd. (b).) Moreover, in the event of a protest, the franchisor may not replace the franchise until a protest filed by a franchisee is resolved. (Cal. Veh. Code § 3060, subd. (b)(1).)

41.     California Vehicle Code section 11705 permits the DMV after notice and hearing to suspend or revoke the license issued to a distributor upon determining the licensee has "[v]iolated any provision of Article 1 (commencing with Section 11700 [and including Section 11713.3]) of, or Article 1.1 (commencing with Section 11750) of, Chapter 4 of Division 5 or any rule or regulation adopted pursuant thereto." (Cal. Veh. Code § 11705, subd. (a)(10).)

42.     Here, SOA violates Section 11713.3 subdivision (l) by treating Courtesy's Dealer Agreement and the Stipulated Decision as terminated and modifying Courtesy's Dealer Agreement by refusing to cooperate in good-faith with Courtesy concerning ongoing efforts to complete the permanent facility, pursuant to the terms of each agreement.

43.     As noted above, SOA sought to terminate Courtesy's Dealer Agreement pursuant to the Stipulated Decision. Following the proceeding called for in the Stipulated Decision, ALJ Matteucci issued the Confidential Decision finding SOA was unable to show Courtesy materially failed to comply with the Stipulated Decision and denying SOA's efforts to terminate Courtesy's Dealer Agreement.

44.     As a result of the Confidential Decision, the Stipulated Decision, and Courtesy's Dealer Agreement remain in full force and effect. Courtesy is required to continue construction of the permanent facility and SOA is required to "cooperate fully with [Courtesy] in the performance of this Confidential Agreement, and will execute such additional documents or instruments as may reasonably be required to carry out the intent of the Parties." (Exhibit 1 at ¶ 39.) This provision requires SOA to provide the Sign Package necessary to permit Courtesy to complete construction of the permanent facility. Moreover, the parties incorporated the Stipulated Decision, including the provision in paragraph 39, by reference into Courtesy's Dealer Agreement. (*See* Exhibit 2 at ¶ 5.)

45.     Similarly, Paragraph 29 of the Stipulated Decision required the parties "not do anything to interfere with or inhibit the ability of any other Party to comply with their respective obligations under the terms of the Confidential Agreement." (Exhibit 1 at ¶ 29.) SOA is treating Paragraph 29 and other provisions of the Stipulated Decision and Dealer Agreement as terminated by refusing to provide the

1  Sign Package.

2      46.    By refusing to provide Courtesy the Sign Package, SOA is unlawfully interfering with

3  the Stipulated Decision and the Dealer Agreement.  SOA's position that Courtesy's permanent facility

4  "should not be built" shows SOA is treating Courtesy's Dealer Agreement as terminated despite the

5  Confidential Decision finding SOA could not terminate the Dealer Agreement.  SOA is treating Courtesy

6  as terminated pending its writ petition despite the express provisions of Section 3060(a) requiring SOA

7  to continue Courtesy's Dealer Agreement in good faith unless and until terminated pursuant to Section

8  3060(a).

9      47.    In addition, by refusing to provide the Sign Package, SOA is modifying the Stipulated

10  Decision and Courtesy's Dealer Agreement by unilaterally preventing Courtesy from completing the

11  permanent facility as authorized in the agreements.  This modification will substantially affect

12  Courtesy's investment as well as its sales and service obligations because it will be unable to complete

13  and utilize a permanent facility in which Courtesy has already invested over $14 million.

14      48.    SOA will claim it has not terminated the Courtesy franchise because it permits it to

15  operate at its current location.  However, SOA is well aware Courtesy cannot operate from the temporary

16  location indefinitely.  SOA's efforts to prevent Courtesy's relocation to the permanent location is the

17  deliberate constructive termination of Courtesy's franchise.

18      49.    SOA failed to provide statutory notice of its treatment of Courtesy as terminated nor

19  SOA's modification of the Stipulated Decision and Courtesy's Dealer Agreement, as required by Section

20  3060.  SOA's refusal to provide Courtesy the Sign Package violates Section 3060.

21      50.    As a result of SOA's violation of Section 3060, SOA is also in violation of Vehicle Code

22  section 11713.3 subdivision (l) which makes it unlawful for SOA to violate Section 3060.  (Cal. Veh.

23  Code § 11713.3, subd. (l).)

24      51.    Because SOA is in violation of Section 11713.3(l), the DMV is permitted by law to

25  suspend or revoke SOA's distributor license.  (Cal. Veh. Code § 11705, subd. (a)(10).)  This Board may

26  order the DMV to exercise its authority to suspend or revoke SOA's distributor license based on SOA's

27  violation of Section 3060.  (Cal. Veh. Code § 3050, subd. (b)(3).)

28      52.    As a matter of public policy, this Board should not ignore SOA's willful violation of

Section 3060.  If SOA is permitted to ignore the Stipulated Decision, Dealer Agreement, and Section 3060 by refusing to provide Courtesy the Sign Package and treating Courtesy as *soon to be terminated*, SOA will continue to ignore the Board's jurisdiction and authority as well as California law.  For example, SOA's arguments contained in its May 25, 2022, letter apply equally to issuing Courtesy an OL 124 once its permanent facility is completed.  SOA, and any other franchisor, must be required to treat a franchisee in good faith while a Board decision in the franchisee's favor is pending a writ petition.[5]

53.    Courtesy respectfully requests the Board direct the DMV to conduct an investigation of SOA's violation of Sections 3060 and 11713.3 as described herein and make a written report on the results of the investigation.  Upon receipt of the DMV's written report, Courtesy requests the Board make a determination whether or not to order the DMV to take action against SOA's license.

**SECOND VIOLATION:**

**SOA violates California Vehicle Code section 11713.3(d) by seeking to directly or indirectly require or attempt to require Courtesy to sell its Subaru franchise by refusing to provide the Sign Package**

54.    Petitioner incorporates by reference each of the allegations alleged in the preceding paragraphs as if specifically alleged herein.

55.    California Vehicle Code section 11713.3 subdivision (d) makes it unlawful for a manufacturer, manufacturer branch, distributor, or distributor branch to directly or indirectly "prevent or require, or attempt to prevent or require, by contract or otherwise, a dealer, or an officer, partner, or stockholder of a dealership, the sale or transfer of a part of the interest of any of them to another person." (Cal. Veh. Code § 11713.3, subd. (d)(1).)

56.    California Vehicle Code section 11705 permits the DMV after notice and hearing to suspend or revoke the license issued to a distributor upon determining the licensee has "[v]iolated any provision of Article 1 (commencing with Section 11700 [and including Section 11713.3]) of, or Article 1.1 (commencing with Section 11750) of, Chapter 4 of Division 5 or any rule or regulation adopted pursuant thereto."  (Cal. Veh. Code § 11705, subd. (a)(10).)

57.    Here, SOA is requiring or attempting to require Courtesy to "cease and desist with the

---

[5] As noted above, SOA writ petition in this instance is unauthorized and meritless.

building, terminate or *sell the franchise*….." (*See* Exhibit 6 (emphasis added).) SOA alleges without support that Courtesy agreed to sell its Subaru franchise and that the sale of Courtesy's franchise "would be very profitable for Courtesy and significantly more productive than litigation." (*Id.*)

58.    SOA's letter and refusal to provide the Sign Package is an effort "by contract or otherwise" to force Courtesy to sell its franchise. SOA's letter is a thinly veiled threat to continue to litigate against Courtesy unless and until Courtesy sells the franchise. Moreover, as described in SOA's letter, SOA's refusal to provide the Sign Package is designed to force Courtesy to terminate or sell its Subaru franchise.

59.    SOA's actions violate Section 11713.3(d)(1) based on SOA requiring or attempting to require, by contract or otherwise, a dealer [Courtesy], to sell or transfer Courtesy's entire interest in its Subaru franchise to another person. (*See* Cal. Veh. Code § 11713.3, subd. (d)(1).)

60.    Because SOA is in violation of Section 11713.3(d)(1), the DMV is permitted by law to suspend or revoke SOA's distributor license. (Cal. Veh. Code § 11705, subd. (a)(10).) This Board may order the DMV to exercise its authority to suspend or revoke SOA's distributor license based on SOA's violation of Section 11713.3. (Cal. Veh. Code § 3050, subd. (b)(3).)

61.    Courtesy respectfully requests the Board direct the DMV to conduct an investigation of SOA's violation of Sections 3060 and 11713.3 as described herein and make a written report on the results of the investigation. Upon receipt of the DMV's written report, Courtesy requests the Board make a determination whether or not to order the DMV to take action against SOA's license.

[*intentionally left blank*]

1

**REQUEST FOR RELIEF**

2       62.     Courtesy respectfully requests the Board exercise its jurisdiction as described in this

3   Petition as it relates to the Stipulated Decision, the Confidential Decision, Courtesy's Dealer Agreement,

4   and California Vehicle Code sections 3060 and 11713.3.  Courtesy respectfully requests:

5       A.     The Board direct the DMV to conduct an investigation of SOA's violation of

6   Sections 3060 and 11713.3 as described herein and make a written report on the results of the

7   investigation.   Upon receipt of the DMV's written report, Courtesy requests the Board make a

8   determination whether or not to order the DMV to take action against SOA's license pursuant to

9   California Vehicle Code section 3050 subdivision (b)(3).

10

11

12   Dated:  June 20, 2022                      LAW OFFICES OF
                                               GAVIN M. HUGHES
13

14                                             By *Robert Mayville Jr.*
15                                             Gavin M. Hughes
                                               Robert A. Mayville, Jr.
16                                             Attorneys for Petitioner

17

18

19

20

21

22

23

24

25

26

27

28

-14-
[UNREDACTED] PETITION

# EXHIBIT 1

1   Lisa M. Gibson, Bar No. 194841
    Crispin L. Collins Bar No. 311755
2   NELSON MULLINS RILEY & SCARBOROUGH
    19191 South Vermont Ave., Suite 900
3   Torrance, California  90502
    Telephone:    424.221.7403
4   Facsimile:    424.221.7405
    Email:    lisa.gibson@nelsonmullins.com
5             crispin.collins@nelsonmullins.com

6

7   Attorneys for Respondent
    Subaru of America, Inc.

8                       STATE OF CALIFORNIA

9                  NEW MOTOR VEHICLE BOARD

10

11  In The Matter Of The Protest Of:        Protest No. PR-2570-18

12  COURTESY AUTOMOTIVE GROUP,
13  INC., dba COURTESY SUBARU OF            **[PROPOSED] STIPULATED**
    CHICO,                                  **DECISION AND ORDER OF THE**
14                                          **BOARD RESOLVING PROTEST AND**
                            Protestant,     **LAWSUIT**
15
                    v.
16
    SUBARU OF AMERICA, INC.,
17                          Respondent.

18
        Pursuant to Sections 3050.7, 3060, 3061, 3066, and 3067 of the California Vehicle Code,
19
    Respondent Subaru of America, Inc. ("SOA" or "Respondent"), on the one hand, and Protestant
20
    Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico ("Chico" or "Protestant"), on the
21
    other hand, hereby enter into the following agreement (the "Stipulated Decision") resolving the
22
    above-captioned Protest.  This Stipulated Decision is dated March 20, 2019.
23
        SOA and Chico (the "Parties") hereby request that the California New Motor Vehicle Board
24
    (the "Board") issue an order approving the Stipulated Decision as a Stipulated Decision and Order
25
    of the Board, and that the Board reserve jurisdiction solely to enforce its Order if requested by
26
    either party hereto.
27

28

---
EXHIBIT 1 TO CONFIDENTIAL AGREEMENT TO STIPULATED DECISION AND ORDER OF THE BOARD, FILED UNDER SEAL

# I.

## **THE PARTIES**

1.      Protestant Chico is a new motor vehicle dealer licensed by the California Department of Motor Vehicles.  Chico is a corporation organized and existing under the laws of California, with its principal place of business at 2520 Cohasset Road, Chico, California 95973.  Its principal place of place is the location of its BMW, Buick, Cadillac and GMC dealerships. Chico operates as a SOA dealership pursuant to a Subaru Dealer Agreement, executed on or about May 5, 2015 and as amended on December 1, 2017, December 21, 2017 and May 8, 2018 (the "Dealer Agreement").  Chico is represented in this matter by Gavin M. Hughes, Law Offices of Gavin M. Hughes, 3436 American River Dr., Ste. 10 Sacramento, CA  95864.

2.      Respondent SOA is a distributor of new motor vehicles, and holds an occupational license issued by the California Department of Motor Vehicles.  It distributes new SOA vehicles to dealers located in California, as well as in other states.  SOA is a corporation organized and existing under the laws of New Jersey, with its principal place of business at One Subaru Drive, Camden, New Jersey 08103 and is authorized to do business in the State of California.  SOA is represented in this matter by Lisa M. Gibson and Crispin L. Collins of Nelson, Mullins, Riley & Scarborough, 19191 South Vermont Ave., Suite 900, Torrance, California 90502.

# II.

## **FACTUAL AND PROCEDURAL BACKGROUND**

3.      The Dealer Agreement authorized, among other things, Chico to sell Subaru vehicles and other authorized products ("Subaru Products") at 2562 Cohasset Road, Chico, California 95973 ("Sales Premises") and to service Subaru Products and maintain its parts and general office operations at 2520 Cohasset Road, Chico, California 95973  ("Service Premises", collectively "the Dealership Premises").  Section 11 of the Dealer Agreement identifies the Dealership Premises as the only authorized locations and also identifies the specific use of each facility as either the Sales Premises or the Service Premises.

4.      On April 30, 2015, Chico entered into a Subaru Dealership Sign Lease Agreement ("Sign Lease Agreement") with Subaru Leasing Corp ("SLC") a wholly-owned entity of SOA.

Pursuant to the Sign Lease Agreement, Chico leases two signs from SLC. SLC owns and continues to own these signs to this date. Chico agreed pursuant to protect the signs from "damage, defacing or marring." Chico also agreed that it would not allow any "banners, signs, lights or materials of any kind whatsoever" to be affixed to the signs owned by SLC.

5.      On or about August 7, 2018, in a face-to-face meeting at the Dealership Premises, Chico informed Mr. Scott Farabee, Zone Director of the San Francisco Zone for SOA, and SOA learned for the first time of Chico's pending intent to relocate its Subaru sales operations from the Sales Premises to an authorized location.

6.      During that meeting and by letter dated August 9, 2018, Chico was notified that the relocation of the Sales Premises was unauthorized, without SOA's consent, and would constitute a material breach of the Dealer Agreement. In the August 9th letter, SOA made a formal demand that the Subaru operations remain at the Sales Premises or SOA would be forced to seek any remedies available to it under the terms of the Dealer Agreement and relevant California law, up to and including termination of the Dealer Agreement.

7.      On or about August 11, 2018, Chico vacated the Sales Premises and moved all Subaru sales operations to 2522 Cohasset Road, Chico, California 95763 (the "Unauthorized Premises".)

8.      Upon information and belief, during 2016 the property for the Sales Premises was sold to another entity directly or indirectly owned or controlled by Mr. Brian Bowen, the principal operating the competing Nissan and Hyundai dealerships. Sometime after this sale, Chico's lease for the Sales Premises was on a month-to-month basis having expired long before the August 7, 2018 meeting with SOA representatives informing them that Chico was relocating to the Unauthorized Premises.

9.      Chico had the obligation to maintain a lease for the Sales Premises and the failure to do so constituted a material breach under Section 17.1.8 of the Dealer Agreement.

10.     The Sales Premises are currently occupied by a Hyundai dealer and are under renovation for the purposes of operating a Hyundai dealership. The Subaru constellation logo and name have been removed from the fascia of the Sales Premises. They have been replaced with the

Hyundai designation.  The Subaru pylon sign in front of the Sales Premises has been obliterated and covered with a banner or "shroud" bearing the Hyundai trademarks over the Subaru name and logo.

11.    The Dealer Agreement, among other things, authorized Chico to use any trademark, service mark, collective mark, certification mark, logo, insignia, product designation, slogan, fictitious name, or trade name now or at any time adopted, used or claimed by SOA ("Marks") and anything similar which is likely to be confused with or contains a significant part of element of any such Mark.

12.    Under Section 13(c) of the Dealer Agreement, it provides that the consent of SOA is required for the relocation of Chico's Subaru operations to any location other than the Dealership Premises.

13.    SOA's written decision to withhold consent was promptly communicated by SOA to Chico in the August 9, 2018 letter.

14.    On or about August 13, 2018, SOA provided Chico with notice of SOA's intent to terminate the Dealer Agreement (the "NOT") for its unauthorized relocation of the dealership facilities to the Unauthorized Location;

15.    In response to the NOT on or about August 22, 2018 and pursuant to section 3060 of the California Vehicle Code, Chico filed a protest with the New Motor Vehicle Board of the State of California ("Board"), No. PR- 2570-18 (the "Protest");

16.    In addition, SOA filed a lawsuit in the Eastern District of California, Case No. 2-18-cv-02778-KJM-KJN, (the "Lawsuit");

17.    SOA and Chico have negotiated the issues between them and desire to resolve the Protest and Lawsuit without the need for further litigation.

### III.

### STIPULATION

The Parties have entered into a confidential agreement (the "Confidential Agreement") to resolve the above-captioned Protest and Lawsuit.  A true and correct copy of the Confidential Agreement is attached hereto as Exhibit 1.

18.    The Parties hereby request that the Board issue an order approving the Confidential Agreement and its terms as a Stipulated Decision and Order of the Board, and that the Board reserve jurisdiction solely to enforce its Order in the future if requested by either party hereto.

19.    The Parties further request that the Board issue an order maintaining the Confidential Agreement and its terms and conditions under confidential seal, so that they are not disclosed or made available to any third parties, including but not limited to, members of the public, dealer members of the Board or the motor vehicle industry.    This request for confidentiality of compromise and settlement documents promotes the public policy of encouraging early, efficient settlement of disputes, and helps to conserve judicial and administrative resources.  This request for confidentiality is also consistent with the provisions of Sections 6254.5 (e) and 6276.28 of the Government Code.

**IN WITNESS WHEREOF, the Parties have entered into this Stipulated Decision and Order as of the date last signed below.**

DATED:  3/19/19 , 2019

COURTESY AUTOMOTIVE GROUP, INC. DBA
COURTESY SUBARU OF CHICO

By_____

Print Name:  Shahram Mihanpajooh

Title:  President


DATED:  March 20 , 2019

SUBARU OF AMERICA, INC.


By_____

Print Name: Anthony J. Graziano

Title:  Vice President, Western Region

---

1    **APPROVED AS TO FORM AND SUBSTANCE:**

2
3    DATED: _March 20_ , 2019            NELSON, MULLINS, RILEY & SCARBOROUGH

4                                        By _____
5                                            Lisa M. Gibson
                                             Crispin L. Collins
6                                            Attorneys for Subaru of America, Inc.

7
8    DATED: _March 19_ , 2019            LAW OFFICES OF GAVIN M. HUGHES

9
10                                       By _____
                                             Gavin M. Hughes, Esq.
11                                           Attorneys for Courtesy Automotive Group,
12                                           Inc. dba Courtesy Subaru of Chico

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2  Lisa M. Gibson, Bar No. 194841
   Crispin L. Collins, Bar No. 311755
3  NELSON MULLINS RILEY & SCARBOROUGH
   19191 South Vermont Ave., Suite 900
4  Torrance, California  90502
   Telephone:    424.221.7403
5  Facsimile:    424.221.7405
   Email:    lisa.gibson@nelsonmullins.com
6             crispin.collins@nelsonmullins.com

7  Attorneys for Respondent
   Subaru of America, Inc..

8

9                    STATE OF CALIFORNIA

10               NEW MOTOR VEHICLE BOARD

11

12  In The Matter Of The Protest Of:          Protest No. PR-2570-18

13  COURTESY AUTOMOTIVE GROUP,
    INC., dba COURTESY SUBARU OF
14  CHICO,

15                    Protestant,          **EXHIBIT 1 TO CONFIDENTIAL
                                           AGREEMENT TO STIPULATED
16                 v.                       DECISION AND ORDER OF THE
                                           BOARD, FILED UNDER SEAL**
17  SUBARU OF AMERICA, INC.,
                      Respondent.
18

19

20       Pursuant to Sections 3050.7, 3060, 3061, 3066, and 3067 of the California Vehicle Code,

21  Respondent Subaru of America, Inc. ("SOA" or "Respondent"), on the one hand, and Protestant

22  Courtesy Automotive Group, Inc. dba Courtesy Subaru of Chico  ("Chico" or "Protestant"), on the

23  other hand, hereby enter into the following agreement (the "Stipulated Decision") resolving the

24  above-captioned Protest.  This Stipulated Decision is dated March **20**, 2019.

25       SOA and Chico (the "Parties") hereby request that the California New Motor Vehicle Board

26  (the "Board") issue an order approving the Stipulated Decision as a Stipulated Decision and Order

27  of the Board, and that the Board reserve jurisdiction solely to enforce its Order if requested by

28  either party hereto.

_____
EXHIBIT 1 TO CONFIDENTIAL AGREEMENT TO STIPULATED DECISION AND ORDER OF THE BOARD, FILED UNDER SEAL

I.

## THE PARTIES

1.        Protestant Chico is a new motor vehicle dealer licensed by the California

Department of Motor Vehicles.  Chico is a corporation organized and existing under the laws of

California, with its principal place of business at 2520 Cohasset Road, Chico, California 95973.

Its principal place of place is the location of its BMW, Buick, Cadillac and GMC dealerships.

Chico operates as a SOA dealership pursuant to a Subaru Dealer Agreement, executed on or

about May 5, 2015 and as amended on December 1, 2017, December 21, 2017 and May 8, 2018

(the "Dealer Agreement").  Chico is represented in this matter by Gavin M. Hughes, Law Offices

of Gavin M. Hughes, 3436 American River Dr., Ste. 10 Sacramento, CA  95864.

2.        Respondent SOA is a distributor of new motor vehicles, and holds an occupational

license issued by the California Department of Motor Vehicles.  It distributes new SOA vehicles

to dealers located in California, as well as in other states.  SOA is a corporation organized and

existing under the laws of New Jersey, with its principal place of business at One Subaru Drive,

Camden, New Jersey 08103 and is authorized to do business in the State of California.  SOA is

represented in this matter by  Lisa M. Gibson and Crispin L. Collins of Nelson, Mullins, Riley &

Scarborough, 19191 South Vermont Ave., Suite 900, Torrance, California 90502.

II.

## FACTUAL AND PROCEDURAL BACKGROUND

3.        The Dealer Agreement authorized, among other things, Chico to sell Subaru

vehicles and other authorized products ("Subaru Products") at 2562 Cohasset Road, Chico,

California 95973 ("Sales Premises") and to service Subaru Products and maintain its parts and

general office operations at 2520 Cohasset Road, Chico, California 95973  ("Service Premises",

collectively "the Dealership Premises").  Section 11 of the Dealer Agreement identifies the

1   Dealership Premises as the only authorized locations and also identifies the specific use of each

2   facility as either the Sales Premises or the Service Premises.

3       4.      On or about August 11, 2018, Chico vacated the Sales Premises and moved all

4   Subaru sales operations to 2522 Cohasset Road, Chico, California 95763 (the "Unauthorized

5   Premises".)

6       5.      On or about August 13, 2018, SOA provided Chico with notice of SOA's intent to

7   terminate the Dealer Agreement (the "NOT") for its unauthorized relocation of the dealership

8   facilities to the Unauthorized Location;

9       6.      In response to the NOT on or about August 22, 2018 and pursuant to section 3060

10  of the California Vehicle Code, Chico filed a protest with the New Motor Vehicle Board of the

11  State of California ("Board"), No. PR- 2570-18 (the "Protest");

12      7.      In addition, SOA filed a lawsuit in the Eastern District of California, Case No. 2-18-

13  cv-02778-KJM-KJN, (the "Lawsuit");

14      8.      SOA and Chico have negotiated the issues between them and desire to resolve the

15  Protest and Lawsuit without the need for further litigation.

### III.

### SETTLEMENT

In view of the foregoing, it is hereby stipulated by and between the Parties to this Confidential Agreement, and the Board finds, as follows:

9.      Subject to its full and timely compliance with the conditions specified below ("Conditions"), Chico shall continue to operate its SOA dealership operations unless and until its Dealer Agreement is terminated pursuant to the terms of this Confidential Agreement or pursuant to a new NOT issued on factual circumstances and factual grounds separate from and in addition to the facts and grounds which are currently the subject of the Protest.

10.    <u>Voluntary Dismissal of Lawsuit</u>.   Upon issuance of the Order by the Board of this Stipulated Decision, counsel for SOA shall file with the court for the Eastern District of California a Request for Dismissal of the Lawsuit, and shall copy counsel for Chico with same.

11.    <u>Attorney Fees</u>. Both Parties acknowledge and agree that each party is solely responsible for its own attorneys' fees, costs and expenses in all circumstances, including the Lawsuit and the Protest.

12.    <u>Withdrawal of NOT</u>. SOA shall withdraw the NOT and shall forbear from issuing a new NOT to Chico for a period of four (4) months from the date of this Stipulated Decision.  SOA does not waive any right to issue a new NOT to Chico after that time, if it is deemed warranted by SOA.  Other than as set forth herein, SOA expressly does not waive its right to raise any additional breaches of the Dealer Agreement, or issue any NOT or Notice To Cure pertaining to such breaches at a later time.

13.    <u>Acquisition of Temporary Property and Renovation of Temporary Subaru Sales Facility</u>.   Chico has executed a lease of the property identified as 896 East Avenue, Chico, California 95926 (the "Temporary Property"), for a total term of time necessary   (the "Lease") until the facility at the New Location is completed and approved by SOA as set forth herein.   In return, SOA will, in a new Subaru Dealer Agreement to be executed by the Parties concurrently herewith, consent to the establishment of temporary sales operations to be located at the Temporary Property, subject to the terms and conditions set forth below.

14.    Chico agrees to remodel the facility located on the Temporary Property to meet SOA's requirements, in consideration of the available space, as set forth in the SOA Facilities Addendum, to be attached to the new Subaru Dealer Agreement which will be executed by the Parties concurrently herewith.   A relocation documentation package must be completed with SOA/Western Region and all requirements met and approved **before** Chico can begin operating in Temporary Property.

15.    Concurrently with the execution of this Confidential Agreement and the completion, submission and approval of any SOA-required documentation by Chico, SOA will offer, and Chico agrees to execute a new Subaru Dealer Agreement and Standard Provisions

1   ("Dealer Agreement") in a form acceptable to SOA, which shall approve Chico sales operations

2   at the Temporary Property at 896 East Avenue, Chico, California 95926, subject to the conditions

3   set forth in this Confidential Agreement.  The Dealer Agreement shall include a Facility

4   Addendum, which shall include the following provisions related to the Temporary Property

5   approved operations of Chico:

6        a)        Chico will provide to SOA (i) a fully executed copy of the Lease for a period of

7   time that will cover (by way of the Lease or an option to lease) the completion of the Permanent

8   Facility and, (ii) will provide written evidence to SOA that Chico has obtained the right to occupy

9   the Temporary Property, both prior to the execution of this Confidential Agreement.

10       b)        Within 90 days of the execution of this Confidential Agreement and the dismissal

11  of the Lawsuit, Chico will provide a a $750,000 letter of credit or performance bond to insure

12  Chico's performance on its commitment to the new ground-up facility on the New Location in

13  Chico, CA ("Permanent Facility".) In good faith, SOA will refund the $200,000 performance

14  funds that Chico previously provided to SOA. These funds will be returned to Chico

15  contemporaneous upon issuance of letter of credit or performance bond.

16       c)        An initial visual inspection of the Proposed Temporary Facility must be scheduled

17  and performed by the San Francisco Zone, any corrections and modifications stated by the San

18  Francisco Zone must be completed and the Proposed Temporary Facility must have SOA's final

19  approval before Chico commences operations there. The Temporary Property is presently

20  unacceptable to conduct Subaru operations. In order to obtain SOA's approval, the building's

21  interior paint, furniture, ceiling tiles (if applicable), floor tiles, customer lounge amenities, etc.

22  must comply with the Subaru Finish Schedule and brand standards.  Additionally, the Temporary

23  Property must have a Subaru customer waiting lounge that is not walled off, at least 3 large

24  graphic lifestyle murals displayed in showroom, fixtures and space for customer refreshments and

25  display mounting of lifestyle accessories, i.e., kayak and bike carrier from ceiling.  The Temporary

26  Property must also have all approved Subaru signage.  This Temporary Property, will not be

27  considered a Subaru Signature Facility even if approved after Chico's completion of the above-

28  referenced renovations. Which Signature Facility standards will and will not be required is in

1  SOA's sole discretion. Chico agrees that no other line makes will be allowed to utilize the

2  Temporary Property at any time that Subaru occupies that location. The San Francisco Zone's

3  final inspection must occur and conclude that the required improvements are complete no later

4  than 120 days from the date of execution of this Confidential Agreement and dismissal of the

5  Lawsuit.

6      d)    A Facility Addendum will be required as part of the relocation documentation

7  package for the Temporary Property and will be part of the Subaru Dealer Agreement for the

8  Temporary Property. This Addendum will include benchmarks for the completion of the

9  permanent facility that Chico has committed to build at the New Location (as defined below.)

10     e)    Chico will commence remodelling of the facility at the Temporary Property upon

11  execution of this Confidential Agreement;

12     f)    Chico will complete remodelling of the facility on the Temporary Property by no

13  later than Sixty (60) days after execution of this Confidential Agreement; and

14     g)    Chico will occupy and commence operations at the Temporary Property upon

15  completion of the remodelling, which shall be by no later than Fifteen (15) days following

16  completion of the remodeling of the Temporary Facility.

17     h)    Chico agrees that the Subaru facility at the Temporary Property must satisfy

18  SOA's requirements and be approved in writing to be satisfactory to SOA at the time that

19  remodelling is completed and prior to Chico's occupancy and commencement of any dealership

20  operations thereat.

21     16.    New Location. Chico's new Subaru vehicle and used vehicle sales, service and

22  parts operations will relocate permanently to one of the APN parcels (APN: 006-400-061 APN:

23  006-400-063, 006-400-064, 006-400-065 and 006-400-066, the "New Location".) With respect to

24  the New Location, Chico agrees to construct the facility to meet or exceed the 2023 SOA

25  Signature Facility Image standards, and the Minimum Standards and Operating Guidelines for

26  Dealership Operations taking place at the New Location.  The Dealer Agreement shall include the

27  following provisions:

28

a)    Chico will submit completed construction drawings and site plans to SOA for its prior written approval by June 1, 2019.  Such plans will be for a facility which shall comply with Subaru's projected Signature Image Facility Standards for a dealership facility, (Exhibit A hereto), and be approved in advance of construction in writing by SOA.

b)    Chico will obtain necessary zoning, permits and necessary governmental approvals to provide for the construction of the permanent facility at the New Location as soon as practicable, but in any event on or before December 1, 2019.

c)    Chico will commence construction of the facility on or before January 31, 2020.

d)    Chico will complete construction of the facility and obtain all necessary licenses and permits as to the Subaru sales facility at the New Location by January 31, 2021 and

e)    Chico will obtain a Final Review Verification letter from Feltus Hawkins for compliance upon completion of the remodelling, which Verification shall be provided by Feltus Hawkins by March 1, 2021.

f)    Chico will complete the permanent facility at the New Location by no later than January 31, 2021.

17.    The parties agree that compliance with the terms of this Confidential Agreement and execution by both parties of a Subaru Dealer Agreement with Facility Addendum, containing the milestones for completion of construction and renovations to both the Temporary Property and the New Facility as set forth herein are each separately required according to the timetables set forth in this Confidential Agreement, and completion of construction and renovations for one property/facility does not excuse the need to complete the construction/renovation of the other and that SOA may seek any and all available legal and equitable remedies for any breach of this Confidential Agreement and/or the Dealer Agreement.

18.    Delay Based On Government Action or Inaction.  If, notwithstanding Chico's commercially reasonable best efforts, the necessary approval of a governmental entity cannot be obtained in order to timely satisfy the deadlines set forth herein, solely for reasons beyond the control of Chico, Chico shall, upon first learning of such delay, immediately notify SOA's SFO Zone representative in writing, and shall request the minimum extension of time necessary to

1    complete the actions set forth herein.  SOA representatives are and shall be authorized by Chico

2    to verify these facts (or any facts deemed relevant by SOA in its sole discretion) directly with any

3    governmental entity representatives, and SOA shall retain all rights and remedies as set forth

4    herein.

5          19.    If SOA verifies that the delay is caused by the governmental entity and not by

6    Chico, SOA shall agree to extend the affected deadlines set forth above, on a weekly basis, until

7    the governmental-caused delay is not a factor.  Chico shall provide weekly reports to SOA

8    regarding the status of any governmental delay and the progress, if any, being made on the

9    elimination of the delay and expected duration of the remaining delay.  However, should SOA

10   determine, that all or part of the delay is caused by Chico or its agents, vendors or employees, or

11   should Chico fail or refuse to promptly provide either the first notice or the weekly reports to

12   SOA or not allow SOA to verify such facts directly with any governmental entity representative,

13   then SOA shall not grant any extension (or any further extension), and the deadlines (either as set

14   forth herein or as previously extended by SOA) shall remain in place.

15         20.    <u>No Obligation to Provide Extensions and Force Majeure</u>.  Chico also understands

16   and agrees that SOA has no obligation to extend any time periods or deadlines set forth in this

17   Confidential Agreement, whether or not Chico is unable to comply due to causes within or

18   beyond Chico' control, and further, that any extension of time and the duration of any such

19   extension are made, if at all, solely at SOA's discretion, except as expressly set forth herein and

20   in Paragraph 18.  Any such extension shall be valid only if made in writing, signed by then-

21   current Western Regional Manager of SOA and delivered to Chico.

22         21.    Notwithstanding the provisions of this section, neither party shall be in default or

23   liable for any delay or failure of compliance with this Confidential Agreement to the extent due to

24   any future event which is beyond the control of the defaulting party including, without limitation,

25   landlord approval, fire, flood, hurricane, tornado, earthquake, war, acts of terrorism, embargo, riot

26   or an unforeseeable intervention of any government authority (excluding delays in obtaining

27   permits and licenses), but excluding transport difficulties or strike, lock out or other labor

28   disputes of Chico or third parties, provided the party suffering such delay or failure of compliance

1    immediately notifies the other party of such delay or failure of compliance.  Should such an event

2    of *force majeure* take place, SOA shall extend the time periods set out in Paragraph 16 to this

3    Confidential Agreement to allow for delays incurred as a result of the event of *force majeure*.

4    Failure to obtain landlord approval for any change contemplated herein shall not be excused by

5    the terms of this paragraph and Chico shall immediately notify SOA of any such failure to obtain

6    landlord approval.

7        22.    <u>Eligibility for SOA Remodelling Funds</u>.  Chico is eligible to obtain funds from

8    SOA if there is a facility funding program in place at the time of execution of this Confidential

9    Agreement and if Chico qualifies under the terms of said facility funding program. Additionally,

10    the remodelling contemplated by this Confidential Agreement must be completed according to its

11    terms and within a time period and in a manner meeting the eligibility requirements for the

12    applicable SOA program, if any.  The amount of such funds and the timing of their disbursement

13    shall be determined by the terms of the SOA program rules.

14        23.    <u>Notices</u>.  All notices, requests or other communications hereunder shall be in

15    writing and, except as otherwise expressly provided in this Confidential Agreement, shall be

16    deemed to have been duly given when transmitted by facsimile or e-mail or by a nationally

17    recognized overnight courier service addressed to the Parties' respective addresses set forth

18    below, as such addresses may be modified from time to time on written notice as provided herein.

19        To Chico:

20        Shahram "Jerry" Mihanpajouh
        Courtesy Automotive Group, Inc.

21        dba Courtesy Subaru of Chico

22        2520 Cohasset Road
        Chico, CA 95973

23        jpajouh@me.com

24        With copy to:

25        Gavin M. Hughes, Esq.
        Law Offices of Gavin M. Hughes

26        3436 American River Drive, Suite 10
        Sacramento, California 95864

27        gavin@hughesdealerlaw.com

28

To SOA :

Al Salazar
Assistant General Counsel
Subaru of America, Inc.
One Subaru Drive
Camden, NJ  08103
asal@subaru.com

With copy to:
Lisa M. Gibson
Crispin L. Collins
Nelson Mullins Riley & Scarborough LLP
Pacific Gateway, Suite 900
19191 South Vermont Ave
Torrance, CA  90502
Lisa.Gibson@nelsonmullins.com
Crispin.Collins@nelsonmullins.com

24.    <u>Mutual Release and Covenant Not To Sue</u>. SOA and Chico, each for themselves,
their owners, Affiliates and any of their respective members, partners, venturers, stockholders,
officers, directors, employees, agents, spouses, legal representatives, successors, and assigns
(collectively, the "Related Parties"), hereby release, settle, cancel, discharge, and acknowledges
to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs,
expenses, liens, actions, and causes of action of every kind and nature whatsoever, whether
known or unknown, foreseen or unforeseen, suspected or unsuspected, which either Party or
Related Parties or anyone claiming through or under them currently has against the other Party or
Related Parties arising out of or relating to the  Protest, Lawsuit or any issues in connection
therewith, provided that the foregoing releases shall not extend to:

a)    Valid, non-false and unpaid claims: (a) any vehicle sale incentives currently owing
to Chico; (b) any amounts currently owing to Chico in its open account (or equivalent); (c) any
advertising incentives or co-op funds currently due and owing to Chico; (d) any credits due SOA
from Chico based on transactions in the ordinary course of business posted or to be posted to the
open account or Chico' floor plan credit line or otherwise due and owing by Chico to SOA,
including but not limited to (1) valid warranty and incentive chargebacks and adjustments, (2)
amounts due SOA for the purchase of vehicles, parts or accessories, or for special tools, and (3)
amounts due to SOA or third parties for training, publications, subscriptions, data processing or

1   other goods or services that normally post to the open account; (4) enforcement of this

2   Confidential Agreement; and (5) any dispute over the failure or refusal of SOA to pay Chico any

3   amounts due or alleged to be due under any SOA Program.

4         b)     Product liability or service-related claims alleging a defect in a vehicle

5   manufactured or distributed by SOA or service or inspection provided on a vehicle by Chico and

6   other claims for indemnity by either party under the provisions of the Subaru Dealer Agreement.

7         c)     The Parties hereby acknowledge, understand and agree that, except as provided

8   above and as to any claims arising from a claimed breach of this Confidential Agreement, the

9   foregoing release extends to, and is expressly intended by them to extend to, all claims of every

10   nature and kind whatsoever, known or unknown, suspected or unsuspected.  In this regard, each

11   of the Parties hereby expressly waives the benefit, if any, to it of Section 1542 of the California

12   Civil Code, which reads as follows:

13   **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE**

14   **CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT**

15   **THE TIME OF EXECUTION OF THE RELEASE, WHICH IF KNOWN BY HIM OR**

16   **HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH**

17   **THE DEBTOR."**

18         d)     The Parties expressly assume the risk that after the execution and delivery of this

19   Confidential Agreement they may discover facts which are different from those facts which they

20   believed to be in existence on the date hereof.  Any such discovery shall not affect the validity or

21   effectiveness of the release contained herein.

22        25.    Buy/Sell Deadline. Subject to potential delays and extensions as set forth above,

23   should Chico either (a) not complete the remodeling and construction and occupancy of the

24   permanent facility at the New Location on or before January 31, 2021; or  (b) fails to meet any

25   other Condition or Deadline set forth in this Confidential Agreement,  as set forth above; or (c) not

26   timely produce a Buy/Sell Application Package involving all of its stock or assets, herein by close

27   of business on the Buy/Sell Deadline, as defined herein below, then SOA shall have the right to

28   issue a notice of non-compliance with the terms of this Stipulated Decision and Order.

a)      The Buy/Sell Deadline shall be calculated as follows:  If Chico notifies SOA that it desires to sell its SOA dealership assets, in writing and in the matter set forth in Paragraph 23, Chico shall have six (6) months to submit a complete Buy/Sell Application Package, as defined herein.

b)      SOA reserves the right at any time following Chico's failure to comply with the foregoing to issue a notice of non-compliance with the Conditions of this Confidential Agreement, effective 60 days following its receipt by Chico.  SOA will provide written notice to Chico of any perceived non-compliance providing at least 30 days to correct or rebut any alleged non-compliance, prior to invoking the Board's jurisdiction to request an order of termination pursuant to the stipulated decision and order.

c)      The Parties agree that Chico's failure to comply with any of the Conditions herein shall constitute good cause to terminate the SOA Dealer Agreement between them under Vehicle Code sections 3060 and 3061.

d)      Post-termination provisions of the Dealer Agreement remain in effect, including: i) Chico would remain liable to SOA for any balance owed on its Parts Account and SOA would remain liable to Chico for any credit balance due Chico on the Parts Account; ii) SOA would honor a repurchase request from Chico for the eligible SOA vehicles and products in the manner provided for in the Dealer Agreement; and iii) Chico shall remove at its expense or permit SOA to remove at Chico's expense, all SOA signs and trademarks at the Chico facilities.  Chico acknowledges and agrees that either it owns the dealership facilities and grants SOA permission to remove the subject signs and trademarks or that it will obtain written permission from the land owner for SOA to do so.

26.     Alternatively to its compliance with the terms and conditions in a timely manner and for the periods set forth above, the Parties agree that SOA will permit Chico to present SOA with a Buy/Sell Application Package, prior to the Buy/Sell Deadline, and under the terms and conditions as set forth herein.  The Buy/Sell Deadline period shall be tolled upon submission of a completed buy-sell and shall resume upon receipt of a written rejection.

27.    Any such proposed buy/sell must satisfy the following requirements, or be subject to automatic rejection by SOA ("Buy/Sell Application Package"):

a)    The Asset Purchase Agreement ("APA") entered into by Chico must be with an entity or persons not owned or controlled, in whole or in part, by the current owners of Chico and/or their family members;

b)    The APA must provide for a closing within 60 days of approval of the proposed transferee by SOA;

c)    The proposed transferee must agree to abide by the terms of a SOA Dealer Agreement as presented to it by SOA and agree to provide an acceptable facility in accordance with the requirements and timeline as reasonably determined by SOA;

d)    The proposed transferee must agree to operate in a market acceptable to SOA, and at a location acceptable to SOA in its sole discretion.

e)    Failure to close the transfer of the SOA dealership assets within 60 days of approval by SOA, which APA was timely submitted during the period created by Paragraph 11(g) of this Confidential Agreement, for any reason will result in the immediate issuance of a notice of non-compliance with the Conditions of this Confidential Agreement.

f)    As modified herein, Chico shall have the right to submit and SOA reserves the right to approve or reject any proposed Buy/Sell Application Package pursuant to the provisions of the California Vehicle Code and other applicable law.  Should SOA reject the proposed Buy/Sell Application Package Chico's remedies are limited to those set forth herein;

g)    Should either SOA reject or should Chico withdraw the  first Buy/Sell Application Package, Chico shall have the right to submit at least one other Buy/Sell Application Package, in compliance with the terms set forth above, pursuant to the following terms and conditions: if Chico submits a Buy/Sell Application Package prior to the close of business on the Buy/Sell Deadline, SOA shall have 60 calendar days from the date of SOA's receipt to approve or reject the final Buy/Sell Application Package.  However, if Chico fails to submit a Buy/Sell Application Package by the Buy/Sell deadline, SOA reserves its right to issue the notice of non-compliance with conditions of this Confidential Agreement.

1           h)      The Parties hereto acknowledge that, under California law, the New Motor

2 Vehicle Board does not have jurisdiction to adjudicate claims regarding buy/sell rejections and that

3 such claims are adjudicated in the courts.

4           i)      Under no circumstances shall SOA be required to consider more than one

5 Buy/Sell Application Package from Chico at the same time. Submission of a subsequent Buy/Sell

6 Application Package at any time prior to the Buy/Sell Deadline, whether approved or rejected or

7 not yet acted upon by SOA, shall be considered to be a simultaneous withdrawal of any previous

8 Buy/Sell Application Package by Chico, and

9           j)      Chico will provide or has already provided SOA with a buy/sell assist letter

10 for the purposes of facilitating Chico in locating potentially qualified transferees.

11     28.   <u>Notice of Non-Compliance</u>.  If SOA contends that there is a failure by Chico to

12 comply with any or all of the Conditions set forth herein, SOA shall, within fifteen (15) business

13 days of its awareness of such failure, serve a notice on Chico in the manner set forth in paragraph

14 23, setting forth its alleged non-compliance with the Conditions, with a courtesy copy to the Board.

15 Chico shall have fifteen (15) days from receipt of that notice to file a written request with the Board

16 asking it to appoint an Administrative Law Judge ("ALJ") to hold a hearing on the allegations made

17 in the notice of non-compliance and to make the final determination of whether there has been a

18 material failure to comply with the Conditions by Chico.  Chico shall serve a copy of such written

19 request in the manner set forth in paragraph 23 on SOA.

20     a)      If Chico fails to file such request in accordance with the deadline set forth in this

21 Paragraph, Chico shall terminate automatically as a SOA dealer without any recourse or right of

22 appeal to any individual, forum, or entity of any kind or nature whatsoever, including, without

23 limitation, the Board, any state or federal agency, any state or federal court, or any other

24 governmental, judicial, quasi-judicial, or private entity or forum, in any proceeding challenging the

25 termination or seeking damages or relief of any nature whatsoever arising out of the termination.

26     b)      The Board will have continuing jurisdiction over this matter solely for the purpose

27 of appointing an ALJ to determine, in the event of a timely request by Chico, whether there has

28 been a failure by Chico to materially comply with any of the Conditions of this Confidential

1  Agreement. Any such timely request will be submitted for binding, non-appealable determination

2  to an ALJ appointed by the Board on an expedited basis, and in no event later than thirty (30) days

3  after the filing by Chico of the request.

4          c)       "Binding, non-appealable" means that each Party adopts the ALJ's decision as a

5  final, binding settlement of the matter at issue and waives any and all recourse, right of action, or

6  appeal with respect to the resulting ruling and/or any resulting termination, to any individual,

7  forum, or entity of any kind or nature whatsoever, including, without limitation, any state or federal

8  agency, any state or federal court, or any other governmental, judicial, quasi-judicial, or private

9  entity or forum. The Parties expressly waive any claim that the Board itself should consider the

10  ALJ's decision, should reach its own decision, or otherwise involve itself in resolving the issue or

11  dispute.

12          d)       The ALJ's decision will be issued expeditiously after the close of evidence. If the

13  ALJ determines that Chico has materially failed to comply with any of the Conditions set forth

14  herein, the termination shall be effective immediately upon issuance of the ALJ's decision and no

15  further conditions may be imposed to require continuation of the relationship between SOA and

16  Chico. If the ALJ determines that Chico has complied with the Condition or Conditions in question,

17  the provisions of this Confidential Agreement that take effect in the event of compliance with the

18  Condition or Conditions in question are effective immediately upon issuance of the ALJ's decision.

19          29.     The Conditions set forth in this Confidential Agreement, and each of them, are fair,

20  reasonable and in the best interests of Chico, SOA, and the consuming public. Chico agrees and

21  acknowledges that this Confidential Agreement and the provisions herein do not violate the

22  provisions of the California Vehicle Code or any other provision of California or Federal law due

23  to the actions and agreements of the Parties as set forth herein, that the each of the Parties has

24  entered and will enter into this Confidential Agreement of its own free will, and agrees not to

25  challenge the legality of this Confidential Agreement under any provision of California or Federal

26  law. Chico understands that SOA is entering into this Confidential Agreement in reliance upon all

27  of Chico's commitments set forth herein. Chico agrees to execute or obtain any documents required

28  by SOA to evidence its agreement as set forth in this paragraph. The Parties agree that they will

1  not do anything to interfere with or inhibit the ability of any other Party to comply with their

2  respective obligations under the terms of the Confidential Agreement.

3        30.    <u>Terms Reasonable Under Economic Conditions</u>.  Chico agrees that both a

4  construction of a facility at the New Location, as well as the remodeling of facility at the

5  Temporary Property, as contemplated under this Confidential Agreement are each reasonable in

6  light of all existing circumstances, including economic conditions and are not prohibited or

7  affected by any provision of applicable law, including without limitation section 11713.13 of the

8  California Vehicle Code.

9        31.    <u>Informed and Voluntary Acts</u>.   The Parties have reviewed this Confidential

10  Agreement with their legal, tax, or other advisors and are fully aware of all of its rights and

11  alternatives.  In executing this Confidential Agreement, each Party acknowledges that its

12  decisions and actions are entirely voluntary and free from any mental, physical, or economic

13  duress. The Parties represent and acknowledge that they have carefully read this Confidential

14  Agreement, that they have not relied upon any oral statements, promises or explanations made by

15  the other party, and that they understand all of its terms.

16        32.    <u>Effectiveness</u>.  This Confidential Agreement shall be deemed executed on the date

17  on which it has been fully and properly executed by both Parties, which date shall be entered in

18  the introductory paragraph of this Confidential Agreement.  If any portion of this Confidential

19  Agreement is held invalid by operation of law, the remaining terms of this Confidential

20  Agreement shall not be affected.

21        33.    <u>Complete Agreement of the Parties</u>.  This Confidential Agreement contains the

22  entire understanding of the Parties relating to the subject matter of this Confidential Agreement

23  and supersedes all prior statements, representations and agreements relating to the subject matter

24  of this Confidential Agreement.  The Parties represent and agree that, in entering into this

25  Confidential Agreement, they have not relied upon any oral or written agreements,

26  representations, statements or promises, express or implied, not specifically set forth in this

27  Confidential Agreement.

28

34.     <u>Interpretation</u>.  Each Party and its counsel have reviewed this Confidential Agreement and the rule of construction that any ambiguities are to be resolved against the drafter will not be employed in the interpretation of this Confidential Agreement.

35.     <u>Non-Assignability</u>.  The Parties agree that this Confidential Agreement shall not be assignable without the express written consent of the non-assigning Party.  Any purported assignment in violation of the preceding sentence shall be void.

36.     <u>No Third-Party Beneficiaries</u>. This Confidential Agreement does not encompass any third-party beneficiaries, and is intended to benefit only the actual parties executing this agreement.

37.     <u>Captions</u>. The caption headings in this Confidential Agreement are for convenience purposes only and shall not be used to interpret or to define any of the terms and provisions of this Confidential Agreement.

38.     <u>Enforcement of Confidential Agreement</u>.   Should it become necessary for any Party to this Confidential Agreement to commence a legal proceeding for the purpose of enforcing or interpreting the terms of this Confidential Agreement, the prevailing Party in such action shall be entitled to recover its reasonable attorneys' fees and costs incurred in prosecuting or defending that action.

39.     <u>Further Assurances</u>.  All the Parties hereto agree to and will cooperate fully with each other in the performance of this Confidential Agreement, and will execute such additional agreements, documents or instruments as may reasonably be required to carry out the intent of the Parties.

40.     <u>Time is of the Essence</u>.  Time is of the essence and the timely satisfaction of the conditions of this Confidential Agreement, and each of them, is necessary in order to provide adequate SOA motor vehicles sales, service, and parts to the consuming public and to provide for the needs of the consuming public, and it would be injurious to the public welfare if the Conditions, and each of them, were not fulfilled by the deadlines set forth in this Confidential Agreement.

41.     <u>Final and Binding</u>. It is the intention of the Parties that this Confidential Agreement be final as between them and that this Confidential Agreement shall resolve this Protest and Lawsuit

1  in its entirety, as well as any claims that could have been brought in connection with the Protest

2  and Lawsuit, and concludes all proceedings before the Board.

3     42.   Entire Agreement. This Confidential Agreement contains the entire agreement and

4  understanding concerning the subject matter hereof between the Parties and supersedes and replaces

5  all prior negotiations, proposed settlements and agreements, written or oral relating to the resolution

6  of the Protest and Lawsuit.  Each of the Parties to this Confidential Agreement acknowledges that

7  no other party to this Confidential Agreement, nor any agent or attorney of any such party, has

8  made any promise, representation, or warranty whatever, express or implied, not contained in this

9  Confidential Agreement, to induce him to execute this Confidential Agreement. Each of the Parties

10  further acknowledges that he is not executing this Confidential Agreement in reliance on any

11  promise representation or warranty not contained in this Confidential Agreement.

12     43.   Days. Any reference to "days" in this Confidential Agreement is to calendar days.

13  Where the final day to undertake an act contemplated herein falls on a weekend or holiday, the time

14  to perform that act is extended to the next regular business day.

15     44.   Counterparts. This Confidential Agreement may be executed in several

16  counterparts, each of which shall be an original as against any party who signed it, and all of which

17  shall constitute one and the same document.

18     45.   Waiver. To the extent any party has, by entering into this Confidential Agreement,

19  waived any right of action, recourse, or appeal, that waiver is intentional, knowing, voluntary, and

20  on advice of counsel of that party's choosing.

21     46.   Advice of Counsel. The Parties to this Confidential Agreement acknowledge that

22  they have signed this Confidential Agreement of their own free will; that they know all of the

23  relevant facts and their rights in connection therewith; that they have received legal advice from

24  attorneys of their choice with respect to the preparation, review and advisability of executing this

25  Confidential Agreement; that they have not been improperly influenced or induced to sign this

26  Confidential Agreement as a result of any act or action on the part of any party or employee, agent,

27  attorney or representative of any other party hereto; and that the terms of this Confidential

28  Agreement have been bargained for after negotiations between the Parties.

47.    <u>Jointly Drafted</u>. Neither party nor their respective counsel shall be deemed the drafter of this Confidential Agreement and instead it shall be deemed to have been jointly drafted, and all provisions hereof shall be construed in accordance with their fair meaning and not for or against either party.

48.    <u>Confidential</u>. The parties Confidential Agreement and each of its terms shall remain strictly confidential between the parties and their respective attorneys, accountants, and necessary financial institutions. Neither the Confidential Agreement nor any part of its terms shall be disclosed to any unauthorized third party without the express written consent of both parties.

49.    <u>Subsequent Waiver</u>. The waiver by any party hereto of the breach of any term, covenant, agreement or condition herein contained shall not be deemed a waiver of any subsequent breach of the same or any other term, covenant, agreement or condition herein, nor shall any custom, practice or course of dealings arising among the Parties hereto in the administration hereof be construed as a waiver or diminution of the right of any party hereto to insist upon the strict performance by any other party of the terms, covenants, agreements and conditions herein contained.

50.    <u>Severability</u>. Should any portion (word, clause, phrase, sentence, or paragraph) of this Confidential Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected.

51.    <u>Due Authority</u>. Each of the persons executing this Confidential Agreement represents and warrants that he is fully authorized to enter into this Confidential Agreement on behalf of the party on whose behalf he is executing the Confidential Agreement and that any required consents, authorizations or approvals have been obtained.  Each of the Parties to this Confidential Agreement represents and warrants that it owns all right, title and interest to all claims, causes of action, demands or indebtedness provided to be released or waived pursuant to

this Confidential Agreement and that no such claims, causes of action, demands or indebtedness have been assigned, hypothecated, transferred or otherwise alienated in whole or in part.

52.    <u>Further Assurances</u>. The Parties hereto agree to cooperate in good faith to effectuate all the terms and conditions of this Confidential Agreement, including doing or causing their agents and attorneys to do whatever is reasonably necessary to effectuate the signing, delivery, execution, filing, and entry of any documents necessary to perform the terms of this Confidential Agreement.

53.    <u>California Law</u>. This Confidential Agreement shall in all respects be interpreted, enforced and governed by the laws of the State of California.

**IN WITNESS WHEREOF, the Parties have entered into this Confidential Agreement to the Stipulated Decision and Order as of the date last signed below.**

DATED:    _3/19/19_, 2019          COURTESY AUTOMOTIVE GROUP, INC. DBA
                                   COURTESY SUBARU OF CHICO

                                   By_____

                                   Print Name: _Shahram Mbamoujoul_

                                   Title: _President._

DATED:    _March 20_, 2019         SUBARU OF AMERICA, INC.

                                   By _Anthony J. Graziano_

                                   Print Name: Anthony J. Graziano

                                   Title: Vice President, Western Region

**APPROVED AS TO FORM AND SUBSTANCE:**

DATED: March 20 , 2019          NELSON MULLINS RILEY & SCARBOROUGH

By _____
   Lisa M. Gibson
   Crispin L. Collins
   Attorneys for Subaru of America, Inc.

DATED: March 19 , 2019          LAW OFFICES OF GAVIN M. HUGHES

By _____
   Gavin M. Hughes
   Attorneys for Courtesy Automotive Group,
   Inc. dba Courtesy Subaru of Chico

EXHIBIT 2

1 | NEW MOTOR VEHICLE BOARD
P.O. Box 188680
2 | Sacramento, California 95818-8680
Telephone: (916) 445-1888                    **CERTIFIED MAIL**

3

4

5

6

7

8                    STATE OF CALIFORNIA
9                    NEW MOTOR VEHICLE BOARD

10

11 | In the Matter of the Protest of                    **Protest No. PR-2570-18**

12 | COURTESY AUTOMOTIVE GROUP, Inc., dba
COURTESY SUBARU OF CHICO,                    **CONFIDENTIAL DECISION**
13                                                **RESOLVING STIPULATED**
                    Protestant,            **DECISION AND ORDER DISPUTE**
14              v.

15 | SUBARU OF AMERICA, INC.,

16                    Respondent.

17

18                    **PRELIMINARY STATEMENT**[1]

19           1.      In 2015, Protestant Courtesy Automotive Group, Inc., dba Courtesy Subaru of Chico

20   ("Courtesy" or Protestant)[2] was authorized to conduct its Subaru sales operations at 2562 Cohasset Road,

21   Chico, California ("sales premises") and to service Subaru Products and maintain its parts and general

22   office operations at 2520 Cohasset Road, Chico, California. [Exh. J-301.02:20-26, .08:22-27] In 2016,

23   the Subaru sales premises which Courtesy leased, were sold to an entity associated with the competing

24   Nissan and Hyundai dealerships. In 2018, the property became occupied by a Hyundai dealership, and

25   ///

26   —————————————————

27   [1] References herein to Roman numerals are to the transcript volumes of the proceedings.
     [2] All references to "Chico" in the Stipulated Decision and letters from Subaru of America, Inc. ("SOA") are to the
28   Protestant, and not the City of Chico.  It was agreed at the hearing that for purposes of clarity, Protestant would be
     referred to as Courtesy, not Chico. [RT Vol. I 11:25-2:17]

1    the Subaru constellation logo and name were removed. [Exh. J-301.03:18-23; .03:26-.04:3; .09:3-6] In

2    August 2018, Courtesy relocated its Subaru sales operations to its Buick/GMC facility located at 2522

3    Cohasset Road in Chico, California, which was not an authorized location for Subaru sales. [Exh. J-

4    301.03:15-17; RT Vol. V 181:12-18; Vol. VI 140:24-141:12] Subaru service, and the sale of Subaru

5    parts and other products continued to be maintained at 2520 Cohasset Road, as authorized by the Dealer

6    Agreement. [Exhs. J-300.05; J-301.02:20-26]

7          2.    In 2018, Respondent Subaru of America, Inc. ("SOA") sent Courtesy a notice of intent to

8    terminate the franchise because of Courtesy's unauthorized relocation of its Subaru sales facility.

9    Courtesy filed a timely Vehicle Code section 3060 termination protest on August 22, 2018.[3]

10         3.    The parties sought to resolve the protest by entering into a Confidential Agreement

11   ("Confidential Agreement") and Stipulated Decision and Order (collectively "Stipulated Decision") on

12   March 20, 2019, pursuant to Sections 3050.7, 3060, 3061, 3066 and 3067.[4] Section 3050.7(a) provides

13   that the "board may adopt stipulated decisions and orders, without a hearing pursuant to Section

14   3066 . . ., to resolve one or more issues raised by a protest . . . filed with the board."

15         4.    The Stipulated Decision noted that Courtesy had executed a lease for a temporary Subaru

16   location at 896 East Avenue, Chico, and that SOA agreed to consent to the establishment of temporary

17   Subaru vehicle sales at this location, in a concurrently executed new Subaru Dealer Agreement.[5]

18   Courtesy agreed to complete remodeling of the facility to meet SOA's requirements no later than 60 days

19   after execution of the Confidential Agreement. [Exh. J-301.10:13-19, .12:12-13] Further, the Stipulated

20   Decision provided that a new Subaru Dealer Agreement and Standard Provisions, which shall include a

21   Facility Addendum, will be executed by Courtesy and it will include "benchmarks for the completion of

22   the permanent facility" at the "New Location" referenced as certain APN parcels on Garner Lane in

23   Chico. [Exh. J-301.10:26-.11:4,12:7-9, 21-23; P-32.001, .023, .043; P-64.010; R-104.17-.18, .21] The

24   Stipulated Decision, which became a New Motor Vehicle Board ("Board") Order on April 9, 2019,

25   _____

26   [3] Hereinafter, all section references are to the California Vehicle Code unless otherwise indicated.

27   [4] This Decision is confidential and is not subject to disclosure absent stipulation of counsel for both parties. [Exh. J-301.04-.05]

28   [5] The new Subaru Dealer Agreement, executed on October 17, 2019, authorized Subaru vehicle sales at the temporary location, subject to five conditions as outlined in Joint Exhibit 300, pages .33-.34.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

confirmed that the Board shall retain jurisdiction pursuant to the terms and conditions contained therein. [Exhs. J-301.20:26-21:1; J-302.01-.02]

      5.     SOA and Courtesy entered into a Subaru Dealer Agreement and Standard Provisions ("Dealer Agreement") and Facility Addendum dated October 17, 2019. [Exh. J-300.01-.36] The Dealer Agreement has a stated termination date of October 16, 2022. [J-300.02] The Facility Addendum provided that "[a]ll terms, conditions and provisions of this Addendum and of the Stipulated Decision and Order of the Board Resolving Protest and Lawsuit dated March 20, 2019 (and the Confidential Agreement attached as Exhibit 1 thereto) held under confidential seal by the California New Motor Vehicle Board in Protest No. PR-2570-18, shall be incorporated by reference into the [Dealer] Agreement pursuant to Paragraph 20.10 of the [Dealer] Agreement."[6] [Exh. J-300.35, ¶ 7]

      6.     Subsequently, an Amendment to the Facility Addendum to the Subaru Dealer Agreement was entered into by the parties. The Amendment to Facility Addendum, dated May 21, 2020, was executed by Mr. Pajouh on behalf of Courtesy on May 21, 2020, and by Mr. Graziano for SOA on May 22, 2020. [Exh. R-101.01-.03]

## STATEMENT OF THE CASE

      7.     In 2020, a dispute arose between Courtesy and SOA concerning Courtesy's compliance with the terms of the Stipulated Decision.

      8.     On August 24, 2020, SOA issued a Notice of Non-Compliance to Courtesy. The Notice stated:[7]

> On March 20, 2019, Courtesy Subaru of Chico ("Chico") and Subaru of America, Inc. ("SOA") entered into a Stipulated Decision ("Stipulated Decision") pursuant to which Chico agreed to meet certain milestones required for compliance with the Confidential Agreement attached as Exhibit 1 thereto ("Confidential Agreement"). The final Subaru Facility Addendum amendment dated on 05/22/2020 ("Facility Addendum") to the Subaru Dealer Agreement dated October 17, 2019 ("Subaru Dealer Agreement") also includes agreed-upon benchmarks related to the construction of Courtesy Subaru of Chico. At this point, Chico has missed the first two Stipulated Decision milestones as noted below. **Accordingly, this letter serves as formal Notice of Non-Compliance with the Stipulated Decision based on Chico's failure to meet the following milestones:**

*///*

---

[6] Paragraph 20.10 of the Dealer Agreement is entitled Documents Incorporated by Reference and provides that the Dealer Agreement is "deemed to incorporate and render enforceable" nine listed documents. [Exh. J-300.31]
[7] See Footnote 2.

### 1. Obtain zoning and permits.

Pursuant to paragraph 16.b of the Confidential Agreement, Chico was required to "obtain necessary zoning, permits and necessary governmental approvals to provide for the construction of the permanent facility at the New Location as soon as practicable, but in any event on or before December 1, 2019."

Paragraph 4.b. of the Facility Addendum also requires Chico to obtain "necessary zoning, permits and necessary governmental approvals to provide for the construction of the Permanent Facility on or before December 1, 2019."

To date, Chico has not obtained the necessary zoning, permits and government approvals necessary to satisfy this milestone.

### 2. Commence construction.

Pursuant to paragraph 16.c of the Confidential Agreement, Chico was required to "commence construction of the facility on or before January 31, 2020." However, Chico has still not commenced construction as required.

The milestones for obtaining zoning/permits and commencing construction pursuant to the Stipulated Decision have not been achieved and are dates that clearly precede any COVID-19 related timeframe. Even during the pandemic timeframe, construction has been ongoing throughout California due to its status as an essential service under California Executive Order N-33-20. There is, therefore, nothing that Chico has provided SOA in terms of establishing either the necessary governmental action or inaction that the zoning permits have not been attainable. Chico also has not established a *force majeure* given that the Executive Orders in California deem construction as an essential business. The Stipulated Decision milestones are each separately required to be achieved and each separately constitute its own material breach of the Stipulated Decision. Based on its failure to meet the two milestones outlined above, at this time, Chico is in material breach of the Stipulated Decision.

The failure to meet the first benchmark of the Facility Addendum is also a material breach of the Subaru Dealer Agreement. Although this letter should not be deemed a notice of termination of the Subaru Dealer Agreement under California Vehicle Code §3060(a)(1)(A), it is notification in writing of the non-compliance of the Stipulated Decision by [Courtesy] Subaru of Chico relating to the two missed milestones. SOA reserves the right to exercise all remedies available under the Subaru Dealer Agreement and Facility Addendum, including but not limited to issuing a notice of intent to terminate the Subaru Dealer Agreement.

**Accordingly, please be advised that should Chico not come into compliance with the milestones outlined above within thirty (30) days of receipt of this letter, SOA is hereby requesting an order of termination of your Subaru Dealer Agreement from the California New Motor Vehicle Board in accordance with its rights under the Stipulated Decision.** (Emphasis in original.) [Exh. J-303.01-.02]

9.      On February 1, 2021, SOA issued an Amended Notice of Non-Compliance and added the failure by Courtesy to complete construction by January 31, 2021. The Notice had essentially the first two paragraphs set forth above, and in addition provided, in pertinent part, as follows:

///

1  To date, Chico[8] has not completed construction or obtained the necessary licenses and
2  permits for its Subaru sales facility as required.

3  . . .

4  **Accordingly, please be advised that should Chico not come into compliance with the
5  milestones outlined above within thirty (30) days of receipt of this letter, SOA is
   hereby requesting an order of termination of your Subaru Dealer Agreement from
6  the California New Motor Vehicle Board in accordance with its rights under the
   Stipulated Decision and this Amended Notice of Non-Compliance. The additional
7  missed milestone is hereby included with the issues raised by SOA in the non-
   compliance hearing relating to the Protest filed by Chico as Protest No. PR-2570-18
8  which is currently pending before the New Motor Vehicle Board in accordance with
   its rights under the Stipulated Decision.** (Emphasis in original.) [Exh. J-304.01-02]

9      10.    Pursuant to Paragraph 28 of the Stipulated Decision, the Administrative Law judge is to

10 hold a hearing and "to make the final determination of whether there has been a material failure to

11 comply with the Conditions" by Courtesy. [Exh. J-301.20] Thus, this Decision will not be considered by

12 the Board.

13     11.    Section 3050.7 (b) provides that:

14     "[i]f the board adopts a stipulated decision . . . filed pursuant to Section 3060 . . . in which
       the parties stipulate that good cause exists for the termination of the franchise of the
15     protestant, and the order provides for a conditional or unconditional termination of the
       franchise of the protestant, . . . . a hearing to determine whether good cause exists for
16     termination of the franchise, is inapplicable to the proceedings. . . . If the stipulated
       decision and order provides for the termination of the franchise, conditioned upon the
17     failure of a party to comply with specified conditions, the franchise may be terminated
       upon a determination, according to the terms of the stipulated decision and order, that the
18     conditions have not been met. If the stipulated decision and order provides for the
       termination of the franchise conditioned upon the occurrence of specified conditions, the
19     franchise may be terminated upon a determination, according to the terms of the stipulated
       decision and order, that the stipulated conditions have occurred."
20

21 Section 3050.7 does not state what standard applies to determine if conditions "have been met" or

22 "occurred." The statute does not preclude substantial occurrence or excuse of condition.

23     12.    The Stipulated Decision does not provide that good cause existed at that time of the

24 execution of the Confidential Agreement for the termination of Protestant's franchise. Rather, the parties

25 agreed that Courtesy's failure to comply with any of the conditions in the Stipulated Decision shall

26 constitute good cause to terminate the SOA Dealer Agreement between them under Sections 3060 and

27 _____

28 [8] See Footnote 2.

3061. [Exh. J-301.18:11-13]

## PARTIES AND COUNSEL

13.    Courtesy is a new motor vehicle dealer and a "franchisee" within the meaning of Sections 331.1 and 3060(a)(1). Courtesy's general office, parts facility, and service facility are located at 2520 Cohasset Road and its new vehicle showroom and display, outside used vehicle display and storage, and sales work area and office are located at 896 East Avenue in Chico, California. [Exh. J-300.05]

14.    Protestant is represented by Gavin M. Hughes, Esq. and Robert A. Mayville, Jr., Esq. of the Law Offices of Gavin M. Hughes at 3436 American River Drive, Suite 10, Sacramento, California 95864.

15.    SOA is a distributor of new motor vehicles and is a "franchisor" within the meaning of Sections 331.2 and 3060(a)(1).

16.    Respondent is represented by Lisa M. Gibson, Esq. and Amy M. Toboco, Esq. of Nelson Mullins Riley & Scarborough  LLP, 19191 South Vermont Avenue, Suite 900, Torrance, California 90502.

17.    This matter was assigned to Administrative Law Judge Evelyn I. Matteucci ("ALJ Matteucci"). Initially, it was to be decided on the parties' briefs, declarations with exhibits, and a day of witness testimony. After extensive briefing, this matter was heard on September 14-16, 2021, and October 18-19, 26, and 28, 2021.

## WITNESSES

### Respondent's Witnesses

18.    Anthony ("Tony") Graziano has been the Regional Vice-President of the Western Region of SOA since 2005. [Stipulation Regarding Background and Qualifications of Witnesses] The Western Region is based in Denver, Colorado and covers 13 western states, including California. Courtesy is located in the SOA Western Region. [Stipulated Glossary of Non-Controversial Terms]

19.    Scott Farabee has been the Director, San Francisco Zone, SOA since 2017. [Stipulation Regarding Background and Qualifications of Witnesses] The Zone is the geographic area including sub-groupings of Subaru Retailers' Areas of Responsibilities ("AORs") within the Region that are called upon by a District Sales Manager and a District Parts and Service Manager. Courtesy is located in the

San Francisco Zone.[9] [Amended Stipulated Glossary of Non-Controversial Terms]

20.     Ray Smit is the Market Development Manager for SOA in Northern California. [Stipulation Regarding Background and Qualifications of Witnesses] Mr. Smit is the "SOA employee who is responsible for working with SOA Retailers in undersized or non-compliant dealership facilities to expand their facility capacity through upgrades, construction, expansions and/or relocations." [Stipulated Glossary of Non-Controversial Terms]

## Protestant's Witnesses

21.     Jerry Mihanpajouh ("Mr. Pajouh") is the Dealer Principal of Courtesy and also owns and operates franchises for Cadillac, Buick, GMC, BMW, Mercedes-Benz and Volvo. He previously constructed a dealership facility in Fresno, California and has been involved in the new car sales industry for 42 years. [Stipulation Regarding Background and Qualifications of Witnesses] Mr. Pajouh was also called as an adverse witness for Respondent pursuant to Evidence Code section 776.[10] [RT Vol. I 104:2-4, 117:5-7]

22.     James Stevens (testimony via deposition only) is a land surveyor with Northstar Design Solutions ("Northstar"), an engineering and building design firm, where he has worked since 1983. He was charged with securing entitlements from the County of Butte[11] prior to annexation of the Courtesy properties by the City of Chico.[12] [Stipulation Regarding Background and Qualifications of Witnesses; Exh. P-46.009:9-15; RT Vol. I 152:12-17] Northstar originally contracted directly with Courtesy for site plans related to grading and drainage, County entitlements and the Development Agreement until June 25, 2020. Mr. Stevens then contracted with Modern Building in August 2020 for further site development and design services for an estimated fee of $6,200. [Exhs. P-20.001; P-21.001-.010; P-46.009:9-15; P-62.051:12-18; P-66.002:3-16; R-119.27:17-19, .28:10-12; RT Vol. I 134:21-24, 135:12-

---

[9] The Stipulated Glossary states that Courtesy is in the San Francisco *Region*, but it is clear from the testimony that Courtesy is in the San Francisco Zone, which covers from Monterey to Eureka, California and over to Reno, Nevada. [RT Vol. II 69:23-70:9]

[10] Subdivision (a) of Evidence Code section 776 provides that: "A party to the record of any civil action, or a person identified with such a party, may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the witness."

[11] References to "County" mean "Butte County."

[12] References to "City" mean the "City of Chico."

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

20, 138:17-22; Vol. II 29:25-30:10]

23.     James Seegert is the Responsible Managing Officer and president of Modern Building, the general contractor on the multi-franchise dealership under construction for Courtesy. [Stipulation Regarding Background and Qualifications of Witnesses]

**Independent Witness**

24.     Michael Sawley, employed by the City of Chico since 2006, is currently the principal planner for the City, and during some of the timeframe of this matter, was the senior planner. Mr. Sawley was assigned to process the Development Agreement in connection with the project. [Stipulation Regarding Background and Qualifications of Witnesses; RT Vol. III 7:17-23]

**ISSUES PRESENTED**

25.     Did SOA sustain its burden of proof of establishing that which is alleged in the Notice of Non-Compliance dated August 24, 2020, that: "The Stipulated Decision milestones are each separately required to be achieved and each separately constitute its own material breach of the Stipulated Decision. Based on its failure to meet the two milestones outlined above,[13] at this time, Chico [Courtesy] is in material breach of the Stipulated Decision" and that "[t]he failure to meet the first benchmark of the Facility Addendum is also a material breach of the Subaru Dealer Agreement?"[14] [Exh. J-303.02]

26.     If Courtesy has failed to achieve the milestones/benchmarks as alleged by SOA, should Courtesy's delay be excused due to circumstances beyond its control? This is Courtesy's burden of proof.

///

///

///

---

[13] As stated in the Notice of Non-Compliance of February 1, 2021, there are now three missed milestones which are: "[t]he milestones for obtaining zoning/permits and commencing construction pursuant to the Stipulated Decision have not been achieved and are dates that clearly precede any COVID-19 related timeframe. Chico [Courtesy] has now also failed to meet the milestone to complete construction of the Subaru sales facility." [Exh. J-304.02]

[14] It is noted that the Notice of Non-Compliance is reinforcing the conclusion that the parties intended that the standard to be applied to the non-occurrence of the milestones/benchmarks is that of whether any non-occurrence constitutes a "material breach" of the Stipulated Decision and the Subaru Dealer Agreement.

## PROCEDURAL BACKGROUND

### Request for Appointment of ALJ to Determine
### Compliance with Stipulated Decision

27.     Paragraph 28 of the Stipulated Decision provides that if SOA contends that there is a failure by Courtesy "to comply with any or all of the Conditions, SOA shall, within fifteen (15) business days of its awareness of such failure, serve a notice on [Courtesy] in the manner stated in paragraph 23, setting forth its alleged non-compliance with the Conditions, with a courtesy copy to the Board." Courtesy "shall have fifteen (15) days from receipt of that notice to file a written request with the Board asking it to appoint an Administrative Law Judge ('ALJ') to hold a *hearing* on the allegations made in the notice of non-compliance and to make the final determination of whether *there has been a material failure to comply with the Conditions by [Courtesy].*"[15] (Emphasis added.) [Exh. J-301.20]

28.     Paragraph 28.b further provides "[t]he Board will have continuing jurisdiction over this matter solely for the purpose of appointing an ALJ to determine, in the event of a timely request by [Courtesy], *whether there has been a failure by [Courtesy] to materially comply* with any of the Conditions of this Confidential Agreement. Any such timely request will be submitted for binding, non-

---

[15] Respondent asserts that there is no authority for the ALJ to hold an "evidentiary hearing," with live testimony in this matter. [Respondent's Reply Brief p. 20, lines 19 through 27] In a traditional merits hearing, the Board conducts its hearings pursuant to the Administrative Procedure Act ("APA"). The provisions, beginning in Government Code section 11400 through 11529, Chapter 4.5 (Gov. Code §§ 11400-11475.70), apply to any adjudicative proceeding required to be conducted under Chapter 5 (Gov. Code §§ 11500-11529). These statutes are the basic authority or "rules of procedure" governing administrative quasi-judicial proceedings. They govern administrative hearing procedures unless the statutes relating to a specific agency's proceedings provide otherwise. (Gov. Code §§ 11410.50, 11415.10, and 11415.20) Government Code section 11415.20 defines "adjudicative proceeding" as "an evidentiary hearing for determination of facts pursuant to which the agency formulates and issues a decision." The hearing the parties agreed to is an adjudicative proceeding.

Any provisions of the APA not in conflict or inconsistent would supplement the Vehicle Code and the Board's regulations in Title 13 of the California Code of Regulations. The Courtesy hearing is a hybrid that is, in part, defined by the Stipulated Decision. The parties stipulated and the Board ordered a "hearing" be held. Subdivision (b) of Section 3050.7 provides in part: "If the stipulated decision and order provides for the termination of the franchise conditioned upon the occurrence of specified conditions, the franchise may be terminated upon a determination, *according to the terms of the stipulated decision and order*, that the stipulated conditions have occurred." (Emphasis added.) Without a specifically defined dispute mechanism in the Stipulated Decision (other than the word "hearing"), the Board defaults to the APA, the Vehicle Code, the Board's Regulations and any other applicable laws to ensure due process. A hearing was held over seven days and SOA was allowed to present witnesses, including Mr. Pajouh as an adverse witness, and Courtesy called witnesses, including Mr. Sawley.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  appealable determination to an ALJ appointed by the Board on an expedited basis, and in no event later

2  than thirty (30) days after the filing by [Courtesy] of the request." (Emphasis added.) [Exh. J-301.20-.21]

3      29.    On February 8, 2022, the record was opened to admit additional exhibits.

4      30.    On March 18, 2022, a Zoom hearing was held regarding "counsel for Respondent's

5  assertion that ALJ Matteucci received an 'impermissible ex parte communication during a pending

6  proceeding under Section 11430.10 of the Government Code.'"[16] (March 11, 2022 Order Opening the

7  Record Regarding the Alleged Ex Parte Communication) At the commencement of the hearing, ALJ

8  Matteucci indicated that it was not necessary to open the record to have the emails be admitted as

9  evidence in the proceeding as the email communications from each side became part of the

10 administrative record upon their receipt by the Board. ALJ Matteucci determined that the March 10,

11 2022, email communication did not meet the definition of an ex parte communication pursuant to

12 Government Code section 11430.10[17] because "[t]he content of the alleged ex parte communication is:

13 (1) Not an 'issue in the proceeding;' (2) The Board is not a party to the Protest; (3) Respondent's counsel

14 was copied in the email communication; and (4) The Responses of Respondent's counsel were forwarded

15 to ALJ Matteucci prior to her response to Protestant's March 10, 2022 email." ALJ Matteucci also

16 determined that "Respondent's assertions that the transmission of the March 10, 2022, email to the Board

17 and its subsequent handling by the Board's staff and the Administrative Law Judge resulted in an ex

18 ///

19 _____

20 [16] The communication in question was an email sent on March 10, 2022, from Mr. Hughes, counsel for Protestant, with a copy to Ms. Gibson and Ms. Toboco, counsel for Respondent, directed to Robin P. Parker, Esq., Chief

21 Counsel, and Danielle R. Phomsopha, Esq., Senior Staff Counsel, New Motor Vehicle Board. This email was forwarded in the normal and customary course by Ms. Parker to ALJ Matteucci. Ms. Gibson responded to the

22 initial email and those responses were also forwarded to ALJ Matteucci. After consideration of Protestant's request and Respondent's responses, ALJ Matteucci indicated in an email sent by Ms. Parker that "Protestant's request for

23 relief is outside the Board's jurisdiction. The dispute as to whether the payment is proper under the Letter of Credit needs to be resolved in Superior Court. This email correspondence will not be considered by ALJ Matteucci in

24 drafting the Decision. . . ." (March 10, 2022, email chain) The referral to Superior Court is consistent with subdivision (e) of Section 3050 ("the courts have jurisdiction over all common law and statutory claims originally

25 cognizable in the courts. For those claims, a party may initiate an action directly in any court of competent

26 jurisdiction.")
[17] Government Code section 11430.10(a) provides: "While the proceeding is pending there shall be no

27 communication, direct or indirect, regarding any issue in the proceeding, to the presiding officer from an employee or representative of an agency that is a party or from an interested person outside the agency, without notice and

28 opportunity for all parties to participate in the communication."

1  parte communication in violation of ethical standards are without merit."[18] (March 21, 2022 Order

2  Following Hearing Opening the Record Regarding the Alleged Ex Parte Communication/Order Striking

3  Language in the "Order Opening the Record Regarding the Alleged Ex Parte Communication" Dated

4  March 11, 2022)

5  <u>**Effect of the ALJ's Findings in this Matter Per the Stipulated Decision**</u>

6  31.    Paragraph 28.c of the Stipulated Decision states that "'binding, non-appealable' means

7  that each Party adopts the ALJ's decision as a final, binding settlement of the matter at issue and waives

8  any and all recourse, right of action, or appeal with respect to the resulting ruling and/or any resulting

9  termination . . . The Parties expressly waive any claim that the Board itself should consider the ALJ's

10  decision, should reach its own decision, or otherwise involve itself in resolving the issue or dispute."

11  [Exh. J-301.21]

12  32.    Further, in Paragraph 28.d of the Stipulated Decision it is stipulated that "[i]f the ALJ

13  *determines that* [*Courtesy*] *has materially failed to comply* with any of the Conditions set forth herein,

14  the termination shall be effective immediately upon issuance of the ALJ's decision and no further

15  conditions may be imposed to require continuation of the relationship between SOA and [Courtesy]."

16  (Emphasis added.) [Exh. J-301. 21]

17  33.    On September 3, 2020, Protestant filed a Request for Appointment of ALJ to Determine

18  Compliance with Stipulated Decision. In its request, Courtesy asserted that it "exercised its best efforts to

19  achieve timely compliance" and any non-compliance on its part "is due to factors beyond Protestant's

20  control." [Exh. J-305.02:13-15] Protestant claimed that: (1) it used commercially reasonable best efforts

21  to satisfy its obligations set forth in the Stipulated Decision; (2) governmental delays excused

22  Protestant's alleged untimely compliance; and (3) substantial investment had already been made toward

23  the construction of its permanent facility as well as the investment made in its temporary location. [Exh.

24  J-305.02:19-23] On February 8, 2021, Courtesy filed with the Board an Amended Request for

25  Appointment of ALJ to Determine Compliance with Stipulated Decision, with essentially the same

26  contentions. [Exh. J-306]

27  _____

28  [18] There has been no violation of Rule 3.5 of the California Rules of Professional Conduct.

**The ALJ's November 5, 2020 Order**

34.    On November 5, 2020, an Order was issued pertaining to the relevancy of the Facility

Addendum to the Subaru Dealer Agreement and the parties' burden of proof. The Order provided that:

> The burden to prove there has been a "material failure" by Protestant to "materially comply" with Paragraphs 16.b and 16.c of the Stipulated Decision is on SOA. Paragraph 28 of the Stipulated Decision provides, the ALJ is to hold a hearing on the allegations of non-compliance made by SOA and make a determination of whether there has been a "material failure to comply with the Conditions by Chico [Courtesy]." The parties are in agreement with this initial burden determination.[19]
>
> Once that burden is met by SOA, the burden shifts to Courtesy to show that its failure to comply or perform the Condition(s) is not material or is otherwise excused, including, but not limited to, that performance of the Condition(s) was waived by SOA.
>
> The Subaru Dealer Agreement with Facility Addendum, which includes different deadlines, although referenced in Paragraphs 15(d) [sic] and 17 of the Stipulated Decision, is not part of the Stipulated Decision nor incorporated explicitly or by reference into the Stipulated Decision.  However, in order to determine non-compliance with the Conditions of the Stipulated Decision, the Subaru Dealer Agreement with Facility Addendum may be relevant to the determination of material compliance or excuse. If the deadlines in the Subaru Dealer Agreement with Facility Addendum are relevant, the burden of proof would not change." [Order Following Briefing and Oral Argument on Issues Pertaining to Respondent's Notice of Protestant's Non-Compliance with the Conditions in the Stipulated Decision]

35.    That Order was subsequently amended on July 20, 2021, clarifying the language

concerning Courtesy's burden, and provides as follows: "Once that burden is met by SOA, the burden

shifts to Courtesy to show that its failure to comply or perform the Condition(s) is excused, including, but

not limited to, that performance of the Condition(s) was waived by SOA." [Amended "Order Following

Briefing and Oral Argument on Issues Pertaining to Respondent's Notice of Protestant's Non-

Compliance with the Conditions in the Stipulated Decision"]

**THE CONFIDENTIAL SETTLEMENT AGREEMENT
AND STIPULATED DECISION**

**The Milestones**

36.    Both Paragraphs 15 and 16 of the Stipulated Decision required that a new Subaru Dealer

---

[19] At the hearing on this matter, SOA noted for the first time that the November 2020 order placed a "double materiality burden" on SOA of showing both material failure by Protestant to comply, and also Protestant's failure to materially comply with Paragraphs 16.b pertaining to zoning, permits and approvals by December 1, 2019, and 16.c regarding Courtesy commencing construction by January 31, 2020. Such a "double burden" was not intended by the wording of the order, and it was clarified at the hearing that SOA's burden was to show only material failure by Courtesy to comply with or complete the milestones. [RT Vol. I 48:19-50:10]

Agreement and Standard Provisions be executed concurrently with the execution of the Confidential Agreement, including a Facility Addendum. The parties agreed that the Facility Addendum shall include the milestones set forth in Paragraphs 15 and 16 related to the Temporary Property and the New Location.

37.    The following milestones[20] were set forth in the Confidential Agreement and agreed to by the parties:

a.    Paragraph 15.a required Courtesy provide SOA a fully executed copy of the lease for the property at 896 East Avenue and evidence of the right to occupy.

b.    Paragraph 15.b required Courtesy provide SOA a $750,000 letter of credit ("LOC") or performance bond. (Courtesy provided $750,000 cash in lieu of the LOC.)

c.    Paragraph 15.c sets forth a series of facility remodeling requirements for the temporary Courtesy Subaru location required to be completed to SOA's satisfaction and approval.

d.    Paragraph 15.d-h required that a Facility Addendum will be part of the Subaru Dealer Agreement and largely reiterated the preceding benchmarks.

e.    Paragraph 16 required the Dealer Agreement include the following provisions:

(1)    Paragraph 16.a required Courtesy submit construction drawings and site plans for a facility meeting Subaru's Signature Image Facility Standards and receive SOA's approval in writing by June 1, 2019.

(2)    Paragraph 16.b required Courtesy to have secured all government approvals and construction permits to provide for the construction of the permanent facility at the new location by December 1, 2019.

(3)    Paragraph 16.c required Courtesy to have commenced construction of the facility before January 31, 2020.

(4)    Paragraph 16.d required Courtesy to have completed construction of the facility and obtain all necessary licenses and permits as to the Subaru sales facility at the new location by January 31, 2021.

---

[20] The Stipulated Decision uses the following terms seemingly interchangeably: "conditions," "Conditions," "deadlines," "benchmark," and "milestones."

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

(5) Paragraph 16.e required Courtesy to have obtained a Final Review Verification letter from Feltus Hawkins by March 1, 2021.[21]

(6) Paragraph 16.f required Courtesy to have completed the permanent facility by January 31, 2021. [Exh. J-301.10-.13]

38.     Paragraph 17 provides, in part, that "[t]he parties agree that compliance with the terms of this Confidential Agreement and execution by both parties of a Subaru Dealer Agreement with Facility Addendum, containing the milestones for completion of construction and renovations to both the Temporary Property and the New Facility as set forth herein are each separately required according to the timetables set forth in this Confidential Agreement . . ."

## OTHER RELEVANT PROVISIONS OF THE STIPULATED DECISION

39.     Paragraph 9 of the Stipulated Decision provides that Courtesy shall, "[s]ubject to its full and timely compliance with the conditions specified . . ., continue to operate its SOA dealership operations" unless and until terminated or pursuant to a Notice of Intent to Terminate. [Exh. J-301.09:22-26]

40.     With regard to delays in performance by Courtesy, the Stipulated Decision provides, in relevant part, as follows:[22]

> 18.     Delay Based On Government Action or Inaction.  If, notwithstanding Chico's commercially reasonable best efforts, the necessary approval of a governmental entity cannot be obtained in order to timely satisfy the deadlines set forth herein, solely for reasons beyond the control of Chico, Chico shall, upon first learning of such delay, immediately notify SOA's SFO Zone representative in writing, and shall request the minimum extension of time necessary to complete the actions set forth herein. SOA representatives are and shall be authorized by Chico to verify these facts (or any facts deemed relevant by SOA in its sole discretion) directly with any governmental entity representatives, and SOA shall retain all rights and remedies as set forth herein.
>
> 19.     If SOA verifies that the delay is caused by the governmental entity and not by Chico, SOA shall agree to extend the affected deadlines set forth above, on a weekly basis, until the governmental-caused delay is not a factor. Chico shall provide weekly reports to SOA regarding the status of any governmental delay and the progress, if any, being made on the elimination of the delay and expected duration of the remaining delay. However, should SOA determine, that all or part of the delay is caused by Chico or its

---

[21] Feltus Hawkins is a "[t]hird-party vendor (architectural consultants) utilized by SOA to perform on-site dealership design consultations, the renderings for the Retailer's Subaru Signature compliant design, and post-construction compliance evaluations against Subaru Signature requirements." [Stipulated Glossary of Non-Controversial Terms]

[22] As noted in footnote 2, "Chico" is used by the parties in the Stipulated Decision to refer to "Courtesy."

agents, vendors or employees, or should Chico fail or refuse to promptly provide either the first notice or the weekly reports to SOA or not allow SOA to verify such facts directly with any governmental entity representative, then SOA shall not grant any extension (or any further extension), and the deadlines (either as set forth herein or as previously extended by SOA) shall remain in place.

20. <u>No Obligation to Provide Extensions and Force Majeure</u>.  Chico also understands and agrees that SOA has no obligation to extend any time periods or deadlines set forth in this Confidential Agreement, whether or not Chico is unable to comply due to causes within or beyond Chico' [*sic*] control, and further, that any extension of time and the duration of any such extension are made, if at all, solely at SOA's discretion, except as expressly set forth herein and in Paragraph 18. Any such extension shall be valid only if made in writing, signed by then-current Western Regional Manager of SOA and delivered to Chico.

21. Notwithstanding the provisions of this section, neither party shall be in default or liable for any delay or failure of compliance with this Confidential Agreement to the extent due to any future event which is beyond the control of the defaulting party including, without limitation, landlord approval, fire, flood, hurricane, tornado, earthquake, war, acts of terrorism, embargo, riot or an unforeseeable intervention of any government authority (excluding delays in obtaining permits and licenses), but excluding transport difficulties or strike, lock out or other labor disputes of Chico or third parties, provided the party suffering such delay or failure of compliance immediately notifies the other party of such delay or failure of compliance. Should such an event of *force majeure* take place, SOA shall extend the time periods set out in Paragraph 16 to this Confidential Agreement to allow for delays incurred as a result of the event of *force majeure*. Failure to obtain landlord approval for any change contemplated herein shall not be excused by the terms of this paragraph and Chico shall immediately notify SOA of any such failure to obtain landlord approval. (Italics in original.) [Exh. J-301.13-.15]

41. Paragraph 25 of the Confidential Agreement, provides in relevant part:

25. <u>Buy/Sell Deadline.</u> Subject to potential delays and extensions as set forth above, should Chico either (a) not complete the remodeling and construction and occupancy of the permanent facility at the New Location on or before January 31, 2021; or (b) fails to meet any other Condition or Deadline set forth in this Confidential Agreement, as set forth above; or (c) not timely produce a Buy/Sell Application Package involving all of its stock or assets, herein by close of business on the Buy/Sell Deadline, as defined herein below, then SOA shall have the right to issue a notice of non-compliance with the terms of this Stipulated Decision and Order.

. . .

b) SOA reserves the right at any time following Chico's failure to comply with the foregoing to issue a notice of non-compliance with the Conditions of this Confidential Agreement, effective 60 days following its receipt by Chico. SOA will provide written notice to Chico of any perceived non-compliance providing at least 30 days to correct or rebut any alleged non-compliance, prior to invoking the Board's jurisdiction to request an order of termination pursuant to the stipulated decision and order.

c) The Parties agree that Chico's failure to comply with any of the Conditions herein shall constitute good cause to terminate the SOA Dealer Agreement between them under Vehicle Code sections 3060 and 3061. [Exh. J-301.17-.18]

///

42.     Other relevant provisions of the Stipulated Decision include:

(1)     Paragraph 29, which acknowledges that the provisions and conditions of the parties' agreement pursuant to the Stipulated Decision are "fair" and "reasonable" and in the best interests of the parties and the consuming public. [Exh. J-301.21-.22]

(2)     Paragraph 30, which provides that Courtesy agrees that "construction of a facility at the New Location . . . as contemplated under [the Stipulated Decision is] reasonable in light of all existing circumstances, including economic conditions. . . ." [Exh. J-301.22]

(3)     Paragraph 33, which provides that "[t]his Confidential Agreement contains the entire understanding of the Parties relating to the subject matter of this Confidential Agreement and supersedes all prior statements, representations and agreements relating to the subject matter of this Confidential Agreement. . . ." [Exh. J-301.22]

(4)     Paragraph 40, which sets forth that "[t]ime is of the essence and the timely satisfaction of the conditions of this Confidential Agreement, and each of them, is necessary in order to provide adequate SOA motor vehicles sales, service, and parts to the consuming public and to provide for the needs of the consuming public, and it would be injurious to the public welfare if the Conditions, and each of them, were not fulfilled by the deadlines set forth in this Confidential Agreement." [Exh. J-301.23] and,

(5)     Paragraph 47 provides that the agreement is jointly drafted by the parties and their counsel and states that "all provisions hereof shall be construed with their fair meaning and not for or against either party." [Exh. J-301.25]

## RESPONDENT SOA'S CONTENTIONS

43.     Respondent asserts that pursuant to the language of the Stipulated Decision, Courtesy "agreed to meet certain construction benchmarks for a new permanent facility beginning in June 2019" in Chico. Starting with the benchmark to secure building permits by December 1, 2019, Courtesy, according to SOA, has failed to meet any of the other agreed upon benchmarks and "all are material breaches of its obligations and substantially based on events within its control." [Respondent Subaru of America, Inc.'s Opening Brief, p. 1, lines 20-24; p. 2, lines 5 through 6]

44.     According to Respondent, "[t]he language of the Stipulated Decision itself … reflects that

16

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

the construction deadlines are **'material'** and must be met in a timely fashion and that a breach of one provision constitutes a breach of the entire agreement, entitling SOA to issue a notice of non-compliance to Courtesy" and support a finding of material breach. (Emphasis in original) [Respondent Subaru of America, Inc.'s Opening Brief, p. 20, lines 20-22; p. 23, lines 20-23] SOA asserts any other interpretation of the Stipulated Decision would render the decision and Board's Order "entirely meaningless" and would require SOA to repeatedly litigate issues concerning Courtesy's non-compliance. "Vehicle Code [Section] 3050.7 would also be gutless [*sic*];" it "would become a nullity." SOA contends that the entire purpose of the Stipulated Decision, which was to eliminate the need for further litigation over Courtesy's non-performance with regard to its Subaru dealership, would be undermined. [Respondent's Reply Brief, p. 1, lines 16 through 19; p. 5, lines 4 through 8; p. 16, lines 27 through p. 17, lines 5]

45.     Respondent's position is that Courtesy "is unable to demonstrate any viable excuse for its failure to achieve the construction benchmarks which would relieve it from performance under the terms of the Stipulated Decision." The delays in obtaining permits were caused by Courtesy "itself failing to timely apply for permits from the County of Butte early on, before Chico annexed the subject dealership property." That failure "resulted in Chico's hands being tied with respect to honoring the County rules for public improvements." SOA contends that because Courtesy "wanted a really sweet deal" in terms of a Development Agreement with Chico, which would significantly benefit [Courtesy] financially, [Courtesy] unnecessarily prolonged negotiations for two years on extraneous factors." Rather than pushing forward and, at least, achieving the agreed-upon milestone of December 1, 2019 for permits, Courtesy "persisted in pursuing a waiver from Chico relating to a right-of-way on a parcel and for a purpose wholly unrelated to permitting the Subaru dealership," causing unnecessary delay in the permitting and finalization of the Development Agreement until February 2021. [Respondent Subaru of America, Inc.'s Opening Brief, p. 2, lines 7-18; p. 4, lines 25 through 28; p. 5, lines 18 through 21]

46.     Courtesy, according to Respondent, "will seek to shift the blame for its failure to meet benchmarks in the Stipulated Decision to Chico, the COVID-19 pandemic and the Camp Fire in Northern California." [Respondent Subaru of America, Inc.'s Opening Brief, p. 2, lines 25-27; Respondent Subaru of America, Inc.'s Reply Brief, p. 3, lines 20-22] However, the provisions of Paragraph 18 of the Stipulated Decision state that before SOA will extend any deadlines set forth in the Stipulated Decision

for failure to obtain the necessary approval of a governmental entity, the delays must be "solely" for reasons beyond the control of Courtesy. [Respondent Subaru of America, Inc.'s Opening Brief, p. 24, line 22 through p. 25, line 2; Respondent Subaru of America, Inc.'s Reply Brief, p. 13, lines 1-12] Respondent notes that the Camp Fire in Butte County occurred in November 2018, one year prior to Courtesy submitting the permit application in November 2019 and did not affect Courtesy's "ability to meet any of the construction benchmarks in the Stipulated Decision." [Respondent Subaru of America, Inc.'s Opening Brief, p. 19, lines 6-10] In addition, "the statewide stay-at-home order related to the COVID[-19] pandemic was not issued by the Governor of the State of California until March 19, 2020, well *after* the deadline for [Courtesy] to obtain permits (December 1, 2019) and to commence construction (January 31, 2020)." (Emphasis in original.) [Respondent Subaru of America, Inc.'s Opening Brief, p. 19, lines 3-6] And, although the City of Chico may have closed its physical office doors for a period of time during the pandemic, City employees were working remotely. [Respondent Subaru of America, Inc.'s Opening Brief, p. 3, lines 1-3]

47.    Moreover, Respondent asserts in order for Courtesy to exercise the excuse for delay provisions of Paragraph 18 of the Stipulated Decision, Courtesy "must establish that it has met certain conditions precedent to raising that provision, namely that [Courtesy] properly notified SOA in writing of its inability to achieve the stated deadlines and the need for an extension of time and that [Courtesy] secured SOA's written authorization to extend the deadlines on a weekly basis. [Respondent Subaru of America, Inc.'s Opening Brief, p. 3, lines 12-16] Courtesy failed to properly notify SOA and thus, did not obtain any written extensions as required. [Respondent Subaru of America, Inc.'s Opening Brief, p. 26, lines 16-23; Respondent Subaru of America, Inc.'s Reply Brief, p. 13, lines 1-6]

48.    It is Respondent's position that because "the milestones for permitting the building (December 1, 2019) and commencing construction (January 31, 2020) all occurred prior to any COVID-related shutdowns (which began in March, 2020)" it could not have been truly excused. Additionally, since construction has been ongoing throughout California during the pandemic and is designated an "essential service" under California Executive Order N-33-20, there is no excuse for Courtesy's failure to construct the facility during the pandemic. [Respondent Subaru of America, Inc.'s Opening Brief, p. 3, lines 19-23]

49.    Respondent further asserts that because Paragraph 21 specifically excludes "delays in obtaining permits and licenses" from the *Force Majeure* provisions, evidence relating to the Camp Fire and COVID-19 pandemic and the governmental orders and actions related thereto, and their impact on construction and permitting in Chico, is not relevant to any of the issues in this matter and cannot excuse Protestant's non-compliance.[23] [Respondent's Reply Brief p. 2, lines 10 through 12; p. 3, lines 20 through 22, p. 4, lines 23 through 24]

50.    SOA also contends that "in California, a 'time is of the essence provision' is generally held to mean that a failure to perform within the time specified in the parties' agreement is [considered] a ***material*** breach of the agreement." See, *Gold Mining & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 27 ("[i]t has been held that when time is made of the essence of a contract, a failure to perform within the time specified is a material breach of the contract," citing *C. O. Bashaw Co.* v. *A. U. Pink ham Co.* (1926) 77 Cal. App. 591) . . ." (Emphasis in original.) [Respondent Subaru of America, Inc.'s Opening Brief, p. 22, lines 17-21; Respondent Subaru of America, Inc.'s Reply Brief, p. 16, lines 17-21] Respondent contends Protestant's reliance on the opinion in M*agic Carpet Ride LLC* v. *Rugger Investment Group, LLC* (2019) 41 Cal. App. 5th 357 is misplaced. According to SOA, *Magic Carpet Ride* is distinguishable because: (1) This case is not a simple breach of contract or a mere settlement agreement, but involves a negotiated Stipulated Decision and order which was approved by the Board; (2) Courtesy has not missed deadlines just by a few days, but by one year, seven months and counting and; (3) "*Magic Carpet Ride* still requires that adherence to time and date conditions be reasonably met." [Respondent Subaru of America, Inc.'s Opening Brief, p. 22, line 23 through p. 23, line 2; Respondent Subaru of America, Inc.'s Reply Brief, p. 18, line 27 through p. 19, line 1]

51.    SOA further asserts that the language of the "no waiver provision" and "integration clause" in the Stipulated Decision "expressly provides that the Stipulation is not modified or affected by any other agreement between the parties. Therefore, the Stipulated Decision stands alone with respect to the issues" in this matter and was not amended by the Amendment to the Facility Addendum.

---

[23] As such, Respondent contended in its Motion in Limine No. 2 that all evidence, testimony and argument regarding these issues should be excluded from consideration at the hearing in this matter. This motion was denied on September 14, 2021. [RT Vol. I 52:21-64:3]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1   [Respondent Subaru of America, Inc.'s Opening Brief, p. 32, lines 6-9, 18-24]

2   **PROTESTANT COURTESY'S CONTENTIONS**

3       52.    Protestant admits that there has been a failure of certain conditions by Courtesy but asserts

4   "the failure of these conditions cannot be considered material because the evidence demonstrates

5   Courtesy's tremendous investment and efforts to achieve full compliance with its obligation [] to

6   construct a new Subaru branded facility." [Protestant's Opening Brief, p. 5, lines 9-12]

7       53.    Moreover, according to Protestant, "the failures of the conditions are the result of

8   circumstances beyond Courtesy's control" and occurred "despite Courtesy's commercially reasonable

9   best efforts." [Protestant's Opening Brief, p. 5, lines 12-13; Protestant's Reply to Subaru of America

10  Inc.'s Opening Brief, p. 19, lines 13-17] "Courtesy has been diligently working to complete a complex

11  facility project involving seven different brands to be housed in three separate showroom buildings, a

12  separate service center, collision center, car wash, and used car lot." The project is complex, requiring

13  "facility design approval from each franchisor and its independent design firms" and is further

14  complicated because the "proposed location is entirely without improvements and requires the

15  establishment of sewer, water, and electricity." [Protestant's Opening Brief, p. 5, lines 16-21]

16      54.    Protestant asserts that the doctrine of equitable estoppel is applicable. "It has four

17  elements: '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct

18  shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so

19  intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the

20  conduct to his injury.' (*Mathews* v. *Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236,

21  258 (quoting *City of Goleta* v. *Superior Court* (2006) 40 Cal.4th 270, 279).)" [Protestant's Opening

22  Brief, p. 10, lines 6-11] SOA therefore "should be estopped from denying it modified the deadlines

23  described in the Stipulated Decision . . . by entering into a subsequent dealer agreement with Courtesy."

24  [Protestant's Opening Brief, p. 10, lines 12-13]

25      55.    Courtesy acknowledges that "SOA was understandably frustrated with the project

26  delays . . ." Courtesy asserts that "it was Mr. Smit's negligent attention to detail that poisoned SOA's

27  decision-making process" by incorrectly assuming and falsely notifying SOA that Courtesy had obtained

28  building permits in January of 2020. [Protestant's Opening Brief, p. 10, line 28 through p. 11, line 4; p.

12, lines 15-18] Because of this mistaken belief that Courtesy had obtained permits, Courtesy contends that "SOA persists in its refusal to acknowledge the extent of Courtesy's efforts toward compliance, the evidence of government delays, and the impact from the pandemic." [Protestant's Opening Brief, p. 11, line 25 through p. 12, line 8; p. 12, lines 15-20]

56.    Courtesy contends that the "primary factual question before the Board is whether Courtesy exercised commercially reasonable efforts to comply with the obligations of the Stipulation." Courtesy claims it exercised "commercially reasonable efforts and should not be considered in breach because the delay is directly attributable to government delay that was compounded by the pandemic." [Protestant's Opening Brief, p. 12, lines 24-27]

57.    Protestant claims to the extent any delay may reasonably be attributable to Courtesy, this delay is immaterial. [Protestant's Opening Brief, p. 5, lines 13-14] "[I]n the event the Board determines Courtesy to be in breach, the Board's inquiry must turn to the question of whether any such breach is *material.*" Protestant contends that "'[i]n determining the materiality of a failure to fully perform a promise[,] the following factors should be considered: (1) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated; (2) the extent to which the injured party may be adequately compensated in damages for lack of complete performance; (3) the extent to which the party failing to perform has already partly performed or made preparations for performance; (4) the greater or less hardship on the party failing to perform in terminating the contract; (5) the willful, negligent, or innocent behavior of the party failing to perform; and (6) the greater or less uncertainty that the party failing to perform will perform the remainder of the contract. (*Sackett* v. *Spindler* (1967) 248 Cal.App.2d 220, 229.)" (Italics in original.) [Protestant's Opening Brief, p. 12, line 28 through p. 13, line 9]

58.    Protestant claims "the substantial forfeiture that would result to Courtesy if the Board determines the failure of the conditions to be material based on timing alone, is not justified in equity." [Protestant's Reply Brief, p. 7, lines 16-17] Courtesy notes that "SOA asks the Board to presume it has been injured because Courtesy's compliance has been delayed. The requirements for the determination of materiality require the consideration of any harm to SOA—there is none. In contrast, Courtesy faces the extreme harm of the loss [of] its Subaru franchise, which is a central piece of its facility project."

1  [Protestant's Reply Brief, p. 8, lines 10-13]

2  59.    Protestant does not claim its entire performance should be excused but rather that the

3  Board must determine "whether Courtesy's inability to timely perform the Stipulation's remaining

4  conditions should be considered a material breach. Courtesy's inability to provide timely compliance is

5  both excused and cannot be considered material." [Protestant's Reply Brief, p. 16, lines 17 through 22]

6  **STIPULATED FACTS[24]**

7  60.    Respondent SOA is a corporation organized and existing under the laws of New Jersey,

8  and is authorized to do business in the State of California. SOA distributes Subaru-brand vehicles in the

9  United States, and holds an occupational license issued by the California Department of Vehicles.

10  [Stipulation of Facts, ¶ 1]

11  61.    Protestant Courtesy Automotive, Inc. dba Courtesy Subaru of Chico ("Courtesy") is a

12  corporation organized and existing under the laws of California, and is a new motor vehicle dealer

13  licensed by the California Department of Motor Vehicles. [Stipulation of Facts, ¶ 2]

14  62.    Courtesy operates a Subaru dealership in Chico, California pursuant to a Subaru Dealer

15  Agreement and Standard Provisions, executed between Courtesy and SOA on October 17, 2019.

16  [Stipulation of Facts, ¶ 3; see also Exh. J-300]

17  63.    The owners and officers of Courtesy are husband and wife, Sharam Mihanpajouh (aka

18  "Jerry Pajouh") and Diane Mihanpajouh (aka "Diane Pajouh"). [Stipulation of Facts, ¶ 4]

19  64.    Mr. Pajouh is the President, Executive Manager, General Manager and Treasurer of

20  Courtesy Subaru. [Stipulation of Facts, ¶ 5]

21  65.    SOA and Courtesy entered into a Stipulated Decision on March 20, 2019 pursuant to

22  Sections 3050.7, 3060, 3061, 3066 and 3067 of the California Vehicle Code to resolve the Section 3060

23  protest filed by Courtesy. [Stipulation of Facts, ¶ 6]

24  66.    The Stipulated Decision was adopted by the New Motor Vehicle Board on April 9, 2019

25  and is a final Order of the Board. [Stipulation of Facts, ¶ 7]

26  67.    The final Order of the Board adopting the Stipulated Decision has never been amended by

27

28  [24] The Stipulation of Facts filed by the parties used Chico as the reference for Courtesy but for clarity, all references to Chico are replaced with Courtesy, unless it is a reference to the City of Chico.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

the Board. [Stipulation of Facts, ¶ 8]

68.     The Stipulated Decision provides the Board shall retain jurisdiction pursuant to the terms and conditions contained therein. [Stipulation of Facts, ¶ 9]

69.     Courtesy and SOA executed the Amendment to Existing Facility Addendum to Conditional Subaru Dealer Agreement Future Address, dated May 21, 2020. This document provided benchmarks for the Courtesy facility project that are different from those set forth in the Stipulation. However, the parties did not seek to amend the Stipulated Decision. [Stipulation of Facts, ¶ 10]

70.     On August 24, 2020, SOA issued a Notice of Non-Compliance with the Stipulated Decision to Courtesy. [Stipulation of Facts, ¶ 11]

71.     On September 3, 2020, Protestant filed with the Board its Request for Appointment of ALJ to Determine Compliance with Stipulated Decision. [Stipulation of Facts, ¶ 12]

72.     On February 1, 2021, SOA issued an Amended Notice of Non-Compliance with the Stipulated Decision to Courtesy. [Stipulation of Facts, ¶ 13]

73.     On February 8, 2021, Courtesy filed with the Board an Amended Request for Appointment of ALJ to Determine Compliance with Stipulated Decision. [Stipulation of Facts, ¶ 14]

74.     In addition to the Subaru dealership, Courtesy also plans to have dealership franchises with Mercedes-Benz, Cadillac, Buick-GMC, BMW and Volvo at the multi-franchise dealership project in Chico, California. [Stipulation of Facts, ¶ 15]

75.     Courtesy submitted its application to Chico for a building permit for the construction of the sales facility for the Subaru dealership on November 26, 2019. [Stipulation of Facts, ¶ 16]

76.     Annexation of the project into Chico commenced by the City of Chico at the end of 2017 and was completed in six months.[25] [Stipulation of Facts, ¶ 17]

77.     Chico issued a building permit for the construction of the sales facility for the Subaru dealership on April 30, 2021. [Stipulation of Facts, ¶ 18]

_____

[25] Although the parties stipulated that the annexation of the area where the project is located started in late 2017 and was completed approximately six months later, that is not correct. The City produced via Mr. Sawley, the City planner, a Butte Local Agency Formation Commission Certification of Completion recorded November 30, 2017 showing annexation of the Esplanade Annexation No. 29 (which includes the project site) was completed by Resolution on October 5, 2017. [Exh. P-64.010]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

78.    Courtesy submitted its application for the service building permits on or about June 10, 2021. Chico has not issued a building permit for the construction of the service center dealership facility. Courtesy entered into a Development Agreement with Chico with regard to the multi-franchise dealership construction project which was finalized and recorded on April 16, 2021. [Stipulation of Facts, ¶ 19]

**OFFICIAL NOTICE**

79.    Government Code section 11515 provides for official notice "of any fact which may be judicially noticed by the courts of the state." Official Notice was taken of the following documents:

(1)    State of California Executive Order N-33-20 ("Stay-At-Home Order") issued by Gavin Newsom, Governor of the State of California, on March 19, 2020, available online at https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

(2)    Relevant excerpts from the document entitled "Essential Workforce" designating "Essential Critical Infrastructure Workers" under the Governor of California's Executive Order N-33-20, available online at https://COVID19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf which included construction as an essential business.

(3)    California Department of Forestry and Fire Protection "Cal Fire News Release" dated May 15, 2019, available online at https://www.fire.ca.gov/media/5121/capfire_cause.pdf. The news release states: "The Camp Fire in Butte County, started the morning of November 8, 2018, and burned a total of 153,336 acres, destroying 18,804 structures and resulting in 85 civilian fatalities and several firefighter injuries. The Camp Fire is the deadliest and most destructive fire in California history." The release continued: "Tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."

(4)    Relevant excerpts from United States of America Department of Commerce, Service Assessment "November 2018 Camp Fire," available online at https://www.weather.gov/media/publications/assessments/sa1162SignedReport.pdf. The assessment notes that: "The Camp Fire began around 6:30 AM PST on Thursday, November 8, 2018 near Pulga in Butte County of Northern California . . . . The Fire was 100 percent contained on November 25, 2018."

(5)     Acting Governor Newsom's November 8, 2018 Proclamation of a State of Emergency pertaining to the Camp Fire in Butte County.

(6)     Governor Newsom's March 4, 2020 Proclamation of a State of Emergency pertaining to COVID-19.

(7)     Chico "On-Line Permit," Permit No. B19-00573, for Butte Humane Society, issued on 7/2/2020 and approved on June 24, 2020. [Exh. R-141]

(8)     Chico "On-Line Permit," Permit No. B19-00481, for Subaru/Volvo, issued on 4/30/2021 and approved on May 3, 2021. [26] [Exh. R-142]

## **FINDINGS OF FACT**[27]

## **The Camp Fire and the COVID-19 Pandemic**

80.     The Camp Fire in Butte County, California, the deadliest and most destructive fire in California history, began on November 8, 2018. The fire decimated three towns, including Paradise, California, a town of 27,000 people, and burned as far as the outskirts of east Chico. The fire was contained on November 25, 2018. On that same day, Acting Governor Newson declared a State of Emergency to exist in Butte County. [See Paragraph 79, *supra*] After the Camp Fire, residential permits in Chico took precedence over commercial permits, including through mid-2020. [RT Vol. III 8:16-9:25] Mr. Sawley, senior planner for the City, testified the impact from the Camp Fire on Chico was "surreal." There was "a crush of stress on the [City] Planning Department . . . it was another huge distraction." [Exh. P-63.112:16-19, 113:17-20]

81.     During the aftermath of the Camp Fire, Mr. Sawley thanked Mr. Stevens, who was the point person on the Courtesy project at the time, for understanding that Mr. Sawley could not give the Courtesy project timely consideration nor review the Development Agreement between the City and Courtesy. Mr. Sawley was instead focused on the residential needs of people displaced from Paradise,

---

[26] The permit for the Butte Humane Society facility was approved first and then issued. Whereas, the permit for the Subaru/Volvo facility was issued first and then approved. [RT Vol. II 167:11-22; Exhs. R-141.01; R-142.01]

[27] References to testimony, exhibits or other parts of the record are intended to be examples of evidence relied upon to reach a finding, and not to be exhaustive. Findings of Fact are organized under topical headings for readability only, and not to indicate an exclusive relationship to an issue denoted by the topic heading. The absence of a citation generally signifies that the underlying facts are foundational or uncontested, or that the finding is an ultimate fact finding of the Board based upon other facts in the record and reasonable inferences therefrom.

1  California. [RT Vol. III 14:1-9; Exh. P-63.111:19-112:7]

2      82.    On March 4, 2020, Governor Newsom declared a State of Emergency in California due to

3  the COVID-19 pandemic. The California statewide COVID-19 stay-at-home Executive Order was issued

4  by Governor Newsom on March 19, 2020. In accordance with the order, the State Public Health Officer

5  designated a list of 13 categories of "Essential Critical Infrastructure Workers," who were exempt from

6  the stay-at-home order. Item 13 was identified as "Industrial, Commercial, Residential and Sheltering

7  Facilities and Services" and included construction workers (and those who assist in construction such as

8  plumbers and electricians) who support construction projects. [See Paragraph 79, *supra*]

9      83.    Similar to events after the Camp Fire, Mr. Sawley testified that Mr. Pajouh was

10  understanding about not being able to give the Courtesy project the time or the immediate attention when

11  Courtesy's items were submitted for review during the COVID-19 pandemic. [Exh. P-63.111:19-.112:14]

12  The Courtesy facility was not a priority for the City during the pandemic. [RT Vol. III 11:2-24]

13      84.    The Chico City offices at 411 Main Street were closed from March 2020 to mid-May

14  2021. [Exh. P-63.109:3-14] The Chico building department offices continued to conduct business

15  during the COVID-19 pandemic and statewide stay-at-home order and employees worked remotely

16  during that time. [Exh. P-63.25:24-.26:11] Mr. Sawley testified the City may have slowed down in its

17  responses, and instituted some protocols during the pandemic. City business was conducted by

18  appointment. COVID-19 created additional burdens and "tremendous" delay in City functions.[28] [Exh.

19  P-63.109:15-110:1] During COVID-19 "it was much harder to get meetings . . . it was extra difficult."

20  [Exh. P-63.27:16-28:2] Mr. Stevens testified that COVID-19 had an effect on virtually all his projects.

21  "It was more challenging and more effort-inspiring, more effort intense." [Exh. P-46.028:2-14]

22      85.    Mr. Pajouh testified to the difficulty communicating with the City in 2020 due to COVID-

23  19. He explained there were delays in City responses throughout 2020 due to the fact that many City staff

24  ///

25  ///

26  ///

27

28  [28] Mr. Sawley testified that the City opened its doors the day before his deposition on May 19, 2021. May 18, 2021 was the first day the doors had not been locked in over a year. [Exh. P-63.109:8-14]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  were working remotely and that City offices were closed.[29] [Exhs. P-14.001-.002; P-62.164:11-24]

2  However, the situation improved at the start of 2021. [Exh. P-62.052:17-20, .053:8-9, .064:11-17,

3  .083:17-24]

4        86.    Mr. Farabee testified in April 2021 that, although technically the automotive industry was

5  deemed essential, SOA employees had not been in their offices and offices were closed to most people

6  for the majority of COVID-19. [Exh. P-59.006:12-20] SOA representatives stopped visiting dealers in

7  person in March 2020. [Exh. P-59.006:12-25] Mr. Graziano confirmed that COVID-19 had impacted

8  SOA and both the regional office and zone offices were closed for some period of time.[30] [Exh. P-

9  61.006:23-.007:21, .008:2-12]

10                                **The Leased Subaru Facility**

11        87.    Mr. Pajouh is currently leasing the property at 896 East Avenue, Chico, a former video

12  store location, for its Subaru sales. [Exh. J-300.02] The store is across the street from Mr. Pajouh's other

13  franchises and has been remodeled, rebranded, and approved by SOA. [RT Vol. II 75:6-17; Vol. IV 80:8-

14  10, 118:3-21] It is on the corner of Cohasset Road and East Avenue. [Exh. P-62.142:11-19] The building

15  does not currently look like a video store. However, it does not look like a traditional dealership building

16  either. [RT Vol. IV 118:18-21] The current Subaru facility is deficient in that it does not meet Subaru

17  Minimum Standards and Operating Guidelines, but Mr. Pajouh said it is better than any of his other

18  facilities. [Exhs. J-300.33; P-62.142:11-19] It is the newest and most modern building that Courtesy

19  operates out of and has better exposure on East Avenue. [RT Vol. VII 24:14-25:9, Exh. 62.142:11-19]

20  Everything that was required to be done at the temporary facility under the Stipulated Decision was

21  completed. [RT Vol. III 232:12-14] Courtesy has a lease on the sales building at the East Avenue location

22  until March 31, 2023. [RT Vol. VI 221:21-222:1; Vol. VII 14:20-15:9]

23        88.    Mr. Pajouh also leases property at 2520-2522 Cohasset Road for his European car sales

24  and the Buick/GMC sales and service facility. Courtesy uses this facility for service of Subaru customers'

25

26  [29] See Exhibit P-14 which are emails to Mr. Smit from Mr. Pajouh about the status of the plans and the difficulty working with City officials during COVID-19.

27  [30] BMW, unlike SOA, recognized that dealers faced issues during COVID-19. BMW sent out a letter to all dealerships that were under either renovations or new building construction, giving an automatic extension of six

28  months to any deadlines, and indicated a re-evaluation of the projects would be done after that. [RT Vol VI 153:8-23]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

cars (as was previously authorized). The term of that property lease is through December 31, 2021. [Exhs. R-176; R-177] Courtesy is negotiating an addendum to the lease to extend the lease until December 2022. [RT Vol. VI 224:8-10; Vol. VII 15:10-17] The European building on Cohasset is currently in escrow to Enterprise Rent-a-Car and the sale is subject to the lease. [RT Vol. VII 15:18-16:25]

### Sales by Courtesy of Subaru Vehicles

89.    In 2015, Mr. Pajouh purchased Courtesy Subaru and his other dealerships in Chico. [Exh. 62.022:2-10, .029:7-13] Courtesy's total investment in the purchase all of the dealerships (Courtesy Automotive Group) was $6.6 million plus assets of approximately $1 million for a total of $7.6 million. [RT Vol. VII 11:1-20] Mr. Pajouh estimated that the cost to purchase the Subaru franchise was approximately 40 percent of the total cost or about $3 million. [RT Vol. VII 11:21-12:2]

90.    For 2016 through 2020, Mr. Pajouh's most profitable year was 2020 by approximately a quarter million dollars. [Exh. P-62.029:20-.030:6] Mr. Farabee testified that he could not offer an opinion whether Subaru is losing sales as a result of Courtesy still being in a temporary location. [RT Vol. III 222:14-21] Subaru sales generally are up six percent and Courtesy's Subaru sales, in particular, were up year-to-date (July 2020 to July 2021). [RT Vol. III 222:18-19, 224:20-23] Courtesy's sales were triple the national average sales (up 19 percent) during that timeframe. [RT Vol. III 224:7-23; Vol. IV 66:22-24, 79:17-22] According to Mr. Farabee, Courtesy sells probably 35-45 Subaru vehicles a month. [RT Vol. IV 116:2-5] Mr. Pajouh testified in his deposition that Subaru is an integral part of the business of Courtesy Automotive Center and is its biggest volume. [Exh. P-62.147:3-21] In 2019, Subaru sales and service accounted for over 40 percent of Courtesy's unit sales in generating cash flow. [RT Vol. VII 8:8-25, 29:20-30:3] Subaru is Courtesy's biggest generator of revenues based on volume.[31] [RT Vol. VII 7:21-8:25, 29:16-30:3]

91.    Courtesy could not sell any more Subaru vehicles than they are currently selling because

---

[31]According to Mr. Pajouh, Courtesy's GM franchise generates more revenues as far as gross profit. He explained that when you multiply the number of units sold per gross profit, gross profit per unit is higher on GM, "but the unit sales are not anywhere near Subaru Sales." As an example, if on an average month Courtesy sells 50 Subaru vehicles and each unit generates $1,500 the total gross revenue would be $75,000, but that same month it sells 8-10 GM products and they generate $2,000-$2,500 per unit the maximum gross would be $25,000. [RT Vol VII 9:9-10:7]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

of the worldwide problem producing computer chips due to COVID-19.[32] [RT Vol. III, 213:5-22, 222:22-223:15] Courtesy is "nearly flat to where they were in [2019], which is pre-pandemic numbers" but "that's better performance than Northern California or the country too."[33] [RT Vol. III 225:1-4] Mr. Farabee testified that in terms of presently not having an inventory of cars that "[m]ost retailers would tell you they're okay with how things are right now . . . because profitability is through the roof. They're making more per car than they have. Their pricing on cars has gone up." [RT Vol. IV 67:24-68:3] In 2021, to the date of Mr. Pajouh's testimony, Courtesy is two-and-a-half times more profitable than 2020. [RT Vol. VII 39:6-15, 40:5-8] Mr. Graziano confirmed that it was the best profit year for Subaru retailers and for the company itself in the history of SOA. [Exh. P-61.006:23-007:4]

## **The Butte Humane Society Building**

92.    According to SOA, the construction of the Butte Humane Society building in Chico is a comparable project and relevant to whether Courtesy could have built its multi-franchise project in a timelier manner. The Butte Humane Society applied for a permit at approximately the same time as Courtesy and is nearing completion. [Exhs. R-141.01; R-142.01; RT Vol. II 168:12-15; Vol. V 92:11-14] The Butte Humane Society owns a 10-acre parcel located at 13391 Garner Lane across the street from the Courtesy property and was originally located in the County and annexed in 2017. [RT Vol. II 167:5-10; Vol. III 24:3-14; Exh. P-64.010] It is currently constructing an approximately 20,000-25,000 square foot main office/kennel building on a portion of the 10 acres [Exh. R-141.01; RT Vol. II 167:17-19; Vol. III 111:8-16; Vol. V 94:17-21] The value of the construction project shown on the permit is a little over $4.3 million. [Exh. R-141.01; RT Vol. III 111:7-21, 119:7-14] The total project cost is approximately $8-9 million. [RT Vol. V 95:1-3]

93.    The entire Butte Humane Society project, which includes a future barn and dog park, is to be done in phases. [RT Vol. III 111:11-16, 111:23-112:5, 113:21-114:4; Vol. V 93:10-13; Exh. P-63.076:13-25] The Butte Humane Society parceled off the three acres where the building was to be built

---

[32] Mr. Farabee explained that longer term, because of a business model shift in the last year of people ordering cars and taking possession in 60 days, Courtesy (and other dealers) could take more sold orders and get more cars. [RT Vol III 223:16-224:5, 225:5-13]

[33] Prior to March 2020 (pre-pandemic), Courtesy's average inventory level was 50-70 cars and in 2019 Courtesy sold 594 new Subaru vehicles or approximately 49 per month. [RT Vol. VI 128:25-129:14]

prior to City design review and the use permit application. This was more of a logical sequencing and thus, easier to process for the City. [RT Vol. III 116:10-25] Butte Humane Society applied for a permit on December 19, 2019 (Permit No. B-19-00573). The permit was approved on June 24, 2020, and issued on July 2, 2020, approximately six months after its application. [RT Vol. II 167:11-22; Exh. R-141.01]

94.     Mr. Sawley, although not assigned to the Butte Humane Society project, was familiar with it. [RT Vol. III 109:21-24, 110:15-111:1] Mr. Sawley explained that unlike Courtesy, Butte Humane Society did not plan to build in the County; it did not submit building permits or planning entitlements prior to annexation. It was conceived and approved in the City. [RT Vol. III 24:12-18, 118:16-119:6] Butte Humane Society's design professionals knew they needed to show and pay for City improvements. There was no need for a Development Agreement to defer improvements and costs.[34] [RT Vol. III 24:15-18, 113:11-15, 118:16-23] Butte Humane Society did ask for the same kind of deferral as Courtesy was getting approved for, but Mr. Sawley stated that the City "shut that down." [RT Vol. III 113:16-20] Because Butte Humane Society was designed to meet City standards, they were able "to get faster through the process." [RT Vol. III 146:3-16] Mr. Sawley agreed that the projects were not comparable given that one did not qualify for use of a Development Agreement and the other did; Courtesy planned to build in the County and had plans that reflected County-level improvements.[35] [RT Vol. III 118:16-119:6] It would have required changes to Courtesy's plans to build to City standards. [*Ibid.*]

95.     Construction of the Butte Humane Society building was very close to being completed at the time of the hearing in September 2021. [RT Vol. II 168:12-24; Vol. V 92:11-14]

96.     Mr. Sawley testified that the Butte Humane Society was "more of a lovable project that doesn't get much opposition." He explained that it was an easier project to process because of its mission to take care of animals that may be displaced from fires and "the wind they have at their back with all their donors and stuff. I mean, don't get in the way of Butte Humane." [RT Vol. III 116:10-25].

97.     Mr. Seegert was also familiar with the project as Modern Building was also the

---

[34]Mr. Sawley admitted that these City requirements for the Butte Humane Society were like "building a sidewalk to nowhere." [Exh. P-63.117:13-22]

[35] Mr. Sawley at the same time testifying the projects were not comparable, clarified his testimony, noting that the building was bigger than he had originally thought (20,000 square feet versus 25,000 square feet) and that the acreage was larger than what he originally testified to (five acres versus 10 acres). [RT Vol. III 111:12-21] He explained that the Butte Humane Society project is "a big project." [RT Vol. III 119:7-19]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  contractor on the building project. [Vol. II 166:22-167:1; Vol. V 107:21-25] In his opinion, the Butte

2  Humane Society kennel building is on a smaller portion of the overall site than Courtesy's and not as

3  complex; "it's not even a comparable project." [RT Vol. II 167:11-22]

4        98.      Although the two projects have some similarities, such as needing to be connected to

5  utilities and the land is approximately 10 acres, they are not comparable. [RT Vol. II 167:11-22, 169:10-

6  15; Vol. III 118:9-119:6] Butte Humane Society is a single building about 20,000-25,000 square feet.

7  Courtesy has five buildings with 110,00-120,000 square feet, needed four permits, and had multiple plan

8  checks. [RT Vol. V 120:2-18] Mr. Sawley testified that that Butte Humane Society project was more

9  straightforward, with one building and a parking area in front. [RT Vol. III 148:9-16] The Courtesy

10  project had more "problems" in obtaining approval such as lot line adjustments and shared parking areas

11  between all the buildings, which required the City to see all the connections. [RT Vol. III 148:1-8] Butte

12  Humane Society had no basis for asserting that City improvements were not required because the project

13  had not applied for any entitlements with the County. Thus, there was no issue of City versus County

14  requirements that would have triggered delay in coordination between the two entities. Butte Humane

15  Society did not have the option to have a Development Agreement to avoid paying presently for City

16  improvements. [RT Vol. II 167:11-22; Vol. III 113:7-114:4, 117:24-118:23] Therefore, the fact that Butte

17  Humane Society applied for their building permit at about the same time as Courtesy, and that its

18  construction is almost complete, is not relevant to whether Courtesy could have built its facility in a

19  timelier manner, or whether it materially breached the conditions of the Stipulated Decision.

20                         **The New Courtesy Multi-Franchise Project**[36]

21                  **(1)**      **The Building Permits and the City Plan Check Process**

22        99.      The Courtesy project is a complex multi-franchise project involving seven different

23  brands: Subaru, Mercedes-Benz, Cadillac, Buick-GMC, BMW and Volvo. [Stipulation of Facts, ¶ 15]

24  The dealerships are to be housed in three separate showroom buildings, each 17,600 square feet, a

25  ///

26  _____

27  [36] For a better understanding of the site and the layout of the project, see Attachments 1, 2 and 3, which were Exhibits "A " and "C" to the Development Agreement. [Exh. R-104.17, .18 and .20] Attachment 1 shows the vicinity of the project, Attachment 2 shows the total acreage and the parcels on the property, and Attachment 3

28  depicts the layout of the buildings superimposed over the five parcels.

separate service and repair center, which is 56,000 square feet, a car wash,[37] and used car lot. [Exhs. P-63.044:1-5, 103:3-8; R-104.02, Section 1.4; RT Vol. VII 18:21-19:21] It is located on five parcels. [Exh. R-172.02] The property is a little over 11 acres and the square footage of the project is approximately 110,000-120,000. [Exh. R-104.02; RT Vol. II 168:7-9, 171:25-172:5; Vol. III 113:1-6]

100.    This project requires facility design approval from each franchisor and their independent design firms. The project is further complicated by the fact the proposed location is a "greenfield project:" which is a ground up facility entirely without public improvements and requires connection to utilities such as sewer, water, gas, fiber optics and electricity. [RT Vol. I 177:11-12; Vol. II 111:25-112:4, 192:7-8]

101.    Courtesy timely completed the first five milestones of the Stipulated Decision and the Facility Addendum, including acquisition and remodeling of the temporary facility according to SOA specifications, provision of $750,000 cash in lieu of a LOC, and completion of, and approval of, construction drawings by June 1, 2019. [RT Vol. IV 58:21-23; Vol. VI 55:15-60:3]

102.    The Subaru and Volvo building was the first to be approved by Courtesy Automotive Group's franchisors and the first to be submitted for approval to the City. [RT Vol. V 115:22-116:3, 116:10-18] Courtesy submitted the application for four permits to the City on November 26, 2019, including for the Subaru/Volvo building (Permit No. B-19-00481).[38] [RT Vol. V 115:22-116:3, 119:19-120:8] The initial plan set was submitted for the Subaru/Volvo building in late 2019, and for the other buildings just after the first of the year in 2020.[39] [40] [RT Vol. V 116:12-18, 117:4-14]

103.    The Chico Building Department is the City unit that is the "pinpoint [department] that delegates or distributes to other departments" and issues the permit. [RT Vol. II 160:7-14, 164:4-16,

---

[37] There is a quick oil and lube building that was specifically requested by SOA. The cost of this building to construct is approximately $200,000. [RT Vol. V 163:19-25, 164:6-25; Vol. VII 18:21-19:9]

[38] Mr. Smit received a copy of the November 26, 2019 permit application and payment receipt from Courtesy, and mistakenly thought the permit had been issued. [Exh. P-51.022:5-24, .035-.036] Mr. Pajouh sent an email on January 8, 2020 explaining to Mr. Smit that he had applied for plan check and permitting in November [2019] and that the City has everything they need to "proceed with permitting." [Exh. P-48.030] However, still under the misunderstanding, Mr. Smit sent out letters indicating that the zoning and permit objective had been achieved. [Exh. P-51.012:20-.013:10, .015:22-.016:14, .026:14-.027:1, .037-.038] Mr. Smit later requested a copy of the permit but it could not be produced since Mr. Pajouh had only filed the application. [Exh. P-51.013:5-16]

[39] Mr. Seegert was given instructions to prioritize the Subaru building. [RT Vol. II 146:18-147:4]

[40] The City of Chico has no capability of having documents submitted online. [Exh. P-47.022:3-17]

165:2-12] The City plan check is a process whereby the building department and a third-party vendor, Bureau Veritas ("BV"), review submitted plans on "big plan checks" such as Courtesy's, and provide feedback to the applicant concerning requested changes or additions to be included with the next set of submitted plans. [Exhs. P-32.003; P-47.015:3-17, .016:13-25; P-63.107:16-25; RT Vol. I 203:18-204:12; Vol. III 21:17-22:4, 71:15-19] The project also required multiple approvals from various other City departments such as Planning, Sewer, and Development Engineering. [Exhs. P-13.002; P-17.001, .003; P-32.001-.062]

104.    On February 14, 2020, Tony Lindsey with the City's building department contacted Mr. Seegert to ask how complete Courtesy's plans were. [Exh. P-17.004; RT Vol. III 179:4-5] Mr. Seegert responded that when the drawings were submitted, the intent was to have the City start the plan check process at that time. [Exh. P-17.004]

105.    Mr. Sawley reviewed the plans on February 18, 2020, and noted that the plans needed to "show public frontage improvements meeting City standards (or complete draft Development Agreement authorizing waiver therefrom)." [Exh. P-32.001; RT Vol. III 36:16-24] Mr. Sawley testified at the hearing that he and the other City reviewers were not "urgently wanting to look at these plans" while the Development Agreement was being negotiated because it would be premature and cause incomplete reviews.[41] [42] [RT Vol. III 29:7-14, 169:19-170:9, 171:6-172:12] Mr. Sawley confirmed that BV performed timely reviews of the plans because they wanted to get back to the City at the predetermined deadlines set by the City. [RT Vol. III 172:4-8]

106.    On February 20, 2020, Mr. Lindsey told Mr. Seegert that BV would receive the plans the following week and had been notified that "it's a priority project." [Exh. P-17.003] BV received the plans from the City the last week of February 2020 or early March due to a delay in City staff receiving

---

[41] Although Mr. Sawley's comments on the City permit review form on February 18, 2020 seem consistent with his testimony, Mr. Sawley did not mention in his deposition the delay of plan reviews pending the Development Agreement. Further, it seems inconsistent with Mr. Lindsey's email where he indicates that Courtesy's plans will be given "priority."

[42] Upon later questioning, Mr. Sawley testified inconsistently. He said that late requests from the City in January and February 2021 asking for such things as intersection alignment and frontage improvements on a nearby private lane to be included in the Development Agreement, did not delay the permit because "the permits are on their own separate track and they're being reviewed by the Building Department for adherence to the building codes." [RT Vol. III 20:3-21:20]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

shipping labels.[43] [RT Vol. III 30:10-24; Exhs. P-17.002-.003; P-47.016:9-22] On March 3, 2020, Mr.

Lindsey confirmed that BV had the plans and were reviewing them. [Exh. P-17. 002] The structural

calculations from Courtesy were received by the City on March 5, 2020, and provided to BV. [RT Vol.

III 33:2-34:4; Exh. P-32.003] BV did a building initial review in approximately three weeks, and on

March 20, 2020, provided a six-page response to the City. [Exh P-32.003-.00.10; Vol. V 144:23-145:4]

Mr. Seegert did not receive any plan check responses until the end of March 2020, which did not include

comments from all departments, and some did not arrive until after April 20, 2020. [RT Vol. II 158:15-

22; Vol. III 30:25-31:16, 40:5-16, 42:4-15; Exhs. P-13.003; P-14.003-004; P-17.001-.004; P-32.003]

107.    The City departments other than building and planning started reviewing the plans on

February 24, 2020. [RT Vol. III 30:10-18, 36:21-24; Exhs. P-32.003; R-166.03] On April 15, 2020, Mr.

Seegert sent an email asking Mr. Lindsey the status of the engineering, parks and sewer departments'

reviews. Mr. Lindsey responded that he would send a reminder to the reviewers and "urge them to

review" the plans.[44] [Exh. P-17.001]

108.    Mr. Pajouh had never heard from Mr. Seegert or been told by anyone from the City that

City personnel were not working on the plan check because the Development Agreement was not

complete or that the plan check process was not proceeding as quickly as possible. [RT Vol. VI 87:12-25,

88:6-14] Mr. Pajouh testified that he understood that the Development Agreement and the plan

check/permit process were "two ships sailing alongside each other." [RT Vol. VI 86:13-23, 87:21-88:5]

109.    Resubmittals were often done by mail during COVID-19, and the plans sat on a shelf for a

couple of days because the City staff thought they could not touch them due to protocols. [RT Vol. III

35:4-16]

110.    Courtesy resubmitted documents responsive to the City's plan check responses on five

occasions. [Exh. P-32.001-.022; RT Vol. II 158:7-14; Vol. III 50:14-22, 52:4-9, 170:21-25] Mr. Sawley

testified that Modern Building was checking in frequently "([Mr. Seegert] was being the pest that he said

---

[43] The City delayed shipment of the plans because of late receipt of shipping labels. [Exh. P-17.002]
[44] Mr. Sawley, when asked about this email, testified that he did not know why these other departments had not responded. He did however note, given the date of "one month into COVID[-19]," that many people were not allowed into the building due to COVID-19 restrictions. The plans were "hard copy plans on the shelf, which means you have to be in the building to look at them." [RT Vol. III 184:18-185:12]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

he didn't want to be") and they were moving forward on all fronts "in the pursuit of trying to get to the end result faster." [RT Vol. III 182:19-184:7]

111.    Courtesy had a billing disagreement with Mr. Stevens at Northstar Design Solutions, who was hired to do the civil design work. Northstar sent a letter to Courtesy dated June 25, 2020, terminating their contract. Northstar noted that it was paid its November 2019 invoice, its December 2019 invoice was skipped, and had not been paid since January 10, 2020. Mr. Pajouh asked for documentation for the disputed billings in February 2020 and Mr. Stevens responded on April 3, 2020. [Exh. R-102.01-.03] The contract termination letter listed 10 remaining items that were "necessary to secure a building permit according to City staff." [Exh. R-102.02-.03] Items one through five (secure ARB approval, ensure site design was acceptable to City staff, design intersection improvements and frontage improvements, and prepare and complete use permit) were not items Northstar had been engaged to perform.[45] [Exhs. R-102.02-03; R-119.15:16-.17:24] There were two other items (numbers six and seven) that NorthStar asserted it had been engaged to perform: (1) apply for and complete the Boundary Line Modification (the five parcels had to be reconfigured because a building cannot be built on an existing parcel line), and (2) abandonment of the right-of-way or ROW[46] at the Highway 99 and Garner Lane intersection.[47] Both could have been done later and did not need to be done before permitting. [Exhs. R-102.03; R-119.18:3-.20:14]

112.    The dispute was resolved "amicably" and Courtesy paid the agreed amount to Northstar after the June 25, 2020 letter Northstar sent to Mr. Pajouh. [Exhs. R-102.01-.03; R-119.11:10-14, .13:2-25, .14:11-15:1] Courtesy was later advised that a storm drainage report was needed, as well as additional civil design services for the Express Service and Wash/Detail buildings, and that Northstar's involvement would be beneficial. [Exh. P-21.001-002] Courtesy then authorized Modern Building to contract directly

---

[45] There is an April 2019 email from Mr. Stevens to Mr. Pajouh indicating that Mr. Sawley agreed with the County's decision to not require a use permit since a rezone was done. [Exh. R-130.10] Mr. Stevens testified that the City changed its mind and wanted a use permit. [Exh. R-119.17:17-24] The Development Agreement indicates that no use permit was required by the City. [Exh. R-104.03, Section 2.1]

[46] Right-of-Way or ROW is defined by the parties as: "The parcel of land owned by the City of Chico, and preserved as a right-of-way, on Garner Lane in the City of Chico adjacent to the property on which the Multi-franchise project is located." [Stipulated Glossary of Non-Controversial Terms]

[47] Mr. Pajouh testified that Northstar was not contracted to do items six and seven. [RT Vol. I 194:5-12, 195:3-5]

with Northstar on August 4, 2020, to complete the work for a fixed price. [Exhs. P-21.003-.010; P-66.002:10-16] Items six and seven in the June 25, 2020 letter from Northstar were not performed by Northstar under the subcontract with Modern Building. [Exh. P-46.025:4-8, .026:10-16]

113.    On July 15, 2020 Mr. Pajouh sent an email to Mr. Smit stating that "James Seegert mentioned they are having difficulties not just with the City Officials but also with their subcontractors and field crew as some have contracted the virus so the rest of the group don't show up for work." [Exh. R-159.08] Mr. Farabee testified in his deposition that he called Mr. Pajouh about the email because his understanding had been that the project was stalled because of the City's closure. According to Mr. Farabee, Mr. Pajouh told him that "there had been some issues contacting the correct people" on Mr. Pajouh's side to secure the information needed by Chico to move forward with the permits and to process requests made by the City on plan checks. Mr. Pajouh told Mr. Farabee that "between his contractor and subcontractors, they were having difficulty getting what they needed back to the city." [Exh. R-122.02:24-.04:15, .12:5-.13:12; .14:8-.15:18]. Mr. Farabee testified at the hearing that he called Mr. Pajouh about the email and Mr. Pajouh "told me that he had what he needed and the City was waiting on his team for a response." He did not recall Mr. Pajouh saying he was having "difficulty with his subcontractors." [RT Vol. II 96:8-97:2]

114.    Mr. Pajouh in his corrected declaration in support of the Protestant's Reply Brief and in his testimony asserts Mr. Farabee's testimony was incorrect. [Exh. P-66.001:26-002:2] Mr. Pajouh explained he was merely repeating in the email what he had heard from Mr. Seegert and that it was not related to the Courtesy project or its subcontractors. [RT Vol. I 184:17-185:2, 186:1-10, 188:16-23] Mr. Pajouh stated that he "was never aware of any significant issue with subcontractor availability due to COVID-19 illness or any other reason." [Exh. P-66.001:26-002:2]

115.    Mr. Seegert testified that intermittently, throughout the job, there were general delays from some of his subcontractors because of issues related to working remotely during COVID-19. [RT Vol. II 172:8-173:3] He did have discussions with Mr. Pajouh about some "boots on the ground" or field crew subcontractors that did not show up for work because of COVID-19 illnesses. [Vol. II 173:12-174:2] There was never a specific instance where a subcontractor on the Courtesy project who was supposed to respond to City plan check could not respond due to COVID-19. [RT Vol. II 173:4-11] Mr.

1    Seegert also testified that there was no one working on responses to plan checks that was unavailable due

2    to anything else in July 2020. [RT Vol. II 177:25-178:4, 178:22-179:4]

3          **(2)      The Development Agreement and The Right-of-Way (ROW) Issue**

4          116.    The Courtesy facility project was originally situated and conceived in Butte County on

5    approximately 11.3 undeveloped acres with unimproved gravel shoulders and roadside ditches. [Exhs. P-

6    46.009:9-15; R-104.01] The County adopted a mitigated negative declaration[48] and established

7    conditions of approval for Courtesy to follow. [Exh. P-46.009:9-.012.3] Courtesy had to prepare

8    construction documents, building plans, and achieve other conditions imposed by the County before the

9    County would issue a building permit. [*Ibid.*]

10         117.    Before County permits could be obtained, Courtesy had to do a general plan amendment, a

11   rezone of the property, and a lot line adjustment. [RT Vol. I 132:3-12; Exhs. P-46.011:11-20; P-

12   63.064:12-065:3] Mr. Pajouh had gone to the County and "got a lot of legislative actions done,"

13   including a specific plan amendment and a rezone, but "they didn't give him entitlement to build and that

14   became a problem upon annexation." [Exh. P-63.101:21-102:15] Courtesy went through a "significant

15   county process," and then the City "snapped up the property through an annexation and that kind of sent

16   him back to the starting gates." [Exh. P-63.012:11-18, 102:12-15, 103.13-.104:1] Courtesy did not apply

17   for permits with the County of Butte prior to the annexation by Chico. [Exhs. P-46.030:20-25; P-

18   63.064:12-22].

19         118.    The November 2017 annexation of the 21 parcels, including the Courtesy dealership and

20   Butte Humane Society properties by the City of Chico, was completed in six months. [RT Vol. III 24:3-

21   14; Exh. P-64] The annexation was "a land speed record," being completed in about one third the usual

22   time. [Exh. P-63.065:4-23] If Courtesy had obtained County permits prior to annexation, the City would

23   have honored those. [Exh. P-63.064:12-22]

24         119.    Part of the City's annexation included an odd-shaped parcel of land near the intersection

25   of Garner Lane and Highway 99 given to Butte County by Caltrans. [Exhs. P-7.001-.003; P-46.015:6-

26   .016:9; P-63.096:4-6] This ROW is adjacent to the property and immediately north of the multi-franchise

27

28   [48]A Mitigated Negative Declaration is "a negative declaration prepared for a project when the initial study has
     identified potentially significant effects on the environment." [Public Resources Code section 21064.5]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

project land. [Exh. P-46.016:15-20]

120.    There were discussions between Courtesy and Butte County about abandonment of the ROW to Courtesy and according to Mr. Stevens, abandonment was "met with concurrence from the county. It wasn't going to do them any good; they were willing to abandon it." [Exhs. P-7.001-.003; P-46.015:6-.016:9; RT Vol. I 153:17-20] Additionally, the Initial Study filed by the County included a notation that the abandonment had been applied for.[49] [RT Vol. III 160:16-23] Mr. Sawley testified that the County was "going down the path of abandonment," and he had no reason to doubt that the County would have abandoned the right-of-way to Courtesy. [RT Vol. III 148:18-149:14, 149:23-150:1; Exhs. P-7.001-.003; P-63.095:12-.096:1, .096:12-.097:3]

121.    The City of Chico, however, acquired the ROW through annexation, and wanted to preserve it for a possible interchange.[50] [Exhs. P-46.016:21-.017:4; P-63.093:13-20; R-119.08:6:25]

122.    Courtesy's design team approached the City and discussed that during the annexation process when a property is annexed, it is annexed with its entitlements. Courtesy had processed a general plan amendment, a specific plan amendment and a rezone under the County's jurisdiction. [Exh. P-63.012:11-18] At the point of entitlement by the County for the project, the City stepped in and annexed the property. Mr. Stevens explained that there is a period of time that entitlement lasts, typically for two to three years. Initially, the City agreed to allow the project to be built to County standards. [Exhs. P-46.012:6-23; P- 46.029:12-21; R-111.01]. But according to Mr. Stevens, the City "went back on their agreement."[51] [Exhs. P-46.029:12-.030:9; R-102.02; R-119.35] Approximately a year and half after the annexation, the City decided that Courtesy had waited too long, and that Courtesy now had to build to City standards. [Exhs. P-46.029:12-.030:9; R-119.22:7-.23:9] It was at this point that a Development Agreement was suggested. [*Ibid.*]

123.    Assistant City Manager Chris Constantin explained it differently in an email dated

---

[49] The California Environmental Quality Act requires that the Lead Agency, through its initial study, evaluate the whole of a project's potential environmental impacts. (Title 14, Cal. Code Reg. § 15063)

[50] Mr. Stevens testified that he was surprised when the City's director of public works first mentioned that the City was thinking about the potential for an interchange in the ROW since construction of a large church had already been allowed on the north side of the ROW by the County. [Exhs. P-12.002; R-119.08:17-.09:1]

[51] In the June 25, 2020, letter from Northstar to Courtesy, Mr. Stevens noted "the *significant* work ahead of [Courtesy] due to the City going back on their agreement. . ." (Emphasis added.) [Exhs. R-102.02; Exh. R-119.35]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

September 20, 2019, to other City staff related to Courtesy's draft Development Agreement. He stated: "The original understanding was that [the City] would honor the standards in place based on the date [Courtesy] filed. For reasons completely under their control, [Courtesy] missed doing so before the property was annexed."[52] [Exh. R-111.01] Mr. Constantin added that: "Our proposal for delaying the public improvements *benefits the City more than Courtesy* (especially if its built to then [later] standards), but it extended a benefit to Courtesy giving them some of what we discussed with them before annexation." (Emphasis added.) [Exh. R-111.01]

124.    In this case, Chico would have required urban frontage improvements (curb, gutter and sidewalk) including reconstruction of the roadway. [Exh P-46.013:11-23] Additionally, the City's typical improvements include storm drainage, sanitary sewer, landscaping, parkstrip and streetlights in order for the project to be permitted and proceed to the construction. [Exhs. R-104.03, Section 2.2; P-63.010:14-11:13] Generally, the City requirements are more burdensome and expensive than the County requirements, creating a more significant financial obligation. [Exhs. P-46.013:6-10; P-63.011:14-23, .110:24-111:4] In the absence of a Development Agreement, Courtesy would have had to include the necessary public improvements in its plans and complete them as part of the construction of the project. [Exhs. P-46.014:6-13; P-63.013:5-.014:23]

125.    A Development Agreement is not required by Chico to construct within the City. [Exh. P-63.015:7-18 ; RT Vol. III 113:7-15] Development Agreements under usual circumstances, take months-to-years to process, depending on the terms. [RT Vol. III 12:13-23] However, it was decided a Development Agreement would be used for the Courtesy project because the project plans, developed prior to the annexation, were based on County standards, and would require a significant cost to meet the City's requirements. [RT Vol. I 133:23-134:13; Exhs. P-46.014:4-25; P-62:166:11-21] Mr. Sawley explained, when asked if "most people do a development agreement in this kind of situation," that "[t]here is no 'this kind of situation'" because "[m]ost of the time developers weren't approved for major

---

[52] There is no testimony from Mr. Constantin. Mr. Sawley testified when asked about the September 2019 email that: "[i]t's really easy to write it in a paragraph, and I'm sure there were important things happening at the time, like they still needed a lot line adjustment from the county to get the property lines out of the way of the building, so there was a similar set of challenges to get it done in the county. And what I don't think comes clear in an email like this is the fact that the city pursued annexation and it was a done deal in like six months, which is a land speed record for annexation. We don't do them that fast. They rarely get done that fast." [Exh. P-63.064:12-.065:12]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  things through the County and then annexed before they were able to secure building permits" and caught

2  between County standards and City standards. He did not know of any other situation where a developer

3  was caught this way. [RT Vol. III 17:8-21]

4      126.    A Development Agreement would allow Courtesy to build essentially to County standards

5  and defer the completion of the City public improvements for 20 years. [Exhs. P-46.014:4-25, .029.7-

6  .030:9; P-62.166:11-21; P-63.055:24-.056:3] The amount deferred was "probably a million dollars' worth

7  of infrastructure." [RT Vol. III 85:17-86:5] The parties agreed in the Development Agreement that

8  construction of City standard improvements along the frontage of the property was premature as there

9  were "no urban-level public frontage improvements in the area." [Exh. R-104.03, Section 2.2]

10     127.    Courtesy applied for the Development Agreement on October 24, 2018, and paid a fee of

11 $6,820. [RT Vol. I 138:9-25; Exh. P-42.04] A draft Development Agreement was sent by Mr. Stevens

12 along with the application. [Exh P-63.043:6-12]

13     128.    Four months later, on March 1, 2019, Mr. Sawley sent a response to the Development

14 Agreement, to Mr. Stevens. [RT Vol. III 127:15-19] Mr. Stevens responded and a second City response

15 or "turnaround" to the Development Agreement was completed by Mr. Sawley on or about June 4, 2019,

16 and sent to Mr. Stevens. [Exh. R-175; RT Vol. III, 133:6-24]

17     129.    Courtesy sent a revised draft of the Development Agreement to the City on September 19,

18 2019, with a deferral of public frontage improvements for 20 years, without any collateral for the City.

19 [Exh. R-111.03] On October 2, 2019, Mr. Sawley sent an email to Mr. Pajouh and Mr. Stevens indicating

20 that abandonment of the ROW by the City was not an option. [Exh R-112.01] Courtesy sent another draft

21 to the City in November 2019. Mr. Sawley acknowledged in an email dated November 21, 2019, that

22 although the draft terms now had sufficient commitment to protect the City's interest, there remained the

23 "sticking point" of abandonment of the ROW, that follows a different legal process and would be

24 challenging to incorporate into the Development Agreement. [Exhs. P-63.040:11-.041:2, .168]

25     130.    Courtesy sent a draft Development Agreement dated December 3, 2019, with four phases

26 to the City. The four phases included: (1) the development of the multi-franchise facilities including

27 dealership buildings and service centers, (2) a pre-owned (used) sales building and an express wash

28 building, (3) a convenience store and a food service building over the ROW and (4) a small retail use

building such as food service or other commercial use in the City's ROW. [Exh. P-63.021:4-.022:16, .042:18-.043:25, .195-.196]

131.   Rather than abandonment of the ROW, Assistant City Manager Chris Constantin continued discussions with Courtesy for possible leasing of the right-of-way land, to generate sales tax revenue, including a possible "temporary" gas station. Mr. Sawley testified that "Chris [Constantin] did go quite a bit down the road with [Mr. Pajouh] on negotiating how that [temporary] lease" would work, without abandoning the ROW. [Exh. P-63.093:2-25; .095:4-11] Mr. Sawley explained that "[w]e're not taking away the right-of way but we're going to let something happen on it." [Exh. P-63.095:4-11]

132.   In February 2020, Mr. Constantin suggested, as an alternative to the Development Agreement, to finance the public improvement infrastructure costs and development impact fees through the state government's Statewide Community Infrastructure Program ("SCIP"). [Exh. P-63.220] The SCIP option would have covered the City standard improvements, but not all the improvements that were included in the Development Agreement, such as light pole heights, signage requirements, and parking spaces on the property. [Exh. P-63.017:18-25; .097:11-25] Mr. Sawley described it as "government morass programs" that Courtesy would have "to wade into and get money out of." [Exh. P-63.20:5-9]

133.   Mr. Sawley testified he did not make the Development Agreement a priority during COVID-19 because it did not require a 30-day turnaround. He testified: "[t]here was a little less heat on getting it processed." [RT Vol. III 11:14-24] Development Agreements were not "the highest priority [during COVID-19]." [Exh. P-63.028:4-9]

134.   Mr. Sawley was a less active participant during 2020 in the negotiations of the Development Agreement because of other duties he had related to COVID-19. Chris Constantin became more involved in order to move things forward. [Exh. P-63.024:19-.025:5; .093:2-7, .100:17-.101:6, .110:9-19] There was back and forth between the City and Courtesy during 2020, but relative to earlier responses from the City, there were delays during COVID-19. [Exh. P-63.027:16-.028:2]

135.   On August 11, 2020, Mr. Constantin wrote to Mr. Pajouh and sent a redline version of the Development Agreement. [Exh. P-23.001-.002] Mr. Constantin stated "the DA [Development Agreement] should not be a stumbling block for your project as the critical path for the development is the Community Development portions that currently include the ARHPB [Architectural Review and

1   Historical Preservation Board ("ARHPB" or "ARB")]. Thus, we can continue to refine and finalize this

2   DA." [Exhs. P-23.001; RT Vol. VI 205:10-206:17] Mr. Pajouh testified that Mr. Constantin also verbally

3   assured him that a Development Agreement was not slowing down the process. [RT Vol. VI 202:19-

4   203:9]

5        136.    The ARB approves new construction projects through a public hearing and one that

6   Courtesy had to go through. [RT Vol. VI 92:15-23; Exhs. P-63:101:21-102:21; P-66.002:18-21; R-

7   159.09-.10] The ARB design review approval process is a City requirement that the County does not

8   have. [Exh. P-63.101:25-102:2] Before taking the project to the ARB, Mr. Sawley asked Courtesy to

9   work out a variant of the design of the collision center to make it look more appealing, which caused a

10  delay. [Exh. P-63.102:22-.103:10] The ARB presentation occurred in the fourth quarter of 2020. [RT

11  Vol. I 210:20-24; Vol. II 52:25-53:17]

12       137.    As late as November 2020, Mr. Pajouh and Mr. Constantin, with Mr. Sawley and others

13  present, discussed changing the lease terms for the ROW from 40 to 30 years, with a 10-year grace period

14  to build and the ability to finance over 20 years. [Exh. P-29.004]

15       138.    The City staff returned to work in early 2021 (although the buildings remained closed),

16  which allowed the project to gain some momentum. [Exh. P-62.052:17-.053:9, .083:17-24, .164:11-24]

17  In February 2021, Mr. Sawley said "things seemed to be getting more urgent" with regard to finalizing

18  the Development Agreement. [Exh. P-63.104:16-105:11, 106:23-107:3; 121:2-16] The project had to be

19  approved by the Planning Commission, which was accomplished on or about February 11, 2021. [RT

20  Vol. III 85:17-23, 87:21-88:4, 89:9-24; Exh. P-29.001] It then was reviewed by the City Council for two

21  meetings and approved by the Chico City Council via ordinance, in February 2021. Lastly, 30 days had

22  to elapse for the ordinance to take effect and before it could be recorded. It was approximately a three-

23  month process. [RT Vol. III 87:15-19; Exh. R-150.01]

24       139.    Bruce McClure, the point person with the Building Department, left the City a number of

25  months before the Courtesy permits were issued. After his departure, City staff could not find pertinent

26  documents so "they were trying to piece the puzzle back together" and Mr. Seegert had to submit

27  replacement documents. [RT Vol. II 164:4-18, 165:2-12] Additionally, it took weeks between when

28  Courtesy was told the permit was approved and issuance of the permit due to the City taking a

1    considerable amount of time to calculate the fees owed. [RT Vol. II 161:15-162:8, 162:24-163:22]

2    140.    Cal Water, a private purveyor, requested that Courtesy and its neighboring businesses

3    make one application for water. [RT Vol. III 92:17-20; Exh. P-46.032:5-12] Courtesy formed an LLC

4    with the Butte Humane Society and another neighboring building owner, Down Range, to bring in the

5    infrastructure, including water, sewer, gas, electricity, and fiber optic cable. [RT Vol. I 177:4-16; Exh. P-

6    46.024:17-.025:3, .033:3-10] An additional demand from the City was that Courtesy and the other two

7    developments extend the City sewer trunk line for connection to the properties and pay for this expense.

8    [RT Vol. I 177:4-16; Exh. P-46.020:20-.021:15, .025:4-.026:4] The City required the sewer extension be

9    built to sufficient capacity (larger than currently needed) for potential future development of other nearby

10    properties that Courtesy and the other members of the LLC did not own. [Exhs. P-25.001-.002; P-

11    46.025:4-.026:9; P-63.122:16-.124:1]

12    141.    The City "haggled" Courtesy over the size of the storm drain pipe, wanting a surge pipe

13    bigger (oversized) than what was needed for the Courtesy development. The City finally agreed to a

14    reimbursement agreement with Courtesy for the higher costs. [Exh. P-63.122:16-.124:8]

15    142.    When asked why the City didn't just reject the proposed use of the ROW by Mr. Pajouh,

16    Mr. Sawley explained that Mr. Constantin's role was "how do we give everybody what they actually

17    need out of the deal." He continued that Mr. Pajouh was trying to salvage the project that was going to be

18    approved by the County with the ROW included and Mr. Constantin was good at exploring "the option of

19    being able to do both." Mr. Pajouh trusted that the City "would be able to work that out in a way that

20    everybody could get onboard with." [Exh. P-63.105:18-106:22] Mr. Constantin left the City in December

21    2020. [Exh. P-63.016:10-17, 017:8-17]

22    143.    Mr. Sawley believed that Mr. Pajouh "was diligently trying to move the project forward"

23    and was "diligently trying to pursue several things at once, including the main thing which is . . . the new

24    dealership buildings." [Exh. P-63.104:7-15] Mr. Sawley thought Mr. Pajouh "wanted a really sweet

25    deal," but the City needed to balance protection of the public interest and facilitating productive

26    development in the City. [Exh. P-63.111:5-17] Mr. Sawley thought it was "unfortunate that [Mr. Pajouh]

27    couldn't let go of the right-of-way sooner, but we entertained different ideas for trying to keep it in the

28    mix . . ." [Exh. P-63.104:7-12]

144.    Mr. Farabee did not recall any discussion that [Courtesy] was not moving forward nor did he have any reason to believe that Courtesy was not diligently working through the plan check process. [Exh. P-52.012:12-20, .016:23-.017:6]

145.    The plan check process and Development Agreement negotiations continued into 2021 with Mr. Sawley. The City would not issue the building permits until the Development Agreement was finalized and until the plan check process was complete. [Exh. R-150:01]

146.    On January 20, 2021, Mr. Sawley in an email indicated he was available to discuss the ROW lease but indicated that his recollection was that the lease area would be suitable for displaying vehicles, "but not so much for structures that would require building permits." He also noted that "the concern about these improvements in the ROW lease area had been narrowed down to just the underground storage tanks associated with the fuel station." If the underground tank issue could be resolved, Mr. Sawley noted that the parties were "closer to a tentative agreement than previously indicated." [Exh. P-29.003]

147.    On January 21, 2020, Mr. Sawley, following a conversation with Mr. Pajouh, sent a draft of the Development Agreement with changes to simplify and streamline the agreement and deleted the ROW. [Exh P-29.001; RT Vol. III 196:2-17] It became apparent to Mr. Pajouh that the Development Agreement would not be recommended for City approval with any reference to the proposed development of the ROW. Mr. Pajouh, in an email to Mr. Sawley on January 25, 2021, agreed to the draft Development Agreement. [Exhs. P-29.001; P-66.002:21-25, 66.021; RT Vol. III 196:2-17, 196:18-23] At this same time, Mr. Pajouh was advised that the plan check process was nearing completion. [Exh. P-66.002:25-26]

148.    The City continued to make additional project demands in 2021, which included the requirement Courtesy secure approval for the realignment of the intersection of Esplanade and Garner Lane. [RT Vol. III 82:2-18, 83:22-84:4; Exhs. P-63.119:7-120:12; R-104.24]

149.    The City also wanted Courtesy to agree to make frontage improvements on Three Sevens Lane, a private road that borders the project. Mr. Sawley succeeded in getting the public works department to drop the request. [Exh. P-63.124:9-25, .246]

150.    The Development Agreement was signed and recorded on April 16, 2021. [Exh R-104.01]

44

1    Courtesy agreed to a subordinated deed of trust on the property with the City as a lien holder. [Exhs. P-

2    63.023:1-13, .050:9-16, .056:21-23; R-104.03] The deferral of the improvements under the agreement is

3    until the first of either two triggering events: (1) 20 years or, (2) development of surrounding properties

4    such that infrastructure is already existing on those properties. The term of the agreement is 22 years.

5    [Exh. P-63.055:2-.056:18]

6        151.    Section 4.7 of the Development Agreement provided for "Special Conditions" that

7    allowed Courtesy to use non-City standards for six free-standing signs (25 feet, 6 inches), freestanding

8    light poles (28 feet), and the depth of the standard parking stalls shall be 19 feet and the drive aisle width

9    25 feet. [Exhs. P-63.097:20-.098:1; R-104.08; RT Vol. I 214:6-23, 215:2-9]

10              **(3)    The Letter of Credit (LOC) and the Amended Facility Addendum**

11       152.    Mr. Smit testified that SOA put the LOC requirement into the Stipulated Decision because

12   "[i]t's a common financial instrument that [SOA] use[s] for assurance on performance." Mr. Smit could

13   not recall if SOA had ever called a LOC. [RT Vol. VI 34:7-24] Mr. Farabee testified that SOA has the

14   practice of requiring a letter of credit for those retailers that are performing a greenfield facility project

15   such as Courtesy's project. Mr. Farabee explained that SOA does this, not in lieu of the dealer

16   performing the facility project, but as an assurance that a project will get done in a set amount of time or

17   by a certain date. [RT Vol. II 111:25-112:4, 112:10-14, 113:14-17; Vol. IV 143:13-145:20]

18       153.    Mr. Smit was the SOA person most knowledgeable and primary point of contact for Mr.

19   Pajouh. Mr. Farabee testified that "Ray [Smit] was most closely tied with [Mr. Pajouh] on this [letter of

20   credit] process." [Exh. P-52.008:2-9] Mr. Smit, according to Mr. Farabee, was the primary person

21   working with Courtesy "on trying to secure the letter of credit that the Stipulated Decision required."

22   [RT Vol. II 107:15-21]

23       154.    In March 2020, Courtesy's sales operation was shut down (service and parts remained

24   open) by the City of Chico code enforcement and Mr. Pajouh communicated that to Mr. Smit. [RT Vol.

25   VI 62:21-24, 65:10-19; Exh. P-62.079:2-6, .080:3-9, .155:3-4] Mr. Pajouh asked for the return of the

26   $750,000 deposit he had given to SOA (in lieu of a LOC) because of the uncertainty due to COVID-19.

27   [RT Vol. VII 21:9-20]

28       155.    By letter dated April 2, 2020, Mr. Smit responded to Mr. Pajouh that SOA declined to

change the terms of the Stipulated Decision and denied the request for early release of the $750,000. [Exh. R-123.14]

156.    After March 2020, Mr. Smit and Mr. Pajouh had a further discussion, and Mr. Smit followed up with an email dated April 29, 2020, stating: "I am following up on our conversation last Tuesday regarding the settlement agreement dates." [Exh. P-16.001] Mr. Smit affirmed that when he referred to "settlement agreement dates" he was referring to the Stipulated Decision. [RT Vol. VI 15:20-16:20] Mr. Smit testified in his deposition that "this noncompliance letter revolves around . . . the Stipulated Decision" and when Mr. Pajouh provided the revised dates, "it was reset."[53] [Exh. P-51.025:17-.026:4]

157.    Mr. Smit stated in the April 2020 email that "to even consider exchanging a LOC in lieu [of] your performance deposit," Mr. Pajouh needed to provide revised and definitive dates for permitting, commencing construction, completing construction, and final verification for the permanent facility. Mr. Smit noted "I know you said [that these] dates were unobtainable during our conversation, but we need solid benchmarks." Mr. Pajouh, in his reply email to Mr. Smit on the same date, noted that the $750,000 was intended to only be a bridge to the issuance of the LOC. He proposed new dates, "based upon little more than hopeful optimism." [Exh. P-16.001] Mr. Smit testified in his deposition that: "Like this is ground zero. We're in the middle of shut down. And he gives us dates to hit, revised dates. And, you know, this in the middle of everything being shut down. So, we take them. He makes a promise to us, and we accept it. I would think you build in some slack on these dates for the unexpected."[54] [55] [Exh R-123.09:3-11] Mr. Pajouh testified that Mr. Smit did not discuss with Mr. Pajouh what he meant in his

---

[53] Mr. Smit testified that he did not expect the dates that he asked Mr. Pajouh to provide would replace the Settlement Agreement dates because "I mean, the Facility Addendum Amendment and Settlement Agreement are two distinct separate things. They're mutually exclusive." But when asked why he referenced the Settlement Agreement dates in his email, he said "I might have talked to him about the Settlement Agreement," but he could not recall that particular conversation. [Exh. R-123.11:4-14]

[54] Mr. Smit could not recall the names of anyone involved in the decision-making for this email other than it was made at multiple levels and it was a "group decision." [RT Vol. VI 18:7-16, 18:25-19:11, 19:15-20:6]

[55] Despite Mr. Pajouh's description of the dates as (1) optimistic, (2) Mr. Smit testifying that he would have built in some "slack," and, (3) that Mr. Pajouh provided the dates in the "the middle of shut down," Mr. Smit testified he did not discuss the selected dates with Mr. Pajouh; he just accepted the dates. [RT Vol. VI 33:4-34:6] In his deposition, Mr. Smit said he tells "all [his] retailers to build in slack time" and that he had "said that to [Mr. Pajouh] before." [Exh. P-51.021:2-19]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  email by "hopeful optimism." Mr. Pajouh felt he had to give them dates to get his cash back in lieu of the

2  LOC. [RT Vol. VI 63:5-24]

3        158.    Mr. Pajouh testified that both parties were optimistic that they could get through the

4  pandemic but did not know how long it would take, and SOA needed dates. Mr. Pajouh thought that they

5  had an understanding that the dates would be reviewed again at a later time. [Exh. P-62.043:2-10]

6        159.    According to Mr. Smit, the purpose of the May 21, 2020, letter was "to update what

7  actually happened" and "actually to help [Mr. Pajouh] with achieving some of the financial instruments

8  needed to continue on with the project."[56] [Exh. R-101; P-51.017:6-13]

9        160.    Mr. Farabee testified that Mr. Pajouh could not secure the letter of credit and the solution

10  was to revise the Facility Addendum. [RT Vol. II 107:18-25, 108:16-20] According to Mr. Farabee, a

11  bank will request the Dealer Agreement when considering a LOC and, in this instance, the Facility

12  Addendum to the Dealer Agreement had benchmarks already missed. Therefore, it was not likely a bank

13  would extend a LOC, so SOA reset the benchmarks for Courtesy. [Exh. R-122.08:6-19]

14        161.    Mr. Graziano testified that SOA helped secure the LOC for Courtesy because SOA "really

15  did try to continue . . . we did try to work with [Mr. Pajouh]. But there was never – our intent was never

16  to extend the date another year. . . . We were hopeful we could move forward. . . . we opted to do what

17  we felt at that point in time was the right thing to do." [RT Vol. V 24:4-19] Mr. Graziano explained that

18  even though SOA sent out the letter in May 2020 with the new dates, SOA believed that they still "could

19  move forward with the dates on the Stipulated Decision." He believed that SOA reserved the right to

20  adhere to the Stipulated Decision dates. [RT Vol. V 28:10-12]

21        162.    An irrevocable standby LOC, with an issuance date of June 22, 2020, was secured from

22  BMO Harris Bank N.A.in the amount of $750,000 "at the request of and for the account of Courtesy

23  Automotive Group . . ." [Exh. J-307.01-.03] The credit was set to expire on December 16, 2021. [Exh. J-

24  307.02] The beneficiary is SOA and the credit "is available against [SOA's] draft drawn at sight on

25  [BMO]" when accompanied by Beneficiary's Certificate stating that "*Courtesy Automotive Group, Inc.*

26  *has failed to fulfill its obligations pursuant to the Facility Addendum to the Subaru Dealer Agreement*

27

28  [56] According to Mr. Smit, the Amended Facility Agreement "remedied any kind of misunderstanding [about the permit date]." [Exh. P-51.017:6-13]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

. . ." (Emphasis added.) [Exh. J-307.02] The LOC stated that "[t]his Credit sets forth in full [BMO's] undertaking and such undertaking shall not in any way be modified, amplified, or limited by reference to any document, instrument or agreement referred to in this Credit . . ." [Exh. J-307.03] The LOC was issued "to support the obligations of Courtesy Automotive Group, Inc. as outlined in the Facility Addendum to the Subaru Dealer Agreement" and BMO Bank acknowledges that Courtesy Automotive Group, Inc. has "committed" to a Subaru dealership facility, at certain identified parcel numbers in Chico, meeting all Subaru minimum standards, "by January 31, 2022." [*Ibid.*] On July 7, 2020 Amendment No. 1 was sent to the parties, amending the expiry date to July 31, 2022. [Exh. J-307.01]

163.    Mr. Smit testified that he thought the trigger date for calling the LOC would be by December 31, 2021 if completion of construction did not happen by that date. He believed Subaru could elect to call it then or sometime thereafter. [RT Vol. VI 34:25-35:11] Mr. Farabee testified that the letter of credit expires July 31, 2022, and requires that Courtesy perform under the Facility Addendum on or before January 31, 2022. In his opinion, Subaru can call the letter of credit on January 31, 2022. [RT Vol. II 113:14-17, 114:8-20, 115:5-10; Vol. IV 144:13-145:20; Exh. J-307.03]

164.    The LOC, according to Mr. Pajouh, was assurance for SOA that they would get a new facility in operation. [RT Vol. VII 20:9-21:20] The LOC cost is $7,500 per year. [RT VII 19:22-20:8]

165.    By an amendment dated May 21, 2020, and executed on May 22, 2020 ("Amended Facility Amendment"), Courtesy and SOA executed a Facility Addendum to the Dealer Agreement. [Stipulation of Facts, ¶ 10] SOA agreed to amend the Facility Addendum for the dates that Mr. Pajouh provided in his April 29, 2020, email to Mr. Smit as follows:

(1)    Obtain final permits by July 31, 2020;

(2)    Commence construction September 30, 2020;

(3)    Complete construction by December 31, 2021;

(4)    Obtain final verification by January 31, 2022.

[Exh. R-101.01-.02]

166.    In the Amended Facility Amendment, if subsequent benchmarks were missed, SOA reserved its rights under the Stipulated Decision and other agreements. The provision reads:

///

This is the final amendment of the facility benchmarks that SOA will issue. If subsequent benchmarks are missed, SOA reserves the right to exercise all remedies available under the Subaru Dealer Agreement, Facility Addendum and/or the Stipulated Decision dated March 20, 2019, including termination of your Subaru Dealer Agreement. Additionally, should the facility not be completed by the agreed upon date, *SOA will execute the Letter of Credit or Performance Bond that secures this amendment.* (Emphasis added.) [Exh. R-101.01]

167.    Courtesy failed to meet each of the following benchmarks contained in the Amended Facility Addendum:

- ▪ "Dealer obtains necessary zoning, permits and necessary government approvals for the construction of the Permanent Facility on or before July 31, 2020;

- ▪ Dealer commences vertical construction of the Permanent Facility on or before September 30, 2020;

- ▪ Dealer completes construction of the Permanent Facility, obtains all necessary licenses and permits no later than December 31, 2021;

- ▪ Dealer obtains a Final Review Verification Letter from Feltus Hawkins for compliance upon completion of the remodeling, which Verification shall be provided by Feltus Hawkins by January 31, 2022." [Exh. R-101.02]

///
///
///
///
///
///
///
///
///
///
///
///
///

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

**Chart Showing the Differing Benchmarks**

168.    The following chart compares the four pertinent benchmark dates under the Stipulated

Decision with those under the Amended Facility Addendum, the date the deadline was or was not

achieved and the number of months of delay.

| Benchmark | Stipulated Decision deadline<br>Board Adopted<br>April 9, 2019 | Amendment to Facility Addendum to Subaru Dealer Agreement<br>(May 21, 2020) | Achieved deadline |
|---|---|---|---|
| Paragraph 16.b: Secure all government approvals and construction permits | December 1, 2019 | July 31, 2020<br>(8-month extension) | The permit for the Subaru/ Volvo building was issued on April 30, 2021; 9-months late. |
| Paragraph 16.c: Commence construction | January 30, 2020 | September 30, 2020<br>(8-month extension) | Ground-breaking on June 28, 2021, and construction began shortly thereafter: 9-months late. |
| 16.d: Complete construction of Subaru sales facility | January 31, 2021 | December 31, 2021<br>(11-month extension) | Completion of construction is delayed at least 16-18 months (December 2022) and/or until April 2023. |
| 16.e: Final Review Verification letter | March 1, 2021 | January 31, 2022<br>(11-month extension) | No information in this regard. |

[Exhs. J-300.33-.36; J-101; R-101; R-142]

**Overview of Courtesy's Permits, Groundbreaking and Construction**

169.    Courtesy was issued construction permits on April 30, 2021, and obtained all government

approvals on May 3, 2021, with the exception of the service building. [Exh. R-142.01] The service

building was submitted to the City for plan check and a response was received with a few remaining

items. [RT Vol. II 124:22-126:2; Vol. V 108:16-109:7] Mr. Seegert testified that he believed that the

permit for the service center building would be issued approximately six weeks from September 15,

2021. The service center building would not delay construction or overall completion of the sales

buildings. It would be completed before the sales buildings. [RT Vol. II 126:7-19, 188:11-25]

170.    Mr. Seegert explained that each building has its own permit and has to have its own

certificate of occupancy. [RT Vol. II 190:11-25] The Subaru/Volvo building will be completed first. Mr.

Seegert testified that "it is highly conceivable" that the Subaru/Volvo building could open first, prior to

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  the other buildings, particularly given its location at the farthest north end of the site. [RT Vol. II 191:1-

2  15]

3     171.    Permits for the infrastructure for water, sewer, electric, gas and fiber optic cable were

4  obtained prior to the permits for the buildings, and construction started on those projects in the first

5  quarter of 2021. [RT Vol. II 55:16-24, 56:2-12] Groundbreaking on the site was June 28, 2021, and

6  construction on the multi-franchise buildings commenced shortly thereafter. [RT Vol. II 189:1-9] At the

7  time Mr. Seegert testified in October 2021, less than 10 percent of the work had been completed and 18

8  percent had elapsed of the total time allotted for the project.[57] [RT Vol. V 74:22-75:3, 77:19-22] The next

9  task is the footings and pouring of slabs for all three buildings, and structural steel is expected in January

10  2022. [RT Vol. V 78:12-79:12, 81:1-5]

11     172.    All of the buildings include a prefabricated steel component. According to Mr. Seegert,

12  there is a huge back-up of prefabricated steel components in the industry. [RT Vol. II 126:20-127:23]

13  The dealership buildings include design build, pre-engineered steel joists in the roof system, that only a

14  handful of companies on the west coast make. [*Ibid.*] The service center is a pre-engineered metal

15  building that has the same supply availability issue as noted above. The normal lead time for a metal

16  building is six months; it is now a year or more. [RT Vol. II 127:24-128:9, 129:9-23] Mr. Seegert ordered

17  these items before receiving the permits, some four-to-five months prior to his testimony in September

18  2021 and anticipates delivery between February and March 2022. [RT Vol. II 128:10-129:4; Vol. V

19  81:6-9]

20     173.    The original timeframe for completion of construction was 16-18 months (or

21  approximately the end of 2022). However, because of long lead time for steel components, the

22  Subaru/Volvo building will not be completed until April 2023.[58] [RT Vol. II 189:10-18; Exhs. P-45.003;

23  P-62.047:20-25] Mr. Pajouh testified that Mr. Seegert's goal is to have the three sales buildings and the

24  service center obtain a certificate of occupancy by December 31, 2022. [RT Vol. VII 18:15-20, 45:1-22]

25  ///

---

[57] Mr. Seegert explained that the total time for the project from June 28, 2021, to March 20, 2023, is 438 workdays. At the time of his testimony, on October 19, 2021, 80 workdays had elapsed, and there were 358 workdays left. [RT Vol. V 74:4-20, 75:1-3]

[58] Mr. Seegert said he is 90% certain of the project closeout date of April 2023. [RT Vol. V 109:14-110:3]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

**The Impact on Courtesy's Multi-Franchise Project if its Subaru Franchise is Terminated**

174.    It would be catastrophic, according to Mr. Pajouh, if Subaru was not part of Courtesy's project. [RT Vol. VI 216:20-23] The project would proceed "to the extent it can" if the Subaru franchise was terminated because of the obligations to the other businesses. However, Mr. Pajouh explained that Subaru, being its biggest volume, accounts for over 40 percent of unit sales in generating cash flow, and is thus, an integral part of Courtesy's business. [RT Vol. VI 216:24-218:25; Vol. VII 8:1-11]

175.    According to Mr. Pajouh, losing the Subaru franchise would "put a financial burden on the whole organization of the volume that we do, the gross profit, the cash flow, the number of employees . . . . [it] would put financial constraint on the organization because now we have the carrying cost of something that's not producing -- generating revenues, gross profit, and everything that it takes for us to continue with [the] total project." [RT Vol. VI 219:1-220:18] Mr. Pajouh testified that "I don't know how the bank would behave with the revenues being lost and not having the franchise . . . . the bank has that as part of their calculation of them approving the financing." [RT Vol. VII 8:1-11] Termination of the Subaru franchise would impact the funding of the entire project because "the funding is based on the whole package, which is all the franchises and the total revenue and gross profit . . ." [RT Vol. VI 232:7-15]

176.    Courtesy's cost for the remodeling of its current location was approximately $225,000-$250,000. [RT Vol. VI 61:25-62:3] The construction cost for the single Subaru/Volvo building is shown on the permit as approximately $2.5 million. [Exh. R-142.01] As of April 2021, Courtesy had spent $5,990,632 on the project. [Exh. P-42.005] From April until the time of Mr. Pajouh's testimony in October 2021, Courtesy spent approximately another $500,000. [RT Vol. VII 6:13-21, 7:2-13] Courtesy's investment in acquisition of the site was $2.8 million. [RT Vol. VI 52:5-7] The $6.5 million in upfront costs plus the purchase price of the property constitutes 20 percent participation by Courtesy in the total cost, apart from furniture, fixtures and equipment ("FF&E"). FF&E costs are estimated to be $4 million for a total cost of the project at $34 million. [RT Vol. VII 43:16-44:16] Mr. Pajouh has a construction loan of $23.5 million and obtained the latest loan approval in May 2020. [RT Vol. VI 50:13-19, 214:10-12, 214:25-215:18; Vol. VII 22:1-2] Mr. Pajouh testified that the delay in having the multi-franchise facility built is costing Courtesy in the tens of thousands of dollars in property carrying costs and

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

insurance every month that it is not completed. [Exh. P-62.046:22-.047:3]

177.   Courtesy spent approximately $7.6 million to purchase all of the dealerships, including goodwill and hard assets. Mr. Pajouh estimated that the Subaru franchise portion of that cost is about 40 percent or approximately $3 million. [RT Vol. VII 11:3-12:2] Should Mr. Pajouh's franchise be terminated, he would lose not only the investments made in the temporary facility, and 40 percent of the $6.5 million, but also the $3 million investment made in purchasing the Subaru dealership. [RT Vol. VII 10:18-11:2]

### Subaru's Damages

178.   Mr. Smit testified that he searched in August 2021 on a local commercial real estate website for properties that might be available in Chico for a replacement dealer. He identified 2522 and 2520 Cohasset Road as for sale, the properties that Courtesy is currently occupying with its other franchises.[59] [RT Vol. VI 6: 2-20, 7:8-15, 10:8-11:6] Mr. Sawley, the senior City planner, knew of no other vacant locations in Chico that could be used as a location for a dealership, other than where Courtesy is currently located. [RT Vol. III 208:1-19] Mr. Graziano did not know of any vacant dealership properties in Chico. [RT Vol. IV 187:4-6]

179.   According to Mr. Smit and Mr. Graziano, it would be acceptable to SOA to move another dealer into the East Avenue site currently occupied by Courtesy, which is, according to SOA, deficient and unacceptable. [RT Vol. VI 8:1-13; Vol. IV 219:1-9] Mr. Graziano testified he had a high level of certainty that SOA could find a qualified dealer to replace Courtesy and his estimate is that it would take approximately 90 days to find one. [RT Vol. IV 186:8-18, 214:23-215:4] SOA would have at least a 90-day disruption of sales and service during that time. [RT Vol. IV 187:12-21, 188:6-17]

180.   The search for another Subaru candidate to operate in Chico involves the process of vetting candidates' applications-including their capital, management, and ability to find an acceptable facility solution. A review of the plans for a permanent location by Feltus Hawkins would be required, but SOA could go forward with a facility design intent and an addendum under a sales and service agreement that the new facility would be built within a certain time. [RT Vol. IV 214:23-215:4, 218:17-

---

[59] These premises are under lease to Courtesy and Mr. Pajouh is negotiating an addendum to the lease to extend the lease until December 2022. [RT Vol. VI 224:8-10; Vol. VII 15:10-17]

219:19; Vol. V 41:1-13, 47:14-48:3, 48:4-21] Mr. Graziano indicated that although SOA is not excited about Courtesy's current location, SOA could continue selling cars there by taking over the existing Courtesy lease, and "figure out a way to handle service." [RT Vol. IV 187:4-188:5; Vol. V 20:12-21:1, 51:10-17] Mr. Graziano noted it is difficult to estimate how long it would take to get another Subaru dealership up and running, but something less than a year. [RT Vol. IV 220:3-8; Vol. V 32:8-21]

181.    SOA is frustrated that Subaru owners' car repair services are not being provided in a Subaru facility, which impacts retaining repeat Subaru customers. [60] [RT Vol. IV 80:17-81:21] From a frequency of "customer touch," service is 15 to 20 times more frequent compared to sales. [RT Vol. IV 116:2-20] A metric used for measuring customer experience is the "Net Promoter Score" based on a survey. Courtesy's scores for both sales and service are historically the bottom ninth or tenth out of 10 stores in their zone, which encompasses the area of Sacramento to Redding.[61] [RT Vol. IV 81:15-21; Exh. R-178.20, .23, .26, .30] According to SOA, it is harmed by service being done at a non-Subaru-branded service department and a sales facility that does not have appropriate parking. These impact "the customer experience" and, according to Mr. Graziano, are "long term impacts for this brand." [RT Vol. IV 158:6-24] Mr. Farabee and Mr. Graziano both agreed that those damages are hard to quantify. [RT Vol. IV 81:1-9, 81:23-82:10, 117:8-13, 159:2-9] Mr. Graziano testified there is no dollar amount to compensate SOA. He noted that SOA is not looking for money – that the LOC is really more of an insurance policy and "not in lieu of a retailer doing what is required." [RT Vol. IV 176:24-177:8]

182.    SOA asserts that COVID-19 was not an impediment to Courtesy building their multi-franchise facility nor did the wildfires have anything to do with Courtesy's failure to meet the benchmarks. [RT Vol. IV 185:13-17, 228:4-11, 231:15-23] Mr. Graziano pointed out that 30-plus Subaru dealership facilities are being built in the region during COVID-19 and 10-13 facilities were completed. [RT Vol. IV 180:17-181:6] Mr. Smit testified that there are approximately six greenfield projects in the San Francisco zone. [RT Vol. V 177:10-20; Vol. IV 205:2-13] Of all these other pending SOA projects,

---

[60] SOA witnesses testified that service is more important than selling cars to SOA, and yet there is no indication that there is any place available in Chico for servicing vehicles if SOA awards a franchise to another dealer in Courtesy's place.

[61] Some of the comments in the survey relate to the location (ease of access to the facility, waiting area and availability of parking) and some relate to servicing of the vehicle (responsiveness to needs and cleanliness of the vehicle on return). [Exh. R-178.04, .10, .14, .23]

the only project that is somewhat similar to Courtesy's project is One Subaru in Hayward, California, which is scheduled to be completed in the Spring of 2022. [RT Vol. II 111:13-14; Vol. III 229:18-230:5; Vol. VI 45:13-24] One Subaru, like Courtesy, is being built on completely vacant land. However, Mr. Farabee did not know whether it was totally undeveloped land with no utilities running to it, as is the case with Courtesy's property. [RT Vol. III 227: 20-25, 229:18-230:5] One Subaru is being built at a cost of approximately $42 million, including $3 million for earthquake remediation. Mr. Smit did not know how much of that total cost was for purchase of the land. [RT Vol. III 228:25-229:3; Vol. VI 36:5-9, 41:6-17] According to Mr. Smit "substantial construction" started in 2020 on that project in the form of foundations poured and installation of earthquake mitigation systems. [RT Vol. VI 42:25-43:11]

## ANALYSIS

183.    This case is very difficult because of the important and significant public policy supporting settlement agreements and enforcement of the Board's Stipulated Decision and Order. However, that public policy is not inviolate, and in the proper circumstances, where there are other competing public policies, there must be a balancing. Enforcement of the agreement may have to give way to other public policy concerns. In the related contexts of enforcement of settlements under Code of Civil Procedure section 664.6, the California Supreme Court has ruled that Section 664.6[62] does allow a court to enforce a provision in a settlement agreement or stipulation which is illegal, contrary to public policy, or unjust. [See *California State Auto Assn. Inter-Ins. Bureau* v. *Superior Court* (1990) 50 Cal.3d 658, 664]

184.    Along the same lines, "[t]he case law uniformly treats a settlement agreement as a contract subject to all the [usual and] normal legal and statutory contractual requirements." [*Timney* v. *Lin* (2003) 106 Cal.App.4th 1121, 1127] "A settlement agreement is in the nature of a contract and is therefore governed by the same legal principles applicable to contracts generally." [*In re Marriage of Hasso* (1991) 229 Cal.App.3d 1174, 1180-1181] The validity of this Stipulated Decision and Order must be judged by

---

[62] Code of Civil Procedure section 664.6(a) provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

the same legal principles applicable to contracts generally. [*Weddington Productions Inc.* v. *Flick* (1998) 60 Cal.App.4th 793, 810-811] There is a strong public policy favoring settlement of litigation, but that "policy does not excuse a contractual clause that is otherwise illegal or unjust." [*Timney* v. *Lin, supra,* 106 Cal.App.4th at 1127]

185.    SOA's counsel noted at the hearing that nothing in Code of Civil Procedure section 664.6 authorizes "a judge to create the material terms of the settlement [agreement]" citing *Hernandez* v. *Board of Education* (2004) 126 Cal.App. 4th 1161, 1176. [RT Vol. I 21:15-18] The court in *Hernandez* notes that when enforcing settlement agreements, the court "is powerless to impose on the parties *more restrictive or less restrictive or different terms* than those contained in their settlement agreement." (Emphasis added.) [*Ibid* at p. 1176] However, no different terms or more restrictive terms are being imposed here. The terms of the agreement were set by the parties and they are "material failure to comply."

186.    There are the understandable frustrations endured by SOA because of the delays, along with the real-life complications for Courtesy initially being in the County's jurisdiction, and then, suddenly thrust into the City's more onerous and complex jurisdiction following a "land speed record" annexation. Then, the devastating Camp Fire occurred in 2018, with its attendant ramifications on Chico and, consequently, on Courtesy during 2019. Next, a worldwide pandemic occurs in March 2020 and the State of California issues the COVID-19 stay-at-home order. The consequences of the order included business disruption impacts and restrictions generally, and specifically resulted in difficulties imposed on City staff to timely process the Development Agreement and plan check reviews. The City told Mr. Pajouh that they would not abandon the ROW as part of the Development Agreement, but they entertained the option of a lease on the ROW until at least mid-January 2021. [Exh. P-29.003-.004; RT. Vol. III 202:21-25, 204:11-22; Vol. VI 82:16-19, 84:1-7] The pandemic restrictions and City negotiations delayed the permits being issued to Courtesy, with its attendant consequences on Courtesy's inability to complete its facility under the original benchmarks. Once Mr. Sawley told Mr. Pajouh he needed to abandon the development of the ROW, the necessary hearings were held and the permits issued. Lastly, there are the enduring disruptions from the now two-year global pandemic which continue to wreak havoc on the project, with supply chain issues related to materials and supplies.

187.    SOA asserts that the wording of the Stipulated Decision eliminates the need for any balancing of factors by the ALJ. However, as noted above, the Stipulated Decision does not provide that good cause existed at that time of the execution of the Confidential Agreement for the termination of the Protestant's franchise, but rather, the parties agreed that Courtesy's *failure to comply with any of the conditions in the Stipulated Decision* shall constitute good cause to terminate the SOA Dealer Agreement between them under Sections 3060 and 3061. [Exh. J-301.18:11-13] The conditions outlined in the Stipulated Decision are whether the Protestant *materially failed* to comply.

**Incorporation by Reference**

188.    The Stipulated Decision and the Facility Addendum had the same benchmarks for the Courtesy facility project and the Stipulated Decision was incorporated by reference into the Facility Addendum. [Exhs. J-301.13 ¶16; J-300.34 ¶4] Incorporation by reference is almost universally held "to mean the inclusion, within a body of a document, of text which, although physically separate from the document, becomes as much a part of the document as if it had been typed in directly. [*Republic Bank* v. *Marine Nat. Bank* (1996) 45 Cal.App.4th 919, 922] Black's Law Dictionary (11th ed. 2019) page 916, defines the phrase to mean "[a] method of making a secondary document part of a primary document by including in the primary document a statement that the *secondary document should be treated as if it were contained within the primary one*." (Emphasis added.) "A written agreement may, by reference expressly made thereto, incorporate other written agreements; and in the event such incorporation is made, the original agreement and those referred to must be considered and construed as one." (Citations omitted.) [*Republic Bank, supra,* 45 Cal.App.4th at 923][63]

189.    The Stipulated Decision and Facility Addendum must be considered and construed as *one document*. The Stipulated Decision is as much a part of the Facility Addendum as if its terms "were recited verbatim." [*Republic Bank, supra,* 45 Cal.App.4th at 921] When SOA executed the Amended

---

[63] In *Republic Bank* the master lease, which had an attorney's fees clause, was incorporated by reference into the sublease. There were provisions in the master lease that differed from or even were inconsistent with the sublease and the master lease had an integration clause. The subleasee argued that due to those differences, the parties did not intend the relationship to be governed by the master lease. The court rejected that argument and held that just because there were overlapping or inconsistent provisions, does not mean "that the parties *necessarily* intended that *no* provisions of the master lease *could possibly* be incorporated into the sublease." (Emphasis in original) [*Republic Bank, supra,* 45 Cal.App.4th at 924-925]

Facility Addendum, it amended the Stipulated Decision also and new benchmarks for both were set. Those new dates are the dates by which Courtesy's actions must be reviewed.

190.    Further, SOA's argument that the integration clause in the Stipulated Decision, which provides that the agreement is not modified or affected by any other agreement between the parties, is not applicable because integration clauses only discharge prior agreements or contemporaneous oral agreements. Integration clauses do not affect subsequent amendments.[64]

**Promissory Estoppel**

191.    An additional basis for the holding that the Amended Facility Addendum also changed the dates as to the Stipulated Decision, is the doctrine of promissory estoppel. The execution of the May 2020 Amended Facility Addendum by SOA is relevant to these proceedings because it induced reliance by Courtesy. SOA essentially authorized Courtesy additional time to secure permits and commence construction beyond the dates set forth in the Stipulated Decision and the Facility Addendum, and Courtesy continued with the project in reliance on those extensions.

192.    Courtesy provided to SOA a $750,000 cash deposit which was a bridge to the issuance of the LOC provided for in the Stipulated Decision. [RT Vol. VI 56:2-6; Vol VII 21:9-20] In March 2020, Mr. Pajouh asked for the return of the $750,000 deposit he had given to SOA, in lieu of a LOC, because of the uncertainty due to COVID-19. [RT Vol. IV 58:21-59:2, 125:3-12; V 22:19-25; VI 62:19-63:15, 65:10-25; VII 21:9-20] On April 29, 2020, Mr. Pajouh again requested the cash deposit be released to him upon issuance of the LOC. Mr. Pajouh said to Mr. Smit: "SOA is well aware of the size and scope of [the] facility project. We did not anticipate having $750,000 in cash locked up for the duration of the project. . . .  My builder and architect are doing all they can to expedite final approval . . . " [Exh. P-16.001]

---

[64] See California Code of Civil Procedure section 1856(a): "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement." Subsection (h) of section 1856 provides that "agreement" includes contracts. See also Uniform Commercial Code (UCC) section 2202: "[t]erms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented." A franchise includes sale of vehicles so a franchise is a transaction in goods and thus, within the UCC Division 2 – Sale of Goods.

193.     SOA argues that the Amended Facility Addendum benchmarks were for the sole purpose of permitting Courtesy to get its money back and secure a $750,000 LOC in its place. SOA claims it always intended to hold Courtesy responsible for the admittedly unachievable timelines, containing benchmarks already missed, set forth in the Stipulated Decision. If SOA's claim is true, SOA possibly mislead the bank by issuing the Amended Facility Addendum with knowledge and expectation the bank would rely on this document in making the determination to issue the LOC. SOA tried to keep the Amended Facility Addendum and the Stipulated Decision separate, as well as the different benchmarks. However, there is sufficient evidence (separate and apart from the fact that the Facility Addendum incorporated the Stipulated Decision, making them one) that Mr. Smit believed that the new agreed dates also changed or reset the Stipulated Decision benchmarks and conveyed that to Mr. Pajouh. [Exh. P-16.001-16.002]

194.     SOA's assertion that the Amended Facility Addendum has no effect on the benchmarks in the Stipulated Decision must fail. According to Mr. Graziano, SOA wanted to continue the project and work with Mr. Pajouh. This was done certainly with the expectation that Courtesy would rely on that extension and would attempt to comply with the dates in the Amended Facility Addendum, continue to expend funds, and start construction of the facility, which it has done.

195.     The Amended Facility Addendum was completed so the bank would issue the LOC, since the dates in the Facility Addendum (which incorporates the Stipulated Decision) had expired. Mr. Smit testified that the new dates were to "make him [Mr. Pajouh] *comply with what was going on with COVID, take that into account*. And I think it was really to help him establish a letter of credit." (Emphasis added.) [Exh. R-123.10:13-24] The Amended Facility Agreement was "to update what actually happened, and . . . to help [Mr. Pajouh] with achieving some of the financial instruments needed to continue on with the project." [Exh. P-51.017:6-13] Courtesy's bank issued the LOC noting that Courtesy had committed to a Subaru dealership in Chico "meeting all [SOA] minimum standards . . . by January 31, 2022" which is the date agreed to for final verification by Feltus Hawkins. [Exh. J-307.03] Thus, the LOC was issued in reliance on the amended dates and Mr. Pajouh continued the project also based on that reliance.

196.     The April 2020 email from Mr. Smit, the SOA person closest to the project, asking for

new benchmarks to be included in the 2020 Facility Addendum specifically states: "I'm following up on our conversation last Tuesday *regarding the settlement agreement dates*. At this point, to even consider exchanging a LOC in lieu of your performance deposit we need revised and definitive dates for the [permits, commencement of construction, completion of construction and final verification] benchmarks." (Emphasis added.) [Exh. P-16.001] Mr. Smit even testified the letter of noncompliance revolves around the Stipulated Decision and when Mr. Pajouh provided the revised dates "it was reset." SOA issued the Amended Facility Addendum with the expectation that Courtesy would continue its efforts to perform by complying with the amended benchmarks and construct the facility as agreed.[65] This conclusion is supported by the fact that, although the Letter of Non-Compliance referenced the missed benchmark dates from the Stipulated Decision, it was not sent until August 24, 2020, after Courtesy missed the new date of July 31, 2020 for obtaining its permit. [Exh. J-303.01]

197.    Without the LOC, the project probably could not continue since Mr. Pajouh needed his $750,000 returned to continue the project. It seems unlikely that the bank would have issued a LOC to support the construction performance and completion by Courtesy in this instance if it knew there were other dates that SOA could rely on to terminate the dealership. It is simply not credible to think the bank would have issued the LOC had it known that SOA would use the Stipulated Decision with dates different from, and older than, those in the Amended Facility Addendum to affect the rights of Courtesy so drastically as to terminate its Subaru dealership. It is unclear if the bank was even aware of the existence of the Stipulated Decision.

198.    California has adopted the Restatement Second of Contracts § 90 doctrine of promissory estoppel: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." [*Kajima/Ray Wilson* v. *Los Angeles County Metropolitan*

---

[65] Mr. Smit's contradictory testimony that the LOC had nothing to do with the Stipulated Decision is not credible. When asked if the dates he was asking Mr. Pajouh to provide would replace the settlement agreement dates, Mr. Smit stated that "[a]bsolutely not. I mean the Facility Addendum Amendment and Settlement Agreement are two distinct separate things. They're mutually exclusive." But when asked why he referenced the settlement agreement in his email, Mr. Smit said: "I might have talked to him about the Settlement Agreement. I can't recall that particular conversation. . . . [w]e were trying to get him so he could get his letter of credit and *comply with the financial instrument required by the Stipulated* [*Decision*]." (Emphasis added.) [Exh. R-123.11:4-24]

1  *Transportation Authority* (2000) 23 Cal.4th 305, 310, citing Rest. 2d Contracts, § 90] Promissory

2  estoppel binds a promisor "when he should reasonably expect a change of position, either by act or

3  forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." (Citation

4  omitted.) [*Jones* v. *Wachovia Bank* (2014) 230 Cal.App.4th 935, 944]

5      199.    The elements needed for application of promissory estoppel are:

6      (1)    A promise clear and unambiguous in its terms;

7      (2)    Reliance by the party to whom the promise is made;

8      (3)    The reliance must be both reasonable and foreseeable; and

9      (4)    The party asserting the estoppel must be injured by his or her reliance [detrimental

10  reliance]. [*Granadino* v. *Wells Fargo Bank, N.A.* (2015) 236 Cal. App. 4th 411, 416]

11      200.    A "promise" is "a person's assurance that the person will or will not do something."

12  [Black's Law Dict. (11th ed. 2019) p. 1466] A promise to employees that if they continued to work for a

13  company until it was sold, they would be paid a bonus from the sale proceeds that would be sufficient for

14  them to retire, was enforceable under the doctrine of promissory estoppel when the employees turned

15  down other offers of employment because they did not want to lose the retirement allowance. [*Moncada*

16  v. *West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768]

17      201.    Promissory estoppel binds a promisor "when he should reasonably expect a substantial

18  change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided

19  only by its enforcement." [*Garcia* v. *World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1041, quoting

20  *Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 249] The court of appeal in *Garcia*

21  explained that "[t]he vital principle is that he who by his language or conduct leads another to do what he

22  would not otherwise have done shall not subject such person to loss or injury by disappointing the

23  expectations upon which he acted. (Citations omitted)." [*Ibid.*] Because promissory estoppel is an

24  equitable doctrine, "courts are given wide discretion in its application." [*U.S. Ecology, Inc.* v. *State of*

25  *California* (2005) 129 Cal.App.4th 887, 902]

26      202.    As noted above, the April 29, 2020, email from Mr. Smit demanded revised and definitive

27  dates from Mr. Pajouh for the benchmarks. According to Mr. Farabee, Mr. Smit was the SOA person

28  most knowledgeable and primary point of contact for Mr. Pajouh. "Ray [Smit] was most closely tied with

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1  [Mr. Pajouh] on this process." [Exh. P-52.008:2-9] Mr. Smit testified the letter of noncompliance

2  revolved around the Stipulated Decision, stating when Mr. Pajouh provided the revised dates, he

3  confirmed that: "I mean, this noncompliance letter revolves around, you know, the Stipulated Decision.

4  It just – he [Mr. Pajouh] gave me the dates. It was reset." [Exh. P-51.025:23-.026:1] When Mr. Smit

5  followed up and asked for the permit that he thought Courtesy had obtained in November 2019, and it

6  could not be produced, he said: "[s]o, we had to correct [the dates]." [Exh. P-51.013:5-10]

7        203.    Additionally, the Amended Facility Addendum itself notes that "[t]his is the final

8  amendment of *the facility benchmarks* that SOA will issue. *If subsequent benchmarks are missed*, SOA

9  reserves the right to exercise all remedies available under the Subaru Dealer Agreement, Facility

10  Addendum *and/or the Stipulated Decision* dated March 20, 2019." (Emphasis added.) [Exh. R-101.01]

11  The letter does not say this is the final amendment to the Facility Addendum – it says it is the final

12  amendment to the *facility benchmarks*. There is little doubt that the new benchmarks are applicable to

13  both documents. Both had the same initial benchmarks for the permanent facility.[66] Both the testimony of

14  Mr. Smit (the person most familiar with the project and the person others at SOA deferred to) and his

15  contemporaneous email referencing the Stipulated Decision connect the resetting of the benchmarks to

16  the Stipulated Decision.

17        204.    SOA knew Courtesy would act upon such an extension and Courtesy did so act by

18  continuing to send in numerous revised plans and to negotiate the Development Agreement with the City

19  so Courtesy could get the necessary permits and start construction. In *Wade* v. *Markwell & Co.* (1953)

20  118 Cal.App.2d 410 the court found detrimental reliance where a coat owner, who had given her coat as

21  security for a loan, was prepared to redeem her coat, but was induced by the lender to forbear from

22  immediately redeeming the coat under the assurance that it would be held for a week. She refrained from

23  exercising her right to redeem for the extra week in reliance on the lender's oral representations, only to

24  have the coat sold. Mr. Pajouh's discussions with Mr. Smit that the dates had been "reset" induced him to

25  believe the extension applied to the Stipulated Decision, as well as the Amended Facility Amendment.

26  Mr. Pajouh's reliance was reasonable and foreseeable given the key role of Mr. Smit. Further, it makes

27  _____

28  [66] The Facility Addendum set specific dates for the provision of the LOC (July 14, 2019) and for when the inspection of the leased premises was to be completed by SOA (July 18, 2019). [J-Exh. 301.33-34]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

1    no sense to have two different deadlines for the same events. The execution of the Amended Facility

2    Addendum induced reliance that SOA authorized Courtesy additional time to secure permits and

3    commence construction, beyond the dates set forth in the Stipulated Decision. SOA understood that it

4    could not seek termination before the newly set permit issuance date of July 31, 2020, which is supported

5    by the non-compliance letter not being sent until August 24, 2020.

6         205.    The fourth element of promissory estoppel of injury, sometimes described as "injustice

7    can be avoided only by enforcement of the promise," is substantively the same principle as the

8    requirement of unconscionable injury. [*Munoz* v. *Kaiser Steel Corp.* (1984) 156 Cal.App.3d 965, 974,

9    distinguished on other grounds in *Dalkilic v. Titan Corp.* (S.D. Ca 2007) 516 F. Supp. 2d 1177, 1194]

10   Unconscionable injury results from denying enforcement of an agreement (or a provision of an

11   agreement) after one party is induced by another party to seriously change position relying upon the

12   agreement. [*Siam Numhong Prods. Co.* v. *Eastimpex* (N.D. Cal. 1994) 866 F. Supp. 445, 448; Rest.2d

13   Contracts, § 139]

14        206.    The dates were reset due to COVID-19 and to secure the LOC. Courtesy changed its

15   position in reliance on the new dates and relied on those dates to its injury, in not only the expense of the

16   LOC, but also in continuing to expend time, effort, and money to get the plans approved, the permits

17   issued, and the buildings constructed. It would be unconscionable for SOA to deny it did not modify the

18   deadlines outlined in the Stipulated Decision by entering into the Amended Facility Addendum with

19   Courtesy and agreeing to those dates set forth as the revised (reset) applicable dates for the project. To

20   assert that the change only applies to the Amended Facility Addendum and to subject Courtesy to

21   termination based on the earlier dates would be an unconscionable injury.

22                              **Conditions Versus Promises**

23        207.    In the Stipulated Decision, the terms "conditions," "deadlines," "benchmarks," and

24   "milestones" seem to be used interchangeably. Section 1436 of the California Civil Code defines a

25   condition precedent as one "which is to be performed before some right dependent thereon accrues, or

26   some act dependent thereon is performed." Although the Restatement avoids the terms "condition

27   precedent" and "condition subsequent," preferring the word "condition" alone to define the former

28   concept (see Rest.2d Contracts, § 224, com. e), the definition it provides is essentially the same for

1    purposes of the issue in this case: "A condition is an event, not certain to occur, which must occur, unless

2    its non-occurrence is excused, before performance under a contract becomes due." [Rest.2d, Contracts, §

3    224]

4          208.    "The existence of a condition precedent normally depends upon the intent of the parties as

5    determined from the words they" use in a contract. [*JMR Construction Corp.* v. *Environmental*

6    *Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 593-594, modified and

7    rehearing denied January 2016] But "'stipulations in an agreement are not to be construed as conditions

8    precedent unless such construction is required by clear, unambiguous language; and particularly so where

9    a forfeiture would be involved or inequitable consequences would result. [Citations.]'" [*Alpha Beta Food*

10   *Markets* v. *Retail Clerks* (1955) 45 Cal.2d 764, 771, cert. denied, 350 U.S. 996 (1956); see *Rubin* v.

11   *Fuchs* (1969) 1 Cal.3d 50, 53 citing the rule that contract provisions are not "construed as conditions

12   precedent in the absence of language plainly requiring such construction."] Because "'such conditions are

13   not favored by the law, [they] are to be strictly construed against one seeking to avail [it]self of them.

14   [Citations.]'" [*Antonelle* v. *Kennedy & Shaw Lumber Co.* (1903) 140 Cal. 309, 315; *JMR Construction*

15   *Corp.* v. *Environmental Assessment & Remediation Management, Inc., supra,* 243 Cal.App.4th at 594;

16   See also *Effects Associates Inc.* v. *Cohen* (9th Cir. 1990) 908 F.2d 555, 559 n.7 "Conditions precedent are

17   disfavored and will not be read into a contract unless required by plain, unambiguous language."] See

18   also *Richardson v. Hislop* (1930) 109 Cal.App. 440, 449, quoting Williston on Contracts, section 671,

19   page 1294, that "[c]ourts are disinclined to construe the stipulations of a contract as conditions precedent

20   . . . [because] such a construction prevents the court from dealing out justice to the parties according to

21   the equities of the case."

22         209.    In *Pacific Allied* v. *Century Steel Products* (1958) 162 Cal.App.2d 70 the defendant,

23   Century, agreed to fabricate and sell steel forms to the plaintiff, Pacific, for the purpose of using them to

24   install storm drains. [*Id.* at p. 72] Century also guaranteed that Pacific's labor costs, through its use of

25   Century's steel forms, would not exceed four cents per square foot. Further, Century would, upon

26   completion of the job and Pacific's submission of an itemized cost breakdown, pay Pacific's labor costs

27   in excess of 4 cents per square foot. [*Id.* at p. 73] Pacific agreed to keep a detailed account of labor costs

28   and give Century a "continuous report." [*Ibid.*] Pacific kept Century apprised of costs during the project

and gave it periodic oral reports, but it did not provide a detailed cost breakdown upon the project's completion. [*Id*. at p. 78] The court rejected Century's contention that Pacific was required to provide a detailed cost breakdown as a condition precedent to its recovery under the contract. [*Id*. at pp. 79-80] The appellate court held that (1) conditions precedent are not favored in the law; (2) neither the express terms of the contract nor a reasonable implication drawn from them compelled a finding that providing the cost breakdown was a condition precedent to Pacific's recovery; and (3) the interpretation advanced by Century was particularly disfavored because it would result in a forfeiture. [*Id*. at pp. 79-80]

210.    Paragraph 9 of the Stipulated Decision begins with "[s]ubject to its full and timely compliance with the conditions specified below." However, "the conditions specified below" are that Courtesy "*agrees* to remodel the facility (¶14); that Courtesy *agrees* to execute a new Subaru Dealer Agreement which shall include a Facility Addendum with certain provisions which Courtesy agrees to do related to the lease (¶15); and that the Dealer Agreement will include benchmarks for completion of the permanent facility, including dates, *inter alia*, for when Courtesy will submit construction drawings, obtain governmental approvals, and commence and complete construction (¶¶ 15 and 16). Further, the parties *agree* that compliance with the terms of the Stipulated Decision and *execution* of the Dealer Agreement containing the *milestones* are each separately required (¶17). (Emphasis added.) [Exh. J-301] Additionally, there is the language in Paragraph 28 in two places that the ALJ must determine whether there has been a *material failure to comply* with the any of the conditions by Courtesy, which certainly implies a promise which is either materially or non-materially breached. [Exh. J-301:020-.021]

211.    It is questionable whether there is a basis here for a construction that the agreement contains language that Courtesy's right to continue its franchise is a condition. The language, which is to be construed against finding a condition here, is ambiguous and does not necessarily purport to declare a condition precedent. The language of the Stipulated Decision is that Courtesy agrees or promises to do certain things by certain deadlines, and agrees to include certain provisions in another document. The language, like that in *Pacific Allied,* does not compel a finding that obtaining permitting, beginning construction, and completing construction are a condition precedent to Courtesy retaining its franchise. Further, the plain language used by the parties is "material breach" of terms that are promises and conditions. Thus, the terms should not be construed as express conditions requiring full and complete

1  performance. As noted above, conditions precedent are not favored and will not be read into an

2  agreement.

3      212.    Further, if the interpretation is that the language (material breach) is a condition, it would

4  here, as in *Allied Pacific*, result in a disproportionate forfeiture being inflicted on Courtesy as Courtesy

5  has spent considerable money, time and effort in completing the project, albeit late, only to lose its

6  Subaru franchise. Thus, the fact that there has not been full occurrence of a condition, if it is a condition,

7  must be excused.

8      213.    Promises are undertakings that something will or will not happen in the future; that is,

9  someone has made a commitment to do or refrain from doing something in the future. Promises may be

10  breached with the level of breach being either a "material breach" (major breach) or "non-material

11  breach" (minor breach). If there is a material breach, the other party may terminate the contract and

12  recover damages or seek some other remedy. If the breach is only minor, the other party must continue to

13  perform and can recover damages only for the minor breach. (Rest. 2d Contracts, § 241)

14      214.    As noted above, the Stipulated Decision does not provide that good cause existed at the

15  time of the execution of the Confidential Agreement for the termination of the Protestant's Subaru

16  franchise. Rather, the parties agreed that Courtesy's failure to comply with *any of the conditions* in the

17  Stipulated Decision shall "constitute good cause to terminate the SOA Dealer Agreement between them

18  under sections 3060 and 3061." The condition for review here is whether there is *material failure to*

19  *comply by Courtesy*. (Emphasis added.) [Exh. J-301.18:11-13, .20]

20      215.    The parties here have used the vocabulary "material breach" regarding the non-

21  compliance with the benchmarks. The parties provided the standard here to be "material failure to

22  comply." Therefore, the occurrence of the conditions here should be measured by whether they have

23  "substantially occurred" or have been "substantially performed" – the same standard that applies to

24  whether there is a "material breach of promise," as the conditions here are also promises.

25      <u>**No Material Failure to Comply with the New Dates --- Courtesy's Substantial Compliance**</u>

26      216.    Based either upon incorporation by reference or promissory estoppel, the new dates in the

27  Amended Facility Addendum (and by incorporation, the Stipulated Decision) apply and materiality will

28  be assessed using those dates. The sole failure to meet those dates does not equal materiality. If it did,

there would be no need for the words "material failure" or "materially complied" in the Stipulated

Decision. However, unlike the characterization of this matter by Respondent that the ALJ is simply to

make a determination of whether Protestant has or has not complied with the provisions of the Stipulated

Decision, the determination to be made is whether Protestant has or has not *materially* complied.

(Emphasis added.) [Exh. J-300.20, ¶28]

217.    Material compliance requires evaluation under the factors articulated in *Sackett* v. *Spindler*

(1967) 248 Cal.App.2d 220. "In determining the materiality of a failure to fully perform a promise the

following factors are to be considered: (1) The extent to which the injured party will obtain the

substantial benefit which he could have reasonably anticipated; (2) the extent to which the injured party

may be adequately compensated in damages for lack of complete performance; (3) the extent to which

the party failing to perform has already partly performed or made preparations for performance; (4) the

greater or less hardship on the party failing to perform in terminating the contract; (5) the wilful [*sic*],

negligent, or innocent behavior of the party failing to perform; and (6) the greater or less uncertainty that

the party failing to perform will perform the remainder of the contract." [*Id.* at 229] Material compliance

requires evaluation under the factors articulated above and analysis under Restatement of Contracts,

Second § 241. [See also Rest. Contracts, § 275]

218.    Although Respondent asserts that the only determination left in the Stipulated Decision is

whether Protestant timely complied or did not timely comply and by how much, "materialness is only

timeliness," this statement oversimplifies the legal definition of materiality. [RT Vol. IV 20:15-23] As

explained above, the Stipulated Decision is a settlement agreement that is a contract subject to all the

usual and normal legal and statutory contractual requirements. Because the legal determination of

materiality requires consideration of whether Respondent suffered any injury or could be adequately

compensated for such harm, the parties did intend by their language for the Board to make findings

concerning legal materiality.

219.    Respondent asserts that because the parties have already stipulated to good cause to

terminate under Section 3061, the factors in *Sackett* have no application to this matter and that case is not

determinative. However, as noted above, the parties in the Stipulated Decision did not stipulate that good

cause existed at the time of the execution of the agreement, but rather that Courtesy's failure to comply

with the conditions in the agreement shall constitute good cause. [Exh. J-301.18 ¶ 25(c)] Thus, the need for determining materiality.

220.    Further, Respondent asserts that because good cause has already been agreed to that essentially the good cause factors in Section 3060 are the same as the *Sackett* factors. Requiring Respondent to show any alleged non-compliance be material is not the same as showing good cause to terminate pursuant to Sections 3060 and 3061. The parties were not litigating the *Sackett* factors in 2018 and they are not litigating the good cause factors in this dispute. Respondent argued in its Motion in Limine that the Board should refrain from considering evidence necessary to determine materiality because the "parties stipulated to good cause for the failure to meet any condition for good reason, to avert this exact balancing of the existing circumstances." [Respondent's Motion in Limine No. 1, p. 3, lines 13-14] Reviewing the evidence regarding the materiality factors is not the same as determining "existing circumstances" under the good cause factors. It is to do a full evaluation of the *Sackett* factors regarding material breach.[67]

221.    Allowing introduction of this evidence of what SOA's damages are, if any, is not tantamount to imposing further conditions to unlawfully continue the franchise relationship in direct contravention of both the Board's retention of jurisdiction and statutory mandate.

## Material Compliance Factors

### (1)    The Extent to which the Injured Party will Obtain the Substantial Benefit

222.    The first requirement is the extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated. The substantial benefit contracted for by SOA is a new facility. The facility project was delayed, with construction commencing on June 28, 2021, some nine months after the time agreed to under the Amended Facility Addendum. The Subaru/Volvo building is expected to be the first building completed and it is expected to be by April 2023, if not sooner. Realistically, the soonest SOA could get another Subaru dealership in operation is approximately a year.

---

[67] However, how circumstances have changed may be important in determining the *Sackett* factors. Paragraph 30 of the Stipulated Decision provides that Protestant agrees that the remodeling of the facility at the temporary facility and the construction of a new facility as contemplated under the Stipulated Decision "are each reasonable in light of all existing circumstances, including economic conditions. . . . ." [Exh. J-301.22] Arguably, this language allows consideration of how circumstances have changed, which they clearly have.

SOA witnesses testified that they would attempt to use the current sales location for the new dealer's sales office, but there is currently no facility available in Chico for service.[68] Although Mr. Smit testified that Courtesy's current service location on Cohasset is for sale, Mr. Pajouh testified that he is negotiating leases of his other dealerships' buildings through December 2022. [RT Vol. VI 224:8-10, 229:13-15; Vol. VII 15:10-17] It is highly unlikely that a new Subaru dealer could have a sales and service location by March of 2023, which is approximately when the Subaru/Volvo building should be completed.

### (2)    The Extent the Injured Party is Adequately Compensated by Damages

223.    The next requirement is the extent to which the injured party may be adequately compensated in damages for lack of complete performance. Respondent contends that evidence of harm and/or damages is not relevant to the determination of the issues because the Stipulated Decision does not provide for damages in the event of non-compliance and the Board is not authorized to award damages or grant any other relief in this matter.[69]

224.    Nothing in the Stipulated Decision provides any statement that damages would be inadequate to address any alleged breach of the Stipulated Decision.[70] Respondent's assertion that damages for failure to timely perform are inadequate is contradicted by the fact a LOC was required by SOA as *assurance for performance*. SOA witnesses testified that the LOC was requested as an assurance of performance. Mr. Farabee testified that the LOC was "an assurance that a project will get done in a set amount of time or by a date certain." He explained that SOA would have a discussion regarding the LOC after the last date in January 2022 (Feltus Hawkins verification) is missed. [RT Vol. IV 144:13-145:20] The May 2020 Amended Facility Addendum states "should the facility not be completed by the agreed upon date, *SOA will execute the Letter of Credit or Performance Bond that secures this amendment*." (Emphasis added.) [R-101.01] If there are damages for lack of timely performance, the LOC for $750,000, which SOA believed it could call as soon as January 31, 2022, should be seen as adequate since that is what the parties agreed to.

---

[68] SOA seems to assume that a new dealer could secure a lease for the current Courtesy premises. Mr. Pajouh has a lease on the 896 East Avenue location until December 2022, with a month-to-month extension for three months through March 2023. [RT Vol. VII 14:16-15:9]

[69] In this Decision, the Administrative Law Judge is not awarding damages nor amending the Stipulated Decision.

[70] We cannot assume, as SOA asserts, that delay automatically equals damages.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

225.    Letters of credit are governed by Division 5 of the California Uniform Commercial Code. Uniform Commercial Code Section 5102(a)(10) defines a LOC as "a definite undertaking that satisfies the requirements of Section 5104 by an issuer to a beneficiary at the request or for the account of an applicant . . . to honor a documentary presentation by payment or delivery of an item of value."[71] In *San Diego Gas & Electric Co. v. Bank Leumi*, (1996) Cal.App.4th 928, the court explained that in recent years, "the use of the letter of credit has expanded to include guaranteeing or securing a bank's customer's promised performance to a third party in a variety of situations. This use is referred to as a standby letter of credit." [*Id*. at 933] The liability of the issuer of a letter of credit to the letter's beneficiary is direct and independent of the underlying transaction between the beneficiary and the issuer's customer. [*San Diego Gas & Electric Co*. v. *Bank Leumi*, supra, 42 Cal.App.4th at pp. 933-934] A letter of credit is not a form of guaranty or a surety obligation.[72] The issuer of a letter of credit cannot refuse to pay based on extraneous defenses that might have been available to its customer. [See Uniform Commercial Code section 5108(f)][73]

226.    SOA will receive the full benefit of a newly constructed Subaru facility in Chico, albeit on a delayed timeframe. The current Subaru facility may be deficient, but Mr. Pajouh said it is better than any of his other facilities. And further, it is the exact location where SOA witnesses testified that SOA would put another dealership if Courtesy were terminated (apparently assuming the new franchisee could lease the location).

227.    Mr. Pajouh testified that Courtesy had a great year selling Subaru vehicles. Mr. Farabee testified that Courtesy's sales were up 19% compared to the national average of 6%. There was no

---

[71] Uniform Commercial Code section 5104 provides that "[a] letter of credit, confirmation, advice, transfer, amendment, or cancellation may be issued in any form that is a record and is authenticated (i) by a signature or (ii) in accordance with the agreement of the parties or the standard practice referred to in subdivision (e) of Section 5108."

[72] Civil Code section 2787 provides that "[a] letter of credit is not a form of suretyship obligation."

[73] Uniform Commercial Code Section 5108(f) provides that "[a]n issuer is not responsible for: (1) the performance or nonperformance of the underlying contract, arrangement, or transaction, (2) an act or omission of others, or (3) observance or knowledge of the usage of a particular trade other than the standard practice referred to in subdivision (e)." Subdivision (e) provides that "[a]n issuer shall observe standard practice of financial institutions that regularly issue letters of credit. Determination of the issuer's observance of the standard practice is a matter of interpretation for the court. The court shall offer the parties a reasonable opportunity to present evidence of the standard practice."

evidence presented that showed any decline or loss in sales by Courtesy by failing to complete the new sales facility in accordance with the schedule. Consequently, there are no damages to SOA for lack of performance in sales. SOA asserts that it is damaged because service is more important than sales and the location where the service is performed on Subaru vehicles is at Courtesy's Buick/GMC location. But that is exactly what SOA agreed to under the original Dealer Agreement, although service has continued there longer than anticipated. Additionally, the new multi-franchise facility will have a new service facility and a separate express service center exclusively for Subaru vehicles which should allay any service concerns.

### (3)    The Extent to which the Party Failing to Perform has Already Partly Performed or Made Preparations for Performance

228.    Courtesy's performance was hindered by annexation, and similar delay requests by the City due to the Camp Fire and COVID-19 impacts on Chico. It was extremely difficult to get everyone in the City together and the additional burdens were tremendous. Mr. Sawley told Mr. Stevens and Mr. Pajouh that he may not be able to give the project his immediate attention. SOA witnesses testified that Courtesy's ongoing performance in getting the project built has been steady and uninterrupted, despite the pandemic.  No one from SOA testified that Courtesy was not moving forward – instead the testimony was that Mr. Pajouh was "doing everything he could." The import of the email about Courtesy's people not getting back to the City was conflicting. It appears that the delay referenced in the email was probably about delays related to Modern Builder's subcontractors who were working "in the field" not showing up for work related to COVID-19, unrelated to the Courtesy project. The "ball was in Courtesy's court" in July 2020 to respond to the City's plan check comments, but there was no testimony that Courtesy delayed in responding to the City. Mr. Sawley testified that Modern Building was checking in frequently ("[Mr. Seegert] was being the pest that he said he didn't want to be") and they were moving forward on all fronts "in the pursuit of trying to get to the end result faster." [RT Vol. III 182:19-184:7]

229.    Courtesy has made many preparations for performance and has spent at least $6.5 million thus far in design and start of construction for the multi-franchise facility. Courtesy has made major investments in acquisition of $2.8 million along with acquiring a construction loan of $23.5 million. As noted above, Subaru sales and service accounted for over 40 percent of Courtesy's unit sales in

1  generating cash flow. Subaru is Courtesy's biggest generator of revenues based on volume. [RT Vol. VII

2  7:21-8:25; 29:16-30:3] Although Courtesy will not lose all of these expended amounts if the Subaru

3  franchise is terminated, the Subaru dealership is arguably approximately 40 percent of that expenditure,

4  which is substantial. The bank loan is also potentially threatened if Mr. Pajouh loses the Subaru franchise

5  since funding the loan was based on the entire project. [RT Vol. VI 232:7-15; Vol. VII 8:6-11, 10:24-

6  11:2]

7           **(4)     The Greater or Less Hardship on the Party Failing to Perform in
8                     Terminating the Contract**

9           230.    The next factor to consider is the degree of harm to the breaching party, in particular, the

10  possibility that the party will suffer inequitable and disproportionate forfeiture if the contract is

11  terminated. Termination would cause substantial hardship to Courtesy and will result in a forfeiture. Mr.

12  Pajouh testified that Subaru is an integral part of the business of Courtesy Automotive Center and is its

13  biggest volume. As noted above, Courtesy has spent approximately $6.5 million thus far apart from the

14  purchase of the property, and has made major investments in acquisition, design, and start of

15  construction.  Mr. Pajouh has incurred a construction loan of $23.5 million. As explained by Mr. Pajouh,

16  losing the Subaru franchise would "put a financial burden on the whole organization of the volume that

17  we do, the gross profit, the cash flow, the number of employees that we have . . ." [RT Vol. VI 220:1-4]

18  To complete the Volvo/Subaru dealership building without the Subaru franchise "would put [a] financial

19  constraint on the organization because now [Courtesy has] the carrying cost of something that's not

20  producing -- generating revenues, gross profit, and everything that it takes to continue with [the] total

21  project." [RT Vol. VI 220:7-18] If the Subaru franchise were to be terminated, Mr. Pajouh testified it

22  would cause an issue with the funding of the entire project because funding is based on the whole

23  project.[74] [RT Vol. VI 232:7-15; Vol. VII 7:16-8:25]

24           **(5)     The Willful, Negligent, or Innocent Behavior of the Party Failing to Perform**

25           231.    Courtesy used commercially reasonable best efforts and encountered delays beyond its

26  _____

27  [74] There was no testimony as to how likely or unlikely it would be to obtain another franchisee to replace the SOA
    franchise in Chico or the willingness or likelihood of another franchisor to award a franchise to a dealer that had

28  been terminated.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

control, including the City's rapid annexation, and Camp Fire and COVID-19 impacts on the City and Courtesy's team. Commercially reasonable best efforts as explained in *California Pines Property Owners Ass'n.* v. *Pedotti* (2012) 206 Cal.App.4th 384, 394 do "not require the promisor to ignore its own interests, spend itself into bankruptcy, or incur substantial losses to perform its contractual obligations." The court explained that where the contract does not define the phrase best efforts, "the promisor must use the diligence of a reasonable person under comparable circumstances." (Citations omitted.) [*Id.* at p. 394] Best efforts requires a person to use "such efforts as are reasonable in light of that party's ability and means at its disposal and of the other party's *justifiable expectations.* . . ." (Emphasis added [*Id.* at pp. 394-395] SOA did not have justifiable expectations that this huge multi-franchise project could get plan check approval, permit approval and the Development Agreement done during COVID-19, especially with all the added requirements from the City. Additionally, the extended dates of the Amended Facility Addendum were not reasonable such that SOA could rely on them. The time to obtain the permit was extended from May 22, 2020, to July 31, 2020, approximately six weeks. Mr. Pajouh told Mr. Smit the dates were unobtainable and optimistic, and Mr. Smit said he would have built in slack. [Exhs. P-16.001; R-123.09:3-11]

232.    Courtesy was not unreasonable in trying to get the ROW development/lease issue resolved in its favor. Basically, the County had made assurances to Courtesy that it would abandon the ROW. The County allowed a church to be built in the ROW, complicating any use of it as an interchange (see footnote 49, *supra*). It took over two years from late October 2018 to January 2021 to reach agreement. However, the Camp Fire occurred in November 2018 and impacted the City of Chico for many months. Mr. Sawley was working on residential needs of the City until June 2020. Mr. Sawley sent his first response to Mr. Stevens in March 2019, a delay of four months. Mr. Sawley asked Courtesy for relief from reviewing the Development Agreement during the aftermath of the Camp Fire and during COVID-19, given his other significant duties. Mr. Pajouh did not have to ignore his own interest in the ROW, and reasonably pursued his negotiations for the lease option as long as the City continued discussions, which Mr. Constantin did, and while the plan check was not complete.

233.    The Development Agreement was not a priority for the City. In March 2020 when COVID-19 hit and the City closed its offices, Mr. Sawley testified because the agreement did not have a

30-day turnaround time, it was not a priority for him. He also testified that he and other City departments delayed plan check review because the Development Agreement was not complete. [RT Vol. III 169:19-170:9] Although Mr. Sawley said he and others did not review the plans given the outstanding Development Agreement, it is not clear that other City departments did so, given the building department's official indicating it was a priority. BV, the primary building reviewer, timely did their review. [RT Vol. V 144:20-145:4, Vol. III 21:16-25, 169:12-18] Further, Mr. Pajouh said he was not aware that Mr. Sawley was not reviewing the plans because of the incomplete Development Agreement, which should have been explained to him. Mr. Pajouh thought the plan check and the Development Agreement were "two ships sailing alongside of each other." [RT Vol. VI 86:13-23, 87:21-88:5]

234.     Mr. Graziano testified Courtesy delayed the multi-franchise project because Mr. Pajouh wanted to build a gas station in the ROW but was having difficulty getting the City to agree. Courtesy, in his opinion, did not move forward with the Subaru facility because it was held up getting the larger project, including the ROW, done at that location. Completing the Subaru facility by a specific date "was not as relevant for [Mr. Pajouh]." [RT Vol. IV 198:2-8, 199:5-17] However, Mr. Sawley said the City was willing to explore options of being able to do both – what the City needed and what Courtesy needed. Chris Constantin continued to negotiate the terms of a lease with Courtesy until late 2020. [Exh. P-29.003-.004] Mr. Sawley explained that "[w]ell [the City] can't give up the [ROW] long term so [the City is] not going to abandon it" and "Chris [Constantin] is really good at saying '[h]ey, let's explore the option of being able to do both." Courtesy "trusted that [the City] would be able to work that out in a way everybody could get onboard with." [Exh. P-63.106:16-22]

235.     Mr. Graziano testified that he thought Mr. Pajouh "willfully did not meet the agreement, because it appears agreements just don't mean that much," citing Mr. Pajouh's repeated failure to complete agreements back to 2015, including the "willful" move to an unauthorized relocation.[75] [RT Vol. IV 179:8-21, 185:4-17] It is difficult to believe Mr. Graziano's testimony about his belief that Mr.

---

[75] SOA witnesses testified that the history of broken promises in their dealings with Courtesy go back to 2015, and their belief that Mr. Pajouh had not been honest and forthright in their dealings influenced their decision to send the Notice of Non-Compliance. [RT Vol. IV 109:6-15, 110:14-25, 185: 4-17] Although it is understandable that history may have played a part in SOA's lack of trust and decision to send the notice, for purposes of this Decision only the facts surrounding the Stipulated Decision and events following thereafter are relevant.

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

Pajouh was "willful" given that SOA extended the benchmark dates via the Amended Facility Addendum and in effect, as found here, extended the time for Courtesy to complete the project. [RT Vol. V 21:8-22:15] Mr. Graziano tried to explain that the extension did not extend the Stipulated Decision, but if one believes that a partner is *willfully* not completing agreements, no extension of any kind should have been given. Mr. Graziano's explanation that it was "just about the LOC" is not credible because giving new dates for the LOC extended the dates for the project or, at the very least, there was the risk that an adjudicator would not agree with SOA that the extension was so limited. [RT Vol. V 22:10-15] Additionally, it is difficult to find willfulness here on the part of Courtesy when Mr. Pajouh testified that the delay in having the multi-franchise facility built is costing Courtesy in the tens of thousands of dollars in expense every month. It is simply not reasonable that someone in this situation could be found to be willfully delaying getting these buildings built.

236.    Mr. Graziano pointed out that 30-plus Subaru dealership facilities are being built during COVID-19 and 10-13 facilities were completed, supporting SOA's position that the pandemic did not stop other projects. [RT Vol. IV 180:17-181:6] Although he agreed that there was a pandemic and wildfires near Chico, Mr. Graziano simply does not believe those "extenuating circumstances" inhibited Courtesy from moving forward. [RT Vol. IV 185:12-17] However, as noted above, only One Subaru in Hayward, of all of those other projects, is similar to Courtesy's, and it may have started construction in 2019.[76] Additionally, the location was not impacted by the Camp Fire and its aftermath.

237.    The project received ARB approval in October 2020 after delays by the City, and Mr. Constantin continued to negotiate with Mr. Pajouh. Not until Mr. Sawley, in January 2021, told Mr. Pajouh that he needed to drop the ROW in order to obtain the permit, did things move, and even then, the City had more requests of Courtesy, such as reconfiguring the intersection of Garner and Esplanade. [RT Vol. I 174:17-175:2, 176:9-177:2; Vol. II 23:4-15]

238.    Moreover, there is repeated testimony that Mr. Pajouh was diligent, and there is no evidence that Courtesy had any intention of doing anything other than build the facility as soon as it possibly could. [Exh. P-63.104:7-15.] Mr. Pajouh asked Mr. Seegert to make the Subaru/Volvo building

---

[76] Mr. Smit hedged as to whether construction at One Subaru started in 2019, testifying only that "substantial construction" began in 2020. [RT Vol.VI 42:19-43:11, 44:1-19]

1    a priority and the City acknowledged to Mr. Seegert that Courtesy's plan check was "a priority project."

2    [Exh. P-17.003]

3          **(6)    The Greater or Less Uncertainty that the Party Failing to Perform will Perform the Remainder of the Contract**

4

5          239.    Mr. Graziano testified that he had a "low level of certainty" that Courtesy will perform the

6    remainder of the settlement agreement. [RT Vol. IV 185:22-186:7] At this point, there is no evidence to

7    support any genuine concern the facility will not be constructed. Courtesy has made a major investment

8    already and has carrying costs associated with both the construction loan and the expense of the leased

9    buildings at the same time. None of Courtesy's other franchisors (Cadillac, Buick/GMC, BMW,

10   Mercedes-Benz and Volvo) have sought to terminate their franchises. Construction has started and at the

11   time of the hearing was approximately 10 percent complete.

12         240.    SOA asserts in its reply brief that *Sackett* supports a finding of material breach in favor of

13   SOA because of the uncertainty of the completion of construction. In *Sackett*, the plaintiff, Sackett, sued

14   for breach of contract after he entered into an agreement with defendant Spindler whereby Sackett agreed

15   to purchase Spindler's outstanding shares in a newspaper corporation. The contract called for a purchase

16   price of $85,000 to be paid by Sackett in installments by specific deadlines. Sackett paid the first

17   payment timely, most of his second payment late, and the third check bounced after being paid a month

18   late. After Spindler reclaimed the shares of the company he had placed in escrow, Sackett telegrammed

19   Spindler that he was ready, willing and eager to transfer the remaining funds. Spindler told Sackett that if

20   he did not pay the balance within 10 days, he would cancel the agreement. Sackett failed to make the

21   payment due. Sackett subsequently agreed to pay the outstanding balance, and Spindler gave him another

22   week. Sackett did not pay, but informed Spindler that he could set up a financing agreement because his

23   assets had been freed due the termination of his divorce proceedings. Spindler responded that he was

24   cancelling the contract as a result of Sackett's delay. Sackett sued for breach of contract and the question

25   before the court was whether Spindler's duty to perform was discharged by Sackett's conduct and

26   whether Spindler was justified in cancelling the contract. The court found that Spindler was justified in

27   terminating the contract for non-payment despite Sackett's subsequent offers and promises to perform.

28   The court held that "despite Sackett's 'offers' to perform and his assurances to Spindler that he would

1    perform, it was extremely uncertain as to whether in fact Sackett intended to complete the contract."

2    [*Sackett, supra,* 248 Cal.App.2d at 230] The court noted that although Sackett never repudiated the

3    contract and expressed willingness to perform, the evidence was sufficient to warrant the inference that

4    he did not intend to perform. [*Id.* at p. 231]

5          241.    Courtesy has expended a considerable amount of time and investment to get the project to

6    the point that it is at currently. Much of the delay was due to the City of Chico's actions or non-actions.

7    The majority of the permits have been obtained and grading is complete, and construction has begun. It is

8    not extremely uncertain that the project will not get built nor does Courtesy want an "open-ended"

9    timeframe to perform, since any delay is costing it in terms of time and money.

10    **<u>Time is of the Essence Provision</u>**

11          242.    A time is of the essence provision in a contract equals materiality in California except

12    when it doesn't. The traditional rule has been tempered so that the provision in a contract does not always

13    make untimely performance a breach. [*Magic Carpet Ride LLC* ("MCR") v. *Rugger Investment Group,*

14    *LLC* ("Rugger") (2019) 41 Cal. App. 5th 357, 367] "[A]n unqualified rule enforcing time is of the

15    essence provisions and permitting default is at odds with prior and subsequent developments in

16    California law." (Citation omitted.) [*Ibid.*]

17          243.    *Magic Carpet Ride* involved a contract by Mr. Rugger to sell an airplane to Mr. Jennings

18    for $610,000. The aircraft was to be released free and clear of all liens and encumbrances. A lien was

19    filed against the aircraft. An amendment was entered into identifying MCR instead of Jennings as the

20    buyer and gave Rugger 90 days from the date of closing in which to show the lien had been released.

21    Rugger agreed to hold back $90,000 in escrow for that 90-day period. If Rugger did not provide evidence

22    that the lien had been released within those 90 days, then the $90,000 would be given to the buyer, MCR.

23    The aircraft bill of sale passed title to the plane to MCR on the date of closing. Rugger paid $38,000 for a

24    lien release eight days after the expiration of the 90 days, and delivered it to escrow. MCR refused to

25    release the $90,000 in escrow to Rugger. Rugger contended it substantially performed, but the trial court

26    held for MCR.

27          244.    The court of appeal concluded that a time is of the essence provision does not

28    automatically make untimely performance a breach of contract where there are triable issues regarding

the scope of that provision and whether its enforcement would result in a forfeiture. The court held that "a time is of the essence provision will not automatically be enforced if doing so would work a forfeiture." [*Magic Carpet Ride LLC, supra,* 41 Cal.App. 5th at 367, citing *Galdjie* v. *Darwish* (2003) 113 Cal.App.4th 1331, 1341] The court, quoting Corbin on Contracts, stated: "If the enforcement of an express provision causes an excessive penalty or an unjust forfeiture, *equity will prevent enforcement.* Thus, equity limits our power to determine our own contractual rights and duties." (Emphasis added; citation omitted.) [*Magic Carpet Ride LLC, supra,* 41 Cal.App. 5th at 368] The court noted that inequitably Rugger would lose the money he paid for the lien release, would lose the $90,000 holdback, in effect a price reduction, and MCR would receive an aircraft free and clear of liens. There was no evidence of any damages suffered by MCR caused by the delay, and if there is any, MCR could be compensated for it. The appellate court sent the case back to the lower court to determine the triable issue of fact as to substantial performance and whether Rugger faced a risk of forfeiture if strict compliance were required. [*Magic Carpet Ride LLC, supra*, 41 Cal.App. 5th at pp. 366-367]

245.    SOA asserts that *Magic Carpet Ride* is distinguishable because this case is not a simple breach of contract or a "mere" settlement agreement, but rather involves a carefully negotiated Stipulated Decision and Order which was approved by the Board. All contracts and settlement agreements are arguably carefully negotiated and crafted. And, as noted above, a settlement agreement, or in this case, a Stipulated Decision does not have a higher value than a contract. It must be judged by the same legal principles applicable to contracts generally. [*Weddington Productions Inc.* v. *Flick* (1998) 60 Cal.App.4th 793, 810-811] It is a Board order, but that fact alone is not a distinction that would make *Magic Carpet Ride*'s holding inapplicable.

246.    Further, SOA argues that Courtesy has not missed deadlines by just a few days (as was the case in *Magic Carpet Ride*) but by one year, seven months and counting. However, given the application of the doctrine of promissory estoppel here, the missed deadline for government approvals and commencement of construction is nine months. *Magic Carpet Ride* does require time and date conditions be reasonably met. [*Magic Carpet Ride LLC,* supra, 41 Cal.App. 5th at p. 364] To resolve whether reasonable adherence has been met, the court in *Magic Carpet Ride* looked at substantial performance and would the enforcement of the provision work a forfeiture. [*Id.* at 367]

247.    The court noted in *Magic Carpet Ride* that the evidence submitted showed that Rugger did not willfully depart from the terms of the contract and diligently sought to obtain the release. [*Id.* at 364] Likewise, Mr. Pajouh did not willfully depart from the terms of the contract and diligently sought to get the project permitted and constructed. The evidence from Mr. Sawley was that Mr. Pajouh was diligently trying to move the project forward, and that he did not sense any sort of desire to delay anything at all by Courtesy. Mr. Farabee testified that he did not recall any discussion that Courtesy was not moving forward.

248.    Nine months delay for the start of construction in this case is adherence to time and date conditions being reasonably met. Given the kind and scope of the project, the benchmarks were reasonably met to the extent possible. The construction of the multi-franchise project was complex, with seven different franchises. In addition, there was the change by the City from allowing County versus City requirements, and the attendant need for figuring out how the different improvements plus the higher cost would be resolved, which necessitated extended discussions with the City over the Development Agreement. Furthermore, there was the need to extend water, sewer and other utility services to the site with other property owners. Mr. Constantin articulated in an email that the completion of the Development Agreement did not delay the project. However, the City continued to delay the project, asking for more improvements, even after the permit was approved. The new dates agreed to in the Amended Facility Addendum were described as "optimistic." SOA was not justified in relying on them given the impact of COVID-19, especially given Mr. Pajouh telling Mr. Smit the dates were "unobtainable," and Mr. Smit's comments that Courtesy should have built in some slack in the dates since "[l]ike this is ground zero. We're in the middle of shut down" due to COVID-19. The pandemic continues to impact business nationwide, and certainly the achievement of deadlines in this case to date. To strictly enforce the provision of time is of the essence here would result in the exact kind of forfeiture for Courtesy that *Magic Carpet Ride* explains should be avoided.

249.    There is no evidence of any damages suffered by SOA caused by the delay. Courtesy is selling as many cars as it can and three times more than the national average. SOA is frustrated that servicing of its customers' vehicles are not being provided in a Subaru facility, which impacts retaining repeat Subaru customers. [RT Vol. IV 80:17-81:21] According to SOA, the Subaru brand is being

1    "poorly" represented because of the deficient temporary location and servicing cars in a shared location.

2    [RT Vol. IV 77:6-78:5] SOA witnesses agreed that those damages are hard to quantify. [RT Vol. IV

3    81:23-82:10, 117:8-13] According to SOA witnesses, the LOC was to provide assurance that Courtesy

4    would perform and Courtesy has not performed as SOA expected. The intent of the amended dates was

5    "to secure the LOC" and "get the building complete." [RT Vol. IV 124:8-21] If there is any harm to SOA

6    because of the delay in performance, SOA can be compensated for it by calling the LOC.

7    <u>**Protestant's Excuse Based on Paragraphs 18 and 19 of the Stipulated Decision**</u>

8    250.    Paragraph 18 of the Stipulated Decision provides that "[i]f, notwithstanding [Courtesy's]

9    commercially reasonable best efforts, the necessary approval of a governmental entity cannot be obtained

10   in order to timely satisfy the deadlines [], *solely* for reasons beyond the control of" Courtesy, Courtesy

11   "shall, upon learning of the delay, immediately notify SOA's SFO Zone representative in writing, and

12   shall request the minimum extension of time necessary to complete the actions" set forth in the Stipulated

13   Decision. (Emphasis added.) [Exh. J-301.13:24-14:1] Paragraph 19 of the Stipulated Decision provides

14   that "[i]f SOA verifies that the delay is caused by a governmental entity and not by [Courtesy], SOA shall

15   agree to extend the affected deadlines [] on a weekly basis, until the governmental-caused delay is not a

16   factor. Courtesy "shall provide weekly reports to SOA regarding the status of any governmental delay

17   and the progress, if any, being made on the elimination of the delay and expected duration of the

18   remaining delay." If SOA determines that all or part of the delay is caused by Courtesy or its vendors or

19   employees, or if Courtesy fails or refuses to promptly provide either the initial notice of the governmental

20   delay or the weekly reports to SOA, or does "not allow SOA to verify such facts directly with any

21   governmental entity representative, then SOA shall not grant any extension (or any further extension),

22   and the deadlines (either as set forth [in the Stipulated Decision] or as previously extended by SOA) shall

23   remain in place." [Exh. J-301.5:14] In other words, if Courtesy was at all responsible for any of the delay

24   in permitting and obtaining the other benchmarks, Courtesy has no excuse for its non-performance under

25   these provisions.

26          **(1)    <u>Delay by Courtesy while in the County's Jurisdiction</u>**

27   251.    There is the conflicting testimony that Courtesy should have moved more quickly between

28   the time of its County application, negotiations, and the annexation.

252.    SOA asserts based on the email from Mr. Constantin that County permits were not obtained prior to annexation due to Courtesy's delay. The email from Mr. Constantin is in conflict with the testimony from Mr. Sawley and Mr. Stevens. Mr. Stevens testified that the City changed its mind and reneged on the agreement to use County requirements. Mr. Sawley testified that Courtesy worked diligently during that year and a half. This testimony supports that Courtesy did not delay getting permits from the County prior to the annexation by the City which would have allowed the City to honor the County standards for the property and no Development Agreement would have been necessary. Mr. Sawley described substantial amounts of work by Courtesy in the County, trying to get the entitlements. Chico moved in such an expeditious way and/or changed its mind as to what was agreed upon that there was not sufficient time for Courtesy to obtain County permits prior to annexation. Given the number of things Courtesy needed to accomplish in the County prior to the annexation, and the speed of the annexation, Mr. Constantin's email comment about Courtesy's delay is rejected.[77]

### (2)    Courtesy's Billing Disagreement with Northstar

253.    Courtesy had issues with Northstar Design Solutions starting in 2019, and Courtesy paid the full agreed-upon amount to Northstar after the June 25, 2020, letter Northstar sent to Mr. Pajouh. Courtesy was later advised additional services were required and that Northstar's prior involvement would be beneficial, so Courtesy authorized Modern Building to contract directly with Northstar in August 2019. There was a delay of approximately six weeks between June 25, 2020, and August 4, 2020, when Mr. Stevens was not working on the project. However, the two items for which Northstar was engaged to perform previously and which had not been completed were not required prior to permitting, and thus did not delay the project. Therefore, there is no delay attributable to the dispute with Northstar.

### (3)    The Conflicting Testimony about the July 2020 Email and Delay by Courtesy's Subcontractors

254.    There was testimony that in July 2020, Mr. Pajouh acknowledged to Scott Farabee for the first time that delays in obtaining permits were also caused by his contractors not providing information

---

[77] Mr. Constantin noted in that email that the Development Agreement benefited the City more than Courtesy since the improvements would be built to standards 20 years later when, presumably, the improvements made would be of a higher quality. [Exh. R-111.01]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE

needed by Chico to process the permits. [Exh. R-122.12:5-13:12, 14:8-18:14] Mr. Pajouh's Declaration claims Mr. Farabee's testimony was incorrect regarding Mr. Pajouh's alleged statements that his subcontractors had contracted COVID-19 and were unable to work. Mr. Seegert confirmed that the delays he and Mr. Pajouh discussed were not on the Courtesy project. Mr. Seegert did not have an on the ground "crew" working on the Courtesy project at the time of the email. The email statement is not very clear as to who is referenced and it appears to be a misinterpretation by Mr. Farabee of the import of the email regarding delay by Courtesy's contractors due to COVID-19. The only clear statement is that the City had sent the plan check documents back to Mr. Seegert and the "ball was in Courtesy's court" to respond. Mr. Seegert clearly testified that Modern Building did not have any issues with subcontractors on the Courtesy project due to COVID-19 or anything else in July 2020 and there is no evidence that Modern Building responded other than timely to the comments on the plan checks from the City.

### (4)    The Development Agreement

255.    It was commercially reasonable for Courtesy to seek the deferral of the City-required improvements through the Development Agreement. Moreover, testimony from Mr. Stevens indicates the City changed directions on Courtesy.

256.    SOA did not have justifiable expectations that this huge project could get approved and built under the old benchmarks or the new ones during COVID-19 (optimistic dates) with all the added requirements of the City versus the County.

257.    Moreover, it is unclear that the negotiations on the Development Agreement did delay the permitting. There is conflicting testimony. Mr. Sawley said that the negotiations delayed the plan check review. The two emails from Mr. Lindsey with the building department stating that the project is a priority and that he would *urge* the others' reviews does not substantiate or comport with the position that reviews by other City departments were being delayed pending the Development Agreement.

258.    Mr. Constantin said "the DA [Development Agreement] should not be a stumbling block for your project as the critical path for the development is the Community Development portions that currently include the ARHPB [Architectural Review and Historical Preservation Board]. Thus, we can continue to refine and finalize this DA." [Exh. P-23.001] Arguably, Courtesy used commercially reasonable best efforts. It is allowable for Mr. Pajouh to look out for his own best interests regarding the

1    ROW, although given the deadlines he was under, it may not have been the wisest decision.

2        259.    The delays in getting the Development Agreement and permitting completed and

3    construction started were mostly attributable to the governmental agencies, but not solely. There were

4    various delays on both sides.

5        260.    There is no evidence that Courtesy notified SOA in writing of the government delay nor

6    did it obtain weekly extensions. Since Courtesy did not provide written notice on a weekly basis to SOA

7    as required, Courtesy did not establish an excuse for its non-compliance under the language of

8    Paragraphs 18 and 19 of the Stipulated Decision.

9                    **Protestant's Excuse Based on Paragraph 21 -- Force Majeure**

10       261.    Paragraph 21 provides that "neither party shall be in default or liable for any delay or

11   failure of compliance" with the Stipulated Decision "to the extent due to any future event which is

12   beyond the control of the defaulting party. . ." Paragraph 21 continues, "including, without limitation,"

13   listing force majeure types of occurrences, including the one event in contention which is "an

14   unforeseeable intervention of any government authority (excluding delays in obtaining permits and

15   licenses), but excluding transport difficulties or strike, lock out or other labor disputes of [Courtesy] or

16   third parties, provided the party suffering such delay or failure of compliance immediately notifies the

17   other party of such delay or failure of compliance." [Exh. J-300.14:22-.15:1]

18                        **(1)    The Camp Fire**

19       262.    The Camp Fire may have been "contained" on November 25, 2018, but the consequences

20   of the "deadliest and most destructive fire in California history," which reached the eastern portion of

21   Chico, were obviously long-term to the communities directly impacted, including the City of Chico. [See

22   Paragraphs 79 and 80, *supra*]

23       263.    Although the Camp Fire came months before the Stipulated Decision was signed, it still

24   can be deemed an "intervening" event that was "unforeseeable." This was one of the largest fires in

25   California history. The nearby City of Paradise was significantly impacted, the town being "decimated

26   within 12 hours." [See Paragraph 79, *supra*] The impact and consequences on Chico and the permitting

27   delay to the project were unforeseeable. Mr. Sawley testified that the consequences of the fire are still

28   impacting Chico. The City's attention was diverted from Protestant's project. Mr. Sawley delayed

working on the Development Agreement until approximately March 2019 and was as diligent as he could be, returning the agreement back to Courtesy, but simultaneously he asked Mr. Stevens if it could be delayed. Commercial properties in Chico were not afforded any priority given the pressing need for housing through mid-2020.

### (2) The COVID-19 Pandemic

264. The doctrine of *force majeure* is set forth in California Civil Code section 3526: "No man is responsible for that which no man can control." Paragraph 2 of California Civil code section 1511 states that non-performance of an obligation or any delay therein "is excused . . . [w]hen it is prevented or delayed by an irresistible, superhuman cause . . ." *Force majeure* is not necessarily limited to the equivalent of an act of God, but the test is whether under the particular circumstances there was such an insuperable interference occurring without the parties' intervention as could not have been prevented by prudence, diligence and care. (*Pacific Vegetable Oil Corp. v. C. S. T., Ltd*. (1946) 29 Cal.2d 228, 238]

265. The nature and spread of the COVID-19 global pandemic are unprecedented or at least have not occurred in 100 years. There were further COVID-19 related delays from the various state orders regarding shutdowns and substantial interruptions to businesses and governments from shelter-in-place orders. SOA itself was impacted as was the world.

266. Additionally, the consequences of the pandemic were not an "intervention" here, but rather resulted in a delay or non-action because of government shutdowns/substantial interruptions and shelter-in-place orders. If the Shelter-in-Place Order restricted the City and its employees from operating or performing their duties, then the non-performing party is not "in default or liable for any delay or failure of performance" (Paragraph 21 of the Stipulated Decision) so long as they can trace their delay or inability to perform (get permits) to the City of Chico's inabilities or delay in performance.

267. The City of Chico was open during COVID-19, and although Mr. Sawley and others kept working, there were delays. Mr. Sawley explained: "I think the record will show that there was back and forth at various times throughout 2020. I think it would also be true that relative to earlier responses from the city, it was delayed during Covid because it was much harder to get meetings . . . during Covid it was extra difficult. . . ." [Exh. P-63.27:16-28:2] Mr. Sawley testified that Development Agreements do not require a 30-day turnaround that most of their other applications do, so he did not "typically promote

1   them to the highest priority." [Exh. P-63.28:6-9, .112:2-14]

2       268.    Therefore, the *force majeure* provisions apply and the Protestant is excused from timely

3   performance of the benchmarks in the Amended Facility Addendum until the City reopened in April

4   2021. Courtesy notified SOA about the difficulties related to COVID-19. In March 2020, Courtesy's

5   sales operation was shut down by the City of Chico code enforcement and Mr. Pajouh communicated

6   that to Mr. Smit. In any event, arguably no notice was required or it would have been superfluous, since

7   these events were well known to SOA.[78]

8   **DETERMINATION OF ISSUES**

9       269.    SOA failed to prove that Courtesy is in material breach of the Stipulated Decision and

10  Order of the Board.

11      270.    The delays in performance by Courtesy are excused as they are due to circumstances

12  beyond its control.

13  **CONCLUSION**

14      Based on the evidence presented and the findings herein, IT IS HEREBY ORDERED THAT

15  SOA's request for an order of termination of Courtesy's Subaru Dealer Agreement is denied without

16  prejudice. SOA is not permitted to terminate the Subaru franchise of Courtesy at this time.

17  SO ORDERED.

18

19  DATED: March 24, 2022              NEW MOTOR VEHICLE BOARD

20

21  By _____

22         EVELYN I. MATTEUCCI
       Administrative Law Judge

23

24

25

26  Attachments: as stated

27  _____

28  [78] As Mr. Graziano testified, the COVID-19 pandemic "impacted the world." [Exh. P-61.006:23-.007:4]

CONFIDENTIAL DECISION RESOLVING STIPULATED DECISION AND ORDER DISPUTE



VICINITY MAP
CITY OF CHICO, CA
NOT TO SCALE

| CITY OF CHICO | PUBLIC WORKS DEPARTMENT | |
|---|---|---|
| DRAWN BY lcm  DATE 1/29/2021<br>CHECKED MJ  SCALE NTS<br>APPROVED<br>for PUBLIC WORKS DIRECTOR | DEVELOPMENT AGREEMENT<br>City of Chico/JP Real Estate<br>Investments LLC (DA 18−01) | EXHIBIT<br>A<br>SHEET 3 OF 4 |

ATTACHMENT 1

RESPONDENT HEARING EXHIBIT R-104.17



ATTACHMENT 2

RESPONDENT HEARING EXHIBIT R-104.18



**Exhibit "C"**

ATTACHMENT 3

**RESPONDENT HEARING EXHIBIT R-104.20**

EXHIBIT 3

Facility Signs

Jerry Pajouh <jpajouh@me.com>

Mon 3/28/2022 11:31 AM

To: Smit, Ray <rsmi@subaru.com>

Good morning Ray, I hope you're doing well.

I am reaching out regarding our new facility signs. I need a full package with detailed specs so I can provide this information to our Electrical and General Contractors. They need details for each sign as soon as possible in order to not delay the completion of our project.

Thank you advance,

Jerry Pajouh
CEO / Dealer Principal
Courtesy Automotive Center
BMW Buick Cadillac GMC Mercedes-Benz Subaru Volvo
Sales Service Parts Collision
2520 Cohasset Road
Chico, CA  95973
o (530) 345-9444
c (559) 824-2026
jpajouh@me.com

## Subaru Signage

Jerry Pajouh <jpajouh@me.com>

Mon 4/4/2022 5:14 PM

To: Smit, Ray <rsmi@subaru.com>

Good afternoon, Ray.  I hope you are well.

I am again reaching out regarding our new facility signs.  As I explained in my March 28 email, I need the full package with detailed specs for the new Subaru signage.  My Electrical and General Contractors keep asking for this information.  Please provide this information as soon as possible.  I am trying to avoid delay wherever possible.  Hopefully you are already aware the Board ruled the prior project deadlines are excused.  Please work with me on this.

Thank you,

Jerry Pajouh
CEO / Dealer Principal
Courtesy Automotive Center
BMW Buick Cadillac GMC Mercedes-Benz Subaru Volvo
Sales Service Parts Collision
2520 Cohasset Road
Chico, CA  95973
o (530) 345-9444
c (559) 824-2026
jpajouh@me.com

Re: Subaru Signage

Jerry Pajouh <jpajouh@me.com>

Mon 5/9/2022 3:16 PM

To: Smit, Ray <rsmi@subaru.com>

Cc: Gavin M. Hughes <gavin@hughesdealerlaw.com>;Farabee, Scott <sfarab@subaru.com>

Hello Ray,

Below please see the General Contractors request for Subaru Sign specs. The complete sign package is needed for all Subaru Required Signs for our dealership. I also sent the below email requesting this information on April 4 with no response from you.

I appreciate a speedy response with all required information.

Jerry Pajouh
CEO / Dealer Principal
Courtesy Automotive Center
BMW Buick Cadillac GMC Mercedes-Benz Subaru Volvo
Sales Service Parts Collision
2520 Cohasset Road
Chico, CA  95973
o (530) 345-9444
c (559) 824-2026
jpajouh@me.com


Jerry –

We are at the point of needing to install exterior sheathing on the Subaru/Volvo dealership building.  We need the backing and electrical requirements for all exterior mounted signs on the building ASAP.

Please let me know how quickly we can get our hands on this information.

Thanks,


James Seegert
President

Modern Building, Inc.
PO Box 772 | Chico, CA 95927
(530) 891-4533  Office
(530) 891-6834  Fax
(530) 518-7200  Cell

 • BUILDING • TOMORROW • TOGETHER

Website | Facebook

On Apr 4, 2022, at 5:14 PM, Jerry Pajouh <jpajouh@me.com> wrote:

Good afternoon, Ray.  I hope you are well.

I am again reaching out regarding our new facility signs.  As I explained in my March 28 email, I need the full package with detailed specs for the new Subaru signage.  My Electrical and General Contractors keep asking for this information.  Please provide this information as soon as possible.  I am trying to avoid delay wherever possible.  Hopefully you are already aware the Board ruled the prior project deadlines are excused.  Please work with me on this.

Thank you,

Jerry Pajouh
CEO / Dealer Principal
Courtesy Automotive Center
BMW Buick Cadillac GMC Mercedes-Benz Subaru Volvo
Sales Service Parts Collision
2520 Cohasset Road
Chico, CA  95973
o (530) 345-9444
c (559) 824-2026
jpajouh@me.com

# EXHIBIT 4

RE: Sign Request -- Chico

Lisa Gibson <lisa.gibson@nelsonmullins.com>
Tue 5/10/2022 1:22 PM
To: Gavin M. Hughes <gavin@hughesdealerlaw.com>
Cc: Robert Mayville <mayville@hughesdealerlaw.com>;Amy Toboco <amy.toboco@nelsonmullins.com>

Dear Gavin,

Please ignore my prior email.  I was mistaken about the request and have received some clarification.

It appears that Mr. Pajouh is requesting electrical and structural specifications on future building signs, not the pylon sign.  As you know, SOA intends to terminate the retailer's dealer agreement pursuant to its rights under the Stipulated Decision and in accordance with its notices of non-compliance thereunder.  In support of this position, we have recently filed a writ in Superior Court for the County of Alameda seeking the court's review of the unauthorized determination by the Board-appointed ALJ and requesting it to order termination of the Subaru dealer agreement.  As you also know, we have cautioned that Mr. Pajouh proceeds with any building at his own risk.  SOA's position is that Mr. Pajouh should not be building either Subaru sales or service facilities while litigation about the future of his dealer agreement is still pending.

Thus, providing Mr. Pajouh with the information he requests is contrary to our legal position and to any requirement on Mr. Pajouh's part to mitigate his damages.  Should the Superior Court grant SOA's writ and order termination of the retailer's dealer agreement, SOA does not wish to be exposed to any claim that the retailer incurred building costs related to the continuing construction of a permanent Subaru dealership that will be terminated.  Given this exposure, SOA will not be forwarding the requested information at this time.

However, should your client wish to release and hold SOA harmless to any and all claims relating to his failure to mitigate damages, we may be able to discuss that further.  It would be something that I would need to first discuss with SOA, so please let me know if there's any interest on your client's part to provide a release.  Nothing in SOA's position should be construed as preventing Mr. Pajouh from continuing his Subaru operations from the temporary facilities in accordance with the current dealer agreement up to and until the time we have a decision from the Superior Court and, therefore, is without prejudice to his present position as an authorized Subaru retailer.  It is consistent, nevertheless, with minimizing the risk of his incurring unnecessary damages while the parties are still in litigation.

Should you have any questions, please do not hesitate to contact me.

Best regards,

Lisa

LISA M. GIBSON  PARTNER
lisa.gibson@nelsonmullins.com

19191 SOUTH VERMONT AVENUE | SUITE 301
TORRANCE, CA 90502

T 424.221.7405  M 310.989.3130  F 424.221.7499

NELSONMULLINS.COM     VCARD   VIEW BIO

**From:** Lisa Gibson
**Sent:** Tuesday, May 10, 2022 7:10 AM
**To:** Gavin M. Hughes (gavin@hughesdealerlaw.com) <gavin@hughesdealerlaw.com>
**Cc:** Robert Mayville <mayville@hughesdealerlaw.com>; Amy Toboco <amy.toboco@nelsonmullins.com>
**Subject:** FW: 25' Subaru Pylon Sign

Good morning Gavin,

Mr. Pajouh is requesting the same information from Ray Smit of SOA's San Francisco Zone Office that I provided to you (see below and attached) last July.  Is there some reason that you did not forward this information to your client?  I request that you do.

Best regards,

Lisa

LISA M. GIBSON  PARTNER

lisa.gibson@nelsonmullins.com

19191 SOUTH VERMONT AVENUE | SUITE 301

TORRANCE, CA 90502

T 424.221.7405   M 310.989.3130   F 424.221.7499

NELSONMULLINS.COM    VCARD  VIEW BIO


**From:** Lisa Gibson
**Sent:** Friday, July 30, 2021 9:07 AM
**To:** Gavin M. Hughes (gavin@hughesdealerlaw.com) <gavin@hughesdealerlaw.com>
**Cc:** Amy Toboco <amy.toboco@nelsonmullins.com>; Robert Mayville <mayville@hughesdealerlaw.com>
**Subject:** 25' Subaru Pylon Sign

Hello Gavin,

Per our discussion, attached are the electrical and structural specs for a 25' pylon.  We are providing this with the understanding that approval for the sign is subject to both the outcome of the pending non-compliance matter and the execution of a standard sign lease agreement.  No approval should be deemed expressly or impliedly by my providing these specification.

Best regards,

Lisa

Case 2:22-cv-00997-WBS-DMC    Document 24    Filed 10/02/23    Page 308 of 317

**LISA M. GIBSON**  PARTNER

lisa.gibson@nelsonmullins.com

**19191 SOUTH VERMONT AVENUE | SUITE 900**

**TORRANCE, CA 90502**

T **424.221.7405**   M **310.989.3130**   F **424.221.7499**

**NELSONMULLINS.COM**    **VCARD**   **VIEW BIO**

**Confidentiality Notice**

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

EXHIBIT 5



Law Offices of
**Gavin M. Hughes**

HughesDealerLaw.com

3436 American River Drive, Suite 10
Sacramento, CA 95864
gavin@hughesdealerlaw.com
(916) 900-8022

May 11, 2022

Lisa Gibson, Esq.                                   Via email
Nelson Mullins Riley Scarborough LLP                lisa.gibson@nelsonmullins.com
19191 S. Vermont Avenue, Suite 900
Torrance, CA 90502

      Re:    *Courtesy Subaru Sign Package.*

Lisa:

      Thank you for your emails of May 10, 2022. However, SOA's conduct toward Courtesy Subaru is both troubling and unlawful. Pursuant to the Board's March 24, 2022 decision ("Decision"), Courtesy Subaru remains a Subaru franchisee and has not been terminated. SOA's disagreement with the result of the Board's Decision does not alter the fact that California law requires SOA to continue to act in good faith in its ongoing franchisee-franchisor relationship with Courtesy Subaru.

      Once again, the plain language from paragraph 28 (b) from Exhibit 1 to the Stipulated Decision provides, "Any such timely request will be submitted for *binding, non-appealable determination* to an ALJ appointed by the Board…" (Emphasis added.) Moreover, paragraph 28 (c) unambiguously provides ""Binding, non-appealable" means that each Party adopts the ALJ's decision as a *final, binding settlement of the matter at issue and waives any and all recourse, right of action, or appeal* with respect to the resulting ruling and/or any resulting termination, to any individual, forum, or entity of any kind or nature whatsoever, including, without limitation, any state or federal agency, any state or federal court, or any other governmental, judicial, quasi-judicial, or private entity or forum. The Parties *expressly waive* any claim that the Board itself should consider the ALJ's decision, should reach its own decision, or otherwise involve itself in resolving the issue or dispute." (Emphasis added.) SOA's writ is without merit.

      Leaving aside the merit of SOA's writ, Courtesy Subaru's facility project is rapidly moving toward completion. The facility will be complete before the writ is even heard by the Court. Courtesy Subaru demands SOA provide the complete sign package. SOA's refusal to provide the sign package is a bad-faith attempt to prevent Courtesy Subaru from completing the agreed to facility to the extent necessary to schedule the final Feltus Hawkins inspection and approval.

Lisa Gibson, Esq.
May 11, 2022
Page 2

We are concerned SOA may subsequently refuse to provide Courtesy Subaru the OL 124 form necessary for the DMV to issue the occupational license for the new facility, upon completion of the facility. As stated above, the facility will likely be complete before the Court considers SOA's writ. It appears SOA intends to withhold the required sign package to prevent Courtesy Subaru from completing the final inspection. Moreover, SOA's disingenuous position on the withholding of the sign package suggests it may apply this same flawed reasoning to a decision to withhold the issuance of the OL 124 form, even if Courtesy Subaru installs the required Subaru signage.

We urge SOA to reconsider its position and immediately provide Courtesy Subaru the complete sign package required for its ongoing facility project. At the very least, SOA should err on the side of caution and seek to limit its growing exposure.

Please provide a response by May 19, 2022. Courtesy Subaru reserves all rights and remedies available through the New Motor Vehicle Board, Occupational Licensing, and in a court of competent jurisdiction.


Sincerely,

Law Offices of Gavin M. Hughes

Gavin M. Hughes


cc    Amy Toboco, Esq.
      Jerry Mihanpajouh

EXHIBIT 6

 **NELSON MULLINS**

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
ATTORNEYS AND COUNSELORS AT LAW

19191 South Vermont Avenue, Suite 900
Torrance, CA 90502
T: 424.221.7400  F: 424.221.7499
**nelsonmullins.com**

Lisa M. Gibson
T: 424.221.7405
**lisa.gibson@nelsonmullins.com**

May 25, 2022

<u>**Via E-mail**</u>

Gavin M. Hughes
Law Offices of Gavin M. Hughes
3436 American River Drive
Suite 10
Sacramento, CA 95864

RE:    Courtesy Auto Group, Inc. dba Courtesy Subaru of Chico

Gavin:

This is in response to your letter to me dated May 11, 2022.

There is nothing unlawful about Subaru of America, Inc.'s ("SOA") response that, while litigation is still pending, it will not provide a sign package for a facility that should not be built.  Courtesy has signs at its existing location and this is all that SOA is obligated by contract and law to provide.

As you know, the writ has been filed and you will have the opportunity to respond.  SOA is well aware of Courtesy's contentions and they are all rejected.  ALJ Matteucci acted without jurisdiction and we will seek to overturn the decision.  In the interim, SOA encourages your client to cease and desist with the building, terminate or sell the franchise, and allow SOA the opportunity to appoint a retailer that is willing to perform its obligations both fully and timely.

If Courtesy wishes to actually do what it promised SOA and sell the Subaru franchise, please do not hesitate to contact me.  It's a solution that would be very profitable for Courtesy and significantly more productive than litigation.

Best regards,

Lisa M. Gibson

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS
MINNESOTA | NEW YORK | NORTH CAROLINA | OHIO | SOUTH CAROLINA | TENNESSEE | TEXAS | VIRGINIA | WEST VIRGINIA

## DECLARATION OF SERVICE BY US AND ELECTRONIC MAIL

I, Robert A. Mayville, Jr., declare that I am employed in the County of Sacramento, State of California, that I am over 18 years of age, and that I am not a party to the proceedings identified herein. My business address is 3436 American River Drive, Suite 10, Sacramento, California 95864.

I declare that on June 20, 2022, I caused to be served a true and complete copy of:

### *[UNREDACTED] PETITION*

***Courtesy Automotive Group, Inc., dba Courtesy Subaru of Chico***
***v.***
***Subaru of America, Inc.***

By US Mail:

CT Corporation System
330 N. Brand Blvd., Suite 700
Glendale, CA 91203-2336
[Agent for Service of Process for
Subaru of America, Inc.]

By Electronic Mail:

Lisa M. Gibson
Amy M. Toboco
Nelson Mullins Riley & Scarborough LLP
Pacific Gateway, Suite 900
19191 South Vermont Ave
Torrance, CA 90502
Lisa.Gibson@nelsonmullins.com
Amy.Toboco@nelsonmullins.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 June 2022, Sacramento, California.

Robert A. Mayville, Jr.

PROOF OF SERVICE

# EXHIBIT 8

DocuSign Envelope ID: 53755506-0AFD-4C48-AD11-34C066A0BC70

1  NEW MOTOR VEHICLE BOARD
   P.O. Box 188680
2  Sacramento, California 95818-8680
   Telephone: (916) 445-1888                    **CERTIFIED MAIL**
3

4

5

6

7

8                      STATE OF CALIFORNIA

9                  NEW MOTOR VEHICLE BOARD

10

11 In the Matter of the Petition of              **Petition No. P-463-22**

12 COURTESY AUTOMOTIVE GROUP, Inc., dba
   COURTESY SUBARU OF CHICO,

13                                                **ORDER GRANTING PETITIONER'S**
                         Petitioner,             **REQUEST FOR RELIEF PURSUANT**
14              v.                                **TO VEHICLE CODE SECTION**
                                                 **3050(b)(1)**
15 SUBARU OF AMERICA, INC.,

16                      Respondent.

17

18 To:    Gavin M. Hughes, Esq.
          Robert A. Mayville, Jr., Esq.
19        Attorneys for Petitioner
          LAW OFFICES OF GAVIN M. HUGHES
20        3436 American River Drive, Suite 10
          Sacramento, California 95864
21
          Lisa M. Gibson, Esq.
22        Amy Toboco, Esq.
          Attorneys for Respondent
23        NELSON MULLINS RILEY & SCARBOROUGH
          19191 South Vermont Avenue, Suite 900
24        Torrance, California 90502

25 ///

26 ///

27 ///

28 ///

                              1
   ORDER GRANTING PETITIONER'S REQUEST FOR RELIEF PURSUANT
        TO VEHICLE CODE SECTION 3050(b)(1)

DocuSign Envelope ID: 53755506-0AFD-4C48-AD11-34C066A0BC70

1   At its regularly scheduled meeting of January 25, 2023, the Public Members of the New Motor

2   Vehicle Board met and considered the above-entitled petition. After consideration, the Public Members

3   of the Board unanimously granted the relief requested in the petition as follows: The Board will direct

4   the Department of Motor Vehicles to conduct an investigation pursuant to subdivision (b)(1) of Vehicle

5   Code section 3050 concerning whether Subaru of America, Inc. violated Vehicle Code sections 3060,

6   11713.3(d)(1), and 11713.3(l). The Board requests that the Department of Motor Vehicles provide the

7   Board with a written report on the results of its investigation within 180 days of the date of this order or

8   a reasonable time as requested by the Department.

9   SO ORDERED.

10

11   DATED: January 26, 2023                    NEW MOTOR VEHICLE BOARD

12

13                                              By *Bismarck Obando*
                                                   BISMARCK OBANDO
14                                                 President

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING PETITIONER'S REQUEST FOR RELIEF PURSUANT
TO VEHICLE CODE SECTION 3050(b)(1)